## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **WBH Energy, LP,** | § | **Case No. 15-10003** |
| **WBH Energy Partners LLC** | § | |
| **WBH Energy GP, LLC** | § | **Chapter 11** |
| | § | |
| Debtors. | § | *Jointly Administered* |

### DEBTORS' EMERGENCY MOTION FOR ENTRY OF (A) INTERIM ORDER APPROVING BREAK-UP FEE AND EXPENSE REIMBURSEMENT AND (B) FINAL ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 364 AND 507 (I) AUTHORIZING POSTPETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF

**A HEARING WILL BE CONDUCTED ON THE INTERIM RELIEF SOUGHT HEREIN ON MARCH 16, 2015 AT 1:30 P.M. IN COURTROOM 2, HOMER J. THORNBERRY FEDERAL JUDICIAL BUILDING, 901 SAN JACINTO BLVD., AUSTIN, TX78701.**

WBH Energy, LP, WBH Energy Partners LLC, and WBH Energy GP, LLC (together, the "Debtors") submit this emergency motion ("Motion") seeking entry of (A) an interim order approving Break-Up Fee and Expense Reimbursement and (B) a final order (i) authorizing the Debtors to obtain postpetition financing of up to $5 million in principal (plus certain fees and costs); (ii) granting adequate protection in the form of security interests and superpriority claims in connection therewith; (iii) scheduling a hearing to consider approval of the DIP Facility on a final basis; and (iv) granting related relief. In support of their Motion, the Debtors respectfully state as follows:

## I.  JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157.   Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.  BACKGROUND

2.      On January 4, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas, Austin Division (the "Court"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses and managing their property as debtors in possession.   No trustees or examiners have been appointed in these cases.

3.      On January 8, 2015, the Court entered its Order Granting Motion for Joint Administration [Docket No. 34] and Order Granting Complex Chapter 11 Bankruptcy Case Treatment [Docket No. 37].

4.      Together, the Debtors operate an oil and gas exploration and production business with a primary focus on the Barnett Combo Play of the Fort Worth Basin.   Each of the Debtors is a Texas entity, is based in Austin, Texas, and was founded in 2011.

5.      WBH Energy, LP is a real property holding company that owns working interests in approximately 1,500 leases consisting of approximately 2,570 net acres throughout the Barnett Combo Play.   Of those leases, approximately 30 horizontal wells and 9 vertical wells are currently producing and 6 horizontal wells have been drilled and cased.   WBH Energy, LP is managed by its general partner, WBH Energy GP, LLC.

6.      WBH Energy Partners LLC is an oil and gas operating company responsible for developing the working interests of WBH Energy, LP and its non-affiliated, non-debtor partner,

2

U.S. Energy Development Corporation ("USED").  Specifically, until March 1, 2015, WBH

Energy Partners LLC was the operator of certain oil and gas interests pursuant to that certain Joint

Operating Agreement (the "JOA") dated September 1, 2011, by and between itself, as operator,

and WBH Energy, LP and USED as oil and gas lease owners and/or oil and gas interest owners.

7.    Prior and subsequent to the Petition Date, the Debtors communicated with several

lenders with initial interest in providing postpetition financing.  The Debtors eventually entered

into substantive discussions with Cantor Fitzgerald, as administrative agent and lender

(collectively, "Lender") to obtain postpetition financing, and the Lender agreed to provide the

Debtors with postpetition financing according to the terms and conditions of the postpetition

debtor in possession term loan agreement ("DIP Credit Facility"), attached hereto as **Exhibit A**.

### III.  RELIEF REQUESTED

8.    The Debtors respectfully request the Court, among other things, (a) authorize the

Debtors to enter into a senior secured priming superpriority debtors in possession term loan facility

with the Lender in an aggregate principal amount of up to $5,000,000 upon the terms and

conditions of the DIP Credit Facility; (b) authorize the Debtors to grant liens, security interests,

and superpriority claims (including a superpriority administrative claim pursuant to section

364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the

Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code) to the

Lender as provided for in the DIP Credit Facility and to perform such other and further acts as may

be necessary or appropriate in connection therewith; (c) allow for payment as an administrative

expense a Break-Up Fee (as defined herein) and Expense Reimbursement (as defined herein); and

(d) schedule a hearing to consider approval of the DIP Credit Facility on a final basis.

