IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **WBH Energy, LP,** *et al* | § | Case No. 15-10003 |
| | § | |
| Debtors. | § | (Jointly Administered) |

**CL III FUNDING HOLDING COMPANY LLC'S OBJECTION TO INTERIM APPROVAL OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF (A) INTERIM ORDER APPROVING BREAK-UP FEE AND EXPENSES REIMBURSEMENT AND (B) FINAL ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 364 AND 507 (I) AUTHORIZING POSTPETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) <u>GRANTING RELATED RELIEF</u>**
[Relates to Docket No. 216]

CL III Funding Holding Company, LLC ("<u>Castlelake</u>") files this Objection to Interim Approval of Debtors' Emergency Motion for Entry of (A) Interim Order Approving Break-Up Fee and Expenses Reimbursement and (B) Final Order Pursuant to Bankruptcy Code Sections 105, 361, 362, 364 and 507 (I) Authorizing Postpetition Financing, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief ("<u>DIP Motion</u>") (Docket No. 216) filed on March 6, 2015, and would show the Court as follows:

I. INTRODUCTION

1.  The Debtors' request for emergency approval to pay $300,000 of administrative expenses to Cantor Fitzgerald Securities ("<u>CFS</u>") comprised of: (i) a $175,000 break-up fee; and (ii) $125,000 expense reimbursement should be denied. There is no emergency to justify granting such relief on ten (10) days' notice and prior to consideration of the DIP financing proposed in the DIP Motion. In addition, these fees are unnecessary for DIP financing as explained below, as

Castlelake has offered to provide DIP financing on better financial terms, without a blanket priming lien and without requiring payment of $300,000 in up-front administrative expenses.

2. The Debtors' requested DIP financing should be denied for multiple reasons. Castlelake has offered to provide DIP financing to the Debtors on superior terms than the financing arrangement proposed by the Debtors with CFS. The Debtors cannot provide adequate protection to Castlelake for the granting of a priming lien and super priority administrative expense claim. Further, as explained below, none of the material findings the Debtors request that the Court make in connection with the Interim Order are supported by the evidence.

3. <u>First</u>, the Debtors cannot show they are unable to obtain DIP financing without granting the lender a break-up fee and expense reimbursement. In fact, the opposite is true. Castlelake has offered the Debtors DIP financing on superior financial terms and without a break-up fee or expense reimbursement. <u>Second</u>, the Debtors cannot show that entry into the DIP credit facility is an exercise of their sound business judgment. In fact, the opposite is true. The financing contemplated by the Debtors is more expensive and is prohibited by the Bankruptcy Code and applicable law. <u>Third</u>, the Debtors are unable and unwilling to offer Castlelake and other existing lienholders adequate protection as required under the Bankruptcy Code.

## II. DISCUSSION

A. *<u>There is No Emergency</u>*.

4. No showing has been made that interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." The Debtors' only argument is that "[a]bsent immediate approval of the Break-Up Fee and Expense Reimbursement, the Debtors may be unable to obtain postpetition financing." First, no support is offered for that assertion. Second, the assertion is wrong because Castlelake has offered superior DIP financing without a

break-up fee or expense reimbursement. Third, if the DIP financing were approvable and such fees were merited, then such fees could just as easily be granted at the final hearing as opposed to an interim hearing on only ten (10) days' notice to creditors. The request for emergency approval of these fees when there is no emergency, coupled with the request that the Court order a waiver of stay under 6004(h), appears to be an attempt to skew the field in favor of a particular DIP financer.

B.  *Castlelake Has Offered Superior Terms.*

5.  The Debtors have previously rebuffed Castlelake's attempts to negotiate DIP financing. Nevertheless, Castlelake has offered DIP financing on terms superior to those the Debtor negotiated with CFS. Attached as **Exhibit A** is a true and correct copy of Castlelake's DIP Financing Term Sheet. The Debtor has a fiduciary duty to move for approval of superior DIP financing terms. Castlelake's terms are more favorable in many ways, including the following:

| Term | CFS | Castlelake |
|---|---|---|
| Interest Rate | 10 % per annum | 5 %, per annum, paid in kind. |
| Default Interest Rate | 12 % per annum | 7 % |
| Closing Fee | 2 % | None |
| Exit/Repayment Fee, payable each and every time the DIP Credit Facility is paid down | 3 % | None |
| Break-Up Fee | $175,000 | None |
| Expense Reimbursement | $125,000 | None |
| Priming Liens | Blanket priming lien on all currently owned or after acquired assets and property of the Debtors and their estates (excluding claims under chapter 5 of the Bankruptcy Code). | Only as to: (a) interests of Debtor LP in the oil and gas wells, leases, units and related property rights which comprise the "Lewis-Stewart Lease Interests" (which are to be more fully described in Exhibit A to the Castlelake DIP Term Sheet); and (b) Debtor LLC's accounts receivables and related property and rights. |

