**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **WBH Energy, LP** | § | Case No. 15-10003 |
| **WBH Energy Partners LLC** | § | |
| **WBH Energy GP, LLC** | § | Chapter 11 |
| | § | |
| Debtors. | § | *Jointly Administered* |

**DEBTORS' INITIAL RESPONSE TO OBJECTIONS TO BREAK-UP FEE AND**
**EXPENSE REIMBURSEMENT IN CONNECTION WITH**
**DIP FINANCING MOTION**
(relates to Dkt. No. 224)

WBH Energy, LP, WBH Energy Partners LLC, and WBH Energy GP, LLC ("Debtors") hereby file this initial response to objections to the Debtors' motion seeking approval of a break-up fee and expense reimbursement in connection with debtor in possession financing.[1] In support of this Response, the Debtors state as follows:

**I. PRELIMINARY STATEMENT**

1. Only a few short weeks ago, Castlelake stated that the Debtors had no hope of DIP financing and the cases should be converted, or the stay lifted. Today, the Debtors have two potential DIP lenders, one of which is Cantor Fitzgerald, an international investment bank, and one of which is Castlelake. While the Debtors appreciate the favorable pricing in Castlelake's latest DIP term sheet and seek to discuss it further, the fact is that it is non-binding, has numerous onerous provisions, and marks the third time the Debtors will attempt to negotiate DIP financing with Castlelake. Meanwhile, the Debtors have committed DIP financing from Cantor Fitzgerald, which requires the interim approval of a break-up fee and expense reimbursement. If

---

[1] The Debtors are not seeking interim approval of any aspect of the DIP financing other than the break-up fee and expense reimbursement. All objections (and responses) to all other aspects of the DIP financing are reserved for the final hearing.

the break-up fee and expense reimbursement are not approved by the Court on an interim basis (**which is the only relief the Debtors seek on an interim basis**), Cantor Fitzgerald will not extend the financing and the Debtors will be left at the mercy of Castlelake without any guaranteed funding whatsoever. Consequently, the Debtors believe it is in their best interests for the break-up fee and expense reimbursement to be approved.

## II. RELEVANT BACKGROUND

2. On January 4, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas, Austin Division (the "Court"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses and managing their property as debtors in possession. No trustees or examiners have been appointed in these cases.

3. On January 8, 2015, the Court entered its Order Granting Motion for Joint Administration [Docket No. 34] and Order Granting Complex Chapter 11 Bankruptcy Case Treatment [Docket No. 37].

4. In the months leading up to the Petition Date, the Debtors attempted to secure DIP financing from Castlelake as part of a prepackaged chapter 11 filing. The Debtors and Castlelake exchanged their first DIP term sheet on October 21, 2014. Over the next two months, the Debtors continued to negotiate with Castlelake on the terms of DIP financing. On the eve of bankruptcy filing, after 10 weeks of negotiations, Castlelake informed the Debtors that it would not be extending DIP financing and the Debtors were left to free fall into bankruptcy.

5. After the Petition Date, the Debtors sought to continue DIP financing negotiations with Castlelake. On January 20, 2015, Castlelake sent the Debtors another term sheet, and Castlelake requested voluminous amounts of seemingly unrelated historical accounting data.

The Debtors willingly provided the accounting data and sent a list of 18 specific questions and comments in response to the January 20th term sheet. Castlelake never responded.

6. With no response forthcoming from Castlelake, the Debtors focused their efforts on obtaining financing from a third party DIP lender. The Debtors executed approximately 8 nondisclosure agreements with possible DIP lenders, provided requested information, and engaged in conference calls with several of the potential lenders. Each of the lenders that the Debtors discussed a DIP loan with expressed (a) a concern that they would incur significant expense negotiating and documenting a DIP loan agreement, only to be scuttled at the last moment by a competing Castlelake DIP loan, and (b) that the DIP loan size requested was too small to be of much interest.

7. Meanwhile, Castlelake initiated a hostile campaign in the Bankruptcy Court with the clear goal of ending these chapter 11 cases. First, Castlelake's attorney made wholly unsupported and *non sequitor* allegations against the Debtors at the conclusion of the preliminary injunction hearing, essentially accusing the Debtors of stealing $11 million. (See Transcript excerpt from February 6, 2015 Hearing, pp. 40-46 (P. Snow Closing Argument)). As a result of those statements, the Court noted that "There was some mention that Castlelake might possibly be a DIP lender to finish these wells, but that possibility seemed highly unlikely as Castlelake's counsel advised the court that it would not be supporting the Debtors' use of cash collateral after the end of this month, February 2015, and wants a forensic accountant." (Court's Oral PI Ruling, February 9, 2015).

8. Next, Castlelake filed four case dispositive motions against the Debtors, seeking to lift the automatic stay and convert these cases to chapter 7. (See Dkt. Nos. 139, 140, 144, 145). The stated basis for these motions was that "the Debtors have no realistic prospects for

-3-

DIP Financing and there is no possibility of a successful reorganization." (Castlelake's motion to convert Debtor LP case, Dkt. No. 144).

9. Faced with silence, then outright antagonism from Castlelake, the Debtors moved forward with securing DIP financing on reasonable terms from Cantor Fitzgerald (the "<u>DIP Lender</u>"). Like other possible lenders that the Debtors spoke to, Cantor Fitzgerald was concerned that it would spend significant money negotiating and documenting a DIP loan agreement, only to have Castlelake come in at the last moment and undercut its agreement.

10. On March 6, 2015, the Debtors filed their emergency motion seeking approval of DIP financing from the DIP Lender (Dkt. No. 216, the "<u>DIP Motion</u>"). The DIP Motion seeks, among other things, the interim approval of a break-up fee of $175,000 and expense reimbursement not to exceed $125,000 "in the event that the Debtors obtain a debtor in possession loan from any person other than the Lender or its affiliates." (DIP Motion ¶ 10).

11. On March 11, 2015, at 4:12 p.m., Castlelake sent the Debtors a proposed DIP term sheet. Forty minutes later, at 4:52 p.m., the Debtors received e-notice of Castlelake's objection to interim approval of the Debtors' DIP motion (Dkt. No. 224).

### III. RESPONSE

12. As of the filing of this pleading, the Debtors have two parties—Castlelake and Cantor Fitzgerald—interested in providing them with DIP financing. This is a marked improvement compared to a few short weeks ago, when:

- On February 6th, Castlelake announced in open court that "we do not plan on supporting cash collateral usage beyond the end of this month.";

- On February 9th, the Court found, on a preliminary basis, that "[t]here was some mention that Castelake might possibly be a possession, or DIP, lender to finish these wells, but that possibility was quickly dashed by Castlelake's counsel who advised the Court that it would not be supporting the Debtor's use of cash collateral after the end of this month, February, 2015."; and

-4-

- On February 11th and 12th, Castlelake filed motions to lift the stay and convert these cases, asserting that "Any increase in value in the Collateral due to the completion of the 6 wells would be offset by the additional debt incurred by the DIP loan" and "the Debtors have no realistic prospect for DIP financing and there is no possibility of a successful reorganization."

13. Clearly, Castlelake has abruptly changed its position in these cases in less than a month. The impetus for such change is obvious: Despite being left for dead (twice) by Castlelake, the Debtors went to the market and, against all odds, obtained committed DIP financing from a reputable third party lender. However, such DIP financing is not without costs.

14. Like the other potential DIP lenders that the Debtors spoke with, the DIP Lender was concerned at the outset of this process that it would expend significant time and expense negotiating the DIP loan, only to have its deal scuttled at the last moment by Castlelake. To protect against this risk, the DIP Lender initially requested that it receive a break-up fee of $250,000 and an unlimited expense reimbursement to the extent that the Debtors accepted the DIP term sheet but failed to enter into definitive documentation with the DIP Lender. However, after substantial negotiation, the Debtors and DIP Lender agreed upon a break-up fee of $175,000 (the "Break-Up Fee") and an expense reimbursement not to exceed $125,000 (the "Expense Reimbursement") payable only if the Debtors abandon Cantor Fitzgerald for a more favorable DIP financing proposal (i.e. use Cantor Fitzgerald as a stalking horse).

15. Bankruptcy courts have authority to approve enhancement or break-up fees under section 364. *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 318 (9th Cir. B.A.P. 1992). In determining whether a lender incentive should be authorized, bankruptcy courts consider "whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest." *Id*. at 317. Such is not the case here, where the requested fees merely serve to compensate the

-5-

DIP Lender for its efforts if the Debtors enter into alternative financing. Furthermore, a break-up fee of 3.5% as requested here, is well within the norm granted by bankruptcy courts in similar situations. *See e.g., In re Edge Petroleum Corp., et al.*, Case No 09-20644 (Bankr. S.D. Tex., October 1, 2009) (court approved break-up fee if 2.31%); *In re TXCO Resources*, Inc., Case No. 09-51807 (Bankr. W.D. Tex. November 20, 2009) (court approved break-up fee equal to 3% of purchase price); *Outsource Holdings, Inc.*, 11-41938 (Bankr. N.D. Tex.)(break-up fee of 6.36% approved in connection with sale of holding company's shares in bank subsidiary).

16. Importantly, and as a result of negotiations, both the Break-Up Fee and Expense Reimbursement are only paid if the Debtors obtain a DIP loan from any person other than the DIP lender or its affiliates. Thus, the Break-Up Fee and Expense Reimbursement are not "up front" expenses as Castlelake alleges. This is the cost of the DIP Lender serving as a successful stalking horse. If the DIP Lender does not receive approval of the Break-Up Fee and Expense Reimbursement on an interim basis, the DIP Lender will exercise its right to exit the DIP Loan. (See DIP Credit Agreement § 3.1(g)).

17. Castlelake has objected to the approval of the break-up fee and expense reimbursement and, roughly 40 minutes before filing its objection, proposed its own DIP term sheet to the Debtors. While Castlelake's latest DIP proposal does provide more favorable pricing than the Cantor Fitzgerald DIP financing it comes with considerable risk and cost to the estates. Among other things, Castlelake's Term Sheet is:

- Non-binding
- Subject to agreement on definitive documentation
- Subject to agreement on DIP budget
- Without prejudice to Castlelake's right to continue to prosecute its pending motions to lift stay and to convert these cases
- Requires a waiver of any claims the estates may have against Castlelake
- Requires the Debtors stipulate as to the extent and validity of Castlelake's prepetition claims and liens

- Contains restrictions on use of cash collateral and DIP financing to challenge extent, validity and priority of Castlelake's prepetition liens and claims; and
- Requires a maturity date and 363 sale closing date of no later than August 1, 2015 which may not allow the estates to realize the benefits of the completion of the Lewis-Stewart wells (the primary purpose of the DIP financing)[2]

18. Notwithstanding these hurdles, the Debtors sent initial comments and questions regarding the proposal within one day of receiving it and advised Castlelake that they wish to discuss the term sheet further.

19. While the Debtors appreciate the Castlelake term sheet and its favorable pricing, the Debtors note that twice already Castlelake has purported to offer the Debtors DIP financing, and twice Castlelake has failed to deliver, both times causing the Debtors to incur significant time and expense with no results. Now, for a *third* time, Castlelake purports to extend DIP financing through a non-binding term sheet. While the Debtors hope that the third time is charmed, there is no guarantee, and the risks are now greater than ever.

20. The Debtors, via the DIP Motion, have proposed a fully negotiated, documented, and executed (subject to Court approval) DIP loan with a third-party international investment bank. In short, the Debtors have a "bird in the hand." While Castlelake has proposed a term sheet to the Debtors, that term sheet is non-binding on any party and provides that "no agreement shall exist unless and until definitive documents are executed and approved by the Bankruptcy Court." (Castlelake DIP term sheet). Based on the two prior attempts spanning three months, the Debtors believe that moving beyond the initial term sheet stage of negotiation with Castlelake may be difficult, and is certainly not guaranteed and worth betting these cases on. What is guaranteed is that if the Court denies the Break-Up Fee and Expense Reimbursement,

---

[2] A comparison of key terms of the Cantor Fitzgerald committed DIP financing and the Castlelake nonbinding DIP term sheet is attached hereto as **Exhibit A.**

-7-

then Cantor Fitzgerald will walk and the Debtors will find themselves in the same place they found themselves only a few short weeks ago: at the mercy and whim of Castlelake with no binding DIP financing to fund these cases and the completion of the Lewis-Stewart wells. On the other hand, if the Debtors are successful in reaching an agreement with Castlelake, Cantor Fitzgerald will have earned its fee, having brought Castlelake back to the table at substantially improved pricing.

21. Based on the foregoing, the Debtors have exercised their business judgment and determined that it is in their best interests to seek allowance of the Break-Up Fee and Expense Reimbursement and not to forego the committed Cantor Fitzgerald DIP financing. Therefore, the Debtors respectfully request that the Court approve the same.

22. The arguments proffered by Castlelake in its Objection related to fees and adequate protection are not relevant to the interim hearing on the Break-Up Fee and Expense Reimbursement and the Debtors reserve the right to supplement this initial response as appropriate.[3]

## V. PRAYER

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested in the DIP Motion, and grant such other and further relief to the Debtors as the Court deems just and proper.

---

[3] The Debtors do note that the adequate protection cases cited by Castlelake are all distinguishable from the case at bar in that they relate to golf clubs and real estate ventures, and not oil and gas leases. One cannot simply 'mow the grass' on oil and gas leases—if the Debtor's oil and gas leases are not developed through DIP funds, they risk forfeiture through non-consent, as detailed in the Debtors' objection to Castlelake's Motion for Relief from the Automatic Stay Against Debtor LP (Dkt. No. 139).

Respectfully Submitted,

**BRACEWELL & GIULIANI LLP**

By: */s/ William A. (Trey) Wood III*
  William A. (Trey) Wood III
  Texas Bar No. 21916050
  Trey.Wood@bgllp.com
  Jason G. Cohen
  Texas Bar No. 24050435
  Jason.Cohen@bgllp.com
  711 Louisiana, Suite 2300
  Houston, Texas 77002
  Telephone: (713) 223-2300
  Facsimile: (713) 221-1212

**COUNSEL FOR THE DEBTORS AND DEBTORS IN POSSESSION**

**CERTIFICATE OF SERVICE**

  I hereby certify that on March 15, 2015 a true and correct copy of the above and foregoing Motion has been served electronically on the parties registered to receive notice through the court's ECF noticing system.

By: */s/ Jason G. Cohen*
  Jason G. Cohen