## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **WBH Energy, LP,** | § | **Case No. 15-10003** |
| **WBH Energy Partners LLC** | § | |
| **WBH Energy GP, LLC** | § | **Chapter 11** |
| | § | |
| Debtors. | § | *Jointly Administered* |

## DEBTORS' MOTION FOR
## ENTRY OF FINAL ORDER PURSUANT TO
## BANKRUPTCY CODE SECTIONS 105, 361, 362, 363, 364 AND 507
## (I) AUTHORIZING POSTPETITION FINANCING, (II) APPROVING USE OF CASH
## COLLATERAL, (III) GRANTING ADEQUATE PROTECTION,
## AND (IV) GRANTING RELATED RELIEF

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON APRIL 20, 2015 AT 1:30 P.M. (CT) IN COURTROOM 2, HOMER J. THORNBERRY FEDERAL JUDICIAL BUILDING, 903 SAN JACINTO BLVD., AUSTIN, TX 78701.**

**OBJECTIONS TO THE RELIEF REQUESTED HEREIN MUST BE IN WRITING AND FILED WITH THE COURT BY APRIL 17, 2015, AT 5:00 P.M. (CT).**

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

WBH Energy, LP, WBH Energy Partners LLC, and WBH Energy GP, LLC (together, the

"Debtors") submit this motion seeking entry of a final order (i) authorizing the Debtors to obtain

postpetition financing of up to $5 million in principal (plus certain fees and costs); (ii) approving

use of cash collateral, (iii) granting adequate protection in the form of security interests and

superpriority claims in connection therewith; and (iv) granting related relief ("Motion").  In support of their Motion, the Debtors respectfully state as follows:

## I.  JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.  BACKGROUND

**Procedural History**

2.      On January 4, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas, Austin Division (the "Court").  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses and managing their property as debtors in possession.  No trustees or examiners have been appointed in these cases.

3.      The Debtors filed their Emergency Motion for an Order (I) Authorizing the Debtors to Use Cash Collateral of Existing Secured Lenders, (II) Granting Adequate Protection for Use Thereof, and (III) Scheduling Final Hearing, on January 5, 2015 [Docket No. 16, the "Cash Collateral Motion"].  The Cash Collateral Motion is incorporated by reference herein as if fully restated.  The Cash Collateral Motion was granted by interim order dated January 5, 2015 (the "Interim Cash Collateral Order").  The use of cash collateral under that interim order has since been extended by four additional orders through May 1, 2015.  (See Docket Nos. 54, 152, 184).

4.      On January 8, 2015, the Court entered its Order Granting Motion for Joint Administration [Docket No. 34] and Order Granting Complex Chapter 11 Bankruptcy Case Treatment [Docket No. 37].

5.      Together, the Debtors operate an oil and gas exploration and production business with a primary focus on the Barnett Combo Play of the Fort Worth Basin.  Each of the Debtors is a Texas entity, is based in Austin, Texas, and was founded in 2011.

6.      WBH Energy, LP is a real property holding company that owns working interests in approximately 1,500 leases consisting of approximately 2,570 net acres throughout the Barnett Combo Play.   Of those leases, approximately 30 horizontal wells and 9 vertical wells are currently producing and 6 horizontal wells have been drilled and cased.  WBH Energy, LP is managed by its general partner, WBH Energy GP, LLC.

7.      WBH Energy Partners LLC is an oil and gas operating company responsible for developing the working interests of WBH Energy, LP and its non-affiliated, non-debtor partner, U.S. Energy Development Corporation ("USED").   Specifically, until March 1, 2015, WBH Energy Partners LLC was the operator of certain oil and gas interests pursuant to that certain Joint Operating Agreement (the "JOA") dated September 1, 2011, by and between itself, as operator, and WBH Energy, LP and USED as oil and gas lease owners and/or oil and gas interest owners.

8.      Prior and subsequent to the Petition Date, the Debtors communicated with several lenders with initial interest in providing postpetition financing.  The Debtors eventually entered into substantive discussions with Cantor Fitzgerald, as administrative agent and lender (collectively, "Cantor") to obtain postpetition financing, and Cantor agreed to provide the

Debtors with postpetition financing according to the terms and conditions of the postpetition debtor in possession term loan agreement ("Initial DIP Credit Facility").

9.      An interim hearing on certain provisions of the Initial DIP Credit Facility was held on March 16, 2015 ("Interim Hearing").  At the Interim Hearing, the Debtors, CL III Funding Holding LLC ("Castlelake"), the Official Creditors' Committee ("Committee"), US Energy Development Corporation ("USED") and Cantor announced a stipulation and agreement by which the Debtors and Castlelake contemplated reaching a definitive written agreement for postpetition financing and, if ultimately approved, Cantor would be entitled to receive reimbursement of its reasonable legal fees and expenses and a reasonable break-up fee, with reasonableness to be determined by the Court.

10.     On March 16, 2015, the Court entered an Order Regarding Hearing on Debtors' Motion for Interim Order Approving Break-Up Fee and Expense Reimbursement, and Setting March 27, 2015 Status Hearing on Debtor in Possession Financing [Docket No. 241].  That order set forth and approved the terms of the parties' stipulation and agreement and scheduled a status hearing for March 27, 2015 at 10:00 a.m.

11.     On March 27, 2015, the status hearing was continued to March 30, 2015, at which time Castlelake and the Debtors announced that they had reached a definitive agreement for debtor in possession financing ("DIP Credit Facility").  A copy of the Castlelake DIP Credit Facility is attached hereto as **Exhibit A**.

**Prepetition Secured Debt**

12.     Prior to the Petition Date, the Debtors entered into the following secured financing transactions:

- the Loan Agreement, dated October 17, 2013, between WBH Partners, WBH LP and WBH GP, as borrowers, and Green Bank, N.A., as lender, as amended

by the Amended and Restated Loan Agreement (as amended, supplemented, and modified, the "Senior Pre-Petition Loan Agreement"), dated December 19, 2013, between WBH Partners, WBH LP and WBH GP, as borrowers, and Green Bank, N.A., as lender. On December 10, 2014, Green Bank, N.A. sold, transferred, assigned, granted, and conveyed to Castlelake the Senior Pre-Petition Loan Agreement and all indebtedness and obligations owing to Green Bank, N.A., along with all rights, benefits, remedies and privileges of Green Bank, N.A. As of January 4, 2015, the amount of $5,547,306.28 was outstanding pursuant to the terms of the Senior Pre-Petition Loan Agreement.

- the Credit Agreement (as amended, supplemented, and modified, the "Junior Pre-Petition Credit Agreement", and together with the Senior Pre-Petition Loan Agreement, the "Lender Pre-Petition Loans"), dated December 19, 2013, between WBH LP, as borrower, and Castlelake, as amended by First Amendment to Credit Agreement entered into as of December 31, 2013, between WBH LP, as borrower and Castlelake, as further amended by the Second Amendment to Credit Agreement, dated as of April 21, 2014, between WBH LP, as borrower and Castlelake. As of January 4, 2015, the amount of $28,901,217.37 outstanding under the Junior Pre-Petition Credit Agreement.

## III. **RELIEF REQUESTED**

13. The Debtors respectfully request the Court, among other things, (a) authorize, on a final basis, the Debtors to use cash collateral under the Lender Pre-Petition Loans ("Cash Collateral") on the terms set forth herein; (b) authorize the Debtors to enter into a senior secured priming superpriority debtor in possession term loan facility with Castlelake in an aggregate principal amount of up to $5,000,000 upon the terms and conditions of the DIP Credit Facility; and (c) authorize the Debtors to grant liens, security interests, and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code) to Castlelake as provided for in the DIP Credit Facility and to perform such other and further acts as may be necessary or appropriate in connection therewith.

14. The Debtors believe that the DIP Credit Facility reasonably addresses their financing requirements and constitutes the best financing option available to them given the

circumstances of their businesses, their capital structure, and these Cases. Pursuant to Bankruptcy Rule 4001, a summary of the material terms of the proposed postpetition financing is set forth below:[1]

- **The DIP Credit Facility**: The Loan Documents provide for a term loan in an aggregate principal amount of up to $5,000,000, which shall provide liquidity to fund the Debtors' approved capital project and continuing operations, subject to certain conditions, upon entry of a Final Order;

- **Term**: The maturity date of the DIP Credit Facility shall be the earliest of (i) September 1, 2015; (ii) the effective date of a chapter 11 plan of reorganization that is confirmed pursuant to an order entered by the Bankruptcy Court; (iii) the closing of any sale of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code; and (iv) acceleration of the due date of the DIP Obligations based on an Event of Default.

- **Interest Rate and Default Rate**: The DIP Credit Facility shall have a 5.00% per annum interest rate and the default interest rate shall be an additional 2.00% per annum.

- **Security**: After giving effect to the Final DIP Order, all DIP Obligations shall be entitled to (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, superpriority claim status in the Bankruptcy Case (senior to all other claims of any kind); (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all now owned or hereafter acquired tangible and intangible property of the Borrowers and the Borrowers' estates in the Chapter 11 Cases (including the Oil and Gas Properties and Personal Property) that is not subject to: (a) valid, perfected an non-avoidable liens in existence as of the Petition Date, or (b) valid and non-avoidable liens in existence as of the Petition Date that are subsequently perfected as permitted by Section 546(b) of the Bankruptcy Code (other than in the case of the Prepetition Liens and security interests held by Castlelake by virtue of Castlelake's prepetition loan documents), excluding however, avoidance actions under Chapter 5 of the Bankruptcy Code; (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all now owned or hereafter acquired tangible and intangible property of the Debtors and the Debtors' estates in the Chapter 11 Cases that is subject to: (a) valid perfected and non-avoidable liens in existence as of the Petition Date that are senior to the liens securing Castlelake's prepetition loans, or (b) valid and non-avoidable liens in existence as of the Petition Date that are senior to the liens securing Castlelake's prepetition loans which are subsequently perfected as permitted by Section 546(b) of the Bankruptcy Code; and (iv) pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on all now owned or hereafter acquired interests of the Debtors in the (a) Lewis-Stuart Completion Operation Wells; (b) the Oil and Gas

---

[1] This Motion contains a summary only and is not intended to alter the actual terms of the DIP Credit Facility. To the extent there is a discrepancy between the terms in this Motion and the DIP Credit Facility, the DIP Credit Facility controls.

Properties associated with the Lewis-Stuart Completion Operations Wells, and (c) Personal Property.

- **DIP Budget**:  Proceeds of the DIP Credit Facility shall be used solely by the Debtors to fund (i) development activities with respect to the Oil and Gas Properties, (ii) payment of the Debtors' working capital and general business purposes, and (iii) payment of Transaction Costs, subject to the limits set forth in the Approved DIP Budget.  The Approved DIP Budget shall mean the budget, approved by Castlelake, setting forth on a weekly basis from the Closing Date through and including July 3, 2015 (i) receipts, (ii) expenditures, and (iii) a detailed list on a well-by-well basis of all capital expenditures to be made, including with respect to the Lewis-Stuart Completion Operation Wells.

- **Covenants**:  The DIP Credit Facility includes such covenants as are customary for debtor in possession financings.  In addition, the DIP Credit Facility requires the Debtors to meet the following milestones: (i) the Sale Motion shall have been filed with the Bankruptcy Court by no later than April 6, 2015; (ii) the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to Castlelake, approving bid procedures set forth in the Sale Motion or otherwise reasonably acceptable to Castlelake by no later than April 30, 2015; (iii) the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to Castlelake approving a Sale Transaction ("Approved Sale Transaction") by no later than August 15, 2015 (the "Sale Approval Date"); and (iv) the Approved Sale Transaction shall have been consummated by the 15th day after the Sale Approval Date.

- **Events of Default**:  The DIP Credit Facility shall include customary events of default for debtor in possession financings, including any Material Adverse Effect with respect to the business, operations or status of the Debtors.

- **Remedies Upon Default**:  Upon an Event of Default, and after five (5) business days' notice, Castlelake may exercise any or all of the rights and remedies provided by law or pursuant to the DIP Credit Facility, including the right to proceed against the Collateral and proceeds from any realization against any such Collateral.

15.    In addition, as a condition to obtaining the proposed financing, Castlelake has required and the Debtors have agreed to certain provisions that may be considered key provisions to be highlighted to the Court.  These provisions include the following:

- **Carve-Out**.  Each of the liens and claims, including the superpriority administrative expense claims granted to Castlelake in connection with the DIP Credit Facility shall be subject only to a carve-out ("Carve-Out") for the following: (a) all fees required to be paid pursuant to 28 U.S.C. § 1930, (b) in the event of the occurrence and during the continuance of an Event of Default under the DIP Credit Facility, the payment of allowed and unpaid estate professionals' fees and disbursements (collectively "Professional Fees") incurred after the first Business Day following delivery of a Carve-Out Trigger

Notice in an aggregate amount not in excess of the $250,000, and (c) all unpaid Professional Fees and operating expenses incurred or accrued in accordance with the DIP Budget prior to the first Business Day following delivery by Castlelake of a Carve-Out Trigger Notice, in each case to the extent allowed by the Bankruptcy Court.  The term "Carve-Out Trigger Notice" shall mean a written notice delivered by Castlelake to the Debtors, their counsel, the Official Creditors' Committee, its counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Credit Facility, expressly stating that the Carve-Out Cap is invoked.

- **Agreed Automatic Stay Order:**  The Debtors and Castlelake shall jointly file a motion or stipulation seeking the entry of an agreed automatic stay order, which shall provide that the automatic stay is lifted without further order of the Bankruptcy Court effective upon the earlier of (i) five business days following notice by Castlelake to the Debtors, USED, and the Official Committee of Unsecured Creditors in Chapter 11 Cases of the occurrence of an Event of Default, or (ii) September 1, 2015.

- **Cantor Fees and Expenses**:  The Debtors shall (a) reimburse Cantor for reasonable, and documented out-of-pocket expenses (including legal fees and expenses) incurred in connection with negotiation and documentation of the Initial DIP Credit Facility, (b) pay a "Break-Up Fee" to Cantor, each as determined by the Court.

- **Expense Reimbursement**:  The Debtors shall reimburse Castlelake for (i) all reasonable and documented out-of-pocket expenses incurred by Castlelake (including legal fees and expenses) in connection with the negotiation, preparation, execution, delivery and administration of the DIP Credit Facility and the other DIP Loan Documents (including any amendment, amendment and restatement, modification or waiver of the provisions hereof or thereof or any agreement or instrument contemplated hereby or thereby), the Final DIP Order (including any amendment, amendment and restatement, modification or waiver of the provisions hereof or thereof), the performance by the parties hereto of their respective obligations hereunder or thereunder and the consummation of the transactions contemplated hereby or thereby, which were incurred (x) on or prior to the Closing Date of up to $125,000, and (y) following the Closing Date of up to the amount set forth in the Approved DIP Budget for such fees and expenses, (ii) all reasonable and documented out-of-pocket expenses incurred by Castlelake in connection with the DIP Loan made hereunder (including, without limitation, all out-of-pocket expenses incurred in connection with the filing and recordation of all applicable DIP Security Documents and post-closing searches to confirm the proper recordation of such DIP Security Documents), (iii) all reasonable and documented out-of-pocket expenses incurred by Castlelake in connection with the enforcement or protection of its rights in connection with the DIP Credit Facility and the other DIP Loan Documents, and (iv) all reasonable and documented out-of-pocket expenses incurred by Castlelake in connection with any workout, restructuring or negotiation in respect of the DIP Credit Facility or DIP Loan Documents.

## IV.  Basis for Relief

16.     As described above, it is essential to the success of the Debtors' chapter 11 cases that the Debtors immediately obtain access to sufficient postpetition financing. The preservation of estate assets, the Debtors' continuing viability, and their ability to timely reorganize successfully under a plan of reorganization (or maximize values under a liquidating plan of reorganization), all depend heavily upon the approval of the DIP Facility and the related actions requested herein.

17.     Bankruptcy Code § 364 distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to Bankruptcy Code § 364(c), a court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing. Because the Debtors propose to obtain financing under the DIP Credit Facility that primes any liens that may exist on the Collateral, the approval of the DIP Credit Facility is governed by Bankruptcy Code §§ 364(c) and 364(d).

**A.  Financing Under Bankruptcy Code § 364(c)**

18.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both. Specifically, Section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (a)     with priority over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code;

(b)      secured by a lien on property of the estate that is not otherwise subject to a lien; or

(c)      secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

19.     Thus, pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit, and the proposed borrowing is in the best interests of its estate. *See, e.g., In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Simasko Production Co*., 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate); *see also* 3 Collier on Bankruptcy ¶ 364.03, at 364-7-18 (15th ed. rev.).

20.     The statutory requirement for obtaining postpetition credit under Bankruptcy Code § 364(c) is a finding, made after notice and hearing, that the debtor-in-possession is "unable to obtain unsecured credit allowable under § 503(b)(l) of [the Bankruptcy Code] as an administrative expense." *See Ames Dep't Stores*, 115 B.R. at 37-39 (a debtor must show that it has made a reasonable effort to seek other sources of financing under Bankruptcy Code §§ 364(a) and (b)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under Bankruptcy Code § 364(c) must prove that it was unable to obtain unsecured credit pursuant to Bankruptcy Code § 364(b)).

21.     Courts have articulated a three-part test to determine whether a debtor may obtain financing under Bankruptcy Code § 364(c):

- the debtor is unable to obtain unsecured credit solely under Bankruptcy Code § 364(b) (i.e., by granting a lender administrative expense priority);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere"); *Ames Dep't Stores*, 115 B.R. at 37-39.

22.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Bankruptcy Code § 364(c).  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Id.*; *see also Pearl-Phil GMT (Far East) Ltd v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtors could not obtain credit as an administrative expense).  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of Section

364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

23.      The Debtors attempted to secure financing on terms other than a secured superpriority basis, but given the Debtors' asset base and balance sheet, they were unable to do so.  The Debtors have been unable to obtain (a) unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense; (b) credit for money borrowed secured solely by a lien on property of the estate that is not otherwise subject to a lien; or (c) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien, in each case, on more favorable terms and conditions than those provided in the DIP Credit Facility.  In addition, the Debtors are unable to obtain credit for borrowed money without granting Castlelake superpriority liens.  The Debtors believe that the terms and conditions outlined in the DIP Credit Facility are reasonable and justified under the circumstances, in that this facility will enable the Debtors to have sufficient liquidity to continue with their operations and the plan process in a manner that will best serve all parties-in-interest herein.  The Court should therefore authorize the Debtors to provide Castlelake a superpriority administrative expense status for any obligations arising under the DIP Credit Agreement as provided for in Section 364(c)(1) of the Bankruptcy Code.

24.      The proposed DIP Credit Facility provides the Debtors and their estates with the most favorable financing available under the circumstances confronting the Debtors, and the Debtors' decision to enter into the DIP Credit Facility was the result of an intensive effort by the Debtors and their professionals to obtain the best terms available.  As a fully funded facility providing new money in the aggregate amount of $5,000,000, the DIP Credit Facility will provide the Debtors with the significant additional liquidity that they need.

25.     For these reasons, the Debtors submit that entry into the DIP Credit Facility is in the best interests of the Debtors' estates, is necessary to preserve the value of estate assets and is an exercise of the Debtors' sound and reasonable business judgment.

**B. Financing and Adequate Protection Under Bankruptcy Code § 364(d)(l)**

26.     In addition to authorizing financing under Section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lien holders, if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected. *See* 11 U.S.C. § 364(d)(1). The Debtors seek approval of the DIP Credit Facility under Bankruptcy Code § 364(d)(l). Specifically, pursuant to the DIP Credit Facility, Castlelake will receive perfected first priority, senior priming liens on all now owned or hereafter acquired interests of Debtors in the (i) Lewis-Stuart Completion Operation Wells, (ii) the Oil and Gas Properties associated with the Lewis-Stuart Completion Operations Wells, and (iii) Personal Property (the "Priming Lien Collateral"), to the extent that the Priming Lien Collateral is subject to any preexisting liens. The only alleged liens upon the Priming Lien Collateral that the Debtors are aware of are those held by Castlelake, and alleged liens claimed by USED and certain mineral liens in favor of vendors under Chapter 56 of the Texas Property Code ("Statutory Mineral Lienholders") (collectively, USED and the Statutory Mineral Lienholders shall be referred to herein as "Prepetition Secured Parties").[2]

27.     When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by Section 364(d) of the Bankruptcy Code, courts focus on whether

---

[2] The Debtors reserve all rights with respect to the validity, priority, and enforceability of the liens alleged by the Prepetition Secured Parties.

the transaction will enhance the value of the debtor's assets.  Courts consider a number of factors, including, without limitation:

- whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); and

- whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003); *In re Farmland Indus., Inc*., 294 B.R. 855, 862–79 (Bankr. W.D. Mo. 2003); *In re Lyondell Chem. Co*., No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); *Barbara K. Enters., Inc.*, 2008 WL 2439649, *10 (Bankr. S.D.N.Y. June 16, 2008); *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (16th ed. rev. 2012).  The DIP Credit Facility satisfies each of these factors.

28.  First, as described above, the Debtors and their advisors explored a variety of possible financing sources, and ultimately determined that Castlelake offered the best option for obtaining the postpetition financing the Debtors require.  The Debtors and Castlelake negotiated the DIP Credit Facility in good faith and at arms-length, and the DIP Credit Facility reflects the most favorable terms on which Castlelake was willing to offer financing.  Adequate debtor in possession financing, structured so as to minimize execution risk, was not available on other bases.

29.  Second, the Debtors need the funds to be provided under the DIP Credit Facility to preserve and enhance the value of their estates for the benefit of all creditors and other parties

in interest.    Absent the DIP Credit Facility, the Debtors will be unable to meet capital expenditure requirements, which could subject them to forfeiture of oil and gas leases and penalties under the JOA.    Providing the Debtors with the liquidity necessary to preserve and enhance their going concern value through the pendency of these Cases is in the best interest of all stakeholders.

30.    Third, upon approval, the DIP Credit Facility will provide access to approximately $5,000,000 in incremental liquidity, which the Debtors have determined is sufficient and, as discussed in greater detail below, necessary to allow the Debtors to maintain their operations notwithstanding the commencement of these Cases and to continue the approved capital projects that are critical to the Debtors' short term ability to generate increased cash flow, maintain and ultimately increase the value of their assets, and to their long term ability to reorganize.    Accordingly, the terms of the DIP Credit Facility are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these Cases.

**i.    Requirement under Bankruptcy Code § 364(d) of Providing Adequate Protection**

31.    A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.    *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.    *See, e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case . . . ."); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is

protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citations omitted)).

32.     The Prepetition Secured Parties are currently provided adequate protection for cash collateral use in accordance with the terms of the Interim Cash Collateral Orders.  The DIP Credit Facility will provide further adequate protection of the Prepetition Secured Parties' interests in the Priming Lien Collateral in several critical ways.  First, the DIP Credit Facility will provide funds for capital expenditures necessary to continue development of the oil and gas properties, which preserves leases and protects from the risk of lease forfeiture for non-development.  Second, this Court has found, on a preliminary basis, that as of the Petition Date, USED was the proper operator of the Debtors' oil and gas leases.  In such capacity, USED issued an Authorization for Expenditure ("AFE") to the Debtors, requiring the payment of approximately $4,500,000 for the development of the "Lewis-Stuart Wells."  Without the DIP Credit Facility, the Debtors will be unable to satisfy the AFE and other operating and overhead costs, which could result in the stay being lifted or these cases being dismissed.  If either should happen, the Debtors may be deemed a "Non-Consenting Party" under the JOA on account of the AFE.  This could subject the Debtors to loss of their working interests in the Lewis-Stuart Wells and/or non-consent penalties of 300% of unpaid costs.  The DIP Credit Facility provides adequate protection by allowing the Debtors to remain in chapter 11 protected by the automatic stay, thereby keeping their interests and avoiding treble damages.  Finally, the capital expenditures on the Lewis-Stuart Wells that will be facilitated by the DIP Credit Facility will create a net increase in asset value to the Debtors, which increase in value will serve to further adequately protect the Prepetition Secured Parties' interests in the assets.

**ii.  The DIP Facility is Necessary to Preserve the Assets of the Estates**

33.     It is essential that the Debtors obtain financing necessary to continue, among other things, the orderly operation of the Debtors' businesses and these cases, and to otherwise satisfy their working capital requirements.  As described above, the DIP Credit Facility will allow continued development of oil and gas leases, which protects from lease forfeiture and penalties under the JOA.  Without immediate access to new borrowing relief, the Debtors' business operations and these cases in general could be seriously jeopardized.  The new liquidity offered by the proposed DIP Credit Facility would ensure that the Debtors can maintain and ultimately increase the value of their assets and administer these cases through the bankruptcy process.  Thus, approval of the DIP Credit Facility is crucial to maximizing the value of the Debtors' estates.

### iii.  The Terms of the DIP Credit Facility Are Fair, Reasonable, and Appropriate

34.     The proposed DIP Credit Facility provides generally that the security interests and superpriority administrative expense claims granted to Castlelake are subject to the Carve-Out described above.  In *Ames Department Stores*, the bankruptcy court found that such "carve-outs" are not only reasonable but are necessary to insure that debtors' estates are adequately assisted by counsel and other professionals.  *Ames*, 115 B.R. at 40.

35.     Likewise, the Debtors believe that the expense reimbursement required by Castlelake under the DIP Credit Facility is reasonable and appropriate under the circumstances. The proposed reimbursement under the DIP Credit Facility is within the parameters of market fee structures for similar postpetition financing.  Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in Bankruptcy Code § 364.  *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) (approving a debtor-in-possession financing facility that included a lender "enhancement fee"); *In re Korea Chosun Daily Times, Inc.*, 337 B.R. 773, 783 (Bankr. E.D.N.Y. 2005) (postpetition financing

arrangements under 364 "may include the payment of a loan commitment fee and reimbursement of reasonable fees and expenses in the event that the financing arrangement is not consummated."); *In re Mayco Plastics Inc.*, 379 B.R. 691, 698-99 (Bankr. E.D. Mich. 2008) (Section 364 provides "certain incentives that a trustee or debtor in possession may offer, with court approval, to induce potential lenders to undertake the risks involved in providing post-petition financing to a bankruptcy estate….The greater the debtor's inability to obtain the necessary post-petition financing, the greater the inducements the debtor may offer to obtain such debt. Similarly, the greater the risk undertaken by the post-petition lender, the more heightened its need becomes to obtain the additional inducements that §§ 364(c) and (d) permit the Court to authorize a debtor to offer.").

### iv. Application of the Business Judgment Standard

36.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under the circumstances specified therein. Provided that an agreement to obtain secured credit does not undermine the policies underlying the Bankruptcy Code, courts grant a debtor considerable deference in the exercise of its sound business judgment in obtaining such credit. *See, e.g.*, *In re Ames Dept. Stores, Inc.*, 115 B.R. at 40 ("[C]ases consistently reflect that the court's discretion under Section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. at 881 (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment").

37.     Furthermore, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Credit Facility, the Court should consider the

economic terms of the DIP Credit Facility in light of current market conditions. The Court may appropriately take into consideration noneconomic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc*., the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

38.     As described above, after appropriate investigation and analysis, the Debtors' have concluded that the DIP Credit Facility provides the best alternative available under the circumstances of these chapter 11 cases. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility, and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of

administration of the estate, and threaten the court's ability to control a case impartially.");

*Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

39.     The Debtors have exercised sound business judgment in determining that a postpetition credit facility is appropriate and have satisfied the legal prerequisites to incur debt under the DIP Credit Facility.  Accordingly, the Court should grant the Debtors the authority to enter into any the DIP Credit Facility and any necessary ancillary loan documentation and obtain funds from Castlelake on the secured and administrative superpriority basis described above, pursuant to Bankruptcy Code § 364(c) and (d).

## C.  The Scope of the Carve-Out is Appropriate

40.     The proposed DIP Credit Facility subjects the security interests and administrative expense claims of Castlelake to the Carve-Out.  Such carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can obtain appropriate assistance from counsel and other professionals.  *See, e.g.*, *Ames*, 115 B.R. at 40; *In re United Retail*, Case No. 12-10405 (Bankr. S.D.N.Y. Feb. 1, 2012); *In re Eastman Kodak Co.*, Case No. 12-10202 (Bankr. S.D.N.Y. Jan. 19, 2012); *In re Gen. Maritime Corp.*, Case No. 11-15285 (Bankr. S.D.N.Y. Nov. 17, 2011).  The Carve-Out protects against administrative insolvency during the course of these Cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtors and the Creditors' Committee notwithstanding the grant of superpriority and administrative liens and claims under the DIP Credit Facility.

## D.  Castlelake Should Be Deemed a Good Faith Lender Under Section 364(e)

41.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its rights in any lien or security interest securing those

loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides as follows:

> The reversal or modification on appeal of an authorization under this Section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this Section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

42.     As explained in detail herein, the DIP Credit Facility is the result of the Debtors' reasonable and informed determination that Castlelake offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's length, good faith negotiations between and among the Debtors and Castlelake.  The terms and conditions of the DIP Credit Facility are fair and reasonable, and the proceeds of the DIP Credit Facility will be used only for purposes that are permissible under the Bankruptcy Code and pursuant to the DIP Budget.  Further, no consideration is being provided to any party to the DIP Credit Facility other than as described herein.  Accordingly, the Court should find that Castlelake is a "good faith" lender within the meaning of Section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that Section.

**E.  Request for Modification of the Automatic Stay**

43.     The DIP Credit Facility and the proposed Final Order contemplate that the automatic stay arising under Section 362 of the Bankruptcy Code shall be modified, upon the occurrence and during the continuation of any Event of Default (as such term is defined in the DIP Credit Facility), so that Castlelake shall be entitled to exercise its rights and remedies in accordance with the DIP Credit Facility and the Final Order and shall be permitted to satisfy all

DIP Obligations, subject to the Carve-Out and the terms of the Final Order.  However, the DIP Credit Facility and proposed Final Order require Castlelake to provide the Debtors with five (5) days' prior written notice before exercising any enforcement rights or remedies, which will entitle the Debtors to seek an emergency hearing with the Court for determination of whether, in fact, an Event of Default has occurred and is continuing.

44.     Stay modification provisions of this sort are ordinary features of postpetition financing arrangements, and, in the Debtors' business judgment, are reasonable under the circumstances.  *See, e.g.*, *In re MPF Holdings US LLC*, Case No. 08-36084 (Bankr. S.D. Tex. Feb. 18, 2009) (final order modifying automatic stay); *see also In re United Retail Grp., Inc*., Case No. 12-10405 (Bankr. S.D.N.Y. Feb. 22, 2012); *In re Sbarro, Inc*., Case No. 11-11527 (Bankr. S.D.N.Y. May 4, 2011); *In re MSR Resort Golf Course LLC*, Case No. 11-10372 (Bankr. S.D.N.Y. Jan. 25, 2012); *In re Great Atl. & Pac. Tea Co*., Case No. 10-24549 (Bankr. S.D.N.Y. Jan. 11, 2011); *In re InSight Health Servs. Holdings Corp*., Case No. 10-16564 (Bankr. S.D.N.Y. Jan. 4, 2011); *In re NR Liquidation III Co. (f/k/a Neff Corp.)*, Case No. 10-12610 (Bankr. June 30, 2010); *In re Lear Corp*., Case No. 09-14326 (Bankr. S.D.N.Y. Aug. 4, 2009); *In re Gen. Growth Props. Inc*., Case No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009); *In re Tronox Inc*., Case No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009); *In re Chemtura Corp*., Case No. 09-11233 (Bankr. S.D.N.Y. Apr. 23, 2009).

45.     The Debtors submit that, in the Debtors' business judgment, such provisions are reasonable under the present circumstances.  Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the DIP Credit Facility.

**F.  The Debtors Should Be Authorized to Use Cash Collateral on a Final Basis**

46.     Section 363(c)(2) of the Bankruptcy Code restricts a debtor's use of a secured creditor's cash collateral. Specifically, that provision provides, in pertinent part, as follows: The trustee may not use, sell, or lease cash collateral . . . unless—

> (A)  each entity that has an interest in such cash collateral consents; or

> (B)  the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this Section [363].

11 U.S.C. § 363(c)(2).

47.     Further, Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." *Id.* § 363(e).

48.     The Debtors satisfy the requirements of subsections (c)(2) and (e) of Section 363 of the Bankruptcy Code, and should be authorized to use the Collateral, including Cash Collateral, under the Lender Pre-Petition Loans.  First, Castlelake, in its capacity as lender under the Lender Pre-Petition Loans has consented to the use of the Collateral, including Cash Collateral, on the terms hereunder. Second, as described in the Cash Collateral Motion and provided for in the Interim Cash Collateral Order, the interests in the Collateral, including Cash Collateral, under the Lender Pre-Petition Loans are adequately protected in satisfaction of Section 363(e) of the Bankruptcy Code on account of the totality of the diminution in value of the Cash Collateral, if any, from and after the Petition Date in accordance with section 506(a) of the Bankruptcy Code arising from the imposition and enforcement of the automatic stay and the

Debtors' use or disposition of the Cash Collateral, as the case may be (each such diminution, a "Diminution in Value") as follows:

- Adequate Protection Liens.  To the extent of the aggregate Diminution of Value, if any, of its interests in the Collateral, including Cash Collateral, and subject to the Carve-Out, Castlelake shall have valid and perfected additional and replacement security interests in, and liens upon (the "Adequate Protection Liens"), all of the relevant Debtors' right, title and interest in, to, and under all of the Debtors' now owned and after-acquired property, cash, and Cash Collateral of the Debtors (whether maintained with the Prepetition Bank Lenders or other financial institutions), any investment of such cash and cash collateral, inventory, accounts receivable, any cause of action (excluding avoidance or other actions arising under chapter 5 of the Bankruptcy Code), and the proceeds thereof (whether recovered by judgment, settlement or otherwise), any right to payment whether arising before or after the Petition Date, and the proceeds, products, rents and profits of all of the foregoing, but only to the extent and priority that Castlelake had valid prepetition liens and security interests in such collateral as of the Petition Date that is not subject to defense, offset, avoidance or subordination (collectively, the "Adequate Protection Collateral"); and

- Adequate Protection Superpriority Claims.  To the extent of the aggregate Diminution of Value, if any, of its respective interests in the Collateral, including Cash Collateral, and subject to the Carve-Out, Castlelake is hereby granted, in addition to claims under section 503(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code in the relevant Debtor's chapter 11 case (collectively, the "Adequate Protection Superpriority Claims").

49.    The Adequate Protection Liens granted to Castlelake on account of Cash Collateral use shall be of the same relative priority as the liens and security interests which secured the Lender Pre-Petition Loans as of the Petition Date.

50.    Accordingly, the Court should authorize the Debtors to use the Cash Collateral under Section 363(c)(2) of the Bankruptcy Code.

## V.  Request for Waiver of Stay

51.    The Debtors further seek a waiver of any stay of the effectiveness of the order approving this motion.  Pursuant to Bankruptcy Rule 6004(h), "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the DIP Credit Facility

is essential to prevent irreparable damage to the Debtors' operations, value and ability to reorganize. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## VI.  CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Final Order attached hereto as **Exhibit B**; and (ii) grant such further relief to which the Debtors may be entitled.

Respectfully Submitted,

**BRACEWELL & GIULIANI LLP**

By: */s/ William A. (Trey) Wood III*
      William A. (Trey) Wood III
      Texas Bar No. 21916050
      Trey.Wood@bgllp.com
      Jason G. Cohen
      Texas Bar No. 24050435
      Jason.Cohen@bgllp.com
      711 Louisiana, Suite 2300
      Houston, Texas 77002
      Telephone: (713) 223-2300
      Facsimile: (713) 221-1212

**COUNSEL FOR THE DEBTORS AND DEBTORS IN POSSESSION**

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2015 a true and correct copy of the above and foregoing Motion has been served (i) electronically on the parties registered to receive notice through the court's ECF noticing system; and (ii) via electronic mail or facsimile where available, otherwise by regular U.S. mail, postage prepaid, on the parties listed in the attached Master Service List. Where served by regular U.S. mail, Exhibit A has been omitted and is available by request.

By: */s/ Jason G. Cohen*
      Jason G. Cohen

#4861601.1