9.    The Debtors believe the DIP Credit Facility reasonably addresses their financing

requirements and constitutes the best financing option available to them given the circumstances

#4779047

of their businesses, their capital structure, and these Cases.   Pursuant to Bankruptcy Rule 4001, a

summary of the material terms of the proposed postpetition financing is set forth below:[1]

- **The DIP Credit Facility**: The Loan Documents provide for a term loan in an aggregate principal amount of up to $5,000,000, which shall provide liquidity to fund the Debtors' approved capital project and continuing operations, subject to certain conditions, upon entry of a Final Order;

- **Closing Date**:   The Closing Date is the date immediately following the satisfaction of the conditions precedent and Bankruptcy Court approval, expected to be on or about March 27, 2015.

- **Term**:   The maturity date of the DIP Credit Facility shall be the earliest of (i) the 12 month anniversary of the Closing Date; (ii) the effective date of a Chapter 11 plan of reorganization; (iii) the date of consummation of any sale of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code; (iv) if a final order with respect to the DIP Credit Facility is not entered, 35 days after the Closing Date, and (v) the date of acceleration of the loans and the termination of the DIP Obligations upon the occurrence of an event of default.

- **Interest Rate and Default Rate**: The DIP Credit Facility shall have a 10.00% per annum interest rate and the default interest rate shall be an additional 200 bps per annum.

- **Guarantors**:   The DIP Credit Facility shall be guaranteed by all of the Debtors' direct and indirect subsidiaries.

- **Security**:   Effective immediately upon entry of the Final Order and without the necessity of the execution or recordation of filings by the Debtors or Lender of mortgages, security agreements, control agreement, pledge agreement, financing statements or other similar documents, or the possession or control by Lender or its agents of any Collateral, the Debtors shall grant the Lender continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition superpriority security interests in and liens on (the "DIP Liens") all currently-owned or after acquired assets and property, including without limitation all real and personal property, interests in oil, mineral, and gas leases, plant and equipment, rights to payment, accounts receivable and inventory, intellectual property, claims, and causes of action (but not claims and causes of action under chapter 5 of the Bankruptcy Code or similar non-bankruptcy law), and any proceeds thereof, and any rights to receive proceeds or distributions from any affiliates or subsidiaries of the Debtors, and any property now owned or hereafter acquired (collectively, the "Collateral").

---

[1] This Motion contains a summary only and is not intended to alter the actual terms of the DIP Credit Facility.   To the extent there is a discrepancy between the terms in this Motion and the DIP Credit Facility, the DIP Credit Facility controls.

The DIP Liens shall be senior secured perfected priming liens on all Collateral, senior to any and all valid, perfected and non-avoidable liens in existence as of the commencement of the Bankruptcy Cases, or to valid and non-avoidable liens in favor of third parties and in existence at the time of such commencement that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code, on or to any of the Collateral, subject only to the Carve Out.

- **DIP Superpriority Claim**: Granting the Lender, upon entry of the Final Order, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim (collectively, the "DIP Superpriority Claim") for all DIP Obligations. The DIP Superpriority Claim shall be subordinate only to the Carve-Out (as defined below). The DIP Superpriority Claim (i) shall otherwise have priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth in the Interim Order), 546(c), 546(d), 726 (to the extent permitted by applicable law), 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code; and (ii) shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estates representative to the extent permitted by law.

- **Fees**:  The Lender shall receive a 2% fee ("Closing Fee") payable on the Closing Date. In addition, the Debtors shall pay the Lender a 3% fee ("Exit / Repayment Fee"), payable each and any time the DIP Credit Facility is paid down.

- **DIP Budget**:  The Debtors will prepare and deliver on or prior to the Closing Date a budget, in form and substance satisfactory to the DIP Lender (the "Approved DIP Budget"), attached hereto as **Exhibit B**, that shall reflect line item projected receipts and expenditures on a weekly basis, from the Closing Date for the 13-week period following the Closing Date.  The Debtors shall deliver two weeks prior to the end of the 13-week period covered by the Approved DIP Budget then in effect an updated budget, in form and substance satisfactory to the DIP Lender, for the 13-week period immediately following the 13-week period covered by such then-current Approved DIP Budget.  The Debtors shall also provide a weekly cumulative Approved DIP Budget variance report since the petition date, on Wednesday of each week, starting in the first week after the Closing Date.

- **Covenants**:  The DIP Credit Facility is not intended to have financial maintenance covenants but shall include such covenants as are customary for debtor in possession financings.

- **Events of Default**:  The DIP Credit Facility shall include customary events of default for debtor in possession financings, including any Material Adverse Change with respect to the business, operations or status of the Debtors.

- **Remedies Upon Default**:   Upon an Event of Default, and after five (5) business days' notice, the Lender shall be authorized, at its option, to take any and all actions, and remedies, that the Lender may deem appropriate to proceed against, take possession of, protect, and realize upon the Collateral and any other property of the Debtors' estates upon which the Lender has been or may hereafter be granted liens and security interests to obtain repayment of the indebtedness to the Lender.   Relief from the automatic stay of section 362 of the Bankruptcy Code shall automatically be granted to the Lender subsequent to the Required Notice (as defined in the DIP Credit Facility) upon the occurrence of an event of default.

10.      In addition, as a condition to obtaining the proposed financing, the Lender has required and the Debtors have agreed to certain provisions that may be considered key provisions to be highlighted to the Court.   These provisions include the following:

- **Section 506(c) Claims.**    Upon entry of a Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that may result therefore, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principal of law without the prior written consent of Lender.

- **Carve-Out.**   Each of the liens and claims, including the superpriority administrative expense claims granted to Lender in connection with the DIP Credit Facility shall be subject only to a carve-out ("Carve-Out") for the following: (a) allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6); (b) in the event of the occurrence and during the continuance of an event of default under the DIP Credit Facility, the payment of allowed and unpaid professional fees and disbursements incurred by the Debtors after the first business day following delivery of a Carve-Out Trigger Notice (as defined below) in an aggregate amount not in excess of $250,000 (the "Carve-Out Cap"), and (c) all unpaid professional fees and operating expenses incurred or accrued in accordance with the DIP Budget on and prior to the first business day following delivery by Lender of a Carve-Out Trigger Notice; provided, however, for each advance by the Lender under the DIP Credit Facility, the Carve-Out for professional fees shall be reduced (dollar for dollar) by the amount of legal and professional fees and expenses funded pursuant to the amounts set forth in the Approved DIP Budget for the week corresponding to such advance; provided, further that the Carve-Out shall continue to apply to funds advanced to the Debtors for purposes of paying professional fees under the Approved DIP Budget, but which have not yet been disbursed.   Nothing herein shall be construed to affect the amount of fees or expenses to which any party may otherwise be entitled, and provided further that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation described above.   The term "Carve-Out Trigger Notice" shall mean a written notice delivered by the Lender to the Debtors, their counsel and the U.S. Trustee, which notice may be delivered following the occurrence and

6

during the continuation of an event of default under the DIP Credit Facility, expressly stating that the Carve-Out Cap is invoked.

- **Right to Credit Bid:**   Notwithstanding anything to the contrary contained in an Interim or Final DIP Order, Lender shall retain any and all of its rights to credit bid any and all amounts outstanding under the DIP Credit Facility in any sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, subject to any express restrictions set forth in the DIP Credit Facility.

- **Break-Up Fee and Expense Reimbursement**:   In addition, notwithstanding anything to the contrary contained in the Final Order, and on a final basis, in the event that the Debtors obtain a debtor in possession loan from any person other than the Lender or its affiliates, then the Lender shall have an allowed administrative claim pursuant to section 503(b)(1) of the Bankruptcy Code against the Debtors and their estates, for all reasonable and documented fees and expenses, including legal fees, in an aggregate amount not to exceed $125,000 ("Expense Reimbursement") and a break-up fee in the amount of $175,000 ("Break-Up Fee").   Such allowed administrative claim shall have priority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code.

### IV.  BASIS FOR RELIEF

11.     As described above, it is essential to the success of the Debtors' chapter 11 cases that the Debtors immediately obtain access to sufficient postpetition financing.   The preservation of estate assets, the Debtors' continuing viability, and their ability to timely reorganize successfully under a plan of reorganization (or maximize values under a liquidating plan of reorganization), all depend heavily upon the approval of the DIP Facility and the related actions requested herein.

12.     Bankruptcy Code § 364 distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security.   If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to Bankruptcy Code § 364(c), a court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered

property or a junior lien on encumbered property, or a combination of the foregoing.   Because the

Debtors propose to obtain financing under the DIP Credit Facility that primes any liens that may

exist on the Collateral, the approval of the DIP Credit Facility is governed by Bankruptcy Code

§§ 364(c) and 364(d).

**A.  Financing Under Bankruptcy Code § 364(c)**

13.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain

circumstances, postpetition financing on a secured or superpriority basis, or both.   Specifically,

Section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a

hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative

expense under Section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (a)     with priority over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code;
>
> (b)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (c)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

14.     Thus, pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its

business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit, and

the proposed borrowing is in the best interests of its estate.   *See, e.g., In re Ames Dept. Stores*, 115

B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in

possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re*

*Simasko Production Co*., 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing where

debtor's best business judgment indicated financing was necessary and reasonable for benefit of

estate); *see also* 3 Collier on Bankruptcy ¶ 364.03, at 364-7-18 (15th ed. rev.).

8

15.     The statutory requirement for obtaining postpetition credit under Bankruptcy Code § 364(c) is a finding, made after notice and hearing, that the debtor-in-possession is "unable to obtain unsecured credit allowable under § 503(b)(l) of [the Bankruptcy Code] as an administrative expense."  *See Ames Dep't Stores*, 115 B.R. at 37-39 (a debtor must show that it has made a reasonable effort to seek other sources of financing under Bankruptcy Code §§ 364(a) and (b)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under Bankruptcy Code § 364(c) must prove that it was unable to obtain unsecured credit pursuant to Bankruptcy Code § 364(b)).

16.     Courts have articulated a three-part test to determine whether a debtor may obtain financing under Bankruptcy Code § 364(c):

- the debtor is unable to obtain unsecured credit solely under Bankruptcy Code § 364(b) (i.e., by granting a lender administrative expense priority);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere"); *Ames Dep't Stores*, 115 B.R. at 37-39.

17.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Bankruptcy Code § 364(c).  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986).   "The statute imposes no duty to seek credit from every

9

possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtors could not obtain credit as an administrative expense). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of Section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

18. The Debtors attempted to secure financing on terms other than a secured superpriority basis, but given the Debtors' asset base and balance sheet, they were unable to do so. The Debtors have been unable to obtain (a) unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense; (b) credit for money borrowed secured solely by a lien on property of the estate that is not otherwise subject to a lien; or (c) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien, in each case, on more favorable terms and conditions than those provided in the DIP Credit Facility. In addition, the Debtors are unable to obtain credit for borrowed money without granting Lender the DIP Liens. The Debtors believe that the terms and conditions outlined in the DIP Credit Facility are reasonable and justified under the circumstances, in that this facility will enable the Debtors to have sufficient liquidity to continue with their operations and the plan process in a manner that will best serve all parties-in-interest herein. The Court should therefore authorize the Debtors to

10

provide the Lender a superpriority administrative expense status for any obligations arising under the DIP Credit Agreement as provided for in Section 364(c)(1) of the Bankruptcy Code.

19.     The proposed DIP Credit Facility provides the Debtors and their estate the most favorable financing under the circumstances confronting the Debtors, and the Debtors' decision to enter into the DIP Credit Facility was the result of an intensive effort by the Debtors and their professionals to obtain the best terms available.   As a fully funded facility providing new money in the aggregate amount of $5,000,000, the DIP Credit Facility will provide the Debtors with the significant additional liquidity that they need.

20.     For these reasons, the Debtors submit that entry into the DIP Credit Facility is in the best interests of the Debtors' estates, is necessary to preserve the value of estate assets and is an exercise of the Debtors' sound and reasonable business judgment.

**B.  Financing and Adequate Protection Under Bankruptcy Code § 364(d)(l)**

21.     In addition to authorizing financing under Section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lien holders, if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected.   *See* 11 U.S.C. § 364(d)(1).   The Debtors seek approval of the DIP Credit Facility under Bankruptcy Code § 364(d)(l).   Specifically, pursuant to the DIP Credit Facility, the Lender will receive perfected first priority, senior priming liens upon the Collateral, even to the extent that the Collateral was subject to any preexisting liens.   The only alleged liens upon the Collateral that the Debtors are aware of are those claimed by CL III Funding Holding Company, LLC ("Castlelake"), USED, and certain mineral liens in favor of vendors under Chapter 56 of the Texas Property Code ("Statutory Mineral Lienholders") (collectively, Castlelake, USED,

11

and the Statutory Mineral Lienholders shall be referred to herein as "Prepetition Secured Parties").[2]

22.     When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by Section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtor's assets.   Courts consider a number of factors, including, without limitation:

- whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); and

- whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003); *In re Farmland Indus., Inc*., 294 B.R. 855, 862–79 (Bankr. W.D. Mo. 2003); *In re Lyondell Chem. Co*., No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); *Barbara K. Enters., Inc.*, 2008 WL 2439649, *10 (Bankr. S.D.N.Y. June 16, 2008); *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (16th ed. rev. 2012).   The DIP Credit Facility satisfies each of these factors.

23.     First, as described above, the Debtors and their advisors explored a variety of possible financing sources, and ultimately determined that the Lender offered the best option for obtaining the postpetition financing the Debtors require.   The Debtors and Lender negotiated the DIP Credit Facility in good faith and at arms-length, and the DIP Credit Facility reflects the most

---

[2] The Debtors reserve all rights with respect to the validity, priority, and enforceability of the liens alleged by the Prepetition Secured Parties.

favorable terms on which the Lender was willing to offer financing. Adequate debtor in possession financing, structured so as to minimize execution risk, was not available on other bases.

24.     Second, the Debtors need the funds to be provided under the DIP Credit Facility to preserve and enhance the value of its estate for the benefit of all creditors and other parties in interest. Absent the DIP Credit Facility, the Debtors will be unable to meet capital expenditure requirements, which could subject them to forfeiture of oil and gas leases and penalties under the JOA. Providing the Debtors with the liquidity necessary to preserve and enhance their going concern value through the pendency of these Cases is in the best interest of all stakeholders.

25.     Third, upon approval, the DIP Credit Facility will provide access to approximately $5,000,000 in incremental liquidity, which the Debtors have determined is sufficient and, as discussed in greater detail below, necessary to allow the Debtors to maintain their operations notwithstanding the commencement of these Cases and to continue the approved capital projects that are critical to the Debtors' short term ability to generate increased cash flow, maintain and ultimately increase the value of their assets, and to their long term ability to reorganize. Accordingly, the terms of the DIP Credit Facility are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these Cases.

### i.     Requirement under Bankruptcy Code § 364(d) of Providing Adequate Protection

26.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. *See, e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a

fact-specific inquiry . . . left to the vagaries of each case . . . ."); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citations omitted)).

27.     The Prepetition Secured Parties are currently provided adequate protection for cash collateral use in accordance with the terms of the Interim Cash Collateral Orders.   The DIP Credit Facility will provide further adequate protection of the Prepetition Secured Parties' interest in the Debtors' oil and gas properties in several critical ways.   First, the DIP Credit Facility will provide funds for capital expenditures necessary to continue development of the oil and gas properties, which preserves leases and protects from the risk of lease forfeiture for non-development. Second, this Court has found, on a preliminary basis, that as of the Petition Date, USED was the proper operator of the Debtors' oil and gas leases.   In such capacity, USED issued an Authorization for Expenditure ("AFE") to the Debtors, requiring the payment of approximately $4,500,000 for the development of the "Lewis-Stuart Wells."   USED also issued a notice of default to the Debtors for Debtor LP's failure to pay approximately $11,500,000 in lease operating expenses.   Without the DIP Credit Facility, the Debtors will be unable to satisfy the AFE and other operating and overhead costs, which could result in the stay being lifted or these cases being dismissed.   If either should happen, the Debtors may be deemed a "Non-Consenting Party" under the JOA on account of the AFE and the $11,500,000 in unpaid lease operating expenses.   This could subject the Debtors to loss of their working interests in the Lewis-Stuart Wells and penalties of 300% of unpaid costs incurred by all other wells.   The DIP Credit Facility provides adequate protection by allowing the Debtors to remain in chapter 11 protected by the automatic stay, thereby

14

keeping their interests and avoiding treble damages.  Finally, the capital expenditures on the Lewis-Stuart Wells that will be facilitated by the DIP Credit Facility will create a net increase in asset value to the Debtors, which increase in value will serve to further adequately protect the Prepetition Secured Parties' interests in the assets.

### ii.  The DIP Facility is Necessary to Preserve the Assets of the Estates

28.      It is essential that the Debtors obtain financing necessary to continue, among other things, the orderly operation of the Debtors' businesses and these cases, and to otherwise satisfy their working capital requirements.  As described above, the DIP Credit Facility will allow continued development of oil and gas leases, which protects from lease forfeiture and penalties under the JOA.  Without immediate access to new borrowing relief, the Debtors' business operations and these cases in general could be seriously jeopardized.  The new liquidity offered by the proposed DIP Credit Facility would ensure that the Debtors can maintain and ultimately increase the value of their assets and administer these cases through the bankruptcy process. Thus, approval of the DIP Credit Facility is crucial to maximizing the value of the Debtors' estates.

### iii.  The Terms of the DIP Credit Facility Are Fair, Reasonable, and Appropriate

29.      The proposed DIP Credit Facility provides generally that the security interests and superpriority administrative expense claims granted to the Lender are subject to the Carve-Out described above.   In *Ames Department Stores*, the bankruptcy court found that such "carve-outs" are not only reasonable but are necessary to insure that debtors' estates are adequately assisted by counsel and other professionals.  *Ames*, 115 B.R. at 40.

30.      Likewise, the Debtors believe that the fees and other charges required by the Lender under the DIP Credit Facility are reasonable and appropriate under the circumstances. The proposed fees under the DIP Credit Facility are within the parameters of market fee structures for similar postpetition financing.  Indeed, courts routinely authorize similar lender incentives

15

beyond the explicit liens and other rights specified in Bankruptcy Code § 364.  *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) (approving a debtor-in-possession financing facility that included a lender "enhancement fee"); *In re Korea Chosun Daily Times, Inc.*, 337 B.R. 773, 783 (Bankr. E.D.N.Y. 2005) (postpetition financing arrangements under 364 "may include the payment of a loan commitment fee and reimbursement of reasonable fees and expenses in the event that the financing arrangement is not consummated."); *In re Mayco Plastics Inc.*, 379 B.R. 691, 698-99 (Bankr. E.D. Mich. 2008) (Section 364 provides "certain incentives that a trustee or debtor in possession may offer, with court approval, to induce potential lenders to undertake the risks involved in providing post-petition financing to a bankruptcy estate….The greater the debtor's inability to obtain the necessary post-petition financing, the greater the inducements the debtor may offer to obtain such debt.  Similarly, the greater the risk undertaken by the post-petition lender, the more heightened its need becomes to obtain the additional inducements that §§ 364(c) and (d) permit the Court to authorize a debtor to offer.").

31.     Additionally, the Break-Up Fee and Expense Reimbursement are reasonable and appropriate under the circumstances.  *In re Ames Dept. Stores, Inc.*, 115 B.R. at 40 (The Court's discretion "under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Defender Drug Stores, Inc.*, 126 B.R. 76, 82 (Bankr. D. Ariz. 1991) *aff'd by* 145 B.R. 312 (9th Cir. B.A.P. 1992) ("the debtor was unable to obtain credit on more favorable terms and the credit arrangement, including the enhancement fee, was reasonable and necessary in light of the risks involved to enable to debtor to continue its operation and have the opportunity to realize potential value in excess of that which would be obtained in a foreclosure

16

#4779047

sale."). The Debtors are unable to obtain alternate credit sources, the terms of the DIP Credit Facility have been negotiated at arms-length and are not principally for the benefit of a creditor to the detriment of other parties in interest, and the Debtors' believe, in their business judgment, that the DIP Credit Facility is in the best interest of all parties involved. The Break-Up Fee and Expense Reimbursement are within the realm of incentives contemplated by section 364 to induce potential lenders to undertake the risks involved in providing postpetition financing to a bankruptcy estate, and should be approved.

### iv. Application of the Business Judgment Standard

32. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under the circumstances specified therein. Provided that an agreement to obtain secured credit does not undermine the policies underlying the Bankruptcy Code, courts grant a debtor considerable deference in the exercise of its sound business judgment in obtaining such credit. *See, e.g.*, *In re Ames Dept. Stores, Inc.*, 115 B.R. at 40 ("[C]ases consistently reflect that the court's discretion under Section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. at 881 (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment").

33. Furthermore, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Credit Facility, the Court should consider the economic terms of the DIP Credit Facility in light of current market conditions. The Court may appropriately take into consideration noneconomic benefits to the Debtors offered by a proposed

#4779047

postpetition facility.   For example, in *In re ION Media Networks, Inc*., the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.   Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.   That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

34.   As described above, after appropriate investigation and analysis, the Debtors' have concluded that the DIP Credit Facility provides the best alternative available under the circumstances of these chapter 11 cases.   Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.   *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility, and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

18

35.     The Debtors have exercised sound business judgment in determining that a postpetition credit facility is appropriate and have satisfied the legal prerequisites to incur debt under the DIP Credit Facility.   Accordingly, the Court should grant the Debtors the authority to enter into any the DIP Credit Facility and any necessary ancillary loan documentation and obtain funds from the Lender on the secured and administrative superpriority basis described above, pursuant to Bankruptcy Code § 364(c) and (d).

### C.  The Scope of the Carve-Out is Appropriate

36.     The proposed DIP Credit Facility subjects the security interests and administrative expense claims of the Lender to the Carve-Out.   Such carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can obtain appropriate assistance from counsel and other professionals.   *See, e.g.*, *Ames*, 115 B.R. at 40; *In re United Retail*, Case No. 12-10405 (Bankr. S.D.N.Y. Feb. 1, 2012); *In re Eastman Kodak Co.*, Case No. 12-10202 (Bankr. S.D.N.Y. Jan. 19, 2012); *In re Gen. Maritime Corp.*, Case No. 11-15285 (Bankr. S.D.N.Y. Nov. 17, 2011).   The Carve-Out protects against administrative insolvency during the course of these Cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtors and the Creditors' Committee notwithstanding the grant of superpriority and administrative liens and claims under the DIP Credit Facility.

### D.  The Lender Should Be Deemed a Good Faith Lender Under Section 364(e)

37.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its rights in any lien or security interest securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides as follows:

> The reversal or modification on appeal of an authorization under this Section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this Section of a priority or a lien, does not

> affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

38.     As explained in detail herein, the DIP Credit Facility is the result of the Debtors' reasonable and informed determination that the Lender offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's length, good faith negotiations between and among the Debtors and the Lender.   The terms and conditions of the DIP Credit Facility are fair and reasonable, and the proceeds of the DIP Credit Facility will be used only for purposes that are permissible under the Bankruptcy Code and pursuant to the DIP Budget. Further, no consideration is being provided to any party to the DIP Credit Facility other than as described herein.   Accordingly, the Court should find that the Lender is a "good faith" lender within the meaning of Section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that Section.

### E.  Request for Modification of the Automatic Stay

39.     The DIP Credit Facility and the proposed Final Order contemplate that the automatic stay arising under Section 362 of the Bankruptcy Code shall be modified, upon the occurrence and during the continuation of any Event of Default (as such term is defined in the DIP Credit Facility), so that the Lender shall be entitled to exercise its rights and remedies in accordance with the DIP Loan Document and the Interim and Final Orders and shall be permitted to satisfy the DIP Superpriority Claim and all DIP Obligations, subject to the Carve-Out and the terms of the Interim and Final Order.   However, the DIP Credit Facility and proposed Final Order require the Lender to provide the Debtors with five (5) days' prior written notice before exercising any enforcement rights or remedies, which will entitle the Debtors to seek an emergency hearing

20

#4779047

with the Court for determination of whether, in fact, an Event of Default has occurred and is continuing.

40.     Stay modification provisions of this sort are ordinary features of postpetition financing arrangements, and, in the Debtors' business judgment, are reasonable under the circumstances.   *See, e.g.*, *In re MPF Holdings US LLC*, Case No. 08-36084 (Bankr. S.D. Tex. Feb. 18, 2009) (final order modifying automatic stay); *see also In re United Retail Grp., Inc.*, Case No. 12-10405 (Bankr. S.D.N.Y. Feb. 22, 2012); *In re Sbarro, Inc.*, Case No. 11-11527 (Bankr. S.D.N.Y. May 4, 2011); *In re MSR Resort Golf Course LLC*, Case No. 11-10372 (Bankr. S.D.N.Y. Jan. 25, 2012); *In re Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (Bankr. S.D.N.Y. Jan. 11, 2011); *In re InSight Health Servs. Holdings Corp.*, Case No. 10-16564 (Bankr. S.D.N.Y. Jan. 4, 2011); *In re NR Liquidation III Co. (f/k/a Neff Corp.)*, Case No. 10-12610 (Bankr. June 30, 2010); *In re Lear Corp.*, Case No. 09-14326 (Bankr. S.D.N.Y. Aug. 4, 2009); *In re Gen. Growth Props. Inc.*, Case No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009); *In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. Apr. 23, 2009).

41.     The Debtors submit that, in the Debtors' business judgment, such provisions are reasonable under the present circumstances.   Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the DIP Credit Facility.

## V.   **INTERIM RELIEF**

42.     The Court may grant interim relief in respect of a motion filed pursuant to Section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."   Fed. R. Bankr. P. 4001(b)(2), (c)(2).   In examining requests for interim relief under this rule, courts generally apply

the same business judgment standard applicable to other business decisions.  *See Ames Dep't Stores*, 115 B.R. at 36.

43.     Pending the final hearing, the Debtors require interim approval of the Break-Up Fee and Expense Reimbursement under the DIP Credit Facility.   The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein is not granted promptly.   It is essential that the Debtors have access to the DIP Credit Facility for the reasons stated above.   The Lender will not enter into the DIP Credit Facility without interim approval of the Break-Up Fee and Expense Reimbursement as contemplated by the DIP Credit Facility. Absent immediate approval of the Break-Up Fee and Expense Reimbursement, the Debtors may be unable to obtain postpetition financing.   Accordingly, for the reasons set forth above, prompt entry of the Interim Order (attached as **Exhibit C**) is necessary to avert immediate and irreparable harm to the Debtors' estate and is consistent with, and warranted under, subsections (b)(2) and (c)(2) of Bankruptcy Rule 4001.

## VI.  **REQUEST FOR FINAL HEARING**

44.     Pursuant to subsections (b)(2) and (c)(2) of Bankruptcy Rule 4001, the Debtors request that the Court set the final hearing on this DIP Motion for March 27, 2015 or as soon thereafter as possible ("Final Hearing").

45.     The Debtors request that they be authorized to serve notice of such hearing by first class mail upon the Debtors' Master Service List.   The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## VII.  **REQUEST FOR WAIVER OF STAY**

46.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this motion.   Pursuant to Bankruptcy Rule 6004(h), "An order authorizing the use, sale,

#4779047

or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of

the order, unless the court orders otherwise."   As set forth above, the DIP Credit Facility is

essential to prevent irreparable damage to the Debtors' operations, value and ability to reorganize.

Accordingly, the Debtors submit that ample cause exists to justify a waiver of the fourteen-day

stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## VIII.  CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (i) approve the Break-Up

Fee and Expense Reimbursement on an interim basis; (ii) set a final hearing on this Motion; (iii)

enter the Final Order attached hereto as **Exhibit D**; and (iv) grant such further relief to which the

Debtors may be entitled.


Respectfully Submitted,

**BRACEWELL & GIULIANI LLP**

By: _/s/ William A. (Trey) Wood III_____
      William A. (Trey) Wood III
      Texas Bar No. 21916050
      Trey.Wood@bgllp.com
      Jason G. Cohen
      Texas Bar No. 24050435
      Jason.Cohen@bgllp.com
      711 Louisiana, Suite 2300
      Houston, Texas 77002
      Telephone: (713) 223-2300
      Facsimile: (713) 221-1212

**COUNSEL FOR THE DEBTORS AND
DEBTORS IN POSSESSION**

#4779047

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on March 6, 2015 a true and correct copy of the above and foregoing Motion has been served (i) electronically on the parties registered to receive notice through the court's ECF noticing system; and (ii) via electronic mail or facsimile where available, otherwise by regular U.S. mail, postage prepaid, on the parties listed in the attached Master Service List.  Where served by regular U.S. mail, Exhibit A has been omitted and is available by request.

By: *<u>/s/ Jason G. Cohen</u>*
        Jason G. Cohen

#4779047