3

C. *The Debtors' DIP Budget Further Demonstrates the Excessive Fees and Costs Associated with the CFS DIP Loan.*

6. The budget for spending the CFS DIP loan proceeds attached to the Debtors' DIP Motion is apparently not well thought out. All but approximately $500,000 of the loan is to be spent to pay the AFE for the completion of the Lewis-Stuart Wells. Another 2% is paid up front to CFS as a "Closing Fee." This amounts to $100,000 [$5,000,000 x .02 = $100,000], leaving a balance of $400,000. Another $125,000 is to be paid to the CFS for expense reimbursement, leaving $275,000. Another $250,000 is earmarked for professionals under the Carve-Out, leaving only $25,000 for debt service, other bankruptcy administration costs, and contingencies. To service the debt, interest alone is 10%, which is $41,666.66 per month or $500,000 over the maximum 12 month life of the loan. $25,000 cannot service even one month of interest for this loan.

7. When the loan is repaid, the Debtor must pay CFS a 3% "Exit/Repayment Fee" which equates to another $150,000 [$5,000,000 x .03 = $150,000]. Thus, debt service during the twelve months of the loan is $650,000, for which the Debtors will only have $25,000 of loan proceeds to cover. Default is thus highly likely, and the default will add another 200 basis points, or 2% more interest, which equals another $100,000.

8. It should also be noted that the stated interest rate for the proposed DIP financing is 10%, but the actual rate is over 15% because the 2% "Closing Fee" and the 3% "Exit/Repayment Fee" are both effectively interest, and the maximum time period over which they would be amortized is 12 months, so the effective rates over a shorter time period could be much higher. The Closing Fee cannot be treated as a bona fide cost of issuing the loan because that cost is covered by the additional $125,000 expense reimbursement requested by CFS.

9. The foregoing demonstrates that the Debtors have not properly exercised sound business judgment in agreeing to CFS's terms. Those terms are much more onerous to the estate and more

4

likely to lead to default than the terms offered by Castlelake, with whom the Debtors have failed to meaningfully negotiate at all. The exercise of business judgment necessarily involves weighing the alternatives, and Section 364(d)(1)(a) requires the Debtors to prove they are unable to obtain credit on more favorable terms than under CFS's terms. The Debtors cannot make that showing.

D.      *The Debtors Have Not Offered Castlelake Adequate Protection.*

10.     Instead of obtaining superior financing terms from their existing lender, the Debtors are asking the Court to approve a new lender and a subordination of **all** existing liens on **all** of Debtors' assets to that new lender. The Court should not be led into error. As stated by the Fifth Circuit, "[g]iven the fact that super priority financing displaces liens on which creditors have relied in extending credit, a court that is asked to authorize such financing must be particularly cautious when assessing whether the creditors so displaced are adequately protected." *In re First South Sav. Assoc.*, 820 F.2d 700, 710 (5th Cir. 1987).

11.     The Debtors have made no actual showing that other financing is unavailable on a junior or even an equal basis as required under Sections 364(c) and (d). 11 U.S.C. § 364(c) allows a DIP lender to be "secured by a junior lien on property of the estate that is subject to a lien." If this loan made as much business sense as the Debtors assert in the DIP Motion, then CFS would be willing to accept a junior lien. Indeed, if the completion of the Lewis-Stuart Wells was certain to generate far more in realizable value from those assets than the total amount of the loan, costs, fees, and debt service, then CFS would accept either a junior lien or a priming lien on only the Lewis-Stuart properties and not require a blanking priming lien on the entirety of the Debtors' assets. In reality, the likely outcome of the completions involves more risk than the Debtors

5

assert, and that is reflected in CFS's unwillingness to make a loan without obtaining rights to foreclose, on 5 days' notice, on <u>all</u> of the Debtors' assets.

12. Even if the Debtors could meet the other statutory prerequisites for the proposed DIP financing, the Debtors have not even attempted to show that Castlelake's existing lien position is adequately protected, as Debtors are required to prove under 11 U.S.C. § 364(d). A transaction that is dependent upon a pre-petition secured creditor having adequate protection "should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing." *Swedeland*, 16 F.3d at 564; *In re Mosello*, 195 B.R. 277, 292 (Bankr. S.D. N.Y. 1966)(denying debtor's motion under § 364(d) for a loan to complete a real estate project). If any risk of loss is created, the creditor must be provided some offsetting protection or compensation. *Swedeland*, 16 F.3d at 565, 566; *In re Mosello*, 195 B.R. 277, 293 (Bankr. S.D. N.Y. 1996).

13. Courts approving § 364(d) loans with priming liens have required, among other things, a detailed objective fiscal analysis demonstrating adequate protection and the ability to repay the superpriority loan. *In re Snowshoe Co., Inc.,* 789 F.2d 1085, 1089 (4th Cir. 1986); *Swedeland*, 16 F.3d at 566 n. 17; *Mosello*, 195 B.R. at 292. Here there is no analysis, much less a detailed analysis.

14. A creditor is not protected by projections of future success, particularly if those projections are themselves risky or contain speculation about successful future operations. *Swedeland*, 16 F.3d at 565-566; *Mosello*, 195 B.R. at 293. In this case the Debtors borrowed from Castlelake prepetition by promising the Debtors would achieve certain production results. The Debtors failed to meet any of their revenue projections.

15. Improvements to the property financed by the post-petition loan are not adequate protection unless the debtor establishes that the improvements add value equal to, or beyond, the amount of the superpriority loan. *Swedeland*, 16 F.3d at 566. The Debtors offer no evidence of the amount of increase in value that will occur, even assuming the completion of the six (6) Lewis-Stuart PDNP Wells goes smoothly and within budget. The Debtors merely make the conclusory statement that "the capital expenditures on the Lewis-Stuart Wells that will be facilitated by the DIP Credit Facility will create a net increase in asset value to the Debtors, which increase in value will serve to further adequately protect the Prepetition Secured Parties' interests in the assets." Motion at 15. This is far less than the showing which the Fifth Circuit found was insufficient as a matter of law in the *First South* case.

16. The mere prospect of a possible sale or a new refinancing is not adequate protection. *Swedeland*, 16 F.3d at 566. In this case, the Debtors offer no evidence of a sale prospect, much less one that is reasonably certain to occur before loan maturity and to generate more than enough net proceeds to pay off all of the DIP financing plus the entire present value of the collateral securing Castlelake's loan. The Debtors admit there is no lender available to refinance all of the debt.

17. The DIP financing proposal must also be denied because it is part of an overall plan of reorganization, the details of which have not been disclosed or tested. As stated by the Fifth Circuit granting a mandamus to stop a debtor from proceeding with a DIP loan approved by the bankruptcy court:

> Where the estimates that form the basis of the bankruptcy court's finding that First South would be adequately protected are grounded on assumptions that appear to be part of an overall plan of reorganization whose terms are not disclosed and which obviously has not yet been tested under the standards applicable to plans, it would be error for the bankruptcy court to rely on such evidence. There are no assurances that such a plan would be feasible or confirmable.

*In re First South Sav. Assoc.*, 820 F.2d 700, 714 (5th Cir. 1987).

18.     In the present case, the Debtors are implicitly arguing that all of the following conditions will occur so as to justify taking on this super-priority priming debt: (a) the Debtors' budget for completing the wells is accurate and will not be exceeded[1]; (b) there will be no operational problems; (c) the wells will be successfully completed; (d) the Debtors will be able to service the debt prior to receiving cash flow from anticipated Lewis-Stuart production that is many months in the future; (e) the Debtors will find a buyer and obtain Court-approval of a sale of the Lewis-Stuart Wells before the 12-month term of the DIP loan; (f) that buyer will agree to pay cash consideration of more than the current value of those wells and leases plus the costs of the $5,000,000 DIP financing and its associated costs; (g) that buyer will close and will do so on time; and (h) the Debtors will not have committed any other defaults prior to then. The Debtors have not even disclosed these conditions much less made a showing that each is more likely than not to occur and to occur timely.

19.     The Debtors have made no attempt to provide adequate protection that has been found sufficient in the case law. Adequate protection may be provided by (1) periodic cash payments, (2) additional or replacement liens or (3) other relief resulting in the "indubitable equivalent" of the secured creditor's interest. *In re Stoney Creek Techs., LLC*, 364 B.R. 882, 890 (Bankr. E.D. Pa. 2007)(*citing* § 361); *Wells Fargo Bank N.A. v. Sonora Desert Dairy, L.L.C. (In re Sonora Desert Dairy, L.L.C.)*, 2015 Bankr. LEXIS 18, 31-32 (B.A.P. 9th Cir. Jan. 5, 2015). Debtors do not even attempt to argue that they are providing Castlelake with (1) cash payments or (2) additional or replacement liens.

20.     The third category can be met by showing the existing lienholder is oversecured with a substantial equity cushion. *See Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 (9th Cir.

---

[1] Castlelake has repeatedly requested an updated budget for the completion of the Lewis-Stewart Wells. The only information that Castlelake has been provided is based on estimates which were prepared approximately 9-10 months ago which are not sufficient to confirm the accuracy of the current costs to complete the wells.

8

1984); *Sonora Desert Dairy*, *supra*. The equity cushion must be sufficient for both the prepetition loan and the DIP financing. *See In re Belk Props., LLC*, 421 B.R. 221, 225 (Bankr. N.D. Miss. 2009). In this case, there is no equity cushion. In *Belk*, the court denied a motion to approve post-petition financing. The court found that while the value of the overall project presently provided an equity cushion to the existing secured creditors, it could well be insufficient to provide this adequate protection if the proposed super-priority lien in favor of the DIP lender were added to the mix. *Id*. The court determined that if the actual value of the project were tilted toward a liquidation appraisal value, the effect of the proposed subordination would relegate the prepetition lenders into undersecured positions. *Id*.

21. The Debtors have not attempted to show and cannot show that Castlelake is protected by a substantial equity cushion in this case. In addition, because the maturity of the proposed DIP financing is short, the Debtors' valuations will have to be adjusted more towards liquidation values. This means the amount by which Castlelake could be undersecured could be potentially significant.

22. Another way the third category of indubitable equivalent can be met is by supplying the pre-petition lender with a new third-party guaranty or with substitute collateral. *Resolution Trust Corp. v. Swedeland Dev. Group* (*In re Swedeland Dev. Group*), 16 F.3d 552, 564 (3d Cir. 1994). Again, the Debtors are not even attempting to offer such protection to Castlelake in connection with the proposed DIP loan.

23. The burden of proof is on the Debtors to show that Castlelake is adequately protected. *Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland Dev. Group)*, 16 F.3d 552, 564 (3d Cir. 1994). The Debtors cannot meet that burden in this case. Those cases which have considered improvements to be adequate protection have done so only when the improvements

were made in conjunction with the debtors providing the prepetition lender with additional collateral beyond the contemplated improvements. *In re Seven Falls, LLC*, 2010 Bankr. LEXIS 5228, 22 (Bankr. W.D.N.C. July 6, 2010), *citing Swedeland*. Likewise, where there is no equity cushion, improving value through a DIP loan is not adequate protection. *Seven Falls, supra*.

24. In the *Swedeland* case, the debtor was a developer of a residential golf club community. The debtor ran out of funds with only the golf course and club house built. In chapter 11, the debtor sought approval of a DIP financing that would take priority over the lien of the under-secured prepetition lender. The debtor put on evidence that the DIP financing would be used to build the streets, tennis courts, and other infrastructure which would result in selling the 900 residential lots and that would generate enough money over eight years to pay the prepetition and post-petition loans in full. The bankruptcy court approved the DIP loan (and it was actually funded during appeal), but the district court reversed and the Third Circuit affirmed the district court because the debtor's plans of increased value in the future were not adequate protection of the existing secured lender. The facts here are similar to those in *Seven Falls*.

25. *In re Mosello* is another case in which the debtor wanted to borrow money to complete construction and argued that the existing lender had adequate protection because the additional construction would increase the value of the collateral in an amount greater than the DIP loan. *In re Mosello*, 195 B.R. 277, 288, 293 (Bankr. S.D. N.Y. 1996). The court held the future projected increases in value were not adequate protection. The court noted, as did the court in *Swedeland*, that the debtor had not met its prior projections, which made the projected increases in value even more uncertain. *Id*. Like in those cases, the WBH Debtors have also historically failed to meet their operational and financial projections.

26. Judge Houser applied the *Swedeland* line of cases in *In re Futures Equity L.L.C.*, 2001 Bankr. LEXIS 2229 (Bankr. N.D. Tex 2001). There, Judge Houser held:

> A creditor is not protected by projections of future success, particularly if those projections are themselves risky or contain speculation about successful future operations. *Swedeland*, 16 F.3d at 565-566; *Mosello*, 195 B.R. at 293. Improvements to the property financed by the post-petition loan are not adequate protection unless the debtor establishes that the improvements add value equal to, or beyond, the amount of the superpriority loan. *Swedeland*, 16 F.3d at 566.

Judge Houser found there was a small equity cushion for the prepetition lender in *Futures Equity*, but found the debtors' projections of future increases in value to be insufficiently certain to constitute adequate protection.

27. A similar case is *Suntrust Bank v. Den-Mark Construction, Inc.*, 406 B.R. 683 (E.D. N.C. 2009). The debtors in that case had incompleted subdivisions as their primary assets. They sought a priming lien on one of the subdivisions for a loan to finish development and to sell the lots. *Id*. at 687. The bankruptcy court approved the DIP financing, and the prepetition lender, Suntrust, filed an emergency appeal. The district court reversed. It held that the subordination of Suntrust's lien was not adequately protected despite (a) a $1.1 million equity cushion, (b) payoff of letters of credit owed to Suntrust in the amount of $633,598, and (c) payments of $12,000 per month to Suntrust during the term of the DIP loan. *Id*. at 700-702. The court noted that despite all these additional protections for the prepetition lender, the DIP lender would get a priming lien on the subdivision that was being completed and that asset would be diminished as each lot was sold. *Id*. Thus, the improved asset would also be a diminishing asset. Suntrust would be relegated to seeking repayment of its principal out of the undeveloped subdivision, and the court determined that the bankruptcy court order should be vacated. *Id*. In the present case, the Lewis-Stuart Wells will diminish in value as oil is produced from them, and the Debtors are not offering any of the additional adequate protections which were collectively found to be insufficient to protect Suntrust.

11

28. Another instructive case is *In re YL West 87th Holdings I LLC*, 423 B.R. 421 (Bankr. S.D. N.Y. 2010). In that case, the debtor sought a DIP loan to complete construction to convert a building into condominiums. The court held that the existence of an equity cushion seems to be the preferred test in determining whether priming of a senior lien is appropriate under section 364. *Id*. at 441. The court determined that whether there was an equity cushion was questionable in the debtor's case. Thus, the only form of adequate protection was the potential increase in the value of the property if and when construction of the project was completed. *Id*. at 442. As a matter of law, that is not enough. *Id*., *citing Swedeland*. The court held that even if there were a substantial equity cushion as opined by one of the appraisers, it was questionable whether the DIP loan could be refinanced by its maturity date, so the DIP loan request was denied. *Id*. at 443.

29. While the geology and logging may be sufficient for a reasonable prudent operator to want to spend the money to complete the Lewis-Stuart Wells, that is not the same thing as saying they are without risk. All oil and gas operations are risky, and for a long list of reasons. The presence of such risk is something for which Castlelake is entitled to adequate protection. As stated by Judge Houser, "If any risk of loss is created, the creditor must be provided some offsetting protection or compensation." Here, the Debtors offer Castlelake nothing. Even assuming the Debtors could offer Castlelake something for taking on additional risk, the Debtors would also have to show that their projected increase in value of the collateral would be readily realizable.

30. Where a chain of conditions is required before the value materializes, the DIP financing should be denied. In *In re Futures Equity L.L.C.*, the proposed DIP loan was going to mature in one year. The debtors would not have operating cash flow to pay off the balance in one year and were, instead, counting on a sale or refinance of that debt. The sale or refinance was dependent

12

on the debtors' new projections of cash flow being met. Judge Houser found that there were too many contingencies as to if or when substantial new value in the collateral could be realized by the debtors. Further, the court noted that the values depended, among other things, on the debtors' new projections but the debtors had failed to meet their prior projections. *See also In re Stinson Petroleum*, 2009 Bankr. LEXIS 4116 (Bankr. S.D. Miss. 2009)(DIP financing denied and case converted where debtor's projections for future growth were not substantiated). Upon denial of the DIP financing motion, Judge Houser, like the judge in *Mosello*, granted the prepetition lender's motion to lift stay for foreclosure.

31. The Third Circuit in *Swedeland* held that the bankruptcy court's factual finding of adequate protection was clearly erroneous. It specifically held that "continued construction based on projections and improvement to the property [that secures the prepetition loan] does not alone constitute adequate protection." 16 F.3d at 556. "Those cases which have considered improvements to be adequate protection have done so only when the improvements were made in conjunction with the debtor's providing additional collateral beyond the contemplated improvements." *Id*. "We reject the notion that development property is increased in value simply because a debtor may continue with construction which might or might not prove to be profitable." *Id*.

32. Another case on point is *In re Chevy Devco*, 78 B.R. 585 (Bankr. C.D. Cal. 1987). In that case, the debtor's asset was a shopping center in which there was no equity above the prepetition lien amount. *Id*. at 587. The debtor sought approval of a $1,250,000 DIP super-priority loan for remodeling which was expected to increase the center's value by $2,600,000. *Id*. The court analyzed the prepetition lender's existing rights and found that although it was undercollateralized, it did have knowledge of the property in its current state and could take steps

13

to protect itself by seeking relief from stay and then foreclosing and selling the property. *Id*. at 588. After the proposed new financing, however, the prepetition lender would be subordinated to the DIP lender, the property would be under construction for some period of time, the lender would have no control over that construction or the timing of completion, and new leasing would have to occur along with a sale or refinance within the one-year maturity of the DIP loan. *Id*. In order to be willing to subordinate itself, the prepetition lender would want at least what the DIP lender was getting in terms of monthly payments during bankruptcy, subordination of property taxes, and the interest rates set out in the DIP loan. *Id*. The court reasoned that

> Further, under the facts of this case the secured creditor is being treated as if it were an investor. It is being asked to risk its money on the hope that there is a profit to be made. If there is failure, the creditor has no protection against loss. But unlike an investor, the creditor will not share in the gain if the project is successful. The debtor wants the best of all worlds - to use this creditor's money without risk and to keep the profits for itself.

*Id*. at 590. That is how Debtors propose to treat Castlelake in this case. The court in *Chevy Devco* denied the DIP financing motion and the result should be the same in this case.

33. "Congress did not contemplate that a creditor could find its priority position eroded and <u>as compensation be offered an opportunity to recoup dependent upon the success of a business with inherent risky prospects</u>." *In re Stoney Creek Techs. LLC*, 364 B.R. 882, 890-91 (E.D. Pa. 2007), quoting from *Swedeland*, 16 F.3d at 567. In the *Stoney Creek* case, the debtor had a substantial equity cushion in its property, but the debtor's projections did not show how it would generate sufficient cash flow in time to pay off the DIP loan at maturity. *Id*. at 892. The requested DIP financing was denied. *Id*. at 892.

34. Here, unless the Debtors can (1) offer Castlelake new collateral in addition to the projections for enhanced cash flow, (2) prove that a sale will occur timely, and (3) prove the sale will generate enough net proceeds to pay off both the DIP lender and Castlelake, the Debtors

14

should not be able to obtain approval of a DIP financing under *Swedeland*, *In re Futures Equity*, and other cases cited above.

### III. CONCLUSION

35. The Debtors are unable to meet their burden of proof. There is no emergency, and there is no basis for interim relief. The Debtors cannot show that other financing is unavailable as required by Section 364, and it is not a reasonable exercise of business judgment to ignore superior financing alternatives. The Debtors have not offered Castlelake adequate protection as required by Section 364. The motion should be denied.

March 11, 2015                                   Respectfully submitted,

**SNOW SPENCE GREEN LLP**

By:   */s/   Kenneth Green*
     Phil Snow
     State Bar No. 18812600
     Kenneth Green
     State Bar No. 24036677
     2929 Allen Parkway, Suite 2800
     Houston, Texas 77019
     (713) 335-4800
     (713) 335-4848 (Fax)

**ATTORNEYS FOR SECURED CREDITOR**
**CL III FUNDING HOLDING COMPANY, LLC**

**CERTIFICATE OF SERVICE**

  The undersigned certifies that on March 11, 2015, a true and correct copy of this document was served via electronic means, facsimile or U.S. Mail pursuant to the Court's ECF noticing system.


                */s/  Kenneth Green*
                Kenneth Green

I:\Client\CAST0001-Castlelake-WBH\Bankruptcy\Pleadings-Final\20150311 CL III Objection to Interim Order re DIP Financing Motion (216).docx