

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: May 11, 2015.**

_____
**H. CHRISTOPHER MOTT**
**UNITED STATES BANKRUPTCY JUDGE**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

---

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **WBH Energy, LP,** | § | **Case No. 15-10003** |
| **WBH Energy Partners LLC** | § | |
| **WBH Energy GP, LLC** | § | **Chapter 11** |
| | § | |
| Debtors. | § | *Jointly Administered* |

---

**FINAL ORDER PURSUANT TO**
**11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507**
**(I) AUTHORIZING POSTPETITION FINANCING, (II) APPROVING USE OF CASH**
**COLLATERAL, (III) GRANTING ADEQUATE PROTECTION,**
**AND (IV) GRANTING RELATED RELIEF**

ON APRIL 20, 27 AND 28, 2015 AND MAY 8, 2015, CAME ON FOR

CONSIDERATION in the above captioned cases (the "Cases"), the Motion (the "DIP Motion")

of WBH Energy, LP ("WBH LP"), WBH Energy Partners, LLC ("WBH LLC"), and WBH

Energy GP, LLC ("Debtors"), pursuant to §§ 105, 361, 362, 363, 364, and 507 of title 11 of the

United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended the "Bankruptcy Code"), Rules 2002,

4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the

Local Rules for the Bankruptcy Court for the Western District of Texas, Austin Division (the "Local Rules"), seeking, among other things:

(i)  final authorization to use Cash Collateral;

(ii) authorization for the Debtors to obtain secured postpetition debtor in possession financing, on a superpriority administrative claim and first priority priming lien basis ("DIP Loan") from CL III Funding Holding Company, LLC ("Lender") pursuant to the terms and conditions set forth in that certain credit agreement attached hereto as Exhibit A (the "DIP Credit Facility") and, ultimately, to the terms and conditions of definitive documentation in form and substance satisfactory to Lender and otherwise consistent with the DIP Credit Facility (the "DIP Loan Documents");

(iii)  authorization for the Debtors to execute and deliver the DIP Loan Documents and to perform such other and further acts as may be required in furtherance of the DIP Credit Facility and the DIP Loan Documents;

(iv)  authorization for the Debtors to draw on the DIP Credit Facility in the amount of $5,000,000, subject to the conditions precedent set forth in the DIP Credit Facility, and to use proceeds of the DIP Credit Facility to pay for, among other things, capital expenditures, working capital and general corporate purposes of the Debtors and the administration of the Cases, but only in accordance with the then-current Approved DIP Budget ("Approved DIP Budget") (a copy of which is attached hereto as Exhibit B);

(v)  granting the DIP Credit Facility and all obligations arising thereunder (collectively, the "DIP Obligations") allowed superpriority administrative expense claim status in each of the Cases pursuant to 11 U.S.C. § 364(c)(1);

(vi)   granting to Lender automatically perfected first-priority security interests in and liens on all of the Collateral (as defined below) to secure all DIP Obligations pursuant to 11 U.S.C. §§ 364(c)(2) and 364(c)(3) and priming liens pursuant to § 364(d);

(vii)   allowing for, on a final basis, payment as an administrative expense pursuant to section 503(b)(1) of the Bankruptcy Code, with priority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, an Expense Reimbursement (as defined below) and a Break-Up Fee (as defined below) to Cantor Fitzgerald, Securities; and

(viii)   modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to provide Lender with the relief necessary to implement and effectuate the terms and provisions of the DIP Loan Documents.

NOW THEREFORE, BASED UPON THE RECORD ESTABLISHED AT THE HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A. **Cases**.   On January 4, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for relief under the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  As of the entry of this Final Order, this Court has not appointed a trustee or examiner.

B. **Jurisdiction and Venue**. This Court has jurisdiction over the DIP Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Debtors' chapter 11 cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(1).

C. **Prepetition Secured Debt.** Prior to the Petition Date, the Debtors entered into the following secured financing transactions:

- the Loan Agreement, dated October 17, 2013, between WBH Partners, WBH LP and WBH GP, as borrowers, and Green Bank, N.A., as lender, as amended by the Amended and Restated Loan Agreement (as amended, supplemented, and modified, the "Senior Pre-Petition Loan Agreement"), dated December 19, 2013, between WBH Partners, WBH LP and WBH GP, as borrowers, and Green Bank, N.A., as lender. On December 10, 2014, Green Bank, N.A. sold, transferred, assigned, granted, and conveyed to Castlelake the Senior Pre-Petition Loan Agreement and all indebtedness and obligations owing to Green Bank, N.A., along with all rights, benefits, remedies and privileges of Green Bank, N.A. As of January 4, 2015, the amount of $5,547,306.28 was outstanding pursuant to the terms of the Senior Pre-Petition Loan Agreement.

- the Credit Agreement (as amended, supplemented, and modified, the "Junior Pre-Petition Credit Agreement", and together with the Senior Pre-Petition Loan Agreement, the "Lender Pre-Petition Loans"), dated December 19, 2013, between WBH LP, as borrower, and Castlelake, as amended by First Amendment to Credit Agreement entered into as of December 31, 2013, between WBH LP, as borrower and Castlelake, as further amended by the Second Amendment to Credit Agreement, dated as of April 21, 2014, between WBH LP, as borrower and Castlelake. As of January 4, 2015, the amount of $28,901,217.37 outstanding under the Junior Pre-Petition Credit Agreement.

D. **Unsecured Credit Unavailable**. Since prior to the commencement of these Cases, the Debtors have been confronted with the significant challenge of securing funding to pay for the general expenses of the operation of their businesses, and specifically, to fund joint interest billings owed by WBH LP to complete particular wells to maximize value to the Debtors from such wells, as well as for the administration of their estates. The Debtors have been unable to obtain (a) unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, (b) credit for money borrowed secured solely by a lien on property of the estate that is not otherwise subject to a lien, or (c) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien, in each case, on more favorable terms and conditions than those provided in the DIP Credit Facility and this Final Order. The Debtors are

unable to obtain credit for borrowed money without granting to the Lender the DIP Liens (defined below). The DIP Credit Facility will ensure that the Debtors have the funds necessary to provide working capital and for general corporate purposes, subject to the Approved DIP Budget, including the funding of capital expenditures related to the completion of WBH LP's share of the six (6) Lewis Stuart wells, and to fund the fees, costs, and expenses of the Debtors' estates' professionals incurred prior to the termination of the DIP Credit Facility in the amounts set forth in the Approved DIP Budget, which amounts shall only be used by the Debtors to pay the allowed fees and expenses of estate professionals in accordance with the Approved DIP Budget.

E. **Sound Business Judgment.** The Debtors negotiated the DIP Credit Facility at arms' length and in accordance with their sound business judgment. The financing contemplated by the DIP Credit Facility benefits the Debtors' estates. With the credit provided under the DIP Credit Facility, the Debtors can preserve the enterprise value of the estates. Without the financing furnished by the DIP Credit Facility, the Debtors' efforts to reorganize or sell their assets will be jeopardized.

F. **Cash Collateral Use**. The Debtors require the use of the Cash Collateral of Castlelake and USED (to the extent the Court determines that USED has a valid lien) in order to continue their ordinary course business operations and to maintain the value of their bankruptcy estates.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and good and sufficient cause appearing therefore,

IT IS HEREBY ORDERED that:

#4889092.2

1.  <u>DIP Financing and Cash Collateral Use Approved</u>.   The DIP Motion is GRANTED in accordance with the terms of this Final Order.

2.  <u>Objections Overruled</u>.   All objections to the DIP Motion to the extent not withdrawn or resolved, and all reservations of rights included therein, are hereby overruled.

3.  <u>Cash Collateral Use</u>.   The Debtors are hereby authorized to use Cash Collateral in accordance with the terms and conditions in the DIP Budget.  In no event shall Debtors use Cash Collateral in amounts that deviate from the DIP Budget by more than 10% in the aggregate without the written consent of Castelake and USED, which consent shall not be unreasonably withheld.

4.  <u>Cash Collateral Adequate Protection</u>.  Castlelake is entitled, pursuant to section 361, 362, and 363(e) of the Bankruptcy Code, to adequate protection of its interests in the Collateral under the Lender Pre-Petition Loans on account of the totality of the diminution in value of the Collateral, if any, from and after the Petition Date in accordance with section 506(a) of the Bankruptcy Code arising from the imposition and enforcement of the automatic stay and the Debtors' use or disposition of the Cash Collateral, as the case may be (each such diminution, a "<u>Diminution in Value</u>").  Likewise, USED (to the extent the Court determines that USED has a valid lien)[1] is entitled, pursuant to section 361, 362, and 363(e) of the Bankruptcy Code, to adequate protection of its interests in the Cash Collateral, if any, from and after the Petition Date in accordance with section 506(a) of the Bankruptcy Code arising from a Diminution in Value. Castlelake and USED are hereby granted the following adequate protection (the "<u>Adequate Protection</u>") effective upon the Petition Date and without the necessity of the execution or filing

---

[1] All rights of the Debtors are reserved with respect to the extent, validity, and priority of any alleged liens held by USED upon any Debtor property.

by the Debtors or Castlelake or USED of mortgages, security agreements, pledge agreements, or

financing statements, or otherwise):

> Adequate Protection Liens.  To the extent of the aggregate Diminution of Value, if any, of (i) Castlelake's interests in the Collateral, including Cash Collateral, and (ii) USED's interests in the Cash Collateral, in all cases subject to the Carve-Out, Castlelake and USED shall have valid and perfected additional and replacement security interests in, and liens upon (the "Adequate Protection Liens"), the following (a) in the case of Castlelake, all of the relevant Debtors' right, title and interest in, to, and under all of the Debtors' now owned and after-acquired property, cash, and Cash Collateral of the Debtors (whether maintained with the Prepetition Bank Lenders or other financial institutions), and (b) in the case of USED, all of the relevant Debtors' right, title and interest in, to, and under all of the Debtors' now owned and after-acquired property,  cash, and Cash Collateral of the Debtors, and in the case of both Castlelake and USED, any investment of such cash and cash collateral, inventory, accounts receivable, any cause of action (excluding avoidance or other actions arising under chapter 5 of the Bankruptcy Code), and the proceeds thereof (whether recovered by judgment, settlement or otherwise), any right to payment whether arising before or after the Petition Date, and the proceeds, products, rents and profits of all of the foregoing, but only to the extent and priority that Castlelake and USED (as applicable) had valid prepetition liens and security interests in such collateral as of the Petition Date that is not subject to defense, offset, avoidance or subordination (collectively, the "Adequate Protection Collateral").  The Adequate Protection Liens shall be deemed to be valid and perfected without the need of Castlelake or USED to file anything in any public record or take any other action  required under state or federal law to perfect such liens;

> Adequate Protection Superpriority Claims.  To the extent of the aggregate Diminution of Value, if any, of Castlelake and USED's interests in the Collateral (including Cash Collateral) and Cash Collateral, respectively, and subject to the Carve-Out, Castlelake and USED are hereby granted, in addition to claims under section 503(b) of the Bankruptcy Code, allowed superpriority administrative expense claims pursuant to section 507(b) of the Bankruptcy Code in the relevant Debtor's chapter 11 case (collectively, the "Adequate Protection Superpriority Claims").

The Adequate Protection Liens granted to Castlelake on account of Collateral (including

Cash Collateral) use, and to USED on account of Cash Collateral use, shall be of the same

relative priority as the liens and security interests which Castlelake and USED held, as of the

Petition Date.

> 5.   Authorization of the DIP Credit Facility.    The Debtors are expressly and

immediately authorized to incur and to perform the DIP Obligations in accordance with, and

subject to, the terms of this Final Order and the DIP Credit Facility and to execute the DIP Loan Documents, which are expressly approved and incorporated herein by reference. The DIP Loan of $5,000,000 is hereby approved upon the terms and conditions set forth herein and in the DIP Credit Facility and DIP Loan Documents upon execution.  The DIP Obligations shall represent valid and binding obligations of the Debtors, enforceable against the Debtors and their estates in accordance with their terms.

6.    Authorization to Execute Documentation. The Debtors are hereby authorized to execute, enter into, and deliver the DIP Loan Documents and all instruments and documents which may be required or reasonably necessary for the performance by the Debtors under the DIP Credit Facility and the creation and perfection of the DIP Liens (as defined herein) as described in and provided for by this Final Order and the DIP Credit Facility.  Pending the execution of the DIP Loan Documents, the DIP Credit Facility and this Final Order shall evidence the validity and binding effect of the Debtors' DIP Obligations and shall govern the financial accommodations to be provided to the Debtors by Lender.

7.    Use of DIP Credit Facility Proceeds.  The Debtors shall use advances under the DIP Credit Facility only for the purposes specifically set forth in this Final Order, the DIP Credit Facility, and in compliance with the Approved DIP Budget. Notwithstanding anything to the contrary, in no event shall the proceeds of the DIP Credit Facility be used (a) for any purpose that is not permitted under this Final Order; and (b) in a manner not consistent with the Approved DIP Budget.

8.    Section 6.15 of the DIP Credit Facility is modified to read:

So long as any DIP Obligation remains outstanding, none of the Borrowers nor any Guarantor shall:

…

#4889092.2

6.15.   Compliance with Approved DIP Budget. Deviate from the Approved DIP Budget in excess of ten percent (10%) in the aggregate over any Variance Period, commencing with the Variance Period beginning on the Closing Date, *absent the written consent of the Lender, which consent shall not be unreasonably withheld.*

9.   Personal Property.   The definition of "Personal Property" in the DIP Credit Facility is modified such that "Personal Property" shall not include (i) avoidance and other actions arising under chapter 5 of the Bankruptcy Code, (ii) claims stemming from or related to commercial tort actions and conduct related thereto (excepting contract claims and claims stemming from or related to conduct related thereto), including but not limited to breach of fiduciary duty claims and all claims against officers and directors..

10. Superpriority Claims.  Pursuant to Section 364(c)(1) of the Bankruptcy Code, but subject to the Carve-Out (as defined below), all of the DIP Obligations shall constitute an allowed superpriority administrative expense claim against each of the Debtors (the "DIP Superpriority Claims") with priority over any and all administrative expense claims, adequate protection claims, diminution claims, and all other claims against the Debtors or their estates in the Cases, at any time existing or arising, of any kind or nature whatsoever, including without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 364(c), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code.  The DIP Superpriority Claims shall at all times be senior to the rights of the Debtors and their estates, any successor trustee or other estate representative and any creditor or other party in interest to the extent permitted by law.

11. DIP Liens.  As security for the DIP Obligations, effective and perfected upon the date of entry of this Final Order and without the necessity of the execution, recordation of filings

by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by Lender or its agents over any Collateral (as defined below), the following security interests and liens are hereby granted by the Debtors to Lender subject only to the Carve-Out (defined below):

(a) pursuant to section 364(c)(1) of the Bankruptcy Code, a perfected lien on all Collateral (as defined below) with priority over any or all administrative expenses of the kind specified in sections 503 (b) or 507 (b) of the Bankruptcy Code;

(b) pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected first-priority lien on all currently-owed or hereafter acquired assets and property, including without limitation all real and personal property, interests in oil, mineral, and gas leases, plant and equipment, rights to payment, accounts receivable and inventory, intellectual property, claims, and causes of action (but not claims and causes of action under chapter 5 of the Bankruptcy Code or similar non-bankruptcy law), and any proceeds thereof, and any rights to receive proceeds or distributions from any affiliates or subsidiaries of the Debtors, as well as all stock and other equity interests of subsidiaries of the Debtors, and any other property now owned or hereafter acquired (collectively, the "Collateral"), to the extent that such Collateral is not subject to valid, perfected, and non-avoidable liens as of the commencement of the Bankruptcy Cases. Without limiting the generality of the foregoing, the Collateral shall include a fully perfected security interest in all of the existing and after acquired real and personal, tangible and intangible, assets of Debtors, including without limitation, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, licensing agreements, securities (whether or not marketable), equipment, fixtures, leasehold interests and real property interest, franchise rights, patents, trademarks, tradenames, copyrights, intellectual property, general intangibles, investment property, commercial tort claims, and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds;

(c) pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected lien on all Collateral, subject only to valid, perfected and non-avoidable liens in favor of third parties and in existence as of the commencement of the Bankruptcy Cases, or to valid and non-avoidable liens in favor of third parties and in existence at the time of such commencement that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code; and

(d) pursuant to section 364(d) of the Bankruptcy Code, a senior secured perfected priming lien on all Collateral comprised of all now owned or hereafter acquired interests of Debtors in: (i) the Lewis-Stuart Completion Operation Wells, (ii) the Oil and Gas Properties associated with the Lewis-Stuart Completion Operations Wells, and (iii) Personal Property (as defined in the DIP Credit Facility), senior to any and all valid, perfected and non-avoidable liens in existence as of the commencement of the Bankruptcy Cases, or to valid and non-avoidable liens in favor of third parties and in existence at the time of such commencement that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code;

Lender shall not be required to marshal the Collateral, and shall be authorized to foreclose on and liquidate any of the Collateral as consistent with the DIP Credit Facility, the DIP Loan Documents, and applicable law, in any manner or order in the Lender's sole and absolute discretion.

12. <u>Perfection of DIP Liens.</u>  This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted to the Lender herein, including the DIP Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any action (including, for the avoidance of doubt, entering into any lockbox or deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the Lender to the priorities granted herein.  Notwithstanding the foregoing, the Lender is authorized to file, as it in its sole discretion deems necessary, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, notices, other documents, and approvals shall be deemed to have been filed or

recorded as of the Petition Date; *provided, however,* that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the Lender all such financing statements, mortgages, notices, and other documents as the Lender may reasonably request.  The Lender in its discretion may file a photocopy of this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument, and in such event the recording officer shall be authorized to file or record such copy of this Final Order.

13. <u>Limitation on Charging Expenses Against Collateral.</u>  Subject only to this Final Order, except to the extent of the Carve-Out (as defined below), no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law without the prior written consent of Lender.

14. <u>Carve-Out</u>.  Each of the liens and claims of the Lender, including superpriority administrative expense claims granted to the Lender in connection with the DIP Credit Facility under this Order, shall be subject only to a carve-out (the "<u>Carve-Out</u>") for the following: (a) the payment of allowed administrative expenses pursuant to 28 U.S.C. § 1930, (b) in the event of the occurrence and during the continuance of an event of default under the DIP Loan Documents, the payment of allowed and unpaid professional fees and disbursements incurred by the Debtors (including fees of Committee counsel) after the first business day following delivery of a Carve-Out Trigger Notice (as defined below) in an aggregate amount not in excess of $250,000 (the "<u>Carve-Out Cap</u>"), and (c) the payment of all unpaid professional fees and operating expenses

incurred or accrued in accordance with the Approved DIP Budget on and prior to the first business day following delivery by Lender of a Carve-Out Trigger Notice; provided, however, for each advance by the Lender under the DIP Credit Facility, the Carve-Out for professional fees shall be reduced (dollar for dollar) by the amount of legal and professional fees and expenses funded pursuant to the amounts set forth in the Approved DIP Budget for the week corresponding to such advance; provided, further that the Carve-Out shall continue to apply to funds advanced to the Debtors for purposes of paying professional fees under the Approved DIP Budget, but which have not yet been disbursed.  Nothing herein shall be construed to affect the amount of fees or expenses to which any party may otherwise be entitled, and provided further that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation described above.  The term "Carve-Out Trigger Notice" shall mean a written notice delivered by the Lender to the Debtors, their counsel, the Official Creditors' Committee, its counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an event of default under the DIP Loan Documents, expressly stating that the Carve-Out Cap is invoked.

15. In addition, notwithstanding anything to the contrary contained in this Final Order, and irrespective of existing retainers, in no event shall Lender be obligated to fund any budgeted expense, including any claim to surcharge the collateral under 11 U.S.C. § 506(c) and including legal or professional fees except at such time and in such amounts as are set forth in the Approved DIP Budget, provided that in no event shall Lender be obligated to fund any expense if doing so would, when combined with the amounts advanced by the Lender under the DIP Credit Facility, exceed the aggregate principal amount of the DIP Credit Facility.

16. In addition, notwithstanding anything to the contrary contained in this Final Order, Lender shall retain any and all of its rights to credit bid any and all amounts outstanding under the DIP Credit Facility in any sale of any of the Debtors' assets pursuant to section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, subject to any express restrictions set forth in the DIP Loan Documents.

17. <u>Maturity.</u>  The DIP Loan shall mature and be immediately due and payable in full, and the Lender shall have no further obligation to make advances under the DIP Credit Facility and the Debtors shall have no further use of the DIP Credit Facility or any funds previously advanced thereunder, upon the earliest to occur of the following events:

    (a) September 10, 2015;

    (b) The effective date of a Chapter 11 plan of reorganization that is confirmed pursuant to an order entered by the Bankruptcy Court;

    (c) the closing of any sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code; and

    (d) acceleration of the due date of the DIP Obligations on the basis of an Event of Default, as provided in Section 9.2 of the DIP Loan Documents.

18. <u>Events of Default</u>.  The Events of Default enumerated in Section 9.1 of the DIP Credit Facility shall be prospective from the execution date of the DIP Credit Facility only; no event in existence prior to the execution date of the DIP Credit Facility shall be the basis for an Event of Default.  Further, it shall not be an Event of Default under Section 9.1(n) for Debtor LLC to file a pleading or pleadings, as applicable, to preserve its rights with respect to the validity and priority of any lien rights securing Debtor LLC's accounts receivables in Adversary Proceeding 15-01010, 15-01078 and 15-01079 prior to the entry of an order approving the sale of Debtor LLC's accounts receivables to a third-party or termination of the automatic stay;

provided however, that Debtor LLC shall not take any action to collect any outstanding joint interest billing accounts receivable claims against Debtor LP or USED.

19. Claims Against USED.  Except as provided in the preceding paragraph, all claims of the Debtors against USED based on prepetition amounts outstanding under joint interest billings due from WBH LP to WBH LLC shall be abated until entry of the Sale Order or further order of this Court.  Nothing in this Order or any related order[2] entered on even date herewith, shall constitute a release of any claims against USED by any party.

20. Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Final Order.  The Lender has acted in good faith in connection with this Final Order and its reliance on this Final Order is good faith.  Based on the finding set forth in this Final Order and the record made during the hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Final Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, the Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such modification, amendment, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or any lien, claim or priority authorized or created hereby.  Any liens or claims granted to the Lender hereunder arising prior to the effective date of any such modification, amendment or vacatur of this Final Order shall be governed in all respects by the original provisions of this Final Order, and the Lender shall be entitled to all of the rights, remedies, privileges, and benefits granted herein.

---

[2] The related orders are the (i) Order Approving Bidding Procedures; Scheduling Bidding Deadline, Auction Date, and Sale Hearing Date; Approving Form and Notice Thereof; (ii) Stipulation and Agreed Order on (1) Motion for Relief from Automatic Stay to Foreclose on Collateral Owned by WBH Energy, LP and (2) Motion for Relief from Automatic Stay to Foreclose on Collateral Owned by WBH Energy Partners LLC Filed by CL III Funding Holding LLC (Castlelake);(iii) Agreed Order Withdrawing the Official Committee of Creditors' Motion for (I) Standing; (II) Leave to Intervene in Certain Pending Litigation; and (III) Leave to File Such Other Claims or Litigation, as May Be Necessary, on Behalf of Debtors' Estates.

21.  <u>Proofs of Claim.</u>  The Lender will not be required to file proofs of claims in any one of the Cases for any claim allowed herein in relation to the DIP Credit Facility. Notwithstanding any order entered by the Court in relation to the establishment of a bar date to the contrary, the Lender is hereby authorized and entitled, in its sole discretion, but not required to file (and amend and/or supplement, as it sees fit) a proof of claim in the Cases for any claim allowed herein in relation to the DIP Credit Facility.

22. <u>Notices</u>.  All notices required to be given by the Lender or USED to the Debtors under this Order or the DIP Documents shall be filed with the Court at substantially the same time given to the Debtors.  Upon the filing of a notice of an Event of Default, any party in interest may seek to challenge, by emergency motion, whether an Event of Default has occurred.

23. <u>Limitations on the DIP Credit Facility and the Collateral.</u>  The DIP Credit Facility and the Collateral may not be used in connection with (a) preventing, hindering, or delaying any of the Lender's enforcement or realization upon any of the Collateral once an Event of Default has occurred;  (b) selling or otherwise disposing of the Collateral without the prior written consent of the Lender, which consent shall not be unreasonably withheld; (c) using or seeking to use any insurance proceeds constituting Collateral without the prior written consent of the Lender; (d) incurring indebtedness without the prior written consent of the Lender; (e) objecting or challenging in any way any claims, liens, Collateral, as the case may be, held by or on behalf of the Lender; (f) asserting, commencing, or prosecuting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the Lender, or any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees; or (g) prosecuting an objection to, or contesting in any manner, or

raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, or any other rights or interests of the Lender.

24.    <u>Effect of Stipulations on Third Parties.</u>    Each stipulation, admission, and agreement contained in this Final Order and the DIP Loan Documents shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all claims, defenses, and causes of action against the Lender as of the date of entry of this Final Order.  Subject to the Challenge Period below, each stipulation, admission, and agreement contained in this Final Order and the DIP Loan Documents shall be binding upon all third parties for all purposes upon entry of this Final Order and expiration of the Challenge Period including Debtors' stipulation that (i) <u>Debtors are jointly and severally indebted to Castlelake under the Senior Pre-Petition Loan Agreement in the amount of $5,547,306.28, inclusive of interest through January 4, 2015; (ii) WBH LP is indebted to Castlelake under the Junior Pre-Petition Loan Agreement in the amount of $28,901,217.37, inclusive of interest through January 4, 2015; and (iii) </u>the Liens granted by Debtors to Castlelake under the Pre-petition Loan Documents are valid, enforceable and perfected, as to each Debtor, respectively.

25. <u>Challenge Period</u>.  June 8, 2015, shall be the deadline for any challenges to the validity and perfection of claims and liens of Lender with respect to the Lender Pre-Petition Loans and Lender Pre-Petition Loan Documents, except to the extent that any third party seeks to challenge the extent, or validity, of the liens under the Lender Pre-Petition Loan Documents in adversary proceeding 15-1010, 15-1078, or 15-1079.  Furthermore, the commencement of a suit or action by June 8, 2015, to challenge the validity and perfection of claims and liens of Lender

with respect to the Lender Pre-Petition Loans and Lender Pre-Petition Loan Documents shall not constitute a default under the DIP Documents.

26. <u>Priority</u>.   This Order does not adjudicate the priority of any liens upon Debtor property other than the priority of the lien under the DIP Loan, which priority is as provided herein.

27. <u>Modification of Automatic Stay.</u>   The automatic stay imposed under Section 362(a) of the Bankruptcy Code is hereby modified solely to the extent necessary to authorize the Debtors to pay, and Lender to retain and apply payments made, in accordance with the terms of this Final Order and the DIP Credit Facility.

28.   <u>No Third Party Rights.</u>  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

29.   <u>No Waiver by Failure to Seek Relief.</u>  The failure of the Lender or USED to seek relief or otherwise exercise its rights and remedies under this Final Order, the DIP Credit Facility, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

30.   <u>Binding Effect of Final Order.</u>  Immediately upon execution by this Court, the terms and provisions of this Final Order shall become valid and binding upon and inure to the benefit of the Debtors, the Lender, all other creditors of the Debtors, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Cases, or upon dismissal of the Cases.

31.   <u>No Modification of Final Order.</u> Until and unless the DIP Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or

provisions contained in the DIP Credit Facility which survive such discharge by their terms) and all commitments to extent credit under the DIP Credit Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not, without the Lender's prior written consent, seek or consent to, directly or indirectly: (a) any modification, stay, vacatur or amendment to this Final Order; (b) the granting of any priority claim or administrative expense against the Debtors (now existing of hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in Sections 503(b), 506(c), or 507(b) of the Bankruptcy Code) in any of the Cases, equal or superior to the DIP Superpriority Claim, (c) the entry of any order allowing use of cash collateral resulting from Collateral; or (d) the granting of any lien on any of the Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Credit Facility. The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Final Order without the Lender's prior written consent, and no such Lender consent shall be implied by any other action, inaction, or acquiescence of the Lender.

32. <u>Headings.</u> Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

33. <u>Survival.</u> The terms and provisions of this Final Order, including the claims, liens, security interests, and other protections granted to the Lender and USED pursuant to this Final Order and/or the DIP Credit Facility, notwithstanding the entry of any such order, shall continue in these Cases, or following dismissal or conversion of these Cases. The claims liens, security interests and other protections granted to Lender with respect to the DIP Credit Facility shall maintain their priority as provided by this Final Order until all the DIP Obligations, pursuant to the DIP Credit Facility and this Final Order, have been indefeasibly paid in full (such

payment being without prejudice to any terms or provisions contained in the DIP Credit Facility with survive such discharge by their terms), and all commitments to extend credit under the DIP Credit Facility are terminated.

34. <u>Order Controls</u>.  Unless this Order specifically provides otherwise, in the event of any conflict between the terms and provisions of this Order and the terms and provisions of any DIP Document, the terms and provisions of this Order shall govern.

35. <u>Bankruptcy Rule 7052.</u>  The Findings and Conclusions set forth in this Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

36. <u>Retention of Jurisdiction.</u>  The Court has and shall retain jurisdiction to enforce this Final Order according to its terms.

###

# EXHIBIT A

---

**SENIOR SECURED, SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**AMONG**

**WBH ENERGY, LP,
WBH ENERGY PARTNERS LLC
WBH ENERGY GP, LLC
AS THE BORROWERS AND DEBTORS-IN-POSSESSION**

**AND**

**CL III FUNDING HOLDING COMPANY, LLC
THE LENDER**

**May __, 2015**

**DEBTOR-IN-POSSESSION TERM LOAN
OF $5,000,000**

---

# TABLE OF CONTENTS

Page

ARTICLE I.  DEFINITIONS AND INTERPRETATION

| | | |
|---|---|---|
| 1.1 | Terms Defined Above | 1 |
| 1.2 | Additional Defined Terms | 1 |
| 1.3 | Undefined Financial Accounting Terms | 15 |
| 1.4 | References | 15 |
| 1.5 | Articles and Sections | 16 |
| 1.6 | Number and Gender | 16 |
| 1.7 | Incorporation of Schedules and Exhibits | 16 |
| 1.8 | Negotiated Transaction | 16 |

ARTICLE II.  TERMS OF FACILITY ........................ 16

| | | |
|---|---|---|
| 2.1 | Term Loan | 16 |
| 2.2 | Evidence of Indebtedness | 17 |
| 2.3 | Use of DIP Loan Proceeds | 17 |
| 2.4 | Advances | 17 |
| 2.5 | Interest Rate | 17 |
| 2.6 | Default Rate. | 17 |
| 2.7 | Interest Payment Dates | 18 |
| 2.8 | Repayment of DIP Loan and Interest | 18 |
| 2.9 | Taxes and Time, Place, and Method of Payments | 18 |
| 2.10 | **RESERVED** | 19 |
| 2.11 | Transaction Costs | 19 |
| 2.12 | Voluntary Prepayments | 20 |
| 2.13 | **RESERVED** | 21 |
| 2.14 | RESERVED | 21 |
| 2.15 | RESERVED | 21 |
| 2.16 | RESERVED | 21 |
| 2.17 | General Provisions Relating to Interest | 21 |
| 2.18 | RESERVED | 22 |
| 2.19 | RESERVED | 22 |
| 2.20 | RESERVED | 22 |
| 2.21 | Letters in Lieu of Transfer Orders or Division Orders | 22 |
| 2.22 | Power of Attorney | 22 |
| 2.23 | Security Interest in Accounts; Right of Offset | 22 |
| 2.24 | Joint and Several Liability | 23 |

ARTICLE III.  CONDITIONS ........................ 23

| | | |
|---|---|---|
| 3.1 | Conditions to Lender Obligations | 23 |
| 3.2 | Condition to the Borrowers and Guarantors Obligations | 24 |

ARTICLE IV.  REPRESENTATIONS AND WARRANTIES ........................ 24

- i -

#4887316.1

| 4.1 | Due Authorization | 24 |
|---|---|---|
| 4.2 | Existence | 25 |
| 4.3 | Valid and Binding Obligations | 25 |
| 4.4 | DIP Security Documents | 25 |
| 4.5 | Budget | 26 |
| 4.6 | No Default | 26 |
| 4.7 | No Material Misstatements | 26 |
| 4.8 | Compliance with Laws | 26 |
| 4.9 | ERISA | 26 |
| 4.10 | Environmental Laws | 26 |
| 4.11 | **RESERVED** | 26 |
| 4.12 | Investment Company Act | 26 |
| 4.13 | Proper Filing of Tax Returns; Payment of Taxes Due | 26 |
| 4.14 | Principal Location | 27 |
| 4.15 | Subsidiaries | 27 |
| 4.16 | Compliance with Anti-Terrorism Laws | 27 |
| 4.17 | Identification Numbers | 27 |

ARTICLE V.  AFFIRMATIVE COVENANTS ........................................................28

| 5.1 | Maintenance of and Access to Records; Delivery of Certain Information | 28 |
|---|---|---|
| 5.2 | Approved Budgets | 28 |
| 5.3 | Notices of Certain Events | 28 |
| 5.4 | Letters in Lieu of Transfer Orders or Division Orders | 29 |
| 5.5 | Joinder Agreements, Guaranties and Additional Security Documents | 29 |
| 5.6 | Additional Information | 29 |
| 5.7 | Compliance with Laws | 30 |
| 5.8 | Payment of Assessments and Charges | 30 |
| 5.9 | Maintenance of Existence or Qualification and Good Standing | 30 |
| 5.10 | Certain Milestones | 30 |
| 5.11 | Further Assurances | 31 |
| 5.12 | Initial Expenses of Lender | 31 |
| 5.13 | Subsequent Expenses of Lender | 31 |
| 5.14 | Operation of Oil and Gas Properties | 31 |
| 5.15 | Maintenance and Inspection of Properties | 31 |
| 5.16 | Maintenance of Insurance | 31 |
| 5.17 | Environmental Indemnification | 32 |
| 5.18 | General Indemnification | 33 |
| 5.19 | Evidence of Compliance with Anti-Terrorism Laws | 33 |
| 5.20 | Compliance Certificate | 33 |
| 5.21 | Operating Accounts and Control Agreements | 33 |
| 5.22 | Acknowledgement. | 33 |

ARTICLE VI.  NEGATIVE COVENANTS .........................................................34

| 6.1 | Indebtedness | 34 |
|---|---|---|

#4887316.1

| | | |
|---|---|---|
| 6.2 | Contingent Obligations | 34 |
| 6.3 | Liens, Etc | 34 |
| 6.4 | Sales of Assets | 34 |
| 6.5 | Leasebacks | 35 |
| 6.6 | Sale or Discount of Receivables | 35 |
| 6.7 | Loans or Advances | 35 |
| 6.8 | Investments | 35 |
| 6.9 | Dividends and Distributions | 35 |
| 6.10 | Issuance of Equity; Changes in Structure | 35 |
| 6.11 | Transactions with Affiliates | 36 |
| 6.12 | Lines of Business | 36 |
| 6.13 | Plan Obligation | 36 |
| 6.14 | Anti-Terrorism Laws | 36 |
| 6.15 | Compliance with Approved DIP Budget | 36 |
| 6.16 | Prepayments of Other Indebtedness | 36 |

**ARTICLE VII. PENDING AUTOMATIC STAY MOTIONS** .......................................36

| | | |
|---|---|---|
| 7.1 | Agreed Automatic Stay Order | 36 |
| 7.2 | Oil & Gas Property Credit Bid | 37 |
| 7.3 | Personal Property Credit Bid | 37 |
| 7.4 | Simultaneous Bids | 37 |

**ARTICLE VIII.  PENDING CONVERSION MOTIONS** ...........................................38

| | | |
|---|---|---|
| 8.1 | Withdrawal of Pending Conversion Motions | 38 |

**ARTICLE IX.  EVENTS OF DEFAULT** ...................................................................38

| | | |
|---|---|---|
| 9.1 | Enumeration of Events of Default | 38 |
| 9.2 | Remedies | 41 |

**ARTICLE X.  MISCELLANEOUS** ...........................................................................42

| | | |
|---|---|---|
| 10.1 | Assignments; Participations | 42 |
| 10.2 | Successors and Assigns | 42 |
| 10.3 | Survival of Representations, Warranties, and Covenants | 43 |
| 10.4 | Notices and Other Communications | 43 |
| 10.5 | Parties in Interest | 44 |
| 10.6 | Renewals; Extensions | 44 |
| 10.7 | Rights of Third Parties | 44 |
| 10.8 | No Waiver; Rights Cumulative | 44 |
| 10.9 | Survival Upon Unenforceability | 44 |
| 10.10 | Amendments; Waivers | 45 |
| 10.11 | Controlling Agreement | 45 |
| 10.12 | Disposition of Collateral | 45 |
| 10.13 | Governing Law | 45 |

10.14     Waiver of Right to Jury Trial...........................................................45
10.15     Waiver of Class Action...................................................................46
10.16     Jurisdiction and Venue ..................................................................46
10.17     Integration....................................................................................46
10.18     Waiver of Punitive and Consequential Damages ..........................46
10.19     Counterparts...................................................................................46
10.20     USA Patriot Act Notice .................................................................47
10.21     Tax Shelter Regulations.................................................................47
10.22     Commercially Reasonable Efforts.................................................47

## LIST OF SCHEDULES

Schedule 4.15     -     Subsidiaries
Schedule 4.17     -     Taxpayer Identification and Organization Numbers
Schedule 5.21     -     Depository Banks and Accounts

## LIST OF EXHIBITS

Exhibit A     -     Form of Note
Exhibit B     -     Form of Compliance Certificate
Exhibit C     -     Leases
Exhibit D     -     Agreed Automatic Stay Order
Exhibit E     -     Approved DIP Budget
Exhibit F     -     Form of Final DIP Order
Exhibit G     -     Form of DIP Security Agreement
Exhibit H     -     Form of DIP Deed of Trust, Security Agreement, Financing Statement and
                    Assignment of Production

#4887316.1

<u>CREDIT AGREEMENT</u>

This SENIOR SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT is executed as of the __ day of May, 2015, by and among WBH ENERGY, LP, a Texas limited partnership ("WBH LP"), WBH ENERGY PARTNERS LLC, a Texas limited liability company ("WBH Partners"), WBH ENERGY GP, LLC, a Texas limited liability company ("WBH GP," and WBH LP, WBH Partners and WBH GP, collectively, the "Borrowers"), each as the Debtor in Possession in, respectively, Cases 15-10003, 15-10004 and 15-10005 (the "Chapter 11 Cases") filed under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas, Austin Division (the "Bankruptcy Court"), and CL III Funding Holding Company, LLC ("Lender").

WHEREAS, the Borrowers have requested that the Lender provide a senior secured superpriority term credit facility in the aggregate principal amount of $[5,000,000.00]; and

WHEREAS, the Lender is willing to extend such credit to the Borrowers on the terms and subject to the conditions set forth herein.

<u>W I T N E S S E T H</u>:

In consideration of the mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

ARTICLE I.
<u>DEFINITIONS AND INTERPRETATION</u>

1.1    <u>Terms Defined Above</u>.  As used in this Credit Agreement, each of the terms "Bankruptcy Code," "Bankruptcy Court," "Borrowers," "Chapter 11 Cases," "Lender," "WBH GP," "WBH LP" and "WBH Partners" shall have the meaning assigned to such term hereinabove.

1.2    <u>Additional Defined Terms</u>.  As used in this Credit Agreement, each of the following terms shall have the meaning assigned thereto in this <u>Section 1.2</u> or in Sections referred to in this <u>Section 1.2</u>, unless the context otherwise requires:

"Additional Amounts" shall have the meaning set forth in <u>Section 2.9(a)</u> of this Agreement.

"Advances" mean the DIP Loaned funds by Lender to Borrowers as provided in <u>Section 2.4</u>.

"Affiliate" shall mean, as to any Person, any other Person directly or indirectly, controlling, or under common control with, such Person, and includes any "affiliate" of such Person within the meaning of Rule 12b-2 promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, with "control," as used in this definition, meaning possession, directly or indirectly, of the power to direct or cause the direction of management, policies or action through ownership of voting securities, contract,

voting trust, or membership in management or in the group appointing or electing management or otherwise through formal or informal arrangements or business relationships; provided, however, that in no event shall Lender be deemed an Affiliate of any of the Borrowers or any of the Guarantors.

"Agreed Automatic Stay Order" means the Bankruptcy Court order in the form attached hereto as Exhibit D agreed to by Borrowers and Lender modifying the automatic stay in the manner described in Article VII.

"Agreement" shall mean this Credit Agreement, as it may be amended, supplemented, restated or otherwise modified from time to time.

"Anti-Terrorism Laws" shall mean any laws relating to terrorism or money laundering, including Executive Order No. 13224 and the USA Patriot Act.

"Approved Bid Procedures" mean the bid procedures approved by the Bankruptcy Court in connection with the Sale Motion.

"Approved Bid Procedures Date" has the meaning specified in Section 5.10(b).

"Approved Sale Transaction" has the meaning specified in Section 5.10(c).

"Approved DIP Budget" shall mean the budget complying with the requirements of this Agreement, approved by Lender on the date of this Agreement, setting forth on a weekly basis from the Closing Date through and including July 3, 2015 (i) receipts, (ii) expenditures, and (iii) a detailed listing on a well-by-well basis of all capital expenditures to be made, including with respect to the Lewis-Stuart Completion Operation Wells, as such budget may be amended or modified with written consent of Lender.

"Approved Lewis-Stuart Completion AFE(s)" shall mean the authorization for expenditure for the Lewis-Stuart Completion Operations to be performed on the Lewis Stewart Completion Wells issued by USED subsequent to March 1, 2015 that are approved by Borrowers.

"Availability Termination Date" means September 10, 2015.

"Blocked Person" shall have the meaning assigned to such term in Section 4.16(b).

"Business Day" shall mean a day other than a Saturday, Sunday, legal holiday for commercial banks under the laws of the State of New York, or any other day when banking is suspended in the State of New York.

"Business Entity" shall mean a corporation, partnership, joint venture, limited liability company, joint stock association, business trust or other business entity.

"Carve-Out Amount" shall mean (i) all fees required to be paid pursuant to 28 U.S.C. § 1930, (ii) in the event of the occurrence and during the continuance of an Event of Default under the DIP Loan Documents, the payment of allowed and unpaid estate professionals' fees and

disbursements (collectively "Professional Fees") incurred after the first Business Day following delivery of a Carve-Out Trigger Notice (as defined below) in an aggregate amount not in excess of the Carve-Out Cap, and (iii) all unpaid Professional Fees and operating expenses incurred or accrued in accordance with the DIP Budget prior to the first Business Day following delivery by Lender of a Carve-Out Trigger Notice, in each case to the extent allowed by the Bankruptcy Court.

"Carve-Out Cap" shall mean Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00).

"Carve-Out Trigger Notice" shall mean a written notice delivered by the Lender to the Borrowers, their counsel, the Official Creditors' Committee, its counsel and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Loan Documents, expressly stating that the Carve-Out Cap is invoked.

"Cash" means money, currency or a credit balance in any demand or deposit account.

"Closing" shall mean the establishment of the Facility.

"Closing Date" shall mean the date on which all of the conditions in Article III have been satisfied.

"Collateral" shall mean all Property of Borrowers, including all Oil and Gas Properties and Personal Property, but excluding causes of action pursuant to Chapter 5 of the Bankruptcy Code.

"Commonly Controlled Entity" shall mean any Person which is under common control with any of the Borrowers within the meaning of Section 4001 of ERISA.

"Compliance Certificate" shall mean each certificate, substantially in the form attached hereto as Exhibit B, executed by a Responsible Officer of the relevant Borrower and furnished to Lender in accordance with Section 5.20.

"Contingent Obligation" shall mean, as to any Person, any obligation of such Person guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends, or other obligations of any other Person (for purposes of this definition, a "primary obligation") in any manner, whether directly or indirectly, including any obligation of such Person, regardless of whether such obligation is contingent, (a) to purchase any primary obligation or any Property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any primary obligation, or (ii) to maintain working or equity capital of any other Person in respect of any primary obligation, or otherwise to maintain the net worth or solvency of any other Person, (c) to purchase Property, securities or services primarily for the purpose of assuring the owner of any primary obligation of the ability of the Person primarily liable for such primary obligation to make payment thereof, or (d) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof, with the amount of any Contingent Obligation being deemed to be equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or

#4852354.4
#4887316.1

determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.

"Contract Rate" shall have the meaning set forth in Section 2.5 of this Agreement.

"Default" shall mean any event or occurrence which with the lapse of time or the giving of notice or both would become an Event of Default.

"Default Rate" shall mean a daily interest rate equal to the sum of (i) the Contract Rate plus (ii) two percent (2.00%) per annum calculated on the basis of a year of 365 or 366 days, as the case may be, but in no event shall the Default Rate exceed the Highest Lawful Rate.

"DIP Deeds of Trust" means, collectively, the WBH LP DIP Deed of Trust and the WBH Partners DIP Deed of Trust.

"DIP Loan" shall mean the $5,000,000.00 superpriority debtor-in-possession loan made by the Lender to or for the benefit of any or all of the Borrowers pursuant to this Agreement.

"DIP Loan Balance" shall mean, at any point in time, the aggregate outstanding principal balance of the DIP Loan.

"DIP Loan Documents" shall mean this Agreement, the Note, the DIP Security Documents, Escrow Agreement, Agreed Automatic Stay Order, any Joinder Agreements, any Guaranties and all other documents and instruments now or hereafter delivered pursuant to the terms of or in connection with this Agreement, the Note or the DIP Security Documents, and all renewals and extensions of, amendments and supplements to, and restatements of, any or all of the foregoing from time to time in effect.

"DIP Obligations" shall mean, without duplication of the same amount in more than one category, (a) all Indebtedness of the Borrowers under this Agreement and (b) all other obligations and liabilities of the Borrowers or any of them to the Lender, now existing or hereafter incurred, under, arising out of or in connection with any DIP Loan Document, and to the extent that any of the foregoing includes or refers to the payment of amounts deemed or constituting interest, only so much thereof as shall have accrued, been earned and which remains unpaid at each relevant time of determination.

"DIP Security Agreements" shall mean, collectively, the WBH LP DIP Security Agreement and the WBH Partners DIP Security Agreement.

"DIP Security Documents" shall include, but are not limited to, (i) the DIP Security Agreements, (ii) the DIP Deeds of Trust, (iii) any document or instrument required to perfect a security interest in the Collateral, (iv) any documents or instruments executed and delivered in satisfaction of the condition set forth in Article III, and (v) all other documents and instruments at any time executed as security for all or any portion of the DIP Obligations, as such instruments may be amended, supplemented, restated or otherwise modified from time to time.

"Dollars" and "$" shall mean dollars in lawful currency of the United States of America.

- 4 -

"Domestic Subsidiary" shall mean any Subsidiary of any of the Borrowers or any of the Guarantors that is organized under the laws of the United States of America or any state thereof or the District of Columbia.

"Environmental Complaint" shall mean any written or oral complaint, order, directive, claim, citation, notice of environmental report or investigation, or other notice by any Governmental Authority or any other Person with respect to (a) air emissions, (b) spills, releases, or discharges to soils, any improvements located thereon, surface water, groundwater, or the sewer, septic, waste treatment, storage, or disposal systems servicing any Property of any of the Borrowers or the Guarantors, (c) solid or liquid waste disposal, (d) the use, generation, storage, transportation, or disposal of any Hazardous Substance, or (e) other environmental, health or safety matters affecting any Property of either of the Borrowers or the business conducted thereon.

"Environmental Laws" shall mean (a) the following federal laws as they may be cited, referenced, and amended from time to time:  the Clean Air Act, the Clean Water Act, the Safe Drinking Water Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Endangered Species Act, the Resource Conservation and Recovery Act, the Hazardous Materials Transportation Act, the Occupational Safety and Health Act, the Oil Pollution Act, the Resource Conservation and Recovery Act, the Superfund Amendments and Reauthorization Act, and the Toxic Substances Control Act; (b) any and all equivalent environmental statutes of any state in which Property of any of the Borrowers or the Guarantors is situated, as they may be cited, referenced and amended from time to time; (c) any rules or regulations promulgated under or adopted pursuant to the above federal and state laws; and (d) any other equivalent federal, state, or local statute or any requirement, rule, regulation, code, ordinance, or order adopted pursuant thereto, including those relating to the generation, transportation, treatment, storage, recycling, disposal, handling, or release of Hazardous Substances.

"Equipment" has the meaning assigned to that term in the UCC and includes all surface or subsurface machinery, goods, equipment, fixtures, inventory, facilities, supplies or other personal or moveable property of whatsoever kind or nature (excluding property rented by Borrowers or taken to the premises for temporary uses) now owned or hereafter acquired (in whole or in part) by Borrowers which are now or hereafter located on or under any of the Lands attributable to the Properties which are used for the production, gathering, treatment, processing, storage or transportation of hydrocarbons and whether or not attributable to the Properties, including any of the above covered by the Pipeline Construction, Ownership and Operating Agreement, dated effective May 1, 2012, between  Montague Transfer Partners, LLC, WBH LP and Strategic Energy Income Fund I, LP (together with all accessions, additions and attachments to any thereof), including, without limitation, all Wells, casing, tubing, tubular goods, rods, pumping units and engines, Christmas trees, platforms, derricks, separators, compressors, gun barrels, flow lines, water injection lines, tanks, gas systems (for gathering, treating and compression), pipelines (including gathering lines, laterals and trunklines), chemicals, solutions, water systems (for treating, disposal and injection), power plants, poles, lines, transformers, starters and controllers, machine shops, tools, storage yards and equipment stored therein, telegraph, telephone and other communication systems, loading docks, loading racks, shipping facilities, platforms, well equipment, wellhead valves, meters, motors, pumps, tankage, regulators, furniture, fixtures, automotive equipment, forklifts, storage and handling equipment,

#4852354.4
#4887316.1

together with all additions and accessions thereto, all replacements and all accessories and parts therefor, all manuals, blueprints, documentation and processes, warranties and records in connection therewith including, without limitation, any and, to the extent permitted, all seismic data, geological data, geophysical data and interpretation of any of the foregoing, all rights against suppliers, warrantors, manufacturers, sellers or others in connection therewith, and together with all substitutes for any of the foregoing.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, and the regulations thereunder and interpretations thereof.

"Escrow Agreement" shall mean an agreement in a form acceptable to Lender pursuant to which funds advanced by Lender under this Agreement with respect to Borrowers' share of Approved Lewis-Stuart Completion AFEs are deposited and released on a weekly basis or as otherwise agreed upon, upon submission of invoices from USED.

"Event of Default" shall mean any of the events specified in Section 9.1.

"Excluded Taxes" shall mean, with respect to any and all payments to the Lender or any other recipient of any payment to be made by or on account of any DIP Obligation, net income taxes, branch profits taxes, franchise and excise taxes (to the extent imposed in lieu of net income taxes), and all interest, penalties and liabilities with respect thereto, imposed on Lender.

"Executive Order No. 13224" shall mean Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Facility" shall mean the credit facility extended to the Borrowers pursuant to this Agreement.

"Federal Funds Rate" shall mean, for any day, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve New York, New York, on the Business Day next succeeding such day, provided that (a) if the day for which such rate is to be determined is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if such rate is not so published for any day, the Federal Funds Rate for such day shall be the average rate charged to the Lender on such day on such transactions as determined by the Lender.

"Final DIP Order" shall mean the Bankruptcy Court order approving the DIP Loan and the DIP Loan Documents and approved by the Lender in the form attached hereto as Exhibit F or as modified in a manner acceptable to Lender in its sole discretion.

"Fiscal Quarter" means a period of approximately three consecutive months ending on the last day of March, June, September or December.

- 6 -

"GAAP" shall mean generally accepted accounting principles established by the Financial Accounting Standards Board or the American Institute of Certified Public Accountants and in effect in the United States from time to time.

"Governmental Authority" shall mean any nation, country, commonwealth, territory, government, state, county, parish, municipality, or other political subdivision and any entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to government.

"Guaranties" shall mean, collectively, those certain agreements, each styled "Guaranty", dated as of the Closing Date and executed by the Initial Guarantor in favor of the Lender, in form and substance acceptable to the Lender and those entered into after the Closing Date by newly formed Domestic Subsidiaries of any of the Borrowers or any of the Guarantors in favor of the Lender, in form and substance reasonably satisfactory to the Lender.

"Guarantors" shall mean collectively, the Initial Guarantor and any and all future Domestic Subsidiaries of any of the Borrowers or any of the Guarantors formed subsequent to the Closing Date.

"Hazardous Substances" shall mean flammables, explosives, radioactive materials, hazardous wastes, asbestos, or any material containing asbestos, polychlorinated biphenyls (PCBs), toxic substances or related materials, petroleum, petroleum products, associated oil or natural gas exploration, production, and development wastes, or any substances defined as "hazardous substances," "hazardous materials," "hazardous wastes," or "toxic substances" under the Comprehensive Environmental Response, Compensation and Liability Act, the Superfund Amendments and Reauthorization Act, the Hazardous Materials Transportation Act, the Resource Conservation and Recovery Act, the Toxic Substances Control Act, or any other Requirement of Law.

"Highest Lawful Rate" shall mean, as to Lender, the maximum non-usurious interest rate, if any (or, if the context so requires, an amount calculated at such rate), that at any time or from time to time may be contracted for, taken, reserved, charged, or received under laws applicable to Lender, as such laws are presently in effect or, to the extent allowed by applicable law, as such laws may hereafter be in effect and which allow a higher maximum non-usurious interest rate than such laws now allow.

"Indebtedness" shall mean, as to any Person, without duplication, (a) all liabilities (excluding capital, surplus, reserves for deferred income taxes, deferred compensation liabilities, other deferred liabilities and credits and asset retirement obligations) which in accordance with GAAP would be included in determining total liabilities as shown on the liability side of a balance sheet, (b) all obligations of such Person evidenced by bonds, debentures, promissory notes, or similar evidences of indebtedness, (c) all other indebtedness of such Person for borrowed money, and (d) all obligations of others, to the extent any such obligation is secured by a Lien on the assets of such Person (whether or not such Person has assumed or become liable for the obligation secured by such Lien) and (e) all direct or contingent obligations of such Person under letters of credit, banker's acceptances, surety bonds and similar instruments.

#4852354.4
#4887316.1

"Indemnified Taxes" shall mean Taxes other than Excluded Taxes.

"Indemnitee" shall have the meaning assigned to such term in Section 5.17.

"Initial Guarantor" shall mean Cooke Co. Resources, LLC, a Delaware limited liability company.

"Intellectual Property" shall mean patents, patent applications, trademarks, tradenames, copyrights, technology, know-how and processes.

"Investment" means, with respect to any Person:  (a) the acquisition of (or agreement to acquire) any equity interest, (b) the making of any advance, loan or other extension of credit to another Person, or (c) agreeing to guaranty, provide collateral or incur any other contingent obligation in respect of a debt of another Person.

"JOA" shall mean that certain Joint Operating Agreement, dated September 1, 2011, by and among WBH Energy Partners LLC, WBH Energy, LP and USED, as amended.

"Joinder Agreement" shall mean each agreement, in form and substance reasonably acceptable to the Lender, pursuant to which a Domestic Subsidiary of any of the Borrowers or any of the Guarantors makes certain representations and warranties to the Lender and agrees to be bound by the covenants in Article V and Article VI as if such were stated to be applicable to it and which agreement shall constitute a DIP Loan Document.

"Junior Pre-Petition Credit Agreement" has the meaning set forth in the definition of "Lender Pre-Petition Loan Documents".

"Knowledge" the actual knowledge of any of the following officers of the Borrowers, or any such officer's successor: (a) Joseph Warnock, (b) David Henderson or (c) Jacob Warnock.

"Lands" means all lands which are covered by the Leases, together with any easements and other real property rights and interests within three miles of the lands covered by the Leases, including lands covering pipelines, gathering lines, trunklines, laterals and tanks connected with the lands covered by the Leases, including Lands covered by the Pipeline Construction, Ownership and Operating Agreement, dated effective May 1, 2012, between  Montague Transfer Partners, LLC, WBH LP and Strategic Energy Income Fund I, LP and any extensions and amendments thereto, together with any other land now owned or later acquired.

"Lease" or "Leases" means (a) all oil and gas leases, property, mineral leases, mineral estates, including those certain oil, gas and/or mineral leases described in Exhibit C attached hereto (subject to any restrictions as to geographic extent or depth described in Exhibit C), and any other interests in the leases or any other lease of hydrocarbon property, whether now owned or hereafter acquired by Borrowers, in the leases covered thereby, and any extensions, renewals, corrections, modifications, elections or amendments (such as those relating to unitization) of any such lease or leases, (b) other oil and gas and/or mineral leases or other interests, whether now owned or later acquired or at any time, together with all extensions, renewals, replacements, corrections, modifications, elections or amendments to any of them.

- 8 -

"Lease Interests" means all rights, titles, interests and estates now or hereafter acquired by Borrowers in and to the Leases, including all working interests, overriding royalty interests, net profits interests, carried interests, reversionary interests, production payment or similar rights or interests in the Leases.

"Lender Pre-Petition Loan Documents" means, collectively, (i) the Loan Agreement, dated October 17, 2013, between WBH Partners, WBH LP and WBH GP, as Borrowers, and Green Bank, N.A., as Lender, as amended by the Amended and Restated Loan Agreement (as amended, supplemented, and modified, the "Senior Pre-Petition Loan Agreement"), dated December 19, 2013, between WBH Partners, WBH LP and WBH GP, as Borrowers, and Green Bank, N.A., as Lender, and the following documents executed and provided in connection therewith: (a) Revolving Note, dated October 17, 2013, in the original principal amount of $15,000,000; (b) Security Agreement, dated as of October 17, 2013, between WBH Partners, as debtor, and Green Bank, as secured party; (c) Security Agreement, dated as of October 17, 2013, between WBH LP, as debtor, and Green Bank, as secured party; (d) Security Agreement, dated as of October 17, 2013, between WBH GP, as debtor, and Green Bank, as secured party; (e) UCC Financing Statement filed on October 17, 2013 with the Texas Secretary of State, Initial Filing No. 13-0033097258; and (f) Amended, Restated and Supplemented Deed of Trust, Mortgage, Security Agreement, Assignment of Production and Financing Statement, dated as of December 19, 2013, from WBH LP to Geoffrey D. Greenwade, as Trustee for the benefit of Green Bank, N.A. as recorded in the Official Public Records of Cooke County, Texas at Doc. No. 2013-43724, Vol. 1910, Pg. 526, filed on December 26, 2013 and the Official Public Records of Montague County, Texas at Inst. No. 1313777, Vol. 728, Pg. 478, filed on December 26, 2013; and (ii) the Credit Agreement (as amended, supplemented, and modified, the "Junior Pre-Petition Credit Agreement"), dated December 19, 2013, between WBH LP, as Borrower, and Lender, as amended by First Amendment to Credit Agreement entered into as of December 31, 2013, between WBH LP, as Borrower and Lender, as further amended by the Second Amendment to Credit Agreement, dated as of April 21, 2014, between WBH LP, as Borrower and Lender, and the following documents executed and provided in connection therewith:  (a) Advancing Term Note, dated December 19, 2013, in the original principal amount of $31,500,000; (b) Security Agreement, dated as of December 19, 2013, between WBH Partners, as debtor, and Lender, as secured party; (c) Security Agreement, dated as of December 19, 2013, between WBH LP, as debtor, and Lender, as secured party; (d) Security Agreement, dated as of December 19, 2013, between WBH GP, as debtor, and Lender, as secured party; (e) UCC Financing Statement filed on December 31, 2013 with the Texas Secretary of State, Initial Filing No. 13-0040383274; (f) UCC Financing Statement filed on January 3, 2014 with the Texas Secretary of State, Initial Filing No. 14-0000880536; (g) UCC Financing Statement filed on January 2, 2014 with the Texas Secretary of State, Initial Filing No. 14-0000061901; and (h) Deed of Trust, Mortgage, Security Agreement, Assignment of Production and Financing Statement, dated as of December 19, 2013, from WBH LP to Holly C. Hamm, as Trustee for the benefit of Lender as recorded in the Official Public Records of Cooke County, Texas at Doc. No. 2013-43731, Vol. 1910, Pg. 622, filed on December 26, 2013 and the Official Public Records of Montague County, Texas at Inst. No. 1313778, Vol. 728, Pg. 554, filed on December 26, 2013.

"Lender Pre-Petition Loans" means, collectively, (i) as of January 4, 2015, the amount of $5,547,306.28 outstanding pursuant to the terms of the Senior Pre-Petition Loan Agreement, and (ii) as of January 4, 2015, the amount of $28,901,217.37 outstanding under the Junior Pre-

Petition Credit Agreement.  On December 10, 2014, Green Bank, N.A. sold, transferred, assigned, granted, and conveyed to Lender the Senior Pre-Petition Loan Agreement and all indebtedness and obligations owing to Green Bank, N.A., along with all rights, benefits, remedies and privileges of Green Bank, N.A.

"Lender Pre-Petition Loans Adequate Protection" means the adequate protection granted to Lender for and on account of cash collateral usage by Borrowers during the Chapter 11 Cases.

"Lewis-Stuart Completion Operations" means the completion operations to be performed with respect to the Lewis-Stuart Completion Operation Wells pursuant to Approved Lewis-Stuart Completion AFEs.

"Lewis-Stuart Completion Operation Wells" means the Lewis-Stuart B-1H Well, Lewis-Stuart B-2H Well, Lewis-Stuart E-1H Well, Lewis-Stuart E-2H Well, Lewis-Stuart F-3H Well and Lewis-Stuart F-4H Well

"Lien" shall mean any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of such Property, whether such interest is based on common law, statute, or contract, and including, but not limited to, the lien or security interest arising from a mortgage, ship mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt, or a lease, consignment, or bailment for security purposes (other than true leases or true consignments), liens of mechanics, materialmen, and artisans, maritime liens and reservations, exceptions, encroachments, easements, rights of way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting Property which secure an obligation owed to, or a claim by, a Person other than the owner of such Property (for the purpose of this Agreement, each of the Borrowers shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, financing lease, or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person for security purposes).

"Limitation Period" shall mean, with respect to Lender, any period while any amount remains owing under this Agreement and payable to Lender and interest on such amount, calculated at the applicable interest rate, plus any fees or other sums payable to Lender under any DIP Loan Document and deemed to be interest under applicable law, would exceed the amount of interest which would accrue at the Highest Lawful Rate.

"Loan Parties" shall mean each of the Borrowers and the Guarantors.

"Material Adverse Effect" shall mean (a) any material and adverse effect on the business, operations, assets, properties, liabilities (actual or contingent) or combined financial condition of the Borrowers, (b) any material and adverse effect upon the Collateral, including any material and adverse effect upon the value or impairment of ownership of the Collateral, (c) any material adverse effect on the validity or enforceability of any DIP Loan Document or (d) any material adverse effect on the rights or remedies of the Lender under any DIP Loan Document.

"Material Adverse Event" means a material adverse change in, or a material adverse effect on, (A) the operations, business, assets, properties or financial condition of any of the Borrowers or the Guarantors, taken as a whole; (B) the ability of any DIP Loan Party to perform

- 10 -

or pay any of the DIP Obligations under this Agreement or any of the other DIP Loan Documents.

"Maturity Date" shall mean the earliest of (a) September 10, 2015, (b) the effective date of a Chapter 11 plan of reorganization that is confirmed pursuant to an order entered by the Bankruptcy Court, (c) the closing of any sale of all or substantially all of the assets of any of the Borrowers pursuant to Section 363 of the Bankruptcy Code; and (d) acceleration of the due date of the DIP Obligations on the basis of an Event of Default, as provided in Section 9.2.

"Note" means a promissory note of the Borrowers payable to the Lender, in the form of Exhibit A hereto (as such promissory note may be amended, endorsed or otherwise modified from time to time), evidencing the aggregate Indebtedness of the Borrowers to the Lender resulting from the outstanding amount of the DIP Loan, and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"OFAC" shall mean the Office of Foreign Assets Control of the United States Department of the Treasury or any successor Governmental Authority.

"Oil and Gas Properties" shall mean the Lease Interests, Well Interests and Lands, together with contracts executed in connection therewith and all tenements, hereditaments, appurtenances and Properties appertaining, belonging, affixed or incidental thereto.

"Other Taxes" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any DIP Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any DIP Loan Document.

"Pending Automatic Stay Motions" means the Motion For Relief From the Automatic Stay to Foreclose on Collateral Owned by Debtor LLC and the Motion For Relief From the Automatic Stay to Foreclose on Collateral Owned by Debtor LP filed in the Chapter 11 Cases by Lender on February 11, 2014 under docket numbers 140 and 139.

"Pending Conversion Motions" means the Motion to Convert Bankruptcy Case of Debtor LLC to Chapter 7 and the Motion to Convert Bankruptcy Case of Debtor LP to Chapter 7 filed in the Chapter 11 Cases by Lender on February 11, 2014 under docket numbers 144 and 145.

"Permits" means all permits, licenses, registrations, certificates, orders, approvals, authorizations, consents, waivers, franchises, variances and similar rights issued by or obtained from any Governmental Authority or any other Person, including, without limitations, those relating to Environmental Laws.

"Person" shall mean an individual, Business Entity, trust, unincorporated organization, Governmental Authority or any other form of entity.

"Personal Property" means all personal property of every kind, whether now owned or later acquired, including all goods (including Equipment), documents, accounts, chattel paper (whether tangible or electronic), money, deposit accounts, letters of credit and letter-of-credit rights (without regard to whether the letter of credit is evidenced by a writing), documents,

- 11 -

securities and all other investment property, supporting obligations, any other contract rights (including all rights in transportation agreements, processing agreements, delivery agreements and seismic agreements related to the Properties and all rights relating to or arising under the Pipeline Construction, Ownership and Operating Agreement, dated effective May 1, 2012, between Montague Transfer Partners, LLC, WBH LP and Strategic Energy Income Fund I, LP ("Gathering System Agreement")), or rights to the payment of money, insurance claims and proceeds, all general intangibles (including all payment intangibles and rights to seismic and other geophysical data) and all Permits, licenses, books and records related to the Properties or the business of Borrowers as it relates to the Properties in any way whatsoever; provided, however, that "Personal Property" shall not include (i) documents, correspondence or other materials which the Borrowers reasonably believe are subject to the attorney-client privilege or another similar privilege, (ii) electronic mail domain names, accounts or electronic mail correspondence.

"PIK Interest" means interest on the DIP Loan automatically paid-in-kind by the Borrowers pursuant to this Agreement as of any date on which interest on the DIP Loan is due and payable as set forth in this Agreement by increasing the outstanding principal amount of the DIP Loan by the amount of such interest payment.

"Plan" shall mean, at any time, any employee benefit plan which is covered by Title IV of ERISA and in respect of which any of the Borrowers, any of the Guarantors or any Commonly Controlled Entity of any is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Pre-Petition Liens" shall mean any lien securing those certain claims set forth on Schedule D of the Schedules of Assets and Liabilities filed by the Borrowers in the Bankruptcy Court.

"Principal Office" shall mean the office of the Lender located at 4600 Wells Fargo Center, 90 South 7th Street, Minneapolis, MN 55402, or such other office as the Lender may designate in writing to the Borrowers from time to time.

"Projected Reserve Value" means, determined as of a contemplated date of a foreclosure sale of the Oil and Gas Properties, the net cash flow discounted to net present value by ten percent (10%) of estimated oil and gas production computed by a petroleum engineering firm in accordance with the Society of Petroleum Engineers and SEC standing taking into account (i) direct taxes, lease operating expenses, capital expenditures, abandonment costs (all of which shall take into account Borrowers or the current operator's actual expenses with respect to such costs), and (ii) the following pricing assumptions:

(a) for all natural gas to be sold by Borrowers, the purchase price will be based on the NYMEX Natural Gas forward price curve as of the applicable evaluation date, using price escalators or de-escalators existing in the market for the remaining life of the Properties.

(b) for crude oil to be sold by Borrowers, the purchase price will be based on the NYMEX Crude Oil forward price curve as of the applicable evaluation date, using price escalators or de-escalators existing in the market for the remaining life of the Properties.

#4852354.4
#4887316.1

(c)  all hydrocarbon pricing assumptions will be further adjusted (A) by appropriate quality, transportation and location differentials, and (B) to account for the historical basis differentials for each month during the preceding 12-month period calculated by comparing realized natural gas and crude oil prices to the average monthly benchmark spot prices (as quoted in Bloomberg) for natural gas and crude oil, provided that the benchmark prices set forth in this clause (c)(B) shall be based on the Henry Hub Natural Gas Spot Price (Bloomberg ticker: NGUSHHUB Index) and Bloomberg West Texas Intermediate Cushing Crude Oil Spot Price (Bloomberg ticker: USCRWTIC Index).

"Property" or "Properties" means (i) all real property of any kind or character owned by Borrowers, including the Oil and Gas Properties, and (ii) all Personal Property of Borrowers.  For purposes of this Agreement, Borrowers will be deemed to be the owners of any Property which they have acquired or hold subject to a conditional sale agreement, or lease under a financing lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person in a transaction intended to create a financing.

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System (or any successor).

"Regulatory Change" shall mean, with respect to Lender, the passage, adoption, institution or amendment of any federal, state, local or foreign Requirement of Law (including Regulation D), or any interpretation, directive or request (whether or not having the force of law) of any Governmental Authority or monetary authority charged with the enforcement, interpretation or administration thereof, occurring after the Closing Date and applying to a class of lenders including Lender or its lending office.

"Related Parties" with respect to any Person, means such Person's Affiliates and the directors, officers, employees, partners, agents, trustees, administrators, managers, advisors and representatives of such Person and its Affiliates.

"Release of Hazardous Substances" shall mean any emission, spill, release, disposal or discharge, except in accordance with a valid permit, license, certificate or approval of the relevant Governmental Authority, of any Hazardous Substance into or upon (a) the air, (b) soils or any improvements located thereon, (c) surface water or groundwater or (d) the sewer or septic system or the waste treatment, storage or disposal system servicing any Property of any of the Borrowers or the Guarantors.

"Required Notice" shall mean the applicable notice period set forth in Article VII.

"Requirement of Law" shall mean, as to any Person, the certificate or articles of incorporation and by-laws, the certificate or articles of organization and regulations, operating agreement or limited liability company agreement, the agreement of limited partnership, the partnership agreement or other organizational or governing documents of such Person, and any applicable law, treaty, ordinance, order, judgment, rule, decree, regulation or determination of an arbitrator, court or other Governmental Authority, including rules, regulations, orders and requirements for permits, licenses, registrations, approvals or authorizations, in each case as such

- 13 -

now exist or may be hereafter amended and are applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Responsible Officer" shall mean, as to any Business Entity, its Chief Executive Officer, its President, any Vice President, its Managing Member or any other Person duly authorized in accordance with the applicable organizational documents, bylaws, regulations or resolutions to act on behalf of such Business Entity.

"Sale Approval Date" has the meaning specified in Section 5.10(c) of this Agreement.

"Sale Motion" means a motion in form and substance reasonably acceptable to Lender providing for, among other things, the approval of bid procedures reasonably acceptable to Lender with respect to the Sale Transaction and the credit bid by Lender with respect to the DIP Loan and the Lender Pre-Petition Loans, in amounts to be determined (subject to Sections 5.10(b) and 5.10(c)).

"Sale Transaction" means a sale of all or substantially all of the Borrowers' assets pursuant to a stalking horse credit bid made by Lender, subject to higher and better offers, or any other sale of all or substantially all of the Borrowers' assets reasonably acceptable to the Lender so long as such sale was conducted in compliance with the Approved Bid Procedures.

"Senior Pre-Petition Loan Agreement" has the meaning set forth in the definition of "Lender Pre-Petition Loan Documents".

"Subsidiary" shall mean, as to any Person, any Business Entity of which shares of stock or other equity interests having ordinary voting power (other than stock or other equity interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other governing body or other managers of such Business Entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.

"Superfund Site" shall mean those sites listed on the Environmental Protection Agency National Priority List and eligible for remedial action or any comparable state registry or list in any state of the United States.

"Taxes" shall mean any and all present or future taxes, levies, imposts, duties, fees, deductions, charges or withholdings imposed by any Governmental Authority.

"Transaction Costs" shall mean those certain fees and expenses set forth in Section 2.11.

"Transferee" shall mean any Person to which Lender has sold, assigned, transferred or granted a participation in any of the DIP Obligations, as authorized pursuant to the provisions of Section 10.1, and any Person acquiring, by purchase, assignment, transfer or participation, from any such purchaser, assignee, transferee or participant, any part of such DIP Obligations.

"UCC" shall mean the Uniform Commercial Code as from time to time in effect in the State of New York.

"USA Patriot Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001), as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"USED" means U.S. Energy Development Corporation.

"Variance Period" shall mean a period of four (4) consecutive calendar weeks.

"WBH LP DIP Deed of Trust" means the Deed of Trust, Security Agreement, Financing Statement and Assignment of Production from WBH LP as grantor to Holly C. Hamm as trustee for Lender for the benefit of Lender, as amended, supplemented or otherwise modified from time to time in the form of Exhibit H encumbering, among other things, all Oil and Gas Properties of WBH LP, with all blanks in such form completed appropriately.

"WBH LP DIP Security Agreement" means the Security Agreement executed by WBH LP substantially in the form attached hereto as Exhibit G encumbering all Personal Property of WBH LP, with all blanks in such form completed appropriately.

"WBH Partners DIP Deed of Trust" means the Deed of Trust, Security Agreement, Financing Statement and Assignment of Production from WBH Partners as grantor to Holly C. Hamm as trustee for Lender for the benefit of Lender, as amended, supplemented or otherwise modified from time to time in the form of Exhibit H encumbering, among other things, all Oil and Gas Properties of WBH Partners, with all blanks in such form completed appropriately.

"WBH Partners DIP Security Agreement" means the Security Agreement executed by WBH Partners substantially in the form attached hereto as Exhibit G encumbering all Personal Property of WBH Partners, with all blanks in such form completed appropriately.

"Well" means any existing hydrocarbon well, salt water disposal well, injection well, water supply well or any other well located on or related to the Oil and Gas Properties, including the Wells listed on Exhibit C, together with any Well which may hereafter be drilled and/or completed on any of the Oil and Gas Properties, or any facility or equipment in addition to or replacement of any Well.

"Well Interests" means all right, title, interest and estates now or hereafter acquired by Borrowers in and to the Wells, including all working interests, overriding royalty interests, net profits interests, carried interests, reversionary interests, production payments or similar rights or interests in the Wells.

1.3     Undefined Financial Accounting Terms.  Financial accounting terms used in this Agreement without definition are used herein with the respective meanings assigned thereto in accordance with GAAP at the time in effect.

1.4     References.  References in this Agreement to Schedule, Exhibit, Article or Section numbers shall be to Schedules, Exhibits, Articles or Sections of this Agreement, unless expressly stated to the contrary.  References in this Agreement to "hereby," "herein," "hereinafter," "hereinabove," "hereinbelow," "hereof," "hereunder" and words of similar import shall be to this Agreement in its entirety and not only to the particular Schedule, Exhibit, Article,

- 15 -

or Section in which such reference appears.  Specific enumeration herein shall not exclude the general and, in such regard, the terms "includes" and "including" used herein shall mean "includes, without limitation," or "including, without limitation," as the case may be, where appropriate.  Except as otherwise indicated, references in this Agreement to statutes, sections, or regulations are to be construed as including all statutory or regulatory provisions consolidating, amending, replacing, succeeding, or supplementing the statute, section, or regulation referred to. References in this Agreement to "writing" include printing, typing, lithography, facsimile reproduction, and other means of reproducing words in a tangible visible form.  References in this Agreement to agreements and other contractual instruments shall be deemed to include all exhibits and appendices attached thereto and all subsequent amendments and other modifications to such instruments, but only to the extent such amendments and other modifications are not prohibited by the terms of this Agreement.  References in this Agreement to Persons include their respective successors and permitted assigns.

     1.5    <u>Articles and Sections</u>.  This Agreement, for convenience only, has been divided into Articles and Sections; and it is understood that the rights and other legal relations of the parties hereto shall be determined from this instrument as an entirety and without regard to the aforesaid division into Articles and Sections and without regard to headings prefixed to such Articles or Sections.

     1.6    <u>Number and Gender</u>.  Whenever the context requires, reference herein made to the single number shall be understood to include the plural; and likewise, the plural shall be understood to include the singular.  Definitions of terms defined in the singular or plural shall be equally applicable to the plural or singular, as the case may be, unless otherwise indicated. Words denoting sex shall be construed to include the masculine, feminine and neuter, when such construction is appropriate; and specific enumeration shall not exclude the general but shall be construed as cumulative.

     1.7    <u>Incorporation of Schedules and Exhibits</u>.  The Schedules and Exhibits attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for all purposes.

     1.8    <u>Negotiated Transaction</u>.  Each party to this Agreement affirms to the others that it has had the opportunity to consult, and discuss the provisions of this Agreement with, independent counsel and fully understands the legal effect of each provision.

ARTICLE II.<br><u>TERMS OF FACILITY</u>

     2.1    <u>Term Loan</u>.  Subject to the terms and conditions and relying upon the representations and warranties herein set forth, Lender agrees to make loans to Borrowers ("<u>DIP Loan</u>") upon Borrowers' request from time to time during the period from the Closing Date to the Availability Termination Date, not to exceed an aggregate total of up to Five Million Five and 00/100 Dollars ($5,000,000), exclusive of PIK Interest that accrues as and to the extent provided in this Agreement.

#4852354.4
#4887316.1

2.2    <u>Evidence of Indebtedness</u>.  The obligations of Borrowers to repay to Lender the aggregate amount of the DIP Loan made by Lender shall be evidenced by a single advancing term promissory note made by Borrowers payable to the order of Lender in the form of Exhibit A, with appropriate insertions.  The amount of principal owing on the Note at any given time shall be the aggregate amount of all Advances made by Lender under this Agreement, plus, the aggregate amount of all PIK Interest added to the principal amount of the DIP Loan to the extent provided in <u>Section 2.7(b)</u>.  Lender shall maintain in accordance with customary industry practice accounts (which it shall make available (or provide a copy of) to Borrowers upon Borrowers' request) in which it shall record (i) the amount of each Advance made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from Borrowers to Lender hereunder, and (iii) the amount of any sum received by Lender.  The entries made in the accounts maintained pursuant to the foregoing shall be prima facie evidence of the existence and amounts of the DIP Obligations recorded therein (absent manifest error); provided that the failure of Lender to maintain such accounts or any error therein shall not in any manner affect the DIP Obligation of Borrowers to repay the DIP Loan in accordance with the terms of this Agreement.

2.3    <u>Use of DIP Loan Proceeds</u>.  Proceeds of the DIP Loan shall be used solely by the Borrowers to fund (i) development activities with respect to the Oil and Gas Properties inclusive of Approved Lewis-Stuart Completion AFEs, (ii) payment of Borrowers' working capital and general business purposes, and (iii) payment of Transaction Costs.  The usages set forth above are in each case subject to the limits set forth in the Approved DIP Budget, the Final DIP Order and any prohibitions contained in this Agreement.  In addition, proceeds of the DIP Loan may not be used to purchase or carry, directly or indirectly, any margin stock or for any other purpose which would constitute the Facility as a "purpose credit" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System.

2.4    <u>Advances</u>.  Subject to the satisfaction of the terms and conditions as set forth herein, Borrowers can request Advances through the Availability Termination Date.  To request an Advance, Borrowers shall deliver an advance request to Lender by 12:00 p.m., Minnesota, Minneapolis time at least five (5) Business Days prior to the date on which the Advance, if approved, is to be made.  Each advance request will include invoices or other supporting documentation reasonably requested by Lender to support the amount to be paid out and in compliance of the requirements within the Approved DIP Budget and Final DIP Order, which supporting documentation may include, for the avoidance of doubt, a demand for advance payment from USED in accordance with the JOA.

2.5    <u>Interest Rate</u>.  The unpaid principal balance of the DIP Loan (including the aggregate amount of all PIK Interest that has been added to the principal amount of the DIP Loan pursuant to <u>Section 2.7(b)</u>) as reduced by any prepayments will bear interest at an annual rate equal to five percent (5%) per annum compounded quarterly based on a year of 365 or 366 days, as the case may be (the "<u>Contract Rate</u>").

2.6    <u>Default Rate</u>.  If any amount payable by Borrower under this Agreement is not paid when due, such amount shall, until such amount is paid, thereafter bear interest at the Default Rate.

- 17 -

    2.7    <u>Interest Payment Dates</u>.  Interest accrued on the DIP Loan shall be due and payable by the Borrower as follows:

    (a)  in the form of Cash on the Maturity Date with respect to the period beginning on the most recent interest payment date occurring prior to the Maturity Date and ending on the Maturity Date;

    (b)  in the form of PIK Interest (and not Cash) on the first Business Day of each Fiscal Quarter subsequent to the Closing Date until (but not including) the Maturity Date, and on each such day the outstanding principal amount of the DIP Loan will be automatically increased by the amount of such PIK Interest without the further act of any party hereto; and

    (c)  on that portion of the DIP Loan that is accelerated pursuant to <u>Section 9.2(a)</u> in the form of Cash immediately upon such acceleration.

    2.8    <u>Repayment of DIP Loan and Interest</u>.  The DIP Loan Balance, together with the aggregate amount of all PIK Interest that has been added to the principal amount of the DIP Loan pursuant to <u>Section 2.7(b)</u>, shall be due and payable on the Maturity Date.

    2.9    <u>Taxes and Time, Place, and Method of Payments</u>.  (a)  All payments required pursuant to this Agreement shall be made without set-off or counterclaim in Dollars and in immediately available funds free and clear of, and without deduction for, any Indemnified Taxes or Other Taxes; provided, however that if any of the Borrowers shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased by the amount (the "<u>Additional Amount</u>") necessary so that after making all required deductions (including deductions applicable to additional sums described in this paragraph) the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the relevant Borrower shall make such deductions and (iii) the relevant Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.  In addition, to the extent not paid in accordance with the preceding sentence, the Borrowers shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

    (b)  **EACH OF THE BORROWERS SHALL INDEMNIFY THE LENDER FOR INDEMNIFIED TAXES AND OTHER TAXES PAID BY SUCH PERSON, INCLUDING ANY INDEMNIFIED TAXES OR OTHER TAXES ARISING FROM THE NEGLIGENCE, WHETHER SOLE OR CONCURRENT, OF THE LENDER; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT NONE OF THE BORROWERS SHALL BE OBLIGATED TO MAKE PAYMENT TO THE LENDER IN RESPECT OF PENALTIES, INTEREST AND OTHER SIMILAR LIABILITIES ATTRIBUTABLE TO SUCH INDEMNIFIED TAXES OR OTHER TAXES IF SUCH PENALTIES, INTEREST OR OTHER SIMILAR LIABILITIES ARE ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PERSON SEEKING INDEMNIFICATION.**

    (c)  If Lender shall become aware that it is entitled to claim a refund from a Governmental Authority in respect of Indemnified Taxes or Other Taxes paid by any of the Borrowers pursuant to this <u>Section 2.8</u>, including Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrowers, or with respect to which any of the Borrowers has paid Additional Amounts pursuant to the DIP Loan Documents, it shall promptly notify the relevant

Borrower of the availability of such refund claim and, if the Lender determines in good faith that making a claim for refund will not have an adverse effect to its taxes or business operations, shall, within ten days after receipt of a request by the relevant Borrower, make a claim to such Governmental Authority for such refund at the expense of the relevant Borrower.  If Lender receives a refund in respect of any Indemnified Taxes or Other Taxes paid by any of the Borrowers pursuant to the DIP Loan Documents, it shall within 30 days from the date of such receipt pay over such refund to the relevant Borrower (but only to the extent of Indemnified Taxes or Other Taxes paid pursuant to the DIP Loan Documents, including indemnity payments made or Additional Amounts paid, by such Borrower under this Section 2.8 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out of pocket expenses of Lender and without interest (other than interest paid by the relevant Governmental Authority with respect to such refund).

(d)  If Lender is or becomes eligible under any applicable law, regulation, treaty or other rule to a reduced rate of taxation, or a complete exemption from withholding, with respect to Indemnified Taxes or Other Taxes on payments made to it or for its benefit by any of the Borrowers, Lender  shall, upon the request, and at the cost and expense, of the relevant Borrower, complete and deliver from time to time any certificate, form or other document requested by the relevant Borrower, the completion and delivery of which are a precondition to obtaining the benefit of such reduced rate or exemption, provided that the taking of such action by Lender  would not, in the judgment of Lender  be disadvantageous or prejudicial to Lender, or inconsistent with its internal policies or legal or regulatory restrictions.  For any period with respect to which Lender  has failed to provide any such certificate, form or other document requested by any of the Borrowers, Lender shall not be entitled to any payment under this Section 2.8 in respect of any Indemnified Taxes or Other Taxes that would not have been imposed but for such failure.

(e)  All payments by any of the Borrowers shall be deemed received on (i) receipt or (ii) the next Business Day following receipt if such receipt is after 3:00 p.m., Central Standard Time or Central Daylight Savings Time, as the case may be, on any Business Day, and shall be made to the Lender at the Principal Office.  Except as provided to the contrary herein, if the due date of any payment hereunder would otherwise fall on a day which is not a Business Day, such date shall be extended to the next succeeding Business Day, and interest shall be payable for any principal so extended for the period of such extension.

2.10  **RESERVED**.

2.11  Transaction Costs.

(a)  Cantor Fitzgerald Securities' Fees and Expenses.  The Borrowers shall (a) reimburse Cantor Fitzgerald Securities for reasonable and documented out-of-pocket expenses (including legal fees and expenses) incurred in connection with negotiation and documentation of a potential debtor-in-possession term loan, (b) pay a "Break-Up Fee" to Cantor Fitzgerald Securities, each as determined by the bankruptcy court.

(b)  Reimbursement of Lender's Out-of-Pocket Expenses.  The Borrowers shall reimburse the Lender for (i) all reasonable and documented out-of-pocket expenses incurred by

- 19 -

the Lender (including legal fees and expenses) in connection with the negotiation, preparation, execution, delivery and administration of this Agreement and the other DIP Loan Documents (including any amendment, amendment and restatement, modification or waiver of the provisions hereof or thereof or any agreement or instrument contemplated hereby or thereby), the Final DIP Order (including any amendment, amendment and restatement, modification or waiver of the provisions hereof or thereof), the performance by the parties hereto of their respective obligations hereunder or thereunder and the consummation of the transactions contemplated hereby or thereby, which were incurred (x) on or prior to the Closing Date of up to $125,000, and (y) following the Closing Date of up to the amount set forth in the Approved DIP Budget for such fees and expenses, (ii) all reasonable and documented out-of-pocket expenses incurred by the Lender in connection with the DIP Loan made hereunder (including, without limitation, all out-of-pocket expenses incurred in connection with the filing and recordation of all applicable DIP Security Documents and post-closing searches to confirm the proper recordation of such DIP Security Documents), (iii) all reasonable and documented out-of-pocket expenses incurred by the Lender in connection with the enforcement or protection of its rights in connection with this Agreement and the other DIP Loan Documents, including its rights under this Section 2.11(b), and (iv) all reasonable and documented out-of-pocket expenses incurred by the Lender in connection with any workout, restructuring or negotiation in respect of this Agreement or the DIP Loan.  All amounts payable pursuant to this Section 2.11(b) shall be (x) payable upon demand, and (y) limited to the amounts set forth for such fees and expenses set forth in the Approved DIP Budget.

(c)  <u>Certain Professional and Administrative Fees</u>.  So long as an Event of Default shall not have occurred and be continuing, except as provided herein, the Borrowers shall be permitted to pay (i) compensation of professional fees and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and § 331, in accordance with the Approved DIP Budget, as the same may be due and payable, and (ii) administrative expenses arising under 28 U.S.C. § 1930. Following an Event of Default, payment of such fees and expenses shall be subject to the Carve-Out Cap pursuant to the terms of the Final DIP Order.  No portion of the DIP Loan or cash collateral shall be used in connection with (i) preventing, hindering or delaying the Lender's enforcement or realization upon the Collateral once an Event of Default has occurred and is continuing, (ii) using or seeking to use cash collateral or selling or otherwise disposing of the Collateral without the consent of the Lender, (iii) using or seeking to use any insurance proceeds related to the Collateral without the consent of the Lender, or (iv) incurring indebtedness other than in accordance with the Approved DIP Budget.  No portion of the Carve-Out Amount or any of the proceeds of the DIP Loan may be used for or in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Lender with respect to the Lender Pre-Petition Loan Documents or the DIP Loan Documents.

2.12  <u>Voluntary Prepayments</u>.  Subject to applicable provisions of this Agreement, the Borrowers shall have the right at any time or from time to time to prepay all or any portion of the DIP Loan Balance without prepayment penalty; provided, however, that (a) any or all of the Borrowers shall give the Lender notice of each such prepayment no less than one Business Day prior to prepayment, (b) the Borrowers shall pay all accrued and unpaid interest on the amounts prepaid, and (c) no such prepayment or conversion shall serve to postpone the repayment when due of any DIP Obligation or any installments thereof.

- 20 -

2.13    **RESERVED**.

2.14    **RESERVED**.

2.15    **RESERVED**.

2.16    **RESERVED**.

2.17    <u>General Provisions Relating to Interest</u>.    (a)    It is the intention of the parties hereto to comply strictly with all usury laws, if any, applicable to the transactions which are the subject of this Agreement.    In this connection, there shall never be collected, charged, or received on the sums advanced hereunder interest in excess of that which would accrue at the Highest Lawful Rate.

(b)    Notwithstanding anything herein to the contrary, during any Limitation Period, the interest rate to be charged on amounts evidenced by the Note held by Lender shall be the Highest Lawful Rate, and the obligation, if any, of the Borrowers for the payment of fees or other charges deemed to be interest under applicable law shall be suspended.    During any period or periods of time following a Limitation Period, to the extent permitted by applicable laws of the State of New York or the United States of America, the interest rate to be charged hereunder on amounts evidenced by the Note shall remain at the Highest Lawful Rate until such time as there has been paid to Lender (i) the amount of interest in excess of that accruing at the Highest Lawful Rate that Lender would have received during the Limitation Period had the interest rate remained at the otherwise applicable rate, and (ii) all interest and fees otherwise payable to Lender but for the effect of such Limitation Period.

(c)    If, under any circumstances, the aggregate amounts paid on the DIP Loan or under this Agreement or any other DIP Loan Document include amounts which by law are deemed interest and which would exceed the amount permitted if the Highest Lawful Rate were in effect, each of the Borrowers stipulates that such payment and collection will have been and will be deemed to have been, to the extent permitted by applicable laws of the State of New York or the United States of America, the result of mathematical error on the part of the Borrowers and Lender; and Lender shall promptly refund the amount of such excess (to the extent only of such interest payments in excess of that which would have accrued and been payable on the basis of the Highest Lawful Rate) upon discovery of such error by such party or notice thereof from any of the Borrowers.    In the event that the maturity of any DIP Obligation is accelerated, by reason of an election by Lender or otherwise, or in the event of any required or permitted prepayment, then the consideration constituting interest under applicable laws may never exceed that payable on the basis of the Highest Lawful Rate, and excess amounts paid which by law are deemed interest, if any, shall be credited by  Lender on the principal amount of the DIP Obligations, or if the principal amount of the DIP Obligations shall have been paid in full, refunded to the Borrowers.

(d)    All sums paid, or agreed to be paid, to the Lender for the use, forbearance and detention of the proceeds of any advance hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full term hereof until paid in

- 21 -

full so that the actual rate of interest is uniform but does not exceed the Highest Lawful Rate throughout the full term hereof.

2.18  **RESERVED**.

2.19  **RESERVED.**

2.20  **RESERVED.**

2.21  <u>Letters in Lieu of Transfer Orders or Division Orders</u>.  Lender agrees not to send any of the letters in lieu of transfer or division orders provided pursuant to the provisions of <u>Article III</u> or <u>Section 5.4</u> to the addressees thereof unless an Event of Default has occurred and is continuing, at which time Lender may, at its option and in addition to the exercise of any of its other rights and remedies, send any or all of such letters.

2.22  <u>Power of Attorney</u>.  Each of the Borrowers hereby designates Lender as its agent and attorney-in-fact, to act in its name, place and stead solely for the purpose of completing and, upon the occurrence and during the continuance of an Event of Default, delivering any and all of the letters in lieu of transfer or division orders delivered by such Borrower pursuant to the provisions of <u>Article III</u> or <u>Section 5.4</u>, including completing any blanks contained in such letters and attaching exhibits thereto describing the relevant Collateral.  Each of the Borrowers hereby ratifies and confirms all that the Lender shall lawfully do or cause to be done by virtue of this power of attorney and the rights granted with respect to such power of attorney.  This power of attorney is coupled with the interests of Lender in the Collateral, shall commence and be in full force and effect as of the Closing Date and shall remain in full force and effect and shall be irrevocable so long as any DIP Obligation remains outstanding or unpaid.  The powers conferred on Lender by this appointment are solely to protect the interests of Lender under the DIP Loan Documents with respect to the assignment of production proceeds under certain of the DIP Security Documents and shall not impose any duty upon Lender to exercise any such powers.  The power of attorney under this <u>Section 2.22</u> is expressly limited to the rights and powers set forth herein and no additional rights or powers are herein created or implied.  Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers and shall not be responsible to any of the Borrowers or any other Person for any act or failure to act with respect to such powers, except for gross negligence or willful misconduct.

2.23  <u>Security Interest in Accounts; Right of Offset</u>.  As security for the payment and performance of the DIP Obligations, each of the Borrowers hereby transfers, assigns and pledges to Lender and grants to Lender a security interest in all of its funds now or hereafter or from time to time on deposit with Lender, with such interest of Lender to be retransferred, reassigned and/or released at the expense of the Borrowers upon payment in full and complete performance of all DIP Obligations.  All remedies as secured party or assignee of such funds shall be exercisable upon the occurrence and during the continuance of any Event of Default, regardless of whether the exercise of any such remedy would result in any penalty or loss of interest or profit with respect to any withdrawal of funds deposited in a time deposit account prior to the maturity thereof.  Furthermore, each of the Borrowers hereby grants to Lender the right, exercisable at such time as any DIP Obligation shall mature, whether by acceleration of maturity or otherwise, of offset or banker's lien against all of its funds now or hereafter or from time to

#4852354.4
#4887316.1

time on deposit with Lender, regardless of whether the exercise of any such remedy would result in any penalty or loss of interest or profit with respect to any withdrawal of funds deposited in a time deposit account prior to the maturity thereof.

2.24   <u>Joint and Several Liability</u>.   The DIP Obligations shall be owed jointly and severally by the Borrowers.

ARTICLE III.
<u>CONDITIONS</u>

3.1   <u>Conditions to Lender Obligations</u>.   The obligations of Lender to enter into this Agreement and the obligations of Lender to make the DIP Loan are subject to the satisfaction of following conditions precedent that all matters incident to the consummation of the transactions contemplated herein shall be satisfactory to Lender, and upon request, Lender shall have received, reviewed and approved the following documents and other items, appropriately executed when necessary and, where applicable, acknowledged by one or more Responsible Officers of the Borrowers or other Persons, as the case may be, all in form and substance satisfactory to Lender and dated, where applicable, of even date herewith, a date prior thereto, the Closing Date or thereafter and acceptable to Lender:

(a)  multiple counterparts of this Agreement as requested by Lender;

(b)  the duly executed Note;

(c)  a flow of funds memorandum authorizing and directing Lender to withhold and disburse, as appropriate, the amount of funds necessary to pay all fees and expenses that are due and payable on the Closing Date pursuant to this Agreement from the DIP Loan;

(d)  the following duly executed documents, which shall be in place on the Closing Date:

(i)      the DIP Deeds of Trust;

(ii)     the DIP Security Agreements;

(iii)    undated letters, in form and substance satisfactory to Lender, from each of the Borrowers to each purchaser of production and disburser of the proceeds of production from or attributable to the Oil and Gas Properties, with the addressees left blank, authorizing and directing the addressees to make future payments attributable to production from the Oil and Gas Properties directly to Lender; and

(iv)     the Escrow Agreement.

(e)  Lender shall have received a copy of the Approved DIP Budget, which shall be reasonably satisfactory to Lender;

(f)  entry by the Bankruptcy Court of the Final DIP Order (i) approving this Agreement, the DIP Loan and the DIP Loan Documents (ii) establishing the superpriority and lien status of

- 23 -

the DIP Obligations as set forth in Section 4.4, (iii) establishing a deadline of June 8, 2015 for any challenges to the validity and perfection of claims and liens of Lender with respect to the Lender Pre-Petition Loans and Lender Pre-Petition Loan Documents, (iv) granting the Lender Pre-Petition Loans Adequate Protection, and (v) finding that the Lender is extending the DIP Loan in good faith within the meaning of 11 U.S.C. § 364(e);

(g)  entry by the Bankruptcy Court of the Agreed Automatic Stay Order;

(h)  confirmation acceptable to Lender that, other than the proceedings in the Chapter 11 Cases, no event or circumstance, including any action, suit, investigation or proceeding pending, or, to the Knowledge of any of the Borrowers, threatened in any court or before any arbitrator or Governmental Authority, shall have occurred which could reasonably be expected to have a Material Adverse Effect; and

(i)  confirmation acceptable to Lender, that, since the execution of this Agreement, there have been no developments or events, which individually or in the aggregate with other circumstances, constitute or could reasonably be expected to constitute a Material Adverse Event.

3.2    Condition to the Borrowers and Guarantors Obligations.  The obligations of the Borrowers and the Guarantors under this Agreement are conditioned upon and subject to Bankruptcy Court approval of this Agreement and the other DIP Loan Documents pursuant to the Final DIP Order, and therefore any rights, agreements and obligations set forth herein or in the other DIP Loan Documents shall only be deemed effective from and after entry of the Final DIP Order.  Notwithstanding the foregoing, Borrowers will timely file the Sale Motion and use good faith efforts to (i) finalize pleadings and instruments provided for hereunder and (ii) cause the Bankruptcy Court to approve this Agreement and the other DIP Loan Documents and enter the Final DIP Order.

ARTICLE IV.
REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into this Agreement and to make the DIP Loan, each of the Borrowers and the Guarantors represents and warrants to Lender on and as of the Closing Date (which representations and warranties shall survive execution and delivery of this Agreement) that:

4.1    Due Authorization.  The execution and delivery by it of this Agreement and the borrowings by the Borrowers hereunder, the execution and delivery by the Borrowers of the Note, if any, the repayment by the Borrowers of the DIP Loan and interest and fees provided for in this Agreement, the execution and delivery of the DIP Security Documents to which it is a party and the performance by it of its obligations under the DIP Loan Documents to which it is a party are within the power of such Borrower or such Guarantor, have been duly authorized by the Bankruptcy Court, and do not and will not (a) require the consent of any additional Governmental Authority, (b) giving effect to approval by the Bankruptcy Court of the Facility, contravene or conflict with any Requirement of Law, (c) giving effect to approval by the Bankruptcy Court of the Facility, contravene or conflict with any indenture, instrument or other

- 24 -

agreement to which it is a party or by which any of its Property may be presently bound or encumbered or (d) giving effect to approval by the Bankruptcy Court of the Facility, result in or require the creation or imposition of any Lien in, upon or on any of its Property under any such indenture, instrument or other agreement, other than under any of the DIP Loan Documents.

4.2     Existence.   It is a Business Entity duly organized, legally existing and, if applicable, in good standing under the laws of the state of its organization and is duly qualified as a foreign Business Entity and, if applicable, in good standing in all jurisdictions wherein the ownership of its Property or the operation of its business necessitates same.

4.3     Valid and Binding Obligations.   Each DIP Loan Document to which it is a party, when duly executed and delivered by it, constitutes its legal, valid and binding obligation enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

4.4     DIP Security Documents.   The provisions of each DIP Security Document executed by it are effective to create, in favor or for the benefit of Lender, a legal, valid and enforceable Lien in all of its right, title and interest in the Collateral described therein.   After giving effect to the Final DIP Order, all DIP Obligations shall at all times:

(a)  pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority claim status in the Bankruptcy Case (senior to all other claims of any kind);

(b)  pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all now owned or hereafter acquired tangible and intangible property of the Borrowers and the Borrowers' estates in the Chapter 11 Cases (including the Oil and Gas Properties and Personal Property) that is not subject to: (i) valid, perfected and non-avoidable liens in existence as of the Petition Date, or (ii) valid and non-avoidable liens in existence as of the Petition Date that are subsequently perfected as permitted by Section 546(b) of the Bankruptcy Code (other than in the case of the Pre-Petition Liens and security interests held by Lender by virtue of the Lender Pre-Petition Loan Documents), excluding however, avoidance actions under Chapter 5 of the Bankruptcy Code;

(c)  pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all now owned or hereafter acquired tangible and intangible property of the Borrowers and the Borrowers' estates in the Chapter 11 Cases that is subject to: (i) valid, perfected and non-avoidable liens in existence as of the Petition Date that are senior to the liens securing the Lender Pre-Petition Loans, or (ii) valid and non-avoidable liens in existence as of the Petition Date that are senior to the liens securing the Lender Pre-Petition Loans which are subsequently perfected as permitted by Section 546(b) of the Bankruptcy Code; and

(d)  pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on all now owned or hereafter acquired interests of Borrowers in the (i) Lewis-Stuart Completion Operation Wells, (ii) the Oil and Gas Properties associated with the Lewis-Stuart Completion Operations Wells, and (iii) Personal Property.

- 25 -

4.5     Budget.  The Approved DIP Budget for the Borrowers provided to Lender is the budget for the Borrowers approved by the Bankruptcy Court and in effect as of the Closing Date.

4.6     No Default.  No Default has occurred and is continuing.

4.7     No Material Misstatements.  Taken as a whole, no information, exhibit, statement or report furnished to Lender by it or at its direction in connection with this Agreement or any other DIP Loan Document contains any material misstatement of fact or omits to state a material fact or any fact necessary to make the statements contained therein not misleading as of the date made or deemed made.

4.8     Compliance with Laws.  It and its Properties, including any DIP Deed of Trust Properties and Oil and Gas Properties owned by it, are in compliance in all material respects with all applicable Requirements of Law.

4.9     ERISA.  It does not maintain, nor has it maintained, any Plan.  It does not currently contribute to or have any obligation to contribute to or otherwise have any liability with respect to any Plan.

4.10    Environmental Laws.  Except as disclosed in writing to the Lender:

(a)  no Property owned by it, or, to its Knowledge, Property of others adjacent to Property owned by it, is currently on or has ever been on any federal or state list of Superfund Sites;

(b)  no Hazardous Substances have been generated, transported and/or disposed of by it at a site which was, at the time of such generation, transportation and/or disposal, or has since become, a Superfund Site;

(c)  except in accordance with applicable Requirements of Law or the terms of a valid permit, license, certificate or approval of the relevant Governmental Authority, no Release of Hazardous Substances by it or from, affecting or related to any Property owned by it has occurred; and

(d)  no Environmental Complaint has been received by it and remains unresolved.

4.11    **RESERVED**.

4.12    Investment Company Act.  It is not, nor is it directly or indirectly controlled by or acting on behalf of any Person which is, an "investment company" or an "affiliated person" subject to regulation as an "investment company" within the meaning of the Investment Company Act of 1940.

4.13    Proper Filing of Tax Returns; Payment of Taxes Due.  It has duly and properly filed its United States income tax returns and all other tax returns which are required to be filed and has paid all taxes shown as due from it thereon, except such as are being contested in good faith and as to which adequate provisions and disclosures have been made.  The respective charges and reserves on its books with respect to taxes and other governmental charges are adequate.

- 26 -

4.14  <u>Principal Location</u>.  Its principal place of business and chief executive office is located at its address set forth in <u>Section 10.4</u> or at such other location as it may have, by proper written notice hereunder, advised Lender.

4.15  <u>Subsidiaries</u>.  It has no Subsidiaries other than as set forth on <u>Schedule 4.15</u> or as otherwise disclosed to Lender in writing.

4.16  <u>Compliance with Anti-Terrorism Laws</u>.  (a)  Neither it nor any of its Affiliates is in violation of any Anti-Terrorism Law or knowingly engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(b)  Neither it nor any of its Affiliates is any of the following (each a "<u>Blocked Person</u>"):

(i)  a Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(ii)  a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(iii)  a Person with which any bank or other financial institution is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)  a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224;

(v)  a Person that is named as a "specially designated national" on the most current list published by OFAC at its official website or any replacement website or other replacement official publication of such list; or

(vi)  an Affiliate of a Person or entity listed above.

(c)  Neither it nor any of its Affiliates (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224.

(d)  Neither it nor any of its Affiliates is in violation of any rules or regulations promulgated by OFAC or of any economic or trade sanctions administered and enforced by OFAC or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any rules or regulations promulgated by OFAC.

4.17  <u>Identification Numbers</u>.  Its federal taxpayer identification number and its organizational number with the Secretary of State of the state of its organization are as set out on <u>Schedule 4.17</u> or as otherwise disclosed to Lender in writing.

#4852354.4
#4887316.1

ARTICLE V.
<u>AFFIRMATIVE COVENANTS</u>

So long as any DIP Obligation remains outstanding or unpaid, each of the Borrowers and the Guarantors (<u>provided</u> that <u>Section 5.14</u> shall apply only to the Borrowers) shall:

5.1     <u>Maintenance of and Access to Records; Delivery of Certain Information</u>.

(a)  Keep adequate records, in accordance with GAAP, of all its transactions so that at any time, and from time to time, its true and complete financial condition may be readily determined, and promptly following the request of Lender, make such records available for inspection by Lender and, at the expense of the Borrowers, allow Lender to make and take away copies thereof.

(b)  Deliver to Lender as soon as available but no later than thirty (30) days after the end of each calendar month, the unaudited consolidated balance sheets of the Borrowers and the related unaudited consolidated statements of income and cash flows for such for such month, certified by one if its financial officers as presenting in all material respects the results of operations of the Borrowers.

5.2     <u>Approved Budgets</u>.

(a)  Deliver to Lender, two weeks prior to the end of the initial 13-week period covered by the Approved DIP Budget, an updated budget, in form and substance satisfactory to Lender, for the 13-week period immediately following the initial 13-week period covered by the Approved DIP Budget.

(b)  Deliver to Lender, beginning on the first Wednesday after entry of the Final DIP Order and continuing each Wednesday thereafter until the Maturity Date, a weekly report setting forth the actual cash flows for the immediately preceding week with respect to each line item in the Approved DIP Budget, together with a variance report reflecting in reasonably sufficient detail, together with the percentage, if any, by which such cash flows exceeded or were less than the cash flows set forth in the Approved DIP Budget for such period.

5.3     <u>Notices of Certain Events</u>.  Deliver to Lender, promptly, but in no event later than the third Business Day after having Knowledge of the occurrence of any of the following events or circumstances, a written statement with respect thereto, signed by a Responsible Officer of the relevant Borrower and setting forth the relevant event or circumstance and the steps being taken by either or all of the Borrowers with respect to such event or circumstance:

(a)  any Default or Event of Default, unless Lender has previously notified the Borrowers of such Default or Event of Default;

(b)  any default by it under any contractual obligation or any litigation, investigation or proceeding between it and any Governmental Authority which, in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect;

- 28 -

(c) any litigation or proceeding (other than proceedings in any of the Chapter 11 Cases) involving it as a defendant or in which any of its Property is subject to a claim and in which the amount involved is $100,000 or more and which is not covered by insurance or in which injunctive or similar relief is sought;

(d) the receipt by it of any Environmental Complaint, which if adversely determined could reasonably be expected to have a Material Adverse Effect;

(e) any actual, proposed or threatened testing or other investigation by any Governmental Authority or other Person concerning the environmental condition of, or relating to, any of its Property following any allegation of a material violation of any Requirement of Law;

(f) any Release of Hazardous Substances by it or from, affecting or related to any of its Property or Property of others adjacent to any of its Property which could reasonably be expected to have a Material Adverse Effect, except in accordance with applicable Requirements of Law or the terms of a valid permit, license, certificate or approval of the relevant Governmental Authority, or the violation of any Environmental Law, or the revocation, suspension or forfeiture of or failure to renew, any permit, license, registration, approval or authorization, which could reasonably be expected to have a Material Adverse Effect;

(g) any change in the ownership of any of the Borrowers or any Guarantor or in the senior management of any of the Borrowers or any Guarantor;

(h) any material change in its accounting or financial reporting practices; and

(i) any other event or condition which could reasonably be expected to have a Material Adverse Effect.

5.4    Letters in Lieu of Transfer Orders or Division Orders.  Promptly upon request by Lender at any time and from time to time, and without limitation on the rights of Lender pursuant to the provisions of Section 2.22 and Section 2.23, execute such letters in lieu of transfer or division orders in favor of Lender, in addition to the letters delivered to Lender in satisfaction of the condition set forth in clause (d)(iii) of Section 3.1, as are necessary or appropriate to transfer and deliver to Lender proceeds from or attributable to any Mortgaged Property.

5.5    Joinder Agreements, Guaranties and Additional Security Documents.  Cause each Domestic Subsidiary of any of the Borrowers or any of the Guarantors formed after the Closing Date to execute and deliver a Joinder Agreement, a Guaranty in favor of Lender and DIP Security Documents, as requested by Lender, in favor or for the benefit of Lender,  covering assets of such Domestic Subsidiary and take all such other action requested by Lender to perfect the Lien of such DIP Security Documents, and execute and deliver to Lender multiple counterparts, as requested by the Lender, of DIP Security Documents (as requested by Lender and in form and substance satisfactory to Lender) establishing in favor of  Lender, a Lien against all of the issued and outstanding capital stock or other form of equity interests of any such newly formed Domestic Subsidiary of any of the Borrowers or any of the Guarantors.

5.6    Additional Information.  Furnish to Lender, promptly upon the request of the Lender, such additional financial or other information concerning its assets, liabilities, operations

#4852354.4
#4887316.1

and transactions as Lender may from time to time reasonably request, to the extent such information is in the possession, custody or control of the Borrowers; and notify Lender not less than ten Business Days prior to the occurrence of any condition or event that may change the proper location for the filing of any financing statement or other public notice or recording for the purpose of perfecting a Lien in any Collateral, including any change in its name or jurisdiction of organization; and upon the request of the Lender, execute such additional DIP Security Documents as may be necessary or appropriate in connection therewith.

5.7 <u>Compliance with Laws</u>. Comply or, to the extent that the right or obligation to do so rests with another Person, use commercially reasonable efforts to cause such other Person to comply, with all applicable Requirements of Law, including (a) ERISA, (b) Environmental Laws and (c) all permits, licenses, registrations, approvals and authorizations (i) related to any natural or environmental resource or media located on, above, within, related to or affected by any of its Property, (ii) required for the performance of its operations or (iii) applicable to the use, generation, handling, storage, treatment, transport or disposal of any Hazardous Substances; and use commercially reasonable efforts to cause all of its employees, crew members, agents, contractors, subcontractors and future lessees (pursuant to appropriate lease provisions), while such Persons are acting within the scope of their relationship with it, to comply with all such Requirements of Law as may be necessary or appropriate to enable it to so comply.

5.8 <u>Payment of Assessments and Charges</u>. Pay all taxes, assessments, governmental charges, rent and other Indebtedness which, if unpaid, might become a Lien against any of its Property, except any of the foregoing that are being contested in good faith and as to which an adequate reserve in accordance with GAAP has been established or unless failure to pay would not have a Material Adverse Effect.

5.9 <u>Maintenance of Existence or Qualification and Good Standing</u>. Maintain its separate existence and identity and, if applicable, good standing and qualification in its jurisdiction of organization and in all jurisdictions wherein the Property now owned or hereafter acquired or business now or hereafter conducted by it necessitates same.

5.10 <u>Certain Milestones</u>. Each of the Borrowers shall perform the following actions, or shall use commercially reasonable efforts to ensure that the following actions are performed:

(a) the Sale Motion shall have been filed with the Bankruptcy Court by no later than April 6, 2015;

(b) the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the Lender, approving bid procedures set forth in the Sale Motion or otherwise reasonably acceptable to the Lender by no later than May 11, 2015 (the "<u>Approved Bid Procedures Date</u>");

(c) an order, in form and substance reasonably acceptable to the Lender approving a Sale Transaction (the "<u>Approved Sale Transaction</u>") shall have been entered by the Bankruptcy Court by no later than August 24, 2015 (the "<u>Sale Approval Date</u>"); and

(d) the Approved Sale Transaction shall have been consummated by the 15th day after the Sale Approval Date.

- 30 -

5.11    _Further Assurances_.  Promptly cure any defects in the execution and delivery of any of the DIP Loan Documents to which it is a party and all agreements contemplated thereby, and execute, acknowledge and deliver to Lender such other assurances and instruments as shall, in the opinion of Lender, be necessary to fulfill the terms of the DIP Loan Documents to which it is a party.

5.12    _Initial Expenses of Lender_.  Subject to the Approved DIP Budget and pursuant to a flow of funds memorandum from the Borrowers approved by the Lender, an executed copy of which shall be delivered to Lender on or before 10:00 am (EST) on the Closing Date, authorize the Lender to deduct from the DIP Loan proceeds the Transaction Costs owed to the Lender as of the Closing Date under Section 2.11(b)(i)(x).

5.13    _Subsequent Expenses of Lender_.  Upon request by Lender, and subject to the Approved DIP Budget, promptly reimburse Lender for (i) all reasonable and documented out-of-pocket expenses incurred by Lender (including legal fees and expenses) related to, in connection with or as result of the on-going administration of this Agreement and the other DIP Loan Documents (including any amendment, amendment and restatement, modification or waiver of the provisions hereof or thereof or any agreement or instrument contemplated hereby or thereby), the Final DIP Order, the performance by the parties hereto of their respective obligations hereunder or thereunder and the consummation of the transactions contemplated hereby or thereby, (ii) all reasonable and documented out-of-pocket expenses incurred by the Lender in connection with the enforcement or protection of its rights in connection with this Agreement and the other DIP Loan Documents, including its rights under this Section 5.13, and (iii) all reasonable and documented out-of-pocket expenses incurred by Lender related to, in connection with or as a result of any workout, restructuring or negotiation in respect of this Agreement, the DIP Loan, or the Final DIP Order.  All amounts payable pursuant to this Section 5.13 shall be payable upon demand.

5.14    _Operation of Oil and Gas Properties_.  Develop, maintain and operate or, to the extent that the right or obligation to do so rests with another Person, use commercially reasonable efforts to cause such other Person to develop, maintain and operate its Oil and Gas Properties in a prudent and workmanlike manner and in accordance with customary industry standards.

5.15    _Maintenance and Inspection of Properties_.  Maintain or, to the extent that the right or obligation to do so rests with another Person, use commercially reasonable efforts to cause such other Person to maintain all of its tangible Properties in good repair and condition, ordinary wear and tear excepted; make or, to the extent that the right or obligation to do so rests with another Person, use commercially reasonable efforts to cause such other Person to make all necessary replacements thereof and operate such Properties in a good and workmanlike manner; and permit any authorized representative of  Lender, upon prior notice, to visit and inspect, at reasonable times, any of its tangible Property.

5.16    _Maintenance of Insurance_.  Maintain, or, to the extent that the right or obligation to do so rests with another Person, use commercially reasonable efforts to cause such other Person to maintain, insurance with respect to its Properties and businesses against such liabilities, casualties, risks and contingencies as is customary in the relevant industry and

- 31 -

sufficient to prevent a Material Adverse Effect, all such insurance to be in amounts and from insurers acceptable to Lender, name Lender as an additional insured (in the case of liability insurance) and co-loss payee (in the case of physical damage insurance), and, upon any renewal of any such insurance and at other times upon request by Lender, furnish to Lender evidence, satisfactory to Lender, of the maintenance of such insurance.  Lender shall have the right to collect, and each of the Borrowers and the Guarantors hereby assigns to Lender, any and all monies that may become payable under any policies of insurance relating to business interruption or by reason of damage, loss or destruction of any of the Collateral.  In the event of any damage, loss or destruction for which insurance proceeds relating to business interruption exceed $250,000 or Collateral exceed $250,000, Lender may, at its option, apply all such sums or any part thereof received by it toward the payment of the DIP Obligations, whether matured or unmatured, application to be made first to fees, then to interest and then to principal, and shall deliver to the relevant Borrower or the relevant Guarantor, as the case may be, the balance, if any, after such application has been made.  In the event of any other damage, loss or destruction for which insurance proceeds received are $250,000 or less, and provided that no Default or Event of Default has occurred and is continuing, Lender shall deliver any such proceeds received by it to the relevant Borrower or the relevant Guarantor, as the case may be, for use to repair or replace the damaged, destroyed or lost property.  In the event Lender receives insurance proceeds not attributable to Collateral or business interruption, Lender shall deliver any such proceeds to the relevant Borrower or the relevant Guarantor, as the case may be.  Notwithstanding anything in this <u>Section 5.16</u> to the contrary, the Borrowers shall not be relieved of its obligation to obtain and maintain insurance as set forth in this <u>Section 5.16</u> if the obligation to maintain such insurance rests with another Person and such Person fails to maintain the required insurance.

5.17   <u>Environmental Indemnification</u>.  Indemnify and hold Lender and its respective shareholders, officers, directors, employees, agents, attorneys-in-fact and Affiliates and each trustee for the benefit of  Lender under any DIP Security Documents (each of the foregoing an "Indemnitee") harmless from and against any and all claims, losses, damages, liabilities, fines, penalties, charges, administrative and judicial proceedings and orders, judgments, remedial actions, requirements and enforcement actions of any kind, and all costs and expenses incurred in connection therewith (including reasonable attorneys' fees and expenses), arising directly or indirectly, in whole or in part, from (a) the presence of any Hazardous Substances on, under or from any of its Property, whether prior to or during the term hereof, (b) any activity carried on or undertaken on any of its Property, whether prior to or during the term hereof, and whether by it or any of its predecessors in title, employees, agents, contractors or subcontractors or any other Person at any time occupying or present on such Property, in connection with the handling, treatment, removal, storage, decontamination, cleanup, transportation or disposal of any Hazardous Substances at any time located or present on or under such Property, (c) any residual contamination on or under any of its Property, (d) any contamination of any Property or natural resources arising in connection with the generation, use, handling, storage, transportation or disposal of any Hazardous Substances by it or any of its employees, agents, contractors or subcontractors while such Persons are acting within the scope of their relationship with it, irrespective of whether any of such activities were or will be undertaken in accordance with applicable Requirements of Law or (e) the performance and enforcement of any DIP Loan Document or any other act or omission in connection with or related to any DIP Loan Document or the transactions contemplated thereby, including any such claim, loss, damage, liability, fine, penalty, charge, administrative or judicial proceeding, order, judgment, remedial action,

- 32 -

requirement, enforcement action, cost or expense arising from the negligence (but not the gross negligence or willful misconduct), whether sole or concurrent, of any Indemnitee; with the foregoing indemnity surviving satisfaction of all DIP Obligations and the termination of this Agreement, unless all such DIP Obligations have been satisfied wholly in Cash and not by way of realization against any Collateral or the conveyance of any Property in lieu thereof, provided, however, that such indemnity shall not extend to any act or omission by Lender with respect to any Property subsequent to Lender becoming the owner of such Property and with respect to which Property such claim, loss, damage, liability, fine, penalty, charge, proceeding, order, judgment, action or requirement arises subsequent to the acquisition of title thereto by Lender. All amounts due under this <u>Section 5.17</u> shall be payable on written demand therefor.

5.18   <u>General Indemnification</u>.  Indemnify and hold each Indemnitee harmless from and against any and all losses, claims, damages, liabilities and related expenses, including reasonable attorneys' fees and expenses, incurred by or asserted against any Indemnitee arising out of, in any way connected with or as a result of (a) the execution and delivery of this Agreement and the other DIP Loan Documents (including any amendment, amendment and restatement, modification or waiver of the provisions hereof or thereof or any agreement or instrument contemplated hereby or thereby), the Final DIP Order, the performance by the parties hereto of their respective obligations hereunder or thereunder and the consummation of the transactions contemplated hereby and thereby, (b) the use of proceeds of the DIP Loan or (c) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto, including any such loss, claim, damage, liability or expense arising from the negligence (but not the gross negligence or willful misconduct), whether sole or concurrent, of any Indemnitee; with the foregoing indemnity surviving satisfaction of all DIP Obligations and the termination of this Agreement.  All amounts due under this <u>Section 5.18</u> shall be payable on written demand therefor.

5.19   <u>Evidence of Compliance with Anti-Terrorism Laws</u>.  Upon request by Lender, deliver any certification or other evidence as requested from time to time by Lender confirming its compliance with the provisions of <u>Section 6.14</u>.

5.20   <u>Compliance Certificate</u>.  Deliver a Compliance Certificate to Lender, promptly, but in no event later than the third Business Day after receipt of a request for such Compliance Certificate.

5.21   <u>Operating Accounts and Control Agreements</u>.   (a) Continue to maintain its principal operating accounts at the depository bank or banks and under the account numbers set forth on <u>Schedule 5.21</u> attached hereto and (b) execute and deliver deposit account control agreements reasonably satisfactory to Lender no later than fifteen (15) Business Days after written request received subsequent to the Closing Date from Lender.

5.22   <u>Acknowledgement</u>.  Borrowers acknowledge that they are jointly and severally indebted to Lender under the Senior Pre-Petition Loan Agreement in the amount of $5,547,306.28, inclusive of interest through January 4, 2015.  WBH LP acknowledges that it is indebted to Lender under the Junior Pre-Petition Loan Agreement in the amount of $28,901,217.37, inclusive of interest through January 4, 2015.  Borrowers further acknowledge

- 33 -

that the Liens granted by Borrowers to Lender under the Lender Pre-petition Loan Documents are valid, enforceable and perfected, as to each Borrower, respectively.

ARTICLE VI.
NEGATIVE COVENANTS

So long as any DIP Obligation remains outstanding, none of the Borrowers nor any Guarantor shall:

6.1     Indebtedness.     Create, incur, assume or suffer to exist any post-bankruptcy petition Indebtedness, whether by way of loan or otherwise; provided, however, the foregoing restriction shall not apply to (a) the DIP Obligations, (b) unsecured accounts payable, taxes and other assessments, in each case incurred in the ordinary course of business and which are not unpaid in excess of 90 days beyond invoice date or are being contested in good faith and as to which such reserve as is required by GAAP has been made, (c) Indebtedness related to Lender Pre-Petition Loans Adequate Protection obligations of Borrowers, and (d) Indebtedness which arose prior to the filing of the Chapter 11 Cases.

6.2     Contingent Obligations.     Create, incur, assume or suffer to exist any Contingent Obligation; provided, however, the foregoing restriction shall not apply to (a) performance guarantees, performance, surety or other bonds or endorsements of items deposited for collection, in each case provided in the ordinary course of business, (b) trade credit incurred or operating leases entered into in the ordinary course of business, (c) Indebtedness permitted by Section 6.1, (d) any Guaranties or (e) Contingent Obligations which arose prior to the filing of the Chapter 11 Cases.

6.3     Liens, Etc.     Grant any administrative expense, unsecured claim, or other super-priority claim or Lien that is pari passu with or senior to the claims of the Lender with respect to the DIP Loan, or apply to the Bankruptcy Court for authority to do so, except for: (i) the Carve-Out Amount, and (ii) any obligation with respect to the Lender Pre-Petition Loans Adequate Protection.

6.4     Sales of Assets.     Sell, transfer or otherwise dispose of, in one or any series of transactions, any of its Property, whether now owned or hereafter acquired, or enter into any agreement to do so; provided, however, the foregoing restriction shall not apply to (a) the sale of hydrocarbons or inventory in the ordinary course of business, provided, however, that no contract for the sale of hydrocarbons shall obligate the relevant Person to deliver hydrocarbons produced from any of its Oil and Gas Properties at some future date without receiving full payment therefor within 60 days of delivery, (b) the sale or other disposition of Property destroyed, lost, worn out, damaged or having only salvage value or no longer used or useful in the business in which it is used, or (c) an Approved Sale Transaction.  Notwithstanding the forgoing, nothing in this Section 6.4 shall prevent the sale or other disposition of Property to the extent that (a) Lender consents to such sale or other disposition, or (b) the DIP Obligations are satisfied in full in Cash from the proceeds of such sale or other disposition.

#4852354.4
#4887316.1

6.5     Leasebacks.   Enter into any agreement to sell or transfer any Property and thereafter rent or lease as lessee such Property or other Property intended for the same use or purpose as the Property sold or transferred.

6.6     Sale or Discount of Receivables.   Except to minimize losses on bona fide debts previously contracted, discount or sell with recourse, or sell for less than the greater of the face or market value thereof, any of its notes receivable or accounts receivable.

6.7     Loans or Advances.   Make or agree to make or allow to remain outstanding any post-bankruptcy petition loans or advances to any Person; provided, however, the foregoing restriction shall not apply to (a) advances or extensions of credit in the form of accounts receivable incurred in the ordinary course of business and upon terms common in the industry for such accounts receivable, (b) advances to employees for the payment of expenses in the ordinary course of business not exceeding $50,000 in the aggregate for Borrowers on a combined basis with their respective consolidated Subsidiaries outstanding at any time, (c) loans or advances by any of the Borrowers or any Guarantor to any of the Borrowers or any other Guarantor or (d) other loans or advances so long as not exceeding, in the aggregate outstanding at any time, $100,000 in the aggregate for Borrowers on a combined basis with their respective consolidated Subsidiaries.

6.8     Investments.   Make or acquire Investments in, or purchase or otherwise acquire all or substantially all of the assets of, any Person; provided, however, the foregoing restriction shall not apply to the purchase or acquisition of (a) Oil and Gas Properties, (b) Investments in the form of (i) debt securities issued or directly and fully guaranteed or insured by the United States Government or any agency or instrumentality thereof, with maturities of no more than one year, (ii) commercial paper of a domestic issuer rated at the date of acquisition at least P-2 by Moody's Investors Service, Inc. or A-2 by Standard & Poor's Corporation and with maturities of no more than one year from the date of acquisition or (iii) repurchase agreements covering debt securities or commercial paper of the type permitted in this Section 6.8, certificates of deposit, demand deposits, eurodollar time deposits, overnight bank deposits and bankers' acceptances, with maturities of no more than one year from the date of acquisition, issued by or acquired from or through Lender or any bank or trust company organized under the laws of the United States of America or any state thereof and having capital surplus and undivided profits aggregating at least $100,000,000, (c) other short-term Investments similar in nature and degree of risk to those described in clause (b) of this Section 6.8, (d) Investments in money-market funds sponsored or administered by Persons acceptable to Lender and which funds invest in short-term Investments similar in nature and degree of risk to those described in clause (b) of this Section 6.8, (e) Investments by any of the Borrowers or any Guarantor in any of the Borrowers or any other Guarantor or (f) evidences of loans or advances not prohibited by the provisions of Section 6.7.

6.9     Dividends and Distributions.   Declare, pay or make, whether in Cash or Property, any dividend or distribution on, or purchase, redeem or otherwise acquire for value, any of its equity interests.

6.10    Issuance of Equity; Changes in Structure.   Issue or agree to issue any additional equity interests, other than (a) common equity interests and (b) preferred equity interests with terms approved in writing by Lender in advance of the issuance thereof; enter into any

- 35 -

transaction of consolidation, merger or amalgamation in which one of the Borrowers is not the survivor; or liquidate, wind up or dissolve (or suffer any liquidation or dissolution), provided, however this Section 6.10 shall not prohibit the issuance of equity interests pursuant to the terms of a Chapter 11 plan of reorganization approved by the Bankruptcy Court.

6.11  Transactions with Affiliates.  Directly or indirectly, enter into any transaction (including the sale, lease or exchange of Property or the rendering of service) with any of its Affiliates, other than upon fair and reasonable terms no less favorable than could be obtained in an arm's length transaction with a Person which was not an Affiliate, other than transactions disclosed in writing to Lender and consented to by Lender (such consent not to be unreasonably withheld).

6.12  Lines of Business.  Change its principal line of business from that in which it is engaged as of the date hereof.

6.13  Plan Obligation.  Assume or otherwise become subject to an obligation to contribute to or maintain any Plan or acquire any Person which has at any time had an obligation to contribute to or maintain any Plan.

6.14  Anti-Terrorism Laws.  Conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person; deal in, or otherwise engage in any transaction relating to, any Property or interests in Property blocked pursuant to Executive Order No. 13224; or engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, (i) any of the prohibitions set forth in Executive Order No. 13224 or the USA Patriot Act, or (ii) any prohibitions set forth in the rules or regulations issued by OFAC or any sanctions against targeted foreign countries, terrorism sponsoring organizations, and international narcotics traffickers based on United States foreign policy.

6.15  Compliance with Approved DIP Budget.  Deviate from the Approved DIP Budget in excess of ten percent (10%) in the aggregate over any Variance Period, commencing with the Variance Period beginning on the Closing Date.

6.16  Prepayments of Other Indebtedness.  Pay any other Indebtedness unless payment of such other Indebtedness is set forth in the Approved DIP Budget or authorized under the Final DIP Order.

ARTICLE VII.<br>PENDING AUTOMATIC STAY MOTIONS

7.1  Agreed Automatic Stay Order.  The Pending Automatic Stay Motions shall be resolved by the Bankruptcy Court's entry of the Agreed Automatic Stay Order.  The Borrowers and Lender shall jointly file a motion or stipulation seeking the entry of the Agreed Automatic Stay Order.  The Agreed Automatic Stay Order shall provide that the automatic stay is lifted without further order of the Bankruptcy Court effective upon the earlier of (i) five (5) Business Days following notice by the Lender to the Borrowers, USED and the Official Committee of

- 36 -

Unsecured Creditors in Chapter 11 Cases of the occurrence of an Event of Default, or (ii) September 10, 2015.

7.2    Oil & Gas Property Credit Bid.  The Agreed Automatic Stay Order shall provide that Lender in connection with a foreclosure sale of the Oil and Gas Properties shall credit bid (assuming no material intervening transfer or release of any Oil and Gas Property) an amount of the Lender Pre-Petition Loans and DIP Loan equaling the greater of the following:

(a)  the sum of (i) fifty percent (50%) of the DIP Obligations, plus (ii) fifty percent (50%) of the amount outstanding under the Senior Pre-Petition Loan Agreement, plus (iii) an amount outstanding under the Junior Pre-Petition Credit Agreement such that the sum of (i), (ii) and (iii) shall equal the sum of not less than $15 million; or

(b)  a sum equal to one hundred percent (100%) of the Projected Reserve Value of existing proved developed Wells (other than the Lewis-Stuart Completion Operation Wells) plus one hundred ten percent (110%) of the Projected Reserve Value of the Lewis-Stuart Completion Operation Wells.  The credit bid amount pursuant to this subsection (b) would be  consist of: (i) fifty percent of the  DIP Obligations plus (ii) fifty percent (50%) of the amount outstanding under the Senior Pre-Petition Loan Agreement, plus (iii) an amount outstanding under the Junior Pre-Petition Credit Agreement such that the sum of (i), (ii) and (iii) shall equal the sum of  (x) one hundred percent (100%) of the Projected Reserve Value of existing proved developed Wells plus (y) one hundred ten percent (110%) of the Projected Reserve Value of the Lewis-Stuart Completion Operation Wells.  The Projected Reserve Value will be determined by the Bankruptcy Court upon the motion of either Lender or Borrowers.

7.3    Personal Property Credit Bid.  The Agreed Automatic Stay Order shall further provide that Lender in connection with a foreclosure sale of all of the Personal Property (assuming no material intervening transfer or release of any Personal Property) shall credit bid an amount of the Lender Pre-Petition Loans and DIP Loan equal to: (i) fifty percent of the DIP Obligations plus (ii) fifty percent (50%) of the amount outstanding under the Senior Pre-Petition Loan Agreement, plus (iii) an amount outstanding under the Junior Pre-Petition Credit Agreement such that the sum of (i), (ii) and (iii) shall equal the sum of  not less than $10 million.

7.4    Simultaneous Bids.  Lender and Borrowers further agree that: (i) the stalking horse bid by Lender to acquire both  the Oil and Gas Property and Personal Property pursuant to the Sale Motion, Approved Bid Procedures and Approved Sale Transaction shall be the amounts set forth in Sections 7.2 and 7.3, respectively; and (ii) the Lender shall be required to simultaneously bid on both of the Oil and Gas Property and the Personal Property in any foreclosure sale or Approved Sale Transaction in the amounts set forth in Sections 7.2 and 7.3, respectively.  With respect to a foreclosure sale, the "simultaneously" requirement in clause (ii) of the preceding sentence shall be deemed satisfied by Lender provided the applicable Oil and Gas Property foreclosure sales occur in compliance with and during the time periods set forth in Tex. Prop. Code § 51.002, and the applicable Personal Property foreclosure occurs on the same day.

#4852354.4
#4887316.1

ARTICLE VIII.
PENDING CONVERSION MOTIONS

8.1     Withdrawal of Pending Conversion Motions.    Upon Closing, or as soon as reasonably practicable thereafter, the Pending Conversion Motions shall be withdrawn by the Lender, without prejudice to the Lender's ability to re-file such motions upon the earlier of (i) the occurrence of an Event of Default, or (ii) September 10, 2015.

ARTICLE IX.
EVENTS OF DEFAULT

9.1     Enumeration of Events of Default.    Any of the following events shall constitute an Event of Default:

(a)  (i) default shall be made in the payment when due of any principal or interest under this Agreement or the Note (if any), or (ii) default shall be made in the payment when due of any fee or other sum payable (excluding the payment of principal or interest when due) under any of the DIP Loan Documents subject to a one (1) Business Day cure period following notice by Lender;

(b)  default shall be made by any of the Borrowers or any of the Guarantors in the due observance or performance of any of its obligations, covenants or agreements under (i) Section 5.1(b) or Section 5.2 and such default shall continue for three (3) Business Days after notice thereof by Lender, (ii) Section 5.3, or (iii) Article VI;

(c)  except as specified in Section 9.1(a) or Section 9.1(b), default shall be made by any of the Borrowers or any of the Guarantors in the due observance or performance of any of its obligations, covenants or agreements under the DIP Loan Documents and such default shall continue for fifteen (15) days after the earlier of notice thereof by Lender or Knowledge thereof by any of the Borrowers;

(d)  any representation or warranty made by or on behalf of any of the Borrowers or any of the Guarantors in any of the DIP Loan Documents proves to have been untrue in any material respect or any representation, statement (including Financial Statements), certificate or data furnished or made to Lender in connection herewith proves to have been untrue in any material respect as of the date the facts therein set forth were stated or certified;

(e)  an order granting relief from any stay of proceeding (including, without limitation, the automatic stay arising in the Chapter 11 Cases) shall be entered so as to allow a third party to proceed with foreclosure or to otherwise exercise its rights (or granting of a deed in lieu of foreclosure) against any asset with a value in excess $100,000;

(f)  a post-petition final and non-appealable order, judgment or decree shall be entered against any of the Borrowers or any of the Guarantors for money damages and/or Indebtedness that would constitute an administrative expense under the Chapter 11 Cases due in an amount in excess of $100,000, and such order, judgment or decree shall not be dismissed or stayed within 30 days or is not fully covered by insurance (excluding any deductible);

- 38 -

(g)  any charges are filed or any other action or proceeding is instituted by any Governmental Authority against any of the Borrowers or any of the Guarantors under the Racketeering Influence and Corrupt Organizations Statute (18 U.S.C. §1961 et seq.), the result of which could be the forfeiture or transfer of any material Property of any of the Borrowers or any of the Guarantors subject to a Lien in favor of Lender without (i) satisfaction or provision for satisfaction of such Lien or (ii) such forfeiture or transfer of such Property being expressly made subject to such Lien;

(h)  while any DIP Obligations under this Agreement remain outstanding, any of the Borrowers or any of the Guarantors shall have (i) concealed, removed or diverted, or permitted to be concealed, removed or diverted, any part of its Property, with intent to hinder, delay or defraud its creditors or any of them, (ii) made or suffered a transfer of any of its Property which is fraudulent under any bankruptcy, fraudulent conveyance, or similar law with intent to hinder, delay or defraud its creditors, (iii) made any transfer of its Property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid with intent to hinder, delay or defraud its creditors or (iv) shall have suffered or permitted any creditor to obtain a Lien upon any of its Property through legal proceedings or distraint which is not vacated within 30 days from the date thereof;

(i)  any DIP Security Document shall for any reason not, or cease to, create a valid and perfected Lien with the priority described in Section 4.4 against the Collateral purportedly covered thereby, except to the extent permitted by this Agreement;

(j)  any DIP Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all DIP Obligations and termination of this Agreement, ceases to be in full force and effect;

(k)  any of the Borrowers or the Guarantors purports to revoke, terminate or rescind any DIP Loan Document or any provision of any DIP Loan Document;

(l)  the occurrence of a Material Adverse Effect;

(m)  the Final DIP Order has not been entered by the Bankruptcy Court by May 30, 2015;

(n)  the bringing of a motion (other than the motion seeking entry of the Final DIP Order), taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any Borrower in any of the Chapter 11 Cases: (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code without the prior written consent of Lender unless such financing is proposed to refinance the DIP Obligations in full in Cash; (B) to grant any Lien upon or affecting any Collateral; or (C) adverse to Lender or its rights and remedies hereunder or its interest in the Collateral;

(o)  the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Borrower or insider or affiliate of any Borrower to which Lender does not consent in writing or otherwise agree to in writing unless such plan provides for the payment in full of the DIP Obligations in Cash on the effective date thereof and provide for the sale of the Oil and Gas Properties in accordance with Section 5.10;

- 39 -

(p)  the entry of an order in the Chapter 11 Case confirming a plan of reorganization that is not acceptable to Lender in its sole discretion unless such plan contains a provision for repayment in full in Cash of all of the DIP Obligations under this Agreement on or before the effective date of such plan or plans;

(q)  the entry of an order amending, supplementing, staying, vacating or otherwise modifying the DIP Loan Documents or the Final DIP Order without the written consent of Lender, the filing of a motion for reconsideration by any Borrower or any Guarantor with respect to the Final DIP Order or the filing of a motion for reconsideration by any other Person with respect to the Final DIP Order which motion is granted by the Court;

(r)  the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against Lender or any of the Collateral except as authorized under the Final DIP Order or Approved DIP Budget;

(s)  the appointment of an interim or permanent trustee in any of the Chapter 11 Cases or the appointment of a receiver or an examiner in any of the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of any Borrower; or the sale, without Lender's written consent, of all or substantially all of the Borrowers' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in any of the Chapter 11 Cases or otherwise that does not provide for payment in full in Cash of the DIP Obligations;

(t)  the dismissal of any of the Chapter 11 Cases, the conversion of any of the Chapter 11 Cases from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Borrower, insider or Affiliate or any Borrower shall file a motion or other pleading seeking the dismissal of any of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise without written consent of Lender;

(u)  the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which, in either case, involves a claim of $100,000 or more (other than (1) solely for the purpose of allowing such creditor to determine the liquidated amount of its claim or (2) to permit the commencement of or prosecution of a proceeding to collect solely against an insurance company);

(v)  the commencement of a suit or action against Lender relating to any Borrower, any Guarantor or any portion of the Collateral, and, as to any suit or action brought by any Person, other than any Borrower or Guarantor, the continuation thereof without dismissal within thirty (30) days after service thereof on Lender, that asserts or seeks by or on behalf of any Borrower, the Environmental Protection Agency, any state environmental protection or health and safety agency, any official committee in any of the Chapter 11 Cases or any other party in interest in any of the Chapter 11 Cases, (A) a claim in excess of $100,000, (B) any legal or equitable remedy that would have the effect of subordinating any or all of the DIP Obligations or Liens of Lender under the DIP Loan Documents, to any other claim not included in the Final DIP Order

- 40 -

or Approved DIP Budget, (C) would otherwise have a Material Adverse Effect, or (D) have a material adverse effect on the rights and remedies of Lender under any DIP Loan Document or the collectability of all or any portion of the DIP Obligations;

(w)  the entry of an order in any of the Chapter 11 Cases avoiding or requiring repayment of any portion of the payments made on account of the DIP Obligations owing under this Agreement or the other DIP Loan Documents;

(x)  the entry of an order in any of the Chapter 11 Cases granting any other superpriority administrative claim or Lien equal or superior to that granted to Lender, other than as expressly set forth in the Final DIP Order or Approved DIP Budget;

(y)  absent the written consent of Lender, entry by the Bankruptcy Court of an order under Section 363 or 365 of the Bankruptcy Code authorizing or approving the sale or assignment of a material portion of any of any Borrower's assets that does not pay the DIP Obligations in full in Cash.

(z)  absent Lender written consent, the proposal of any sale of all or substantially all of any of the Borrower or any Guarantor's assets (either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan or reorganization in the Bankruptcy Case, or otherwise) that does not preserve Lender's rights to credit bid its claims;

(aa)  any expropriation, attachment, sequestration, distress or execution that remains in effect and is not stayed under Section 362 of the Bankruptcy Code for thirty (30) days or longer and which affects (A) any Oil and Gas Properties of the Borrowers or (B) any other assets of the Borrowers or Guarantors which has an aggregate fair market value greater than $50,000;

(bb)  any non-monetary judgment or order with respect to a post-petition or post-filing event shall be rendered against any Borrower or Guarantor which does or would reasonably be expected to cause a Material Adverse Effect;

(cc)  the failure of any Borrower to comply with any order of the Bankruptcy Court which failure does or would reasonably be expected to cause a Material Adverse Effect;

(dd)  the Borrowers shall be unable to pay any post-petition obligation, including without limitation, all administrative expense claims, in full in Cash when due;

(ee)  absent written consent of Lender, the payment of, or application for authority to pay, any Indebtedness or claims that arose or were incurred prior to the Borrowers' Chapter 11 filings on January 4, 2015, unless otherwise set forth in the Approved DIP Budget; or

(ff)  the failure of any Borrower to perform any of its obligations under the Final DIP Order.

9.2  Remedies.

(a)  Upon the occurrence and during the continuance of any Event of Default, Lender may, by notice in writing to the Borrowers, declare all DIP Obligations under the DIP Loan

- 41 -

Documents immediately due and payable, without presentment, demand, protest, notice of protest, default, or dishonor, notice of intent to accelerate maturity, notice of acceleration of maturity, or other notice of any kind, except as may be provided to the contrary elsewhere herein, all of which are hereby expressly waived by the Borrowers and the Guarantors.

(b)  Upon the occurrence and during the continuance of any Event of Default, Lender may, in addition to the foregoing in this Section 9.2, on the fifth (5th) Business Day following the date notice of an intent to exercise rights and remedies has been provided to the Borrowers by Lender, exercise any or all of the rights and remedies provided by law or pursuant to the DIP Loan Documents.

(c)  Should the DIP Obligations under the DIP Loan Documents become immediately due and payable in accordance with any of the preceding subsections of this Section 9.2, failing receipt by Lender of immediate payment in full of the DIP Loan Balance, any additional DIP Obligations then due and payable, and all accrued and unpaid interest and fees, Lender shall be entitled, on the fifth (5th) Business Day following the date notice of an intent to exercise rights and remedies has been provided to the Borrowers by Lender, to proceed against the Collateral, and proceeds from any realization against any such Collateral.

(d)  Proceeds from realization against the Collateral and any other funds received by Lender from any of the Borrowers or any of the Guarantors when an Event of Default has occurred and is continuing shall be applied (i) first, to fees and expenses due pursuant to the terms of this Agreement and any other DIP Loan Document, (ii) second, to accrued interest on the DIP Obligations under the DIP Loan Documents, (iii) third, to the DIP Loan Balance, in any manner elected by Lender, and any other DIP Obligations then due and payable, pro rata in accordance with the ratio of the DIP Loan Balance or such other DIP Obligations, as the case may be, to the sum of the DIP Loan Balance and such other DIP Obligations and (iv) as provided in subsection (c) immediately above, if applicable.

(e)  In addition to any rights and remedies provided by law or pursuant to the DIP Loan Documents, in the event of a sale of any of the Borrowers' assets, whether by foreclosure or otherwise, Lender shall have the right to credit bid all amounts outstanding under this Agreement or the other DIP Loan Documents, including, without limitation, all fees and expenses payable under this Agreement or any other DIP Loan Document and all principal and interest (including interest accrued at the Default Rate, if applicable) owing on the DIP Loan Balance.

ARTICLE X.<br>MISCELLANEOUS

10.1  Assignments; Participations.  None of the Borrowers nor any of the Guarantors may assign any of its rights or delegate any of its obligations under any DIP Loan Document without the prior written consent of Lender.

10.2  Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby.

- 42 -

10.3    Survival of Representations, Warranties, and Covenants.  All representations and warranties of the Borrowers and the Guarantors and all covenants and agreements of the Borrowers and the Guarantors herein made shall survive the execution and delivery of the Note (if any) and the DIP Security Documents and shall remain in force and effect so long as any DIP Obligation is outstanding.

10.4    Notices and Other Communications.   Except as to oral notices expressly authorized herein, which oral notices shall be confirmed in writing, all notices, requests, and communications hereunder shall be in writing (including by facsimile, electronic mail or other electronic form).  Unless otherwise expressly provided herein, any such notice, request, demand, or other communication shall be deemed to have been duly given or made when delivered by hand or by a nationally-recognized overnight courier service, or, in the case of delivery by mail, five days after being deposited in the mail, certified mail, return receipt requested, postage prepaid, or, in the case of facsimile notice, when receipt thereof is acknowledged orally or by written confirmation report, addressed as follows:

(a)  If to Lender:

> CL III Funding Holding Company, LLC
> 4600 Wells Fargo Center
> 90 South 7th Street
> Minneapolis, MN  55402
> Attention:  Luke Beltnick
> Telephone:  612-851-3019
> Facsimile:  612-851-3001
> Email**:**  luke.beltnick@castlelake.com
>
> with a copy to:
>
> Snow Spence Green LLP
> 2929 Allen Parkway, Suite 2800
> Houston, TX  77019
> Attn:  Phil F. Snow
> Facsimile:  713-335-4902
> Email:  philsnow@snowspencelaw.com

(b)  if to any of the Borrowers or any of the Guarantors, to:

> WBH Energy
> 4407 Bee Caves Road, Suite 421
> Austin, Texas 78746
> Attention:  Joe Warnock
>
> with a copy to:
>
> Willkie Farr & Gallagher LLP
> 600 Travis Street, Suite 2310

- 43 -

Houston, Texas 77002
Attention: Michael De Voe Piazza
Facsimile: (713) 987-3686
E-mail: mpiazza@willkie.com

and to:

Bracewell & Giuliani LLP
711 Louisiana Street
Suite 2300
Houston, Texas 77002-2770
Attention: William A. Wood III
Facsimile: (713) 221-2124
E-mail: trey.wood@bgllp.com

Any party may, by proper written notice hereunder to the others, change the individuals or addresses to which such notices to it shall thereafter be sent.

10.5    Parties in Interest.  Subject to the restrictions on changes in structure set forth in Section 6.10 and other applicable restrictions contained herein, all covenants and agreements herein contained by or on behalf of either of the Borrowers, any of the Guarantors, or Lender shall be binding upon and inure to the benefit of the relevant Borrower, the relevant Guarantor, or Lender, as the case may be, and their respective successors and permitted assigns.

10.6    Renewals; Extensions.  All provisions of this Agreement relating to the Note shall apply with equal force and effect to each promissory note hereafter executed which in whole or in part represents a renewal or extension of any part of the Indebtedness of the Borrowers under this Agreement, the Note or any other DIP Loan Document.

10.7    Rights of Third Parties.  All provisions herein are imposed solely and exclusively for the benefit of the Lender, the Borrowers and the Guarantors.  No other Person shall have any right, benefit, priority or interest hereunder or as a result hereof or have standing to require satisfaction of provisions hereof in accordance with their terms.

10.8    No Waiver; Rights Cumulative.  No course of dealing on the part of Lender or its officers or employees, nor any failure or delay by Lender with respect to exercising any of its rights under any DIP Loan Document shall operate as a waiver thereof.  The rights of Lender under the DIP Loan Documents shall be cumulative and the exercise or partial exercise of any such right shall not preclude the exercise of any other right.  The making of any DIP Loan shall not constitute a waiver of any of the covenants, warranties or conditions of any of the Borrowers or any of the Guarantors contained herein.  In the event any of the Borrowers is unable to satisfy any such covenant, warranty or condition, the making of any DIP Loan shall not have the effect of precluding Lender from thereafter declaring such inability to be an Event of Default as hereinabove provided.

10.9    Survival Upon Unenforceability.  In the event any one or more of the provisions contained in any of the DIP Loan Documents or in any other instrument referred to herein or

- 44 -

executed in connection with the DIP Obligations shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of any DIP Loan Document or of any other instrument referred to herein or executed in connection with such DIP Obligations.

10.10  <u>Amendments; Waivers</u>.  Neither this Agreement nor any provision hereof may be amended, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the amendment, waiver, discharge or termination is sought.  Subject to the preceding sentence, any provision of this Agreement or any other DIP Loan Document may be amended, modified or waived by the Borrowers, the Guarantors and Lender; provided that, notwithstanding any provision of this Agreement to the contrary, (a) no amendment, modification or waiver which extends the final maturity of the DIP Loan, forgives the principal amount of any Indebtedness of the Borrowers outstanding under this Agreement or interest thereon or fees owing under this Agreement, releases any Guarantor of such Indebtedness, releases all or substantially all of the Collateral, reduces the interest rate applicable to the DIP Loan or the fees payable to Lender, affects <u>Section 2.1</u>, <u>Section 2.2</u>, <u>Section 9.2(c)</u> or this <u>Section 10.10</u> or postpones the date of payment of any amount due as a result of any fee payable hereunder shall be effective without the consent of Lender effected thereby; (b) no amendment, modification or waiver which increases the DIP Loan Balance shall be effective without the consent of Lender; and (c) no amendment, modification or waiver which modifies the rights, duties or obligations of Lender shall be effective without the consent of Lender.

10.11  <u>Controlling Agreement</u>.  In the event of a conflict between the provisions of this Agreement and those of any other DIP Loan Document, the provisions of this Agreement shall control.

10.12  <u>Disposition of Collateral</u>.  Notwithstanding any term or provision, express or implied, in any of the DIP Security Documents, but subject to applicable provisions of this Agreement, the realization, liquidation, foreclosure or any other disposition on or of any or all of the Collateral shall be in the order and manner and determined in the sole discretion of Lender; provided, however, that in no event shall Lender violate applicable law or exercise rights and remedies other than those provided in such DIP Security Documents or otherwise existing at law or in equity.

10.13  <u>Governing Law</u>.  **THIS AGREEMENT SHALL BE DEEMED TO BE CONTRACTS MADE UNDER AND SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO PRINCIPLES THEREOF RELATING TO CONFLICTS OF LAW.**

10.14  <u>Waiver of Right to Jury Trial</u>.  **EACH OF THE BORROWERS, THE GUARANTORS AND LENDER HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, COUNTERCLAIM OR OTHER LITIGATION THAT RELATES TO OR ARISES OUT OF THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT OR THE ACTS OR OMISSIONS OF LENDER IN THE ENFORCEMENT OF ANY OF THE TERMS OR PROVISIONS OF THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT OR OTHERWISE WITH RESPECT THERETO.  THE PROVISIONS OF**

THIS **SECTION 10.14** ARE A MATERIAL INDUCEMENT FOR LENDER TO ENTER INTO THIS AGREEMENT.

10.15 <u>Waiver of Class Action</u>. **EACH OF THE BORROWERS, THE GUARANTORS AND LENDER WAIVES THE RIGHT TO LITIGATE ANY CLAIM, DISPUTE OR CONTROVERSY WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT AS A CLASS ACTION, EITHER AS A MEMBER OF A CLASS OR AS A REPRESENTATIVE, OR TO ACT AS A PRIVATE ATTORNEY GENERAL.**

10.16 <u>Jurisdiction and Venue</u>. All actions or proceedings with respect to, arising directly or indirectly in connection with, out of, related to or from this Agreement or any other DIP Loan Document shall be litigated in the Bankruptcy Court or U.S. District Court where the Bankruptcy Court is located. In such regard, each of the Borrowers and the Guarantors hereby submit to the jurisdiction of the Bankruptcy Court, and hereby waive any rights it may have to transfer or change the jurisdiction or venue of any litigation brought against it by Lender in accordance with this <u>Section 10.16</u>.

10.17 <u>Integration</u>. This Agreement and the other DIP Loan Documents constitute the entire agreement among the parties hereto and thereto with respect to the subject hereof and thereof and shall supersede any prior agreement among the parties hereto and thereto, whether written or oral, relating to the subject hereof and thereof, including any term sheet provided to the Borrowers by Lender. Furthermore, in this regard, this Agreement and the other written DIP Loan Documents represent, collectively, the final agreement among the parties thereto and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of such parties. There are no unwritten oral agreements among such parties.

10.18 <u>Waiver of Punitive and Consequential Damages</u>. Each of the Borrowers, the Guarantors and Lender hereby knowingly, voluntarily, intentionally and irrevocably (a) waives, to the maximum extent it may lawfully and effectively do so, any right it may have to claim or recover, in any dispute based hereon, or directly or indirectly at any time arising out of, under or in connection with this Agreement, the other DIP Loan Documents, the Chapter 11 Cases or the Final DIP Order or any transaction contemplated hereby or thereby or associated therewith, before or after the Maturity Date, any special, exemplary, punitive or consequential damages, or damages other than, or in addition to, actual damages and (b) acknowledges that it has been induced to enter into this Agreement, the other DIP Loan Documents and the transactions contemplated hereby and thereby by, among other things, the mutual waivers and certifications contained in this <u>Section 10.18</u>.

10.19 <u>Counterparts</u>. For the convenience of the parties, this Agreement may be executed in multiple counterparts and by different parties hereto in separate counterparts, each of which for all purposes shall be deemed to be an original, and all such counterparts shall together constitute but one and the same Agreement and shall be enforceable as of the date hereof upon the execution of one or more counterparts hereof by each of the parties hereto. In this regard, each of the parties hereto acknowledges that a counterpart of this Agreement containing a set of counterpart execution pages reflecting the execution of each party hereto shall be sufficient to reflect the execution of this Agreement by each party hereto and shall constitute one instrument.

10.20 <u>USA Patriot Act Notice</u>.    Lender hereby notifies the Borrowers and the Guarantors that, pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Borrowers and the Guarantors, which information includes the name and address of each of the Borrowers and the Guarantors and other information that will allow Lender to identify each of the Borrowers and the Guarantors in accordance with the USA Patriot Act.

10.21 <u>Tax Shelter Regulations</u>.    None of the Borrowers intends to treat the DIP Loan and related transactions hereunder and under the other DIP Loan Documents as a "reportable transaction" (within the meanings under current Treasury Regulation Section 1.6011-4 and Proposed Treasury Regulation Section 1.6011-4, promulgated on November 1, 2006).   In the event any of the Borrowers determines to take any action inconsistent with the foregoing statement, it will promptly notify Lender thereof.   If any of the Borrowers so notifies Lender, each of the Borrowers acknowledges that Lender may treat its DIP Loan and related transactions hereunder and under the other DIP Loan Documents as part of a transaction that is subject to current Treasury Regulation Section 301.6112-1 or Proposed Treasury Regulation Section 301.6112-1, promulgated on November 1, 2006, and, in such case, Lender will maintain the lists and other records required, if any, by such Treasury Regulations.

10.22 <u>Commercially Reasonable Efforts</u>.    Notwithstanding anything to the contrary contained in this Agreement, no Borrower shall be in breach, or deemed to be in breach, of any covenant, agreement or obligation in this Agreement relating to the operation of or access to any property that is not operated by the Borrowers or any of their Affiliates so long as the Borrowers have used commercially reasonable efforts under the circumstances to cause the operator thereof to perform or not to perform, as applicable, such covenant, agreement or obligation.

**(Signatures appear on following pages)**

#4852354.4
#4887316.1

IN WITNESS WHEREOF, this Agreement is executed as of the date first above written.

<u>BORROWERS</u>:

WBH ENERGY, LP

By: WBH Energy GP, LLC, its general partner


By:_____
Name: Joseph Warnock
Title: Vice President


WBH ENERGY PARTNERS LLC


By:_____
Name: Joseph Warnock
Title: Vice President


WBH ENERGY GP, LLC


By:_____
Name: Joseph Warnock
Title: Vice President


**(Signatures continue on following page)**

#4852354.4
#4887316.1

<u>LENDER</u>:

CL III FUNDING HOLDING COMPANY LLC,


By: _____
Name: _____
Title: _____

#4852354.4
#4887316.1

**Schedule 4.15**

## <u>SUBSIDIARIES</u>

Cooke Co. Resources, LLC

#4852354.4
#4887316.1

**Schedule 4.17**

## <u>TAXPAYER I.D. AND ORGANIZATIONAL NUMBERS</u>

<u>WBH Energy, LP</u>

<u>Taxpayer ID No.</u>                   <u>Organizational No.</u>

45-4106472                          801527302

<u>WBH Energy Partners LLC</u>

<u>Taxpayer ID No.</u>                   <u>Organizational No.</u>

27-4614935                          801312507

<u>WBH Energy GP, LLC</u>

<u>Taxpayer ID No.</u>                   <u>Organizational No.</u>

45-4106421                          801526448

#4852354.4
#4887316.1

**Schedule 5.21**

**DEPOSITORY BANKS AND ACCOUNT NUMBERS**

| Banking Institution | Account No. | Account Holder | Primary Bank Contact |
|---|---|---|---|
| Horizon Bank | 89XXX | WBH Energy LP | Gregg Bennett (512) 637-5752 |
| Horizon Bank | 6411XXX | WBH Energy LP | |
| Horizon Bank | 259XXX | WBH Energy Partners LLC | |
| Horizon Bank | 259XXX | WBH Energy Partners LLC | |
| Green Bank | 3360212XXX | WBH Energy LP | Jean Evans (972) 528-6772 |
| Green Bank | 5501020XXX | WBH Energy LP | |
| Green Bank | 3360212XXX | WBH Energy Partners LLC | |
| Texas Capital Bank | 4111001XXX | WBH Energy Partners LLC | Jereme Gooch (512) 305-4082 |
| Texas Capital Bank | 4011019XXX | WBH Energy Partners LLC | |
| Texas Capital Bank | 4111002XXX | WBH Energy Partners LLC | |
| Texas Capital Bank | 4111004XXX | WBH Energy Partners LLC | |

#4852354.4
#4887316.1

## <u>EXHIBIT A</u>

**Form of Note**
**WBH ENERGY, LP, WBH ENERGY PARTNERS, LLC**
**WBH ENERGY GP, LLC**

**TERM NOTE**

$[5,000,000.00]                                                    May ___, 2015

     FOR VALUE RECEIVED, the undersigned, WBH ENERGY, LP, a Texas limited partnership, WBH Energy Partners, LLC, a Texas limited liability company and WBH Energy GP, LLC, a Texas limited liability company (collectively, the "<u>Borrowers</u>"), HEREBY PROMISE TO PAY to the order of CL III FUNDING HOLDING COMPANY, LLC, a Delaware limited liability company ("<u>Lender</u>"), at its offices at 4600 Wells Fargo Center, 90 South 7th Street, Minneapolis, MN 55402, or at such other place as Lender may designate from time to time in writing, in lawful money of the United States of America and in immediately available funds, the original principal amount of [FIVE MILLION AND NO/100 ($5,000,000.00)] or as much thereof as shall have been advanced and remaining unpaid and outstanding hereunder, plus all PIK Interest increasing such principal amount and other amounts accrued under the Senior Secured, Superpriority Debtor-in-Possession Credit Agreement (as hereinafter defined).

     1.    <u>Definitions</u>.  Unless the context hereof otherwise requires or provides, the terms used herein have the same meanings as defined in that certain Senior Secured, Superpriority Debtor-in-Possession Credit Agreement among Borrowers and Lender of even date herewith (as the same has been or may be amended or supplemented from time to time, the "<u>DIP Credit Agreement</u>").

     2.    <u>Interest, Principal and Payment</u>.  This Note is issued pursuant to the DIP Credit Agreement, and is entitled to the benefit and security of the DIP Credit Agreement and all DIP Loan Documents.  Reference is hereby made to the DIP Credit Agreement for a statement of all of the terms and conditions under which the Advances evidenced hereby are made and are to be repaid. The date and amount of the Advances made by Lender to Borrowers, the rate and amount of PIK Interest applicable thereto and increasing the principal amount due in connection with the Advances and each payment made on account of the principal thereof, shall be recorded by Lender on its books; provided that the failure of Lender to make any such recordation shall not affect the obligations of Borrowers to make a payment when due of any amount owing under the DIP Credit Agreement or this Note in respect of the Advances to Borrowers.

     The principal amount of the indebtedness evidenced hereto shall be payable in the form, amounts and on the dates specified in the DIP Credit Agreement, the terms of which are hereby incorporated herein by reference.  Interest thereon shall be paid (including in the form of PIK Interest) until such principal amount is paid in full in the form, at such interest rates and at such times, and pursuant to such calculations, as are specified in the DIP Credit Agreement.

     3.    <u>Business Day</u>.  If any payment on this Note becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

Exhibit A-1

4.      Default.  On the Maturity Date, the entire principal of and accrued interest on this Note shall become due and payable without demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices and further actions of any kind, all of which are hereby expressly waived by Borrowers.

5.      Waiver.  Each surety, endorser, guarantor and any other party now or hereafter liable for the payment of this Note in whole or in part ("Surety") and Borrowers hereby jointly and severally (a) waive grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, non-payment or dishonor, notice of intent to accelerate, notice of acceleration and all other notices (except as provided in the DIP Credit Agreement), filing of suit and diligence in collecting this Note or enforcing any other security with respect to same, (b) agree to any substitution, surrender, subordination, waiver, modification, change, exchange or release of any security or the release of the liability of any parties primarily or secondarily liable hereon, (c) agree that Lender is not required first to institute suit or exhaust its remedies hereon against Borrowers, any Surety or others liable or to become liable hereon or to enforce its rights against them or any security with respect to same or to join any of them in any suit against any others of them, and (d) consent to any extension or postponement of time of payment of this Note and to any other indulgence with respect hereto without notice thereof to any of them.  No failure or delay on the part of Lender in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

7.      **WAIVER JURY TRIAL, PUNITIVE DAMAGES, ETC.  BORROWERS KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVE, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT THEY MAY HAVE TO (A) A TRIAL BY JURY IN CONNECTION WITH ANY LITIGATION ARISING FROM OR RELATED TO THIS NOTE, THE ADVANCES, THE DIP LOAN DOCUMENTS OR ANY TRANSACTION CONTEMPLATED BY ANY OF THE DIP LOAN DOCUMENTS, WHETHER BEFORE OR AFTER THE MATURITY DATE, OR (B) CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY SPECIAL DAMAGES.**

8.      **Governing Law.  THIS NOTE AND THE OBLIGATIONS THEREUNDER ARE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THAT STATE'S CONFLICTS OF LAWS RULES.  WITHOUT LIMING THE FOREGOING, IT IS EXPRESSLY INTENDED BY BORROWERS AND LENDER THAT THE LAWS OF THE STATE OF NEW YORK APPLY WITH RESPECT TO ALL MATTERS PERTAINING TO THE RATES OF INTEREST THAT MAY BE LAWFULLY CHARGED UNDER THE DIP CREDIT AGREEMENT AND THIS NOTE.**

9.      **Jurisdiction.  BORROWERS STIPULATE THAT THE BANKRUPTCY COURT OR U.S. DISTRICT COURT WHERE THE BANKRUPTCY COURT IS LOCATED IN THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION, SHALL HAVE IN PERSONAM JURISDICTION AND VENUE OVER BORROWERS IN CONNECTION WITH ANY JUDICIAL PROCEEDING ARISING OUT OF OR RELATED TO THIS NOTE, THE DIP LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED BY THEM. ANY FINAL JUDGMENT RENDERED AGAINST A PARTY IN ANY JUDICIAL PROCEEDING WILL BE CONCLUSIVE WITH RESPECT TO THE SUBJECT MATTER OF THAT FINAL JUDGMENT AND MAY BE ENFORCED IN ANY JURISDICTION IN ANY MANNER PROVIDED BY LAW.**

10.     **Venue.  BORROWERS AGREE THAT ANY JUDICIAL PROCEEDING**

#4852354.4
#4887316.1

**ARISING FROM OR RELATED TO THIS NOTE WILL BE BROUGHT EXCLUSIVELY IN THE BANKRUPTCY COURT OR U.S. DISTRICT COURT WHERE THE BANKRUPTCY COURT IS LOCATED IN THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION. THIS CHOICE OF VENUE IS INTENDED BY THE PARTIES TO (A) BE MANDATORY AND NOT PERMISSIVE IN NATURE, AND (B) PRECLUDE ANY PARTY FROM COMMENCING OR MAINTAINING ANY JUDICIAL PROCEEDING AGAINST ANOTHER PARTY IN ANY JURISDICTION OTHER THAN THE BANKRUPTCY COURT OR U.S. DISTRICT COURT WHERE THE BANKRUPTCY COURT IS LOCATED IN THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION.   IF THAT JUDICIAL PROCEEDING ARISES FROM OR IS RELATED TO THIS NOTE, THE DIP LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED BY THEM, BORROWERS IRREVOCABLY WAIVE ANY RIGHT THEY MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR SIMILAR DOCTRINE OR TO OBJECT TO VENUE WITH RESPECT TO ANY JUDICIAL PROCEEDING COMMENCED OR MAINTAINED IN ACCORDANCE WITH THIS <u>SECTION 10</u>.**

**WBH ENERGY, LP**

By:    WBH Energy GP, LLC, its general partner

By:_____

Name:_____

Title:_____

**WBH ENERGY PARTNERS, LLC**

By:_____

Name:_____

Title:_____

**WBH ENERGY GP, LLC**

By:_____

Name:_____

Title:_____

Exhibit A-3

<u>**EXHIBIT B**</u>

**Form of Compliance Certificate**

**[Date]**

CL III Funding Holding Company, LLC
4600 Wells Fargo Center
90 South 7th Street
Minneapolis, MN  55402
Attention:  Luke Beltnick

> Re:     Senior Secured, Superpriority Debtor-in-Possession Credit Agreement dated effective May __, 2015 by and among WBH Energy, LP, WBH Energy Partners LLC and WBH Energy GP, LLC, as Borrowers and CL III Funding Holding Company, LLC, the Lender, (as amended, supplemented, restated or otherwise modified from time to time, the "<u>Credit Agreement</u>")

Ladies and Gentlemen:

Pursuant to applicable requirements of the Credit Agreement, the undersigned individual, as a Responsible Officer of each of the Borrowers, hereby certifies to you the following information as true and correct as of the date hereof or for the period indicated, as the case may be:

1.     [To the best of the knowledge of the undersigned, no Default or Event of Default (including, but not limited to, any arising from any violation or alleged violation of any Environmental Law) exists as of the date hereof or has occurred since the date of our previous certification to you, if any.]

1.     [To the best of the knowledge of the undersigned, the following Defaults or Events of Default (including, but not limited to, any arising from any violation or alleged violation of any Environmental Law) exist as of the date hereof or have occurred since the date of our previous certification to you, if any, and the actions set forth below are being taken to remedy such circumstances:]

Each capitalized term used but not defined herein shall have the meaning assigned to such term in the Credit Agreement.

Very truly yours,

_____

[insert title] of [insert name of borrower]

Exhibit B-1

#4852354.4
#4887316.1

## **EXHIBIT C**

**Form of Agreed Automatic Stay Order**

Exhibit C-2

#4852354.4
#4887316.1

## **EXHIBIT D**

**Approved DIP Budget**

**(see attached)**

Exhibit D

#4852354.4
#4887316.1

## **EXHIBIT E**

**Form of Final DIP Order**

**(see attached)**

Exhibit E

## EXHIBIT F

### Form of DIP Security Agreement

This SECURITY AGREEMENT (this "<u>Security Agreement</u>") is made and entered into as of May __, 2015 (the "<u>Effective Date</u>"), by [INSERT BORROWER NAME] ("<u>Debtor</u>"), with its principal office in Austin, Texas, and the address for which for purposes hereof is 4407 Bee Caves Road, Suite 421, Austin, Texas 78746 (it being understood and agreed that for notices purposes its address is P.O. Box 302380 Austin, Texas 78703, Attn: Joe Warnock), in favor of CL III FUNDING HOLDING COMPANY, LLC, as secured party (in such capacity, together with its successors in such capacity, "<u>Secured Party</u>"), the address for which, for purposes hereof, being 4600 Wells Fargo Center, 90 South 7th Street, Minneapolis, MN  55402, Attn: Luke Beltnick, for the Lender (as hereinafter defined) pursuant to that certain Credit Agreement dated as of the Effective Date by and among Debtor, certain other parties, as borrowers, and the lender ("<u>Lender</u>") and Secured Party (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>").

### RECITALS

WHEREAS, Debtor, certain other parties, as borrowers, the Lender and Secured Party are parties to the Credit Agreement, pursuant to which, upon the terms and conditions stated therein, the Secured Party and the Lender agree to extend credit to Debtor; and

WHEREAS, to secure the DIP Obligations, Debtor has agreed to assign to Secured Party, and grant to Secured Party a security interest in, all right, title and interest of Debtor in and to the property hereinafter described;

NOW, THEREFORE, (i) in order to comply with the terms and conditions of the Credit Agreement, (ii) for and in consideration of the premises and the agreements herein contained and (iii) for other good and valuable consideration, the receipt and sufficiency of all of which are hereby acknowledged, Debtor hereby agrees with Secured Party as follows:

### ARTICLE I

### GENERAL TERMS

1.1    <u>Terms Defined Above</u>.  As used in this Security Agreement, each of the terms defined in the preamble hereto and the above recital paragraphs shall have the meaning assigned to such term above.

1.2    <u>Definitions Contained in Credit Agreement</u>.  Each term used herein beginning with a capital letter which is not defined herein, if any, shall have the meaning assigned to such term in the Credit Agreement, unless the context hereof otherwise requires.

#4852354.4
#4887316.1

    1.3    <u>Certain Definitions</u>.  As used in this Security Agreement, each of the following terms shall have the meaning set forth for such term below, unless the context otherwise requires:

"<u>Code</u>" shall mean the Uniform Commercial Code as in effect in the State of New York or any other relevant jurisdiction from time to time.

"<u>Collateral</u>" shall mean all Property, including, without limitation, Cash or other proceeds, in which Secured Party shall have a security interest pursuant to <u>Article II</u> of this Security Agreement.

"<u>Gas</u>" shall have the meaning assigned to such term in <u>Article II</u> hereof.

"<u>Related Rights</u>" shall mean all chattel papers, documents and instruments relating to the Accounts or the General Intangibles and all rights now or hereafter existing in and to all security agreements, leases, and other contracts securing or otherwise relating to any Accounts or General Intangibles or any such chattel papers, documents or instruments.

"<u>Secured Obligations</u>" shall mean the Obligations and all renewals and extensions thereof.

"<u>Security Agreement</u>" shall mean this Security Agreement, as the same may from time to time be amended, supplemented, restated or otherwise modified.

    1.4    <u>Terms Defined in Code</u>.  All terms used herein which are defined in the Code shall have the same meaning herein, unless the context otherwise requires.

## ARTICLE II

## <u>SECURITY INTEREST</u>

To secure the Secured Obligations, Debtor hereby grants to Secured Party a continuing security interest in, a general lien upon, and a right of set-off against, the following described Property of Debtor:

    (a)    all now existing and hereafter acquired or arising Accounts, Goods, General Intangibles, Payment Intangibles, Deposit Accounts, Securities Accounts, Chattel Paper (including, without limitation, Electronic Chattel Paper), Documents, Instruments, Software, Investment Property, letters of credit, Letter of Credit Rights, advices of credit, money, As-Extracted Collateral (including As-Extracted Collateral from Debtor's present and future operations, regardless of whether such mineral or gas interests are presently owned or hereafter acquired by Debtor), Commercial Tort Claims, Equipment, Inventory, Fixtures and Supporting Obligations, together with all products of and Accessions to any of the foregoing and all Proceeds of any of the foregoing (including, without limitation, all insurance policies and proceeds thereof);

Exhibit F-2

(b)      to the extent, if any, not included in clause (a) above, Debtor's present and future contracts, agreements, arrangements or understandings (i) for the sale, supply, provision or disposition of any natural gas, casinghead gas, all other hydrocarbons not defined as oil, carbon dioxide, and helium or other substances of a gaseous nature ("Gas"), oil or other minerals by Debtor or any one or more of its agents, representatives, successors or assigns to any purchaser or acquirer thereof, and all products, replacements and proceeds thereof (including, without limitation, all Gas or oil sales contracts) and (ii) relating to the mining, drilling or recovery of any mineral, crude oil or gas reserves for the benefit of or on behalf of Debtor or any of its agents, representatives, successors or assigns (including, without limitation, all contract mining, drilling or recovery agreements and arrangements), and all products and Proceeds thereof and payments thereunder, together with all products and Proceeds (including, without limitation, all insurance policies and proceeds) of and any Accessions to any of the foregoing;

(c)      to the extent, if any, not included in clause (a) above, all Gas, oil and other minerals severed or extracted from the ground (specifically including all "As-Extracted Collateral" of Debtor and all severed or extracted Gas purchased, acquired or obtained from other parties), and all Accounts, General Intangibles and products and Proceeds thereof or related thereto, regardless of whether any such Gas, oil or other minerals are in raw form or processed for sale;

(d)      to the extent, if any, not included above, each and every other item of Personal Property and fixtures, whether now existing or hereafter arising or acquired, including, without limitation, all licenses, contracts and agreements, and all collateral for the payment or performance of any contract or agreement, together with all products and Proceeds (including all insurance policies and proceeds) and any Accessions to any of the foregoing;

(e)      all present and future business records and information, including, without limitation, computer tapes and other storage media containing the same and computer programs and software (including, without limitation, source code, object code and related manuals and documentation and all licenses to use such software) for accessing and manipulating such information;

(f)      all of Debtor's rights, title and interests under a Pipeline Construction Ownership and Operating Agreement Gathering System Montague and Cooke Counties, Texas, dated April 23, 2012, by and between WBH Energy, LP, Montague Transfer Partners, LLC and Strategic Energy Income Fund I, LL, as amended or otherwise modified from time to time; and

(g)      any additional Property of Debtor from time to time delivered to or deposited with Secured Party as security for the Secured Obligations or otherwise pursuant to the terms of this Security Agreement.

Notwithstanding the foregoing or anything to the contrary contained herein, the Debtor does not grant to Secured Party a security interest or any other rights or interest in (i) any avoidance

Exhibit F-3

actions arising under sections 544 through 553 of title 11 of the United States Code, or proceeds therefrom, (ii) documents, correspondence or other materials which the Borrowers reasonably believe are subject to the attorney-client privilege or another similar privilege, or (iii) electronic mail domain names, accounts or electronic mail correspondence.

## ARTICLE III

## <u>REPRESENTATIONS AND WARRANTIES</u>

In order to induce Secured Party to accept this Security Agreement, Debtor represents and warrants to Secured Party (which representations and warranties will survive the creation of the Secured Obligations) as of the Effective Date that:

3.1     <u>Ownership and Liens</u>.  The representations of Borrowers set forth in the Credit Agreement are incorporated herein.

3.2     <u>Status of Accounts</u>.  Each Account now existing represents, and each Account hereafter arising will represent, the valid and legally enforceable indebtedness of a bona fide account debtor arising from the sale or lease or rendition by Debtor of goods and/or services and is not and will not be subject to contra accounts, set-offs, defenses or counterclaims by or available to account debtors obligated on the Accounts except as disclosed to Secured Party in writing; such goods will have been delivered to, or be in the process of being delivered to, Debtor, and such services will have been rendered by Debtor to the account debtor and accepted by the account debtor; and the amount shown as to each Account of Debtor on Debtor's books will be the true and undisputed amount owing and unpaid thereon, subject to any discounts, allowances, rebates, credits and adjustments to which the account debtor has a right and which have been disclosed to Secured Party in writing.

3.3     <u>Status of Related Rights</u>.  All Related Rights of Debtor are, and those hereafter arising will be, valid and genuine.

3.4     <u>Location</u>.  Debtor's chief executive office and chief place of business is located at the address set forth in the opening paragraph of this Security Agreement.  The office where Debtor keeps its records concerning the Accounts of Debtor and the General Intangibles of Debtor and the original of all the Related Rights of Debtor has the same address as Debtor's chief executive office and chief place of business.  The jurisdiction of organization for Debtor is the State of Texas.

3.5     <u>Secured Party's Security Interest</u>.  This Security Agreement creates a valid and binding security interest in the Collateral securing the Secured Obligations.  All filings (which filings with Governmental Authorities are described in <u>Article IV</u> of this Security Agreement) and other actions necessary to perfect or protect such security interest have been duly or will be promptly taken by Debtor.  No further or subsequent filing, recording, registration or other public notice of such security interest is necessary in any governmental office or jurisdiction in order to perfect such security interest or to continue, preserve or protect such security interest

Exhibit F-4

except for continuation statements or for filings upon the occurrence of any of the events stated in Article IV of this Security Agreement.  Such perfected security interest in the Collateral constitutes a first-priority security interest under the Code.

## ARTICLE IV

## COVENANTS AND AGREEMENTS

4.1      A deviation from the provisions of this Article IV shall not constitute a default under this Security Agreement if such deviation is consented to in writing by Secured Party. Without the prior written consent of Secured Party, Debtor will at all times comply with the covenants contained in this Article IV, from the date hereof and for so long as any part of the Secured Obligations is outstanding.

4.2      Debtor recognizes that one or more financing statements pertaining to the Collateral provided by Debtor will be filed in one or more filing offices.  Debtor will promptly notify Secured Party of any condition or event that may change the proper location for the filing of any financing statements or other public notice or recordings for the purpose of perfecting a security interest in the Collateral.  Without limiting the generality of the foregoing, Debtor will (a) promptly notify Secured Party of any change (i) in the location of the office where such Debtor keeps its records concerning its Accounts or (ii) in the "location" of such Debtor within the meaning set forth in the Code or the jurisdiction in which Debtor is incorporated, organized or formed; (b) prior to any of the Collateral provided by Debtor becoming so related to any particular real estate so as to become a fixture on such real estate, notify Secured Party of the description of such real estate and the name of the record owner thereof, to the extent such real estate is not already encumbered in favor or for the benefit of Secured Party to secure the Secured Obligations; and (c) promptly notify Secured Party of any change in Debtor's name, identity or structure.  In any notice furnished pursuant to this paragraph, Debtor will expressly state that the notice is required by this Security Agreement and contains facts that will or may require additional filings of financing statements or other notices for the purpose of continuing perfection of Secured Party's security interest in the Collateral.  Further, Debtor authorizes Secured Party to file, at the expense of such Debtor, any and all financing statements, pursuant to Article 9 of the Code, as Secured Party deems necessary, in its sole discretion, in conjunction with this Security Agreement.

## ARTICLE V

## RIGHTS, REMEDIES AND WARRANTIES

5.1      With Respect to Collateral.  If an Event of Default under the Credit Agreement has occurred and is continuing, on the fifth (5th) Business Day following the date notice of an intent to exercise the rights and remedies set forth in this Article V has been provided to the Debtor by the Secured Party, Secured Party is hereby fully authorized and empowered (without the necessity of any further consent or authorization from Debtor) and the right is expressly granted to Secured Party, and Debtor hereby constitutes, appoints and makes Secured Party, as

Exhibit F-5

its true and lawful attorney-in-fact and agent for it and in its name, place and stead, with full power of substitution, in Secured Party's name or Debtor's name or otherwise, for the sole use and benefit of Secured Party, but at Debtor's cost and expense, to exercise, without notice, all or any of the following powers at any time with respect to all or any of the Collateral:

(a)     to notify account debtors or the obligors on the Accounts, the General Intangibles and the Related Rights to make and deliver payment to Secured Party;

(b)     to demand, sue for, collect, receive and give acquittance for any and all monies due or to become due by virtue thereof and otherwise deal with proceeds;

(c)     to receive, take, endorse, assign and deliver any and all checks, notes, drafts, Documents and other negotiable and non-negotiable Instruments and Chattel Paper taken or received by Secured Party in connection therewith;

(d)     to settle, compromise, compound, prosecute or defend any action or proceeding with respect thereto;

(e)     to sell, transfer, assign or otherwise deal in or with the same or the Proceeds or avails thereof or the relative goods, as fully and effectively as if Secured Party were the absolute owner thereof; and

(f)     to extend the time of payment of any or all thereof and to grant waivers and make any allowance or other adjustment with reference thereto;

provided, however, Secured Party shall be under no obligation or duty to exercise any of the powers hereby conferred upon it and shall be without liability for any act or failure to act in connection with the collection of, or the preservation of any rights under, any Collateral.

5.2     Default Remedies.  Upon the occurrence and during the continuance of any Event of Default, on the fifth (5th) Business Day following the date notice of an intent to exercise the rights and remedies set forth in this Article V has been provided to the Debtor by the Secured Party, Secured Party may then, or at any time thereafter and from time to time, apply, set-off, collect, sell in one or more sales, lease, or otherwise dispose of, any or all of the Collateral, in its then condition or following any commercially reasonable preparation or processing, in such order as Secured Party may elect, and any such sale may be made either at public or private sale at its place of business or elsewhere, or at any brokers' board or securities exchange, either for Cash or upon credit or for future delivery, at such price as Secured Party may deem fair, and Secured Party may be the purchaser of any or all Collateral so sold and may hold the same thereafter in its own right free from any claim of Debtor or right of redemption.  No such purchase or holding by Secured Party shall be deemed a retention by Secured Party in satisfaction of the Secured Obligations.  All demands, notices and advertisements and the presentment of Property at sale are hereby waived.  If, notwithstanding the foregoing provisions, any applicable provision of the Code or other law requires Secured Party to give reasonable notice of any such sale or disposition or other action, Debtor hereby agrees that ten (10) days' prior written notice shall constitute reasonable notice.  Secured Party may require Debtor to

Exhibit F-6

assemble the Collateral and make it available to Secured Party at a place designated by Secured Party which is reasonably convenient to Secured Party and Debtor.  Any sale hereunder may be conducted by an auctioneer or any officer or agent of Secured Party.

5.3     Right of Set-Off.  Upon the occurrence and during the continuance of any Event of Default, on the fifth (5th) Business Day following the date notice of an intent to exercise the rights and remedies set forth in this Article V has been provided to the Debtor by the Secured Party, Secured Party is hereby authorized to then, or at any time thereafter and from time to time, without notice to Debtor (any such notice being expressly waived by Debtor), apply and set-off against the Secured Obligations (i) any and all deposits (general or special, time or demand, provisional or final) of Debtor at any time held by Secured Party; (ii) any and all other claims of Debtor against Secured Party, now or hereafter existing, (iii) any and all other indebtedness at any time owing by Secured Party to or for the account of Debtor; (iv) any and all money, Instruments, securities, Documents, Chattel Paper, credits, claims, demands and other Property, rights or interests of Debtor which at any time shall come into the possession or custody or under the control of Secured Party, for any purpose; and (v) the Proceeds of any of the foregoing Property, in accordance with the Credit Agreement, as if the same were included in the Collateral, and Debtor hereby grants to Secured Party a security interest in, a general lien upon and a right of set-off against the foregoing described Property as security for the Secured Obligations.  Secured Party shall have the right to so set-off and apply such Property against the Secured Obligations regardless of whether or not Secured Party shall have made any demand for payment of any of the Secured Obligations or shall have given any other notice.  Secured Party agrees to promptly notify Debtor after any such set-off and application; provided, however, the failure of Secured Party to give any such notice shall not affect the validity of such set-off and application.  The rights of Secured Party under this Section 5.3 are in addition to other rights and remedies (including, without limitation, other rights of set-off) which Secured Party may have.

5.4     Proceeds.  Following the occurrence and during the continuance of any Event of Default, the proceeds of any sale or other disposition of the Collateral and all sums received or collected by Secured Party from or on account of the Collateral shall be applied by Secured Party in the manner set forth in the Credit Agreement.

5.5     Secured Party's Lack of Duties.  The powers conferred upon Secured Party by this Security Agreement are solely to protect its interest in the Collateral and shall not impose any duty upon Secured Party to exercise any such powers.  Secured Party shall be under no duty whatsoever to make or give any presentment, demand for performance, notice of nonperformance, protest, notice of protest, notice of dishonor or other notice or demand in connection with any Collateral or the Secured Obligations, or to take any steps necessary to preserve any rights against prior parties.  Secured Party shall not be liable for failure to collect or realize upon any or all of the Secured Obligations or Collateral, or for any delay in so doing, nor shall Secured Party be under any duty to take any action whatsoever with regard thereto.  Secured Party shall use reasonable care in the custody and preservation of any Collateral in its possession, but need not take any steps to keep the Collateral identifiable.  Secured Party shall have no duty to comply with any recording, filing or other legal requirements necessary to

#4852354.4
#4887316.1

establish or maintain the validity, priority or enforceability of, or Secured Party's rights in or to, any of the Collateral.

5.6     Secured Party's Actions.  To the extent permitted by applicable law, Debtor waives any right to require Secured Party to marshal or proceed against any Person, exhaust any Collateral or pursue any other remedy in Secured Party's power, and Debtor waives any and all notice of acceptance of this Security Agreement or of creation, modification, rearrangement, renewal or extension for any period of any of the Secured Obligations from time to time.  All dealings between Debtor and Secured Party, whether or not resulting in the creation of the Secured Obligations, shall conclusively be presumed to have been had or consummated in reliance upon this Security Agreement.  Until all the Secured Obligations shall have been paid in full, Debtor shall not have any right to subrogation, and Debtor waives any benefit of and any right to participate in any Collateral or security whatsoever now or hereafter held by Secured Party.  Debtor authorizes Secured Party, without notice or demand and without any reservation of rights against Debtor and without affecting Debtor's liability hereunder or on the Secured Obligations, from time to time to (a) take and hold any other Property as collateral, other than the Collateral, as security for any or all of the Secured Obligations and exchange, enforce, waive and release any or all of the Collateral or such other Property to the Secured Obligations; and (b) apply the Collateral or such other Property and direct the order or manner of sale thereof as Secured Party in its discretion may determine, subject, however, to the provisions of the Credit Agreement.

5.7     Transfer of Secured Obligations and Collateral.  Any of the Secured Obligations may be transferred, in whole or in part, in accordance with the provisions of the DIP Loan Documents, and, upon any such transfer, Secured Party may transfer any or all of the Collateral and shall be fully discharged thereafter from all liability with respect to the Collateral so transferred, and the transferee shall be vested with all rights, powers and remedies of Secured Party hereunder with respect to Collateral so transferred; but with respect to any Collateral not so transferred, Secured Party shall retain all rights, powers and remedies hereby given.  Secured Party may at any time deliver any or all of the Collateral to Debtor, whose receipt shall be a complete and full acquittance for the Collateral so delivered, and Secured Party shall thereafter be discharged from any liability therefor.

5.8     Cumulative Security.  The execution and delivery of this Security Agreement in no manner shall impair or affect any other security (by endorsement or otherwise) for the Secured Obligations.  No security taken hereafter as security for the Secured Obligations shall impair in any manner or affect this Security Agreement.  All such present and future additional security is to be considered as cumulative security.

5.9     Continuing Agreement.  This is a continuing Security Agreement and the grant of a security interest hereunder shall remain in full force and effect and all the rights, powers and remedies of Secured Party hereunder shall continue to exist until the Secured Obligations are paid in full, Debtor is entitled to obtain the release hereof pursuant to the Credit Agreement and Secured Party, upon request of Debtor, has authorized a written termination statement,

Exhibit F-8

reassigned to Debtor, without recourse, the Collateral and all rights conveyed hereby and returned possession of the Collateral in its possession (if any) to Debtor.

5.10     <u>Cumulative Rights</u>.  The rights, powers and remedies of Secured Party hereunder shall be in addition to all rights, powers and remedies given by statute or rule of law and are cumulative.  The exercise of any one or more of the rights, powers and remedies provided herein shall not be construed as a waiver of any other rights, powers and remedies of Secured Party. Furthermore, regardless of whether or not the Code is in effect in the jurisdiction where such rights, powers and remedies are asserted, Secured Party shall have the rights, powers and remedies of a secured party under the Code.

5.11     <u>Exercise of Rights</u>.  Time shall be of the essence for the performance by Debtor of any act under this Security Agreement or in respect of the Secured Obligations, but neither Secured Party's acceptance of partial or delinquent payments nor any forbearance, failure or delay by Secured Party in exercising any right, power or remedy shall be deemed a waiver of any obligation of Debtor or of any right, power or remedy of Secured Party or preclude any other or further exercise thereof; and no single or partial exercise of any right, power or remedy shall preclude any other or further exercise thereof, or the exercise of any other right, power or remedy.

5.12     <u>Remedy and Waiver</u>.  Secured Party may remedy any Event of Default and may waive any Event of Default without waiving the Event of Default remedied or waiving any prior or subsequent Event of Default.

5.13     <u>Non-Judicial Remedies</u>.  Subject to the terms of the Final DIP Order, Secured Party may enforce its rights hereunder without prior judicial process or judicial hearing, and Debtor expressly waives, renounces and knowingly relinquishes any and all legal rights which might otherwise require Secured Party to enforce its rights by judicial process.  In so providing for non-judicial remedies, Debtor recognizes and concedes that such remedies are consistent with the usage of the trade, are responsive to commercial necessity and are the result of bargain at arm's length.  Nothing herein is intended to prevent Secured Party from resorting to judicial process at its option.

## ARTICLE VI

## **MISCELLANEOUS**

6.1     <u>Preservation of Liability</u>.  Neither this Security Agreement nor the exercise by Secured Party of (or the failure to so exercise) any right, power or remedy conferred herein or by law shall be construed as relieving any Person liable on the Secured Obligations from liability on the Secured Obligations and for any deficiency thereon.

6.2     <u>Notices</u>.  Any notice or demand under this Security Agreement or in connection with this Security Agreement may be given as provided in the Credit Agreement, but actual notice, however given or received, shall always be effective.

Exhibit F-9

6.3     <u>Governing Law</u>.   This Security Agreement and the security interest granted hereby shall be governed by the laws of the State of New York, without giving effect to principles thereof relating to conflicts of law.

6.4     <u>Amendment and Waiver</u>.   This Security Agreement may not be amended (nor may any of its terms be waived) except in the manner provided in the Credit Agreement.

6.5     <u>Invalidity</u>.   In case any provision of this Security Agreement is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

6.6     <u>Survival of Agreements</u>.   All covenants and agreements of Debtor herein not fully performed before the effective date of this Security Agreement shall survive such date.

6.7     <u>Successors and Assigns</u>.   All representations and warranties of Debtor herein, and the covenants and agreements herein contained by or on behalf of Debtor, shall bind Debtor and Debtor's legal representatives, successors and assigns and shall inure to the benefit of Secured Party, its successors and assigns.

6.8     <u>Titles of Articles, Sections and Subsections</u>.   All titles or headings to articles, sections, subsections or other divisions of this Security Agreement are only for the convenience of the parties and shall not be construed to have any effect or meaning with respect to the other content of such articles, sections, subsections or other divisions, such other content being controlling as to the agreement between the parties hereto.

6.9     <u>Counterparts</u>.   This Security Agreement may be executed by one or more of the parties hereto in any number of separate counterparts, and all of such counterparts taken together shall be deemed to constitute one and the same instrument and shall be enforceable as of the date hereof upon the execution of one or more counterparts hereof by each of the parties hereto.  In this regard, each of the parties hereto acknowledges that a counterpart of this Security Agreement containing a set of counterpart execution pages reflecting the execution of each party hereto shall be sufficient to reflect the execution of this Security Agreement by each party hereto and shall constitute one instrument.

6.10     <u>Conflict with Credit Agreement</u>.   In the event of a conflict between any provision of this Security Agreement and a provision that is in the Credit Agreement, the provision of the Credit Agreement shall control; <u>provided</u>, <u>however</u>, the inclusion in this Security Agreement of a provision with respect to which there is no corresponding provision in the Credit Agreement shall not constitute a conflict with any provision of the Credit Agreement.

6.11     <u>Commercially Reasonable Efforts</u>.   Notwithstanding anything to the contrary contained in this Security Agreement, the Debtor shall not be in breach, or deemed to be in breach, of any of its covenants, agreements or obligations under this Security Agreement that is applicable to any property or asset that is not operated by the Debtor or any of its affiliates so long as the Debtor has used commercially reasonable efforts under the circumstances to cause

Exhibit F-10

the operator thereof to perform or not to perform, as applicable, such covenant, agreement or obligation.

*(Signature pages follow)*

Exhibit F-11

#4852354.4
#4887316.1

This Security Agreement has been executed by each of the Debtor and Secured Party as of the date first above written.

**DEBTOR:**

[INSERT BORROWER NAME]

By: _____

Name: _____

Title: _____

Exhibit F-1

**SECURED PARTY:**

CL III FUNDING HOLDING COMPANY, LLC

By: _____

Name: _____

Title: _____

Exhibit F-2

## EXHIBIT G

**Form of DIP Deed of Trust, Security Agreement, Financing Statement and Assignment of Production**

(THIS INSTRUMENT CONTAINS AFTER-ACQUIRED PROPERTY PROVISIONS)

This Deed of Trust, Security Agreement, Financing Statement and Assignment of Production (this "Deed of Trust"), dated effective May __, 2015 (the "Effective Date"), is executed by WBH ENERGY, LP, a Texas limited partnership, WBH ENERGY PARTNERS LLC, a Texas limited liability company, and WBH ENERGY GP, LLC, a Texas limited liability company (collectively, "Mortgagor"), in favor of Holly C. Hamm, as trustee and her successors and substitutes in trust, as hereinafter provided (the "Trustee"), for the benefit of CL III FUNDING HOLDING COMPANY, LLC (in such capacity, the "Mortgagee"), for the lender (the "Lender") which are or may become signatories to that certain Credit Agreement dated of even date herewith by and among Mortgagor, Mortgagee and the Lender (as amended, supplemented, restated or otherwise modified from time to time, the "Credit Agreement").

W I T N E S S E T H:

Mortgagor, acting herein by and through its proper officer, who has heretofore been duly authorized, and with its principal office at 4407 Bee Caves Road, Suite 421, Austin, Texas 78746, and the mailing address for which, for purposes hereof, is P.O. Box 302380, Austin, Texas 78703, and Mortgagee, the mailing address for which, for purposes hereof, is 4600 Wells Fargo Center, 90 South 7th Street, Minneapolis, MN 55402, hereby agree as follows:

ARTICLE 1
GRANT

1.1.    Lien.    Mortgagor, for valuable consideration, the receipt of which is hereby acknowledged, and in consideration of the debt and trust hereinafter mentioned, has granted, bargained, sold, conveyed, transferred and assigned, and by these presents does grant, bargain, sell, convey, transfer and assign to Trustee, whose address is P. O. Box 549, Hockley, TX 77447, for the benefit of Mortgagee, with power of sale, the following described Property:

(a)      the specific undivided interests set forth in Exhibit A attached hereto and incorporated herein by this reference in and to the leases, rights-of-way, easements, or other documents described in Exhibit A and all renewals and extensions thereof and all new leases, rights-of-way, easements, or other documents (i) in which an interest arises after the termination or expiration of any lease, right-of-way, easement, or other document described in Exhibit A, and (ii) that covers all or any part of the Property described in and covered by such terminated or expired lease, right-of-way, easement, or other document, to the extent, and only to the extent, such new leases, rights-of-way, easements, or other documents may cover such Property (all of the foregoing in this subsection (a) being the "Leases"), together with any additional interest of Mortgagor in and to the Leases, whether now owned of hereafter acquired;

Exhibit G-1

(b)      the specific undivided interests set forth in Exhibit A in and to the lands subject to the Leases described in Exhibit A (the "Lands"), including, without limitation, the oil, gas, mineral, and leasehold estates in and to the Lands, together with any additional interest of Mortgagor in and to the Lands, whether now owned of hereafter acquired;

(c)      all right, title, and interest in and to any of the oil, gas, and minerals in, on, or under the Lands, including, without limitation, all contractual rights, fee interests, leasehold interests, overriding royalty interests, non-participating royalty interests, mineral interests, production payments, net profits interests, or any other interest measured by or payable out of production of oil, gas, or other minerals from the Leases and/or Lands (all of the foregoing in this subsection (c) being the "Lease Interests");

(d)      any existing hydrocarbon well, salt water disposal well, injection well, water supply well or any other well located on or related to the Properties, including the wells listed on Exhibit A, together with any well which may hereafter be drilled and/or completed on any of the Properties, or any facility or equipment in addition to or replacement of any well (all of the foregoing in this subsection (d) being the "Wells");

(e)      all right, title, interest and estates now or hereafter acquired by Mortgagor in and to the Wells, including all working interests, overriding royalty interests, net profits interests, carried interests, reversionary interests, production payments or similar rights or interests in the Wells (all of the foregoing in this subsection (e) being the "Well Interests");

(f)      all right, title, and interest under a Pipeline Construction, Ownership and Operating Agreement Gathering System Montague and Cooke Counties, Texas, Dated April 23, 2012, by and between WBH Energy, LP, Montague Transfer Partners, LLC and Strategic Energy Income Fund I, LLP, as amended or otherwise modified from time to time (all of the foregoing in this subsection (f) being the "Pipeline, Gathering System and Related Interests");

(g)      all of the foregoing interests in clauses (a)-(f) of this Section 1.1, as such interests may be enlarged by the discharge of any payments out of production or by the removal of any charges or encumbrances;

(h)      all right, title, and interest, whether now owned and existing or hereafter acquired or arising, of Mortgagor in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit A, to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any right, title, and interest, whether now owned and existing or hereafter acquired or arising, of Mortgagor in and to all or any portion of the Leases and/or the Lands, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any Governmental Authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Leases and/or the Lands;

(i)      all right, title, and interest, whether now owned and existing or hereafter acquired or arising, of Mortgagor in, to, and under or derived from all presently existing and future

Exhibit G-2

#4852354.4
#4887316.1

advance payment agreements, oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described in <u>Exhibit A</u>, to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Leases and/or the Lands; and

(j)    all right, title, and interest, whether now owned and existing or hereafter acquired or arising, of Mortgagor in, to, and under or derived from all existing and future permits, licenses, easements, and similar rights and privileges that relate to or are appurtenant to any of the Leases and/or the Lands.

1.2.    <u>Security Interest</u>.  Mortgagor, for the same consideration, hereby grants to Mortgagee a continuing security interest in all right, title, and interest, whether now owned and existing or hereafter acquired or arising, of Mortgagor in and to all improvements and all Personal Property of any kind or character defined in and subject to the provisions of the Uniform Commercial Code (the "<u>UCC</u>"), including, but not limited to, substitutions and replacements for, accessions to, and the proceeds and products from any and all of such improvements and Personal Property, as well as any and all "as-extracted collateral," as such term is defined in the UCC, whether now owned and existing or hereafter acquired or arising, and situated on any of the Leases and/or the Lands, including, but not limited to, pipe, casing, tubing, rods, storage tanks, boilers, loading racks, pumps, foundations, warehouses, and all other Personal Property and Equipment of every kind and character upon, incident, appurtenant, or belonging to and used in connection with the interest of Mortgagor, whether now owned and existing or hereafter acquired or arising, in the Lands and/or the Leases, including, but not limited to, goods that are or are to become fixtures related to such Property and all oil, gas, and other minerals produced or to be produced to the account of Mortgagor from the Leases and/or the Lands and all accounts receivable, general intangibles, and contract rights of Mortgagor in connection with the Lands and/or the Leases, including, but not limited to, oil, gas and other minerals and accounts resulting from the sale thereof arising at any wellhead or minehead located on the Leases and/or the Lands (the Lands, the Leases, the Lease Interests, the Wells, the Well Interests, the Pipeline Gathering System and Related Interests, and the real and Personal Property interests described in <u>Section 1.1</u>, this <u>Section 1.2</u>, <u>Section 1.4</u> and <u>Section 7.7</u>, and all proceeds, products, substitutions, and exchanges thereof, being the "<u>Mortgaged Property</u>").

Notwithstanding any provision in this Deed of Trust to the contrary, in no event is any Building (as defined in the applicable Flood Insurance Regulation) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulation) included in the definition of the "Mortgaged Property", and no Building or Manufactured (Mobile) Home is hereby encumbered by this Deed of Trust.  As used herein, "<u>Flood Insurance Regulations</u>" shall mean (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 (amending 42 USC 4001, *et seq.*), as the same may be amended or recodified from time to time, and (iv) the Flood Insurance Reform Act of 2004 and any regulations promulgated thereunder.

Exhibit G-3

1.3.    Assignment of Security.    Mortgagor, for the same consideration, hereby grants to Mortgagee any and all rights of Mortgagor to Liens securing payment of proceeds from the sale of production from the Mortgaged Property, including, but not limited to, those Liens provided for in TEX. BUS. & COM. CODE ANN. §9.343 (Vernon Supp. 2003), as amended from time to time.

1.4.    After-Acquired Property.    Mortgagor, for the same consideration, hereby grants, bargains, sells, conveys, transfers, and assigns to the Trustee or grants to Mortgagee a continuing security interest in, as the case may be, all additional right, title, or interest which Mortgagor may hereafter acquire or become entitled to in the interests, Properties, Lands, Leases, Wells, Lease Interests, Well Interests, Pipeline Gathering System Related Interests, and premises aforesaid, and in the oil, gas, or other minerals in and under or produced from or attributable to any of the Lands or Leases, which additional right, title, and interest, when acquired, shall constitute "Mortgaged Property," the same as if expressly described and conveyed herein.

1.5.    Habendum.    TO HAVE AND TO HOLD all and singular the Mortgaged Property and all other Property which, by the terms hereof, has or may hereafter become subject to the Liens of this Deed of Trust, together with all rights, hereditaments, and appurtenances in anywise belonging thereto, to the Trustee or Mortgagee, as the case may be, or the successors or assigns of either of them forever, with the priority relative to any other Lien set forth in the Credit Agreement (including Section 4.4) and the Final DIP Order.

ARTICLE 2
INDEBTEDNESS SECURED

This conveyance is made, IN TRUST, HOWEVER, to secure and enforce the payment of the following indebtedness, obligations, and liabilities, together with any renewals, extensions, or modifications thereof:

2.1.    Specific Obligations.    The DIP Obligations, including, without limitation, the indebtedness of Mortgagor in the amount of [FIVE MILLION AND NO/100 DOLLARS ($5,000,000.00)] evidenced by the Credit Agreement, bearing interest and payable as therein provided or as provided in the Credit Agreement, with the last of the DIP Obligations under the Credit Agreement and the other DIP Loan Documents to mature on the Maturity Date.

2.2.    Indebtedness    The word "Indebtedness" wherever used in this Deed of Trust shall refer to all present and future debts, obligations, and liabilities described or referred to in this Article 2, subject, however, to the limitations provided hereinabove in this Article 2.

ARTICLE 3
WARRANTIES

3.1.    Warranty of Title.    The representations and warranties set forth in the Credit Agreement concerning priority of Liens are incorporated herein.  Mortgagor hereby binds itself, its legal representatives, successors, and assigns, subject to the Pre-Petition Liens and Lender Pre-Petition Loans Adequate Protection (which are subordinate to the Liens created pursuant to the DIP Loan

Exhibit G-4

Documents to the extent provided in <u>Section 4.4</u> of the Credit Agreement), to warrant title to the Mortgaged Property and the priority of the liens created in the DIP Loan Documents, and forever defend all and singular the Mortgaged Property to the Trustee and the successors and assigns of the Trustee forever against every Person whomsoever lawfully claiming or to claim the same or any part thereof. Notwithstanding that this Deed of Trust covers all of the right, title and interest, whether now owned and existing or hereafter acquired or arising, of Mortgagor in and to the Mortgaged Property, Mortgagor, for itself, its legal representatives, successors and assigns, further covenants, represents and warrants that Mortgagor has good and defensible title to the Mortgaged Property and that the interests of Mortgagor in and to the Leases and/or Lands described in <u>Exhibit A</u> are not greater than the working interest nor less than the net revenue interest, overriding royalty interest, net profit interest, production payment interest, royalty interest or other interest payable out of or measured by production set forth in connection with each oil or gas well described in <u>Exhibit A</u>. In the event Mortgagor owns any other or greater interest, such additional interest is nonetheless included in, covered by and subject to the Liens created by this Deed of Trust.

3.2. <u>Additional Warranties</u>. Mortgagor, for itself, its legal representatives, successors, and assigns, covenants, represents, and warrants that:

(a) <u>Leases in Effect</u>. All of the Leases specifically described in <u>Exhibit A</u> are in full force and effect. All covenants, express or implied, in respect of the Leases specifically described in <u>Exhibit A</u>, or of any assignment of any of such Leases, which may affect the validity of any of such Leases, have been performed in all material respects insofar as such Leases pertain to the Lands.

(b) <u>Interests Free of Liens</u>. The representations and warranties set forth in the Credit Agreement concerning priority of Liens are incorporated herein. All gross production taxes and all taxes as to which non-payment could result in a Lien, against any of the Mortgaged Property have been paid unless any such taxes are being diligently contested in good faith and adequate reserves have been set aside in accordance with GAAP.

ARTICLE 4
COVENANTS OF MORTGAGOR

In consideration of the Indebtedness, Mortgagor, for itself, its legal representatives, successors, and assigns, covenants and agrees as follows:

4.1. <u>Maintenance of Leases</u>. Mortgagor will, or, to the extent the right or obligation to do so rests with another Person, exercise its reasonable commercial efforts to cause such Person to, in accordance with Mortgagor's normal course of business and to the extent that a reasonably prudent operator would do so, keep and continue all the Leases, estates, and interests herein described and all contracts and agreements relating thereto in full force and effect in accordance with the terms thereof and will not permit the same to lapse or otherwise become impaired for failure to comply with the obligations thereof, whether express or implied. In this connection, Mortgagor shall not release any of the Leases without the prior written consent of Mortgagee

Exhibit G-5

unless any Lease has discontinued to produce oil or gas in paying quantities and any such release is pursuant to prudent operator standards.

4.2.    Maintenance of Property.  Mortgagor will, or, to the extent the right or obligation to do so rests with another Person, exercise its reasonable commercial efforts to cause such Person to, keep and maintain all improvements, Personal Property, and Equipment now or hereafter situated on the Lands and constituting a portion of the Mortgaged Property and used or obtained in connection therewith in good repair and condition, ordinary wear and tear excepted, and will not tear down or remove the same or permit the same to be torn down or removed without the prior consent of Mortgagee, except in the usual course of operations as may be required for replacement when otherwise in compliance with the provisions of this Deed of Trust and the other DIP Loan Documents.

4.3.    Pooling or Unitization.  Mortgagor may, without the prior written consent of Mortgagee and so long as there exists no Event of Default under this Deed of Trust (as provided in Section 5.2 hereof), pool or unitize all or any part of the Mortgaged Property where the pooling or unitization would be, in the reasonable judgment of Mortgagor, advisable in accordance with prudent operator standards.  Immediately after the formation of any pool or unit in accordance herewith, Mortgagor will furnish to Mortgagee a conformed copy of the pooling agreement, declaration of pooling, or other instrument creating the pool or unit.  The interest of Mortgagor included in any pool or unit attributable to the Mortgaged Property or any part thereof shall become a part of the Mortgaged Property and shall be subject to the Liens hereof in the same manner and with the same effect as though the pool or unit and the interest of Mortgagor therein were specifically described in Exhibit A.

4.4.    Operation of Mortgaged Property.  Mortgagor will operate or, to the extent that the right of operation is vested in others, will exercise commercially reasonable efforts to cause the operator to operate the Mortgaged Property and all Wells now or hereafter located thereon continuously and in a prudent and workmanlike manner in accordance with the best usage of the field and in accordance with industry standards, provided, that such operation shall in all events be in accordance with all applicable Requirements of Law.  Mortgagor will comply, or, to the extent the right or obligation to do so rests with another Person, exercise its reasonable commercial efforts to cause such Person to comply, with all terms and conditions of the Leases and each assignment or contract obligating Mortgagor in any way with respect to the Mortgaged Property; but nothing herein shall be construed to empower Mortgagor to bind the Trustee or Mortgagee to any contract or obligation or render the Trustee or Mortgagee in any way responsible or liable for bills or obligations incurred by Mortgagor.

4.5.    Payment of Operating Expenses.  Mortgagor agrees to, or, to the extent the right or obligation to do so rests with another Person, exercise its reasonable commercial efforts to cause such Person to, promptly pay all bills for labor and materials incurred in the operation of the Mortgaged Property and will promptly pay its share of all costs and expenses incurred under any joint operating agreement affecting the Mortgaged Property or any portion thereof except to the extent any such bills, costs or expenses are being diligently contested and adequate reserves have been set aside in accordance with GAAP; will furnish Mortgagee, as and when requested, full

Exhibit G-6

information as to the status of any joint account maintained with others under any such operating agreement; will not take any action to incur any liability or Lien thereunder; and will not enter into any material new operating agreement or any material amendment of any existing operating agreement (including, without limitation, a change of operator) affecting the Mortgaged Property without the prior written consent of Mortgagee. Furthermore, following the occurrence and during the continuance of an Event of Default, Mortgagor will not consent or agree to participate in any proposed operation under any existing operating agreement affecting the Mortgaged Property unless Mortgagor obtains the prior written consent of Mortgagee and, if requested by Mortgagee, deposits with the operator or Mortgagee, where Mortgagor is a non-operator, or with Mortgagee, where Mortgagor is an operator, Mortgagor's share of the estimated cost of the proposed operation prior to electing to participate in the operation. To the extent that Mortgagor is unable to consent to any proposed operation with respect to any of the Mortgaged Property, prior to electing not to participate in the proposed operation, Mortgagor will use its commercially reasonable efforts, to the extent practicable and to the extent allowed to do so under the relevant operating agreement or other applicable contract, to farmout to others acceptable to Mortgagee, on the commercially reasonable terms obtainable and acceptable to Mortgagee, the interest or relevant portion of the interest of Mortgagor in the proposed operation.

4.6.    <u>Access to Mortgaged Property</u>.  To the extent Mortgagor has the ability to do so and so long as Mortgagee or its agents, representatives or employees comply with the reasonable and customary requirements of Mortgagor or the relevant operator (including reasonable prior written notice) for Persons coming on the Mortgaged Property, Mortgagor will permit Mortgagee and its accredited agents, representatives, attorneys and employees, at the expense of Mortgagor, at all reasonable times to go upon, examine, inspect, conduct environmental audits and other testing of, and remain on, the Mortgaged Property, and to go upon the derrick floor of any Well at any time drilled or being drilled thereon, and will furnish Mortgagee (to the extent of Mortgagor's rights to do so), upon request, all pertinent information regarding the development and operation of the Mortgaged Property.

4.7.    <u>Waivers</u>.  Mortgagor hereby expressly waives, to the full extent permitted by applicable law, any and all rights or privileges of marshalling of assets, sale in inverse order of alienation, notices, appraisements, redemption, and any prerequisite in the event of foreclosure of the Liens created herein.  Mortgagee at all times shall have the right to release any part of the Mortgaged Property now or hereafter subject to the Liens of this Deed of Trust, any part of the proceeds of production or other income herein or hereafter assigned or pledged, or any other security it now has or may hereafter have securing the Indebtedness, without releasing any other part of the Mortgaged Property, proceeds, or income, and without affecting the Liens hereof as to the part or parts of the Mortgaged Property, proceeds, or income not so released or the right to receive future proceeds and income.

4.8.    <u>Compliance with Laws</u>.  Mortgagor will comply, or, to the extent the right or obligation to do so rests with another Person, exercise its reasonable commercial efforts to cause such Person to comply, in all material respects, with all Requirements of Law applicable to the Mortgaged Property and the operations conducted thereon, including, without limitation, the Natural Gas Policy Act of 1978, as amended, and Environmental Laws; and, subject to the

Exhibit G-7

foregoing limitation, cause all employees, crew members, agents, contractors, sub-contractors, and future lessees (pursuant to appropriate lease provisions) of Mortgagor, while such Persons are acting within the scope of their relationship with Mortgagor, to comply with all such Requirements of Law as may be necessary or appropriate to enable Mortgagor to so comply.

4.9.    **HAZARDOUS SUBSTANCES INDEMNIFICATION. MORTGAGOR HEREBY INDEMNIFIES AND HOLDS MORTGAGEE AND ITS SHAREHOLDERS, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ATTORNEYS-IN-FACT, AND AFFILIATES AND THE TRUSTEE (EACH OF THE FOREGOING AN "INDEMNITEE") HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, LOSSES, DAMAGES, LIABILITIES, FINES, PENALTIES, CHARGES, ADMINISTRATIVE AND JUDICIAL PROCEEDINGS AND ORDERS, JUDGMENTS, REMEDIAL ACTIONS, REQUIREMENTS AND ENFORCEMENT ACTIONS OF ANY KIND, AND ALL COSTS AND EXPENSES INCURRED IN CONNECTION THEREWITH (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES), ARISING DIRECTLY OR INDIRECTLY, IN WHOLE OR IN PART, FROM (A) THE PRESENCE OF ANY HAZARDOUS SUBSTANCES ON, UNDER, OR FROM ANY MORTGAGED PROPERTY, WHETHER PRIOR TO OR DURING THE TERM HEREOF, (B) ANY ACTIVITY CARRIED ON OR UNDERTAKEN ON OR OFF ANY MORTGAGED PROPERTY, WHETHER PRIOR TO OR DURING THE TERM HEREOF, AND WHETHER BY MORTGAGOR OR ANY PREDECESSOR IN TITLE, EMPLOYEE, AGENT, CONTRACTOR, OR SUBCONTRACTOR OF MORTGAGOR OR ANY OTHER PERSON AT ANY TIME OCCUPYING OR PRESENT ON ANY MORTGAGED PROPERTY, IN CONNECTION WITH THE HANDLING, TREATMENT, REMOVAL, STORAGE, DECONTAMINATION, CLEANUP, TRANSPORTATION, OR DISPOSAL OF ANY HAZARDOUS SUBSTANCE AT ANY TIME LOCATED OR PRESENT ON OR UNDER SUCH PROPERTY, (C) ANY RESIDUAL CONTAMINATION ON OR UNDER ANY MORTGAGED PROPERTY, (D) ANY CONTAMINATION OF ANY MORTGAGED PROPERTY OR NATURAL RESOURCES ARISING IN CONNECTION WITH THE GENERATION, USE, HANDLING, STORAGE, TRANSPORTATION OR DISPOSAL OF ANY HAZARDOUS SUBSTANCES BY MORTGAGOR OR ANY EMPLOYEE, AGENT, CONTRACTOR, OR SUBCONTRACTOR OF MORTGAGOR WHILE SUCH PERSONS ARE ACTING WITHIN THE SCOPE OF THEIR RELATIONSHIP WITH MORTGAGOR, IRRESPECTIVE OF WHETHER ANY OF SUCH ACTIVITIES WERE OR WILL BE UNDERTAKEN IN ACCORDANCE WITH APPLICABLE REQUIREMENTS OF LAW, OR (E) THE PERFORMANCE AND ENFORCEMENT OF THIS DEED OF TRUST OR ANY OTHER ACT OR OMISSION IN CONNECTION WITH OR RELATED TO THIS DEED OF TRUST OR THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING, WITHOUT LIMITATION, ANY OF THE FOREGOING IN THIS SECTION 4.9 ARISING FROM NEGLIGENCE, WHETHER SOLE OR CONCURRENT, BUT NOT GROSS NEGLIGENCE OR WILLFUL MISCONDUCT ON THE PART OF ANY SUCH INDEMNITEE; WITH THE FOREGOING INDEMNITY SURVIVING SATISFACTION OF THE INDEBTEDNESS, THE TERMINATION OF THE CREDIT AGREEMENT, AND THE RELEASE OF THE LIENS CREATED HEREBY.** All amounts due under this Section 4.9 shall be payable on written demand therefor.

4.10.    Site Assessments.  Mortgagee at any time and from time to time, either prior to or after the occurrence of an Event of Default, may contract at the risk and expense of Mortgagor, for the services of Persons (the "Site Reviewers") to perform environmental site assessments and other tests ("Site Assessments") on all or any portion of the Mortgaged Property for the purpose of determining whether any environmental condition exists on any Mortgaged Property which could reasonably be expected to result in any liability, cost, or expense to Mortgagee or any

Exhibit G-8

owner, occupier, or operator of such Mortgaged Property. To the extent Mortgagor has the ability to permit such Site Assessments, Mortgagor shall permit the Site Reviewers to perform Site Assessments at any time or times, upon reasonable notice, and under reasonable conditions established by Mortgagor (or the relevant operator) which do not impede the performance of the Site Assessments. To the extent Mortgagor has the ability to permit such Site Assessments, the Site Reviewers are hereby authorized to enter upon all or any portion of the Mortgaged Property for such purposes. To the extent Mortgagor has the ability to permit such Site Assessments, the Site Reviewers are further authorized to perform both above and below the ground testing for environmental damage or the presence of Hazardous Substances on the Mortgaged Property and such other tests on the Mortgaged Property as may be necessary to conduct the Site Assessments in the reasonable opinion of the Site Reviewers. Mortgagor will supply to the Site Reviewers such historical and operational information regarding the Mortgaged Property as may be reasonably requested by the Site Reviewers to facilitate the Site Assessments and will make available for meetings with the Site Reviewers appropriate personnel having knowledge of such matters. If an Event of Default exists, the cost of performing all Site Assessments shall be paid by Mortgagor upon demand of Mortgagee and any such obligations shall be Indebtedness secured by this Deed of Trust otherwise Mortgagee shall bear such cost.

4.11.   <u>Performance of Gas Contracts</u>.   The Mortgagor will perform and observe, or, to the extent the right or obligation to do so rests with another Person, exercise its reasonable commercial efforts to cause such Person to perform and observe, in all material respects all of its obligations under each contract relating to the sale of gas produced from or attributable to the Mortgaged Property and will not, except in good faith and as the result of arm's length negotiations, change, modify, amend or waive any of the terms or provisions of any such contract or take any other action which would release any other party from its obligations or liabilities under any such contract.

4.12.   <u>Condemnation or Other Taking</u>.   Should the Mortgaged Property or any part thereof become the subject of any public condemnation proceeding or similar action, Mortgagee shall be entitled at its option to appear in and prosecute, in its own name, any action or proceeding, or to make any compromise or settlement in connection with such condemnation proceeding or similar action.   All compensation, awards, damages, proceeds and any other payment or relief in any condemnation proceeding or similar action are hereby assigned to Mortgagee, and, subject to any provision of the Credit Agreement to the contrary, Mortgagee may, after deducting therefrom all its expenses, including, without limitation, attorneys' fees, release any monies so received by it to Mortgagor or apply the same on any Indebtedness secured hereby in such order and such manner as Mortgagee, in its discretion, may elect.

4.13.   <u>Covenants Running with the Land</u>.  All covenants and agreements herein contained shall constitute covenants running with the Land.

Exhibit G-9

ARTICLE 5
DEFEASANCE, FORECLOSURE
AND OTHER REMEDIES

5.1.   <u>Defeasance</u>.  Should the Indebtedness be paid, as the same becomes due and payable, and should Mortgagor duly observe and perform all of the covenants, conditions, and agreements herein and in all other DIP Loan Documents provided to be observed and performed by Mortgagor, then the conveyance of the Mortgaged Property shall become of no further force and effect, and, at the request and expense of Mortgagor, the Liens granted hereunder shall be released, without recourse or warranty; otherwise, it shall remain in full force and effect.

5.2.   <u>Events of Default</u>.  The occurrence of any Event of Default under the Credit Agreement or the sale of any Mortgaged Property (other than the sale of hydrocarbons permitted by the Credit Agreement and other sales permitted by the Credit Agreement or any other DIP Loan Document) without the prior written consent of Mortgagee shall constitute an Event of Default under this Deed of Trust.

5.3.   <u>Acceleration and Exercise of Power of Sale</u>.  (a) Upon the occurrence and during the continuance of an Event of Default, Mortgagee may declare the aggregate principal amount of all Indebtedness then outstanding and all interest accrued thereon immediately due and payable, whereupon the same shall become immediately due and payable without presentment, demand, protest, notice of protest, default or dishonor, notice of intent to accelerate maturity, notice of acceleration of maturity, or other notice of any kind, all of which are hereby expressly waived by Mortgagor to the full extent permitted by applicable law.

(b)   Upon the occurrence and during the continuance of any Event of Default while the Indebtedness or any part thereof remains unpaid, it shall be the duty of the Trustee, on request of Mortgagee (which request is hereby presumed), to enforce this Trust.  In such regard, it shall be the duty of the Trustee, after advertising the time and place of the sale for at least 21 days prior to the day of sale, by posting or causing to be posted a written or printed notice thereof at the courthouse door and by filing a copy of such notice in the office of the county clerk of each county in which the Mortgaged Property or any part thereof may be situated, and serving written notice of the proposed sale on each debtor obligated to pay the Indebtedness according to the records of Mortgagee, by postage prepaid, certified United States mail, at the most recent address for such debtor as shown by the records of Mortgagee, at least 21 days prior to the day of sale, to sell the Mortgaged Property, either as a whole or in parcels, as the Trustee may deem proper, at public venue at the courthouse of the county in which the Mortgaged Property or any part thereof may be situated (and being the county designated in the notice of sale) on the first Tuesday of any month between the hours of 10:00 a.m. and 4:00 p.m., to the highest bidder for Cash, and after such sale to execute and deliver to the purchaser or purchasers good and sufficient deeds and assignments, conveying such Property so sold to the purchaser or purchasers with general warranty of title made on behalf of Mortgagor.  The Trustee, or her successor or substitute, is hereby authorized and empowered to appoint any one or more Persons as his attorneys-in-fact or agents to act as the Trustee under him and in his name, place and stead, such appointment to be evidenced by a written instrument executed by the Trustee, or her successor or

Exhibit G-10

substitute, to perform any one or more act or acts necessary or incident to any sale under the power of sale hereunder, including, without limitation, the posting and filing of any notices, the conduct of the sale and the execution and delivery of any instruments conveying the Mortgaged Property as a result of the sale, but in the name and on behalf of the Trustee, or her successor or substitute; and all acts done or performed by such attorneys-in-fact or agents shall be valid, lawful and binding as if done or performed by the Trustee, or her successor or substitute. No single sale or series of sales by the Trustee shall extinguish the Liens or exhaust the power of sale hereunder except with respect to the items of Property sold, but such Liens and power shall exist for so long as and may be exercised in any manner by law or as herein provided as often as the circumstances require to give Mortgagee full relief hereunder. The purchaser at any such sale shall not assume, nor shall the heirs, legal representatives, successors or assigns of such purchaser, be deemed to have assumed, by reason of the acquisition of Property or rights mortgaged hereunder, any liability or obligation of any owner, lessee or operator of the Mortgaged Property, or any part thereof, arising by reason of any occurrence taking place prior to such sale. It shall not be necessary to have present, or to exhibit at any such sale, any of the personal Property subject to the Liens hereof.

5.4.     Rights as Secured Party.  Upon the occurrence and during the continuance of any Event of Default, Mortgagee shall be entitled to all of the rights, powers, and remedies afforded a secured party by the UCC with respect to the Personal Property, as-extracted collateral and fixtures in which Mortgagee has been granted a security interest hereby, or Mortgagee may proceed in accordance with the provisions hereof as to both the real and Personal Property covered hereby.

5.5.     Application of Proceeds of Sale.  The Trustee is authorized to receive the proceeds of any sale of any of the Mortgaged Property made pursuant to this Article 5 and apply the same as follows:

> FIRST:  to the payment of all costs and expenses incident to the enforcement of this Deed of Trust, including, but not limited to, a fee to the Trustee, if required by the Trustee;

> SECOND:   to any and all Indebtedness then hereby secured, application to be made in such order and in such manner as Mortgagee may, in its reasonable discretion, elect;

> THIRD:   the balance, if any, to Mortgagor or its successors or assigns;

provided, however, if applicable law requires such proceeds to be paid or applied in a manner other than as set forth above in this Section 5.5, then such proceeds shall be paid or applied in accordance with such applicable law.

5.6.     Substitute Trustee.  In the event of the death of the Trustee, or her removal from the State of Texas, or her failure, refusal, or inability for any reason to make any such sale or to perform any of the trusts herein declared, or at any time, whether with or without cause, Mortgagee may

Exhibit G-11

appoint, in writing, a substitute trustee who shall thereupon succeed to all the estates, rights, powers, and trusts herein granted to and vested in the Trustee. In the same events as first above stated, and in the same manner, successive substitute Trustees may thereafter be appointed.

5.7. <u>Statements by Trustee</u>. It is agreed that in any deed or deeds given by the Trustee any and all statements of fact or other recitals therein made as to the identity of the holder or holders of the Indebtedness, or as to default in the payments thereof or any part thereof, or as to the breach of any covenants herein contained, or as to the request to sell, notice of sale, time, place, terms and manner of sale, and receipt, application, and distribution of the money realized therefrom, or as to the due and proper appointment of a substitute Trustee, and, without being limited by the foregoing, as to any other or additional act or thing having been done by Mortgagee or the Trustee, shall be taken by all courts of law and equity as prima facie evidence that the statements or recitals state facts and are without further question to be so accepted absent manifest error. Mortgagor does hereby ratify and confirm any and all acts that the Trustee may lawfully do in the premises by virtue of the terms and conditions of this Deed of Trust.

5.8. <u>Suit to Collect and Foreclose</u>. Mortgagee, at its election, or the Trustee, upon written request of Mortgagee, may, in accordance with the terms hereof and the other DIP Loan Documents evidencing the Indebtedness, proceed by suit or suits, at law or in equity, to enforce the payment of the Indebtedness and to foreclose the Liens of this Deed of Trust as against all or any portion of the Mortgaged Property and to have such Property sold under the judgment or decree of a court of competent jurisdiction.

5.9. <u>Mortgagee or Trustee as Purchaser</u>. Subject to applicable law, Mortgagee or the Trustee may be a purchaser of all or any portion of the Mortgaged Property at any sale thereof, whether such sale be under the power of sale hereinabove vested in the Trustee, upon any other foreclosure of the Liens hereof, or otherwise. Mortgagee or the Trustee so purchasing shall, upon any such purchase, acquire title to the Mortgaged Property so purchased, free of the Liens of this Deed of Trust and free of all rights of redemption in Mortgagor.

5.10. <u>Entry and Operation</u>. Upon the occurrence and during the continuance of any Event of Default, then in each and every such case and in addition to the other rights and remedies hereunder, the Trustee or Mortgagee, whether or not the Indebtedness shall have become due and payable, may, but shall not be obligated to, enter into and upon and take possession of all or any portion of the Mortgaged Property and may exclude Mortgagor, its agents and servants wholly therefrom and have, hold, use, operate, manage, and control all or any portion of the Mortgaged Property and produce the oil, gas, and other minerals therefrom and market the same, all at the sole risk and expense of Mortgagor and at the expense of the Mortgaged Property, applying the net proceeds so derived, first, to the cost of maintenance and operation of such Mortgaged Property; second, to the payment of the Indebtedness, application to be made in such order and in such manner as Mortgagee, in its reasonable discretion, may elect; and the balance thereof, if any, shall be paid to Mortgagor. Upon such payment of all such costs and Indebtedness, the Mortgaged Property shall be returned to Mortgagor in its then condition, and neither the Trustee nor Mortgagee shall be liable to Mortgagor for any damage or injury to the Mortgaged Property

Exhibit G-12

except such as may be caused through the fraud or willful misconduct of the Trustee or Mortgagee, as the case may be.

5.11.    Power of Attorney to Mortgagee.    Mortgagor does hereby designate Mortgagee as the agent of Mortgagor to act in the name, place, and stead of Mortgagor in the exercise of each and every remedy set forth herein and in conducting any and all operations and taking any and all action reasonably necessary to do so, recognizing such agency in favor of Mortgagee to be coupled with the interests of Mortgagee under this Deed of Trust and, thus, irrevocable so long as this Deed of Trust is in force and effect.    Notwithstanding anything in this Section 5.11 to the contrary, Mortgagee agrees not to exercise such power of attorney until the occurrence and during the continuation of an Event of Default.

5.12.    Remedies Cumulative and Non-Exclusive.    The rights of entry, sale, or suit, as hereinabove or hereinafter conferred, are cumulative of all other rights and remedies herein or by law or in equity provided, and shall not be deemed to deprive Mortgagee or the Trustee of any such other legal or equitable rights or remedies, by judicial proceedings or otherwise, appropriate to enforce the conditions, covenants, and terms of this Deed of Trust and the other DIP Loan Documents.    The employment of any remedy hereunder or otherwise shall not prevent the concurrent or subsequent employment of any other appropriate remedy or remedies.

ARTICLE 6
ASSIGNMENT OF PRODUCTION

6.1.    Assignment.    In addition to the conveyance to the Trustee herein made, Mortgagor does hereby transfer, assign, deliver and convey unto Mortgagee, its successors and assigns, all of the oil, gas, and other minerals produced, saved, or sold from the Mortgaged Property and attributable to the interests of Mortgagor therein subsequent to 7:00 a.m. on the effective date of this Deed of Trust, together with the proceeds of any sale thereof.    Mortgagor hereby directs any purchaser now or hereafter taking any production from the Mortgaged Property, upon written request of Mortgagee or written direction of Mortgagor, to pay to Mortgagee such proceeds derived from the sale thereof and to continue to make payments directly to Mortgagee until notified in writing by Mortgagee to discontinue the same.    The purchaser of any such production shall not be required to see to the application of the proceeds thereof by Mortgagee, and payment made to Mortgagee shall be binding and conclusive as between such purchaser and Mortgagor. Mortgagor further agrees to perform all such acts and to execute all such further assignments, transfer and division orders, and other instruments as may be required or desired by Mortgagee or any other party to have such proceeds and revenues so paid to Mortgagee.    Notwithstanding anything to the contrary contained in this Deed of Trust, so long as no Event of Default shall have occurred and be continuing, Mortgagor agrees not to exercise its rights and remedies under this Article 6.

6.2.    Postponement of Payment.    For its convenience, the Mortgagee has elected not to exercise immediately its right to receive payment to it directly of the proceeds of any sale of the oil, gas and other minerals produced or sold from the Mortgaged Property and the purchasers may continue to make such payment or delivery of the proceeds to the Mortgagor until such time

Exhibit G-13

as the purchasers have received notice that the purchasers are directed to make payment or delivery of the proceeds directly to the Mortgagee.  Such failure by the Mortgagee to exercise its rights immediately shall not in any way waive the right of the Mortgagee to receive any of the proceeds, or to make any such demand, or to affect any such assignment as to any proceeds not theretofore paid or delivered to the Mortgagor.  In this regard, if any of the proceeds are paid or delivered directly to the Mortgagee and then, at the request of the Mortgagee, the proceeds are, for a period or periods of time, paid or delivered to the Mortgagor, the Mortgagee shall nevertheless have the right, effective upon written notice to such purchasers, to require that future proceeds be again paid or delivered directly to it.  The Mortgagee shall never be required to send any such notice to all purchasers, and may direct such notice only to those purchasers as it may, in its discretion, desire.  It shall never be necessary for the Mortgagee to institute legal proceedings to enforce the assignment of hydrocarbons, proceeds, or other rents, profits, or income contained in this instrument.  It shall not be necessary for the Mortgagee to obtain possession of the Mortgaged Property as a prerequisite to the Mortgagee's right to collect or receive any hydrocarbons, other minerals, proceeds, or other rents, profits, or income assigned to the Mortgagee under this instrument.  The Mortgagor and the Mortgagee expressly agree and it is the express intention of the Mortgagor and the Mortgagee that in no event will any reduction in the DIP Obligations be measured by the fair market value of the hydrocarbons, other minerals, proceeds, or other rents, profits, or income assigned to the Mortgagee under this instrument.

6.3.    Change of Purchaser.  Should any purchaser taking the production from the Mortgaged Property fail to make prompt payment to Mortgagee in accordance with the provisions of Section 6.1, Mortgagee shall have the right (but subject to any contractual rights of such purchaser), at the expense of Mortgagor, to demand a change of connection and to designate another purchaser with whom a new connection may be made, without any liability on the part of Mortgagee in making such selection, so long as ordinary care is used in the making thereof.  Promptly upon such demand, Mortgagor shall take commercially reasonable action to effect such change of connection.

6.4.    Application of Proceeds.  Mortgagor authorizes and empowers Mortgagee to receive, hold, and collect all sums of money paid to Mortgagee in accordance with the provisions of Section 6.1, and to apply the same as hereinafter provided, all without any liability or responsibility on the part of Mortgagee, save and except as to good faith in so receiving and applying such sums.  Mortgagee may apply all sums received by Mortgagee pursuant to Section 6.1 to the payment of the Indebtedness, application to be made in such order and in such manner as Mortgagee, in its reasonable discretion, may elect, regardless of whether the application so made shall exceed the payments of principal and interest then due as provided in the Notes, the Credit Agreement or any other DIP Loan Document.  After such application has been so made by Mortgagee, the balance of any such sums shall be paid to Mortgagor.

6.5.    No Postponement of Installments on Indebtedness.  It is understood and agreed that should such payments provided for by Section 6.1 be less than the sum or sums then due on the Indebtedness, such sum or sums then due shall nevertheless be paid by Mortgagor in accordance with the provisions of the Note, the Credit Agreement or any other DIP Loan Document, and neither the assignment made pursuant to Section 6.1 nor any other provisions hereof shall in any

Exhibit G-14

manner be construed to affect the terms and provisions of the Note, the Credit Agreement or any other DIP Loan Document. Likewise, neither the assignment made pursuant to <u>Section 6.1</u> nor any other provisions hereof shall in any manner be construed to affect the Liens, rights, titles, and remedies herein granted securing the Indebtedness or the liability of Mortgagor therefor. The rights under this <u>Article 6</u> are cumulative of all other rights, remedies, and powers granted under this Deed of Trust and are cumulative of any other security which Mortgagee now holds or may hereafter hold to secure the payment of the Indebtedness.

6.6.    <u>Turnover to Mortgagee</u>.  Should Mortgagor receive any of the proceeds of any sale of oil, gas, or other minerals produced, saved, or sold from the Mortgaged Property, which under the terms hereof should have been remitted to Mortgagee, Mortgagor will immediately remit same in full to Mortgagee.

6.7.    <u>Release of Proceeds Upon Payment of Indebtedness</u>.  Upon payment in full of all Indebtedness and the termination of the DIP Obligations, the remainder of such proceeds held by Mortgagee, if any, shall be paid over to Mortgagor upon demand, and a release of the interest hereby assigned will be made, without recourse or warranty, by Mortgagee to Mortgagor at its request and its expense.

6.8.    <u>Duty of Mortgagee</u>.  Mortgagee shall not be liable for any failure to collect, or for any failure to exercise diligence in collecting, any funds assigned hereunder.  Mortgagee shall be accountable only for funds actually received.

6.9.    <u>Power of Attorney to Mortgagee</u>.  Mortgagor does hereby designate Mortgagee as the agent of Mortgagor to act in the name, place, and stead of Mortgagor for the purpose of taking any and all actions deemed by Mortgagee necessary for the realization by Mortgagee of the benefits of the assignment of production provided herein, recognizing such agency in favor of Mortgagee to be coupled with the interests of Mortgagee under this Deed of Trust and, thus, irrevocable so long as this Deed of Trust is in force and effect. Notwithstanding anything in this <u>Section 6.9</u> to the contrary, Mortgagee agrees not to exercise such power of attorney until the occurrence and during the continuation of an Event of Default.

ARTICLE 7
<u>MISCELLANEOUS</u>

7.1.    <u>Further Assurances</u>.  Upon request of Mortgagee, Mortgagor will promptly correct any defects, errors, or omissions in the execution or acknowledgment of this Deed of Trust or any other DIP Loan Document, and execute, acknowledge, and deliver such other assurances and instruments as shall, in the opinion of Mortgagee, be necessary to fulfill the terms of this Deed of Trust.

7.2.    <u>Interest</u>.  Any provision in any document that may be executed in connection herewith to the contrary notwithstanding, Lender shall in no event be entitled to receive or collect, nor shall any amounts received hereunder be credited so that Mortgagee shall be paid, as interest a sum greater than that authorized by law.  If any possible construction of this Deed of Trust or any other DIP Loan Document seems to indicate any possibility of a different power given to Lender

Exhibit G-15

or any authority to ask for, demand, or receive any larger rate of interest, this clause shall override and control, and proper adjustments shall be made accordingly.

7.3.     Articles and Sections.  This Deed of Trust, for convenience only, has been divided into Articles, Sections, and subsections.  The rights, powers, privileges, duties, and other legal relations of Mortgagor, the Trustee, and Mortgagee shall be determined from this Deed of Trust as an entirety and without regard to the aforesaid division into Articles, Sections, and subsections and without regard to headings affixed to such Articles, Sections, or subsections.

7.4.     Number and Gender.  Whenever the context requires, reference herein made to the single number shall be understood to include the plural, and the plural shall likewise be understood to include the singular.  Words denoting sex shall be construed to include the masculine, feminine, and neuter when such construction is appropriate; and specific enumeration shall not exclude the general, but shall be construed as cumulative.

7.5.     Rights and Remedies Cumulative.  All rights, powers, immunities, remedies, and Liens and other security of Mortgagee existing and to exist hereunder or under any other instruments or at law or in equity and all other or additional security shall be cumulative and not exclusive, each of the other.  Mortgagee shall, in addition to the rights and remedies herein expressly provided, be entitled to such other remedies as may now or hereafter exist at law or in equity for securing and collecting the Indebtedness, for enforcing the covenants herein, and for foreclosing the Liens hereof.  Resort by Mortgagee to any right or remedy provided for hereunder or at law or in equity shall not prevent concurrent or subsequent resort to the same or any other right or remedy.  No security heretofore, herewith, or subsequently taken by Mortgagee shall in any manner impair or affect the security given by this Deed of Trust or any security by endorsement or otherwise presently or previously given; and all security shall be taken, considered, and held as cumulative.

7.6.     Parties in Interest.  This Deed of Trust shall be binding upon the parties and their respective administrators, legal representatives, successors, and assigns and shall inure to the benefit of Mortgagee and its legal representatives, successors, and assigns.  The terms used to designate any of the parties herein shall be deemed to include the administrators, legal representatives, successors, and assigns of such parties.  The term "Mortgagee" shall also include any lawful owner, holder, or pledgee of any Indebtedness.

7.7.     Supplements.  Without in any manner limiting the effect of Section 1.4 or any other provisions of this Deed of Trust as to the binding effect of this Deed of Trust on after-acquired rights of Mortgagor, it is contemplated by the parties hereto that from time to time additional interests and Properties may or will be added to the interests and Properties subject to the Liens, rights, titles, and interests created by this Deed of Trust by means of supplemental instruments identifying this Deed of Trust and describing such interests and Properties to be so added and included.  Upon the execution of any such supplemental instrument, the Liens, rights, titles, and interests created herein shall immediately attach to and be effective with respect to any such interests and Properties so described, the same as if such interests and Properties had been

Exhibit G-16

specifically described herein, and such interests and Properties being included in the term "Mortgaged Property," as used herein.

7.8.    Invalidity.  In the event that any one or more of the provisions contained in this Deed of Trust shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Deed of Trust or any other DIP Loan Document.

7.9.    Construction.  Article, Section, subsection, and Exhibit references herein are to such Articles, Sections, subsections, and Exhibits of this Deed of Trust unless otherwise specified. The words "hereby," "herein," "hereinabove," "hereinafter," "hereinbelow," "hereof," and "hereunder" when used in this Deed of Trust shall refer to this Deed of Trust as a whole and not to any particular Article, Section, subsection, or provision of this Deed of Trust.

7.10.    Fixtures, Minerals and Accounts.  Without in any manner limiting the generality of any of the foregoing hereof, some portions of the Personal Property described hereinabove are or are to become fixtures on the Lands.  In addition, the security interest created hereby under applicable provisions of the UCC attaches to minerals, including, without limitation, oil and gas, and accounts resulting from the sale thereof, at the wellhead or minehead located on the Lands.

7.11.    Financing Statement Filings.  This Deed of Trust may be filed as provided in Article 9 of the UCC to assure that the security interests granted by this Deed of Trust are perfected.  In this connection, this Deed of Trust may be presented to a filing officer under the UCC to be filed as a Financing Statement covering minerals and fixtures. Further, Mortgagor authorizes Mortgagee to file, at the expense of Mortgagor, at any time and from time to time, any and all financing statements, and any amendments thereto and continuations thereof, in both the real estate records and the office of the Secretary of State of the State of Texas or any other appropriate jurisdiction, pursuant to Article 9 of the UCC, as Mortgagee deems necessary in its sole discretion, in conjunction with this Deed of Trust, and Mortgagor expressly authorizes the filing of such Financing Statements by Mortgagee without need of signature or execution by Mortgagor.

7.12.    Addresses.  For purposes of filing this Deed of Trust as a financing statement, the addresses for Mortgagor, as the debtor, and Mortgagee, as the secured party, are as set forth hereinabove.

7.13.    Counterparts.  For the convenience of the parties, this Deed of Trust may be executed in multiple counterparts, each of which for all purposes shall be deemed, and may be enforced from time to time as, a chattel mortgage, real estate mortgage, deed of trust, security agreement, assignment of contracts, or as one or more thereof.  For recording purposes, various counterparts have been executed, and there may be attached to each such counterpart an Exhibit A containing only the description of the Mortgaged Property, or portions thereof, which relates to the county or state in which the particular counterpart is to be recorded.  A complete, original counterpart of this Deed of Trust with a complete Exhibit A may be obtained from Mortgagee.  Each of the counterparts hereof so executed shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

Exhibit G-17

7.14.   <u>No Waiver by Mortgagee</u>.  No course of dealing on the part of Mortgagee, its officers or employees, nor any failure or delay by Mortgagee with respect to exercising any of its rights or remedies hereunder, shall operate as a waiver thereof, nor shall the exercise or partial exercise of any such right or remedy preclude the exercise of any other right or remedy.

7.15.   <u>Governing Agreement</u>.  This Deed of Trust is made pursuant and subject to the terms and provisions of the Credit Agreement.  In the event of a conflict between the terms and provisions of this Deed of Trust and those of the Credit Agreement, the terms and provisions of the Credit Agreement shall govern and control.  The inclusion in this Deed of Trust of provisions not addressed in the Credit Agreement shall not be deemed a conflict, and all such additional provisions contained herein shall be given full force and effect.

7.16.   <u>Commercially Reasonable Efforts</u>.  Notwithstanding anything to the contrary contained in this Deed of Trust, no Mortgagee shall be in breach, or deemed to be in breach, of any of its covenants, agreements or obligations under this Deed of Trust that is applicable to any property or asset that is not operated by such Mortgagee or any of its affiliates so long as such Mortgagee has used commercially reasonable efforts under the circumstances to cause the operator thereof to perform or not to perform, as applicable, such covenant, agreement or obligation.

**(Signatures and acknowledgements appear on following pages)**

Exhibit G-18

IN WITNESS WHEREOF, this Deed of Trust is executed to be effective on the Effective Date.

**MORTGAGOR (DEBTOR)**:

**WBH ENERGY, LP**

By: WBH Energy GP, LLC, its general partner

By:_____
Name:_____
Title:_____


**WBH ENERGY PARTNERS LLC**


By:_____
Name:_____
Title:_____


**WBH ENERGY GP, LLC**


By:_____
Name:_____
Title:_____


**(Acknowledgments appear on following page)**


Exhibit G-19

STATE OF TEXAS                          §
COUNTY OF _____                     §

     The foregoing instrument was acknowledged before me, the undersigned Notary Public, this ___ day of _____, 2015, by _____, _____of WBH Energy GP, LLC, a Texas limited liability company, as general partner on behalf of WBH Energy, LP, a Texas limited partnership.

     The foregoing instrument was acknowledged before me, the undersigned Notary Public, this ___ day of _____, 2015, by _____, _____of WBH Energy Partners LLC, a Texas limited liability company, on behalf of such limited liability company.

     The foregoing instrument was acknowledged before me, the undersigned Notary Public, this ___ day of _____, 2015, by _____, _____of WBH Energy GP, LLC, a Texas limited liability company, on behalf of such limited liability company.


                _____
                NOTARY PUBLIC in and for
                the State of Texas

Exhibit G-20

EXHIBIT A
TO
DEED OF TRUST, SECURITY AGREEMENT, FINANCING
STATEMENT AND ASSIGNMENT OF PRODUCTION

The designation "Working Interest" or "WI" when used in this Exhibit means an interest owned in an oil, gas, and mineral lease that determines the cost-bearing percentage of the owner of such interest.  The designation "Net Revenue Interest" or "NRI" means that portion of the production attributable to the owner of a working interest after deduction for all royalty burdens, overriding royalty burdens or other burdens on production, except severance, production, and other similar taxes.  The designation "Overriding Royalty Interest" or "ORRI" means an interest in production which is free of any obligation for the expense of exploration, development, and production, bearing only its pro rata share of severance, production, and other similar taxes and, in instances where the document creating the overriding royalty interest so provides, costs associated with compression, dehydration, other treating or processing, or transportation of production of oil, gas, or other minerals relating to the marketing of such production.  The designation "Royalty Interest" or "RI" means an interest in production which results from an ownership in the mineral fee estate or royalty estate in the relevant land and which is free of any obligation for the expense of exploration, development, and production, bearing only its pro rata share of severance, production, and other similar taxes and, in instances where the document creating the royalty interest so provides, costs associated with compression, dehydration, other treating or processing or transportation of production of oil, gas, or other minerals relating to the marketing of such production.

Any reference in this Exhibit to wells or units is for warranty of interest, administrative convenience, and identification and shall not limit or restrict the right, title, interest, or properties covered by this Deed of Trust.  All right, title, and interest of Mortgagor in the properties described herein are and shall be subject to this Deed of Trust, regardless of the presence of any units or wells not described herein.

[Descriptions of the relevant Leases and
the relevant Land are found on the
following pages of this Exhibit]

Exhibit A to Exhibit G

# EXHIBIT B

5/6/2015

Budget Form for WBH Energy LP and WBH Energy Partners LLC
Cash Management Summary
13-Week Cash Flow

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | |
| Week beginning (Monday) | | 5/4/15 | 5/11/15 | 5/18/15 | 5/25/15 | 6/1/15 | 6/8/15 | 6/15/15 | 6/22/15 | 6/29/15 | 7/6/15 | 7/13/15 | 7/20/15 | 7/27/15 | August | September | Total |
| Week ending (Friday) | | 5/8/15 | 5/15/15 | 5/22/15 | 5/29/15 | 6/5/15 | 6/12/15 | 6/19/15 | 6/26/15 | 7/3/15 | 7/10/15 | 7/17/15 | 7/24/15 | 7/31/15 | | | |
| **Operating Receipts** | | | | | | | | | | | | | | | | | |
| Oil revenue (net of severance taxes) | $ | - | - | 170,161 | - | - | - | - | 69,521 | - | - | - | 63,122 | - | 297,396 | 680,573 | 1,280,772 |
| Gas revenue (net of severance taxes) | | - | 169,538 | 242,748 | - | - | - | - | 247,812 | - | - | - | 119,415 | - | 109,725 | 127,089 | 1,016,327 |
| less: gathering/transportation | | - | (47,811) | (61,942) | - | - | - | - | (57,786) | - | - | - | (25,648) | - | (23,558) | (23,219) | (239,963) |
| O&G revenues (net) | | - | 121,727 | 350,967 | - | - | - | - | 259,547 | - | - | - | 156,889 | - | 383,564 | 784,443 | 2,057,136 |
| | | | | | | | | | | | | | | | | | |
| WBH Energy LP - Van B Davis #1 Plugging Prepayment * | | - | 25,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | 25,000 |
| Pipeline revenue | | 82,589 | - | - | - | 77,048 | - | - | - | - | 34,197 | - | - | - | 31,411 | 30,959 | 256,203 |
| **Total Operating Receipts** | $ | 82,589 | 146,727 | 350,967 | - | 77,048 | - | - | 259,547 | - | 34,197 | - | 156,889 | - | 414,974 | 815,402 | 2,338,339 |
| *WBH Energy LP will prepay WBH Energy Partners LLC the cost of the plugging expense | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | | | | | |
| Payroll Related | | | | | | | | | | | | | | | | | |
| WBH Energy LP Payroll | | - | 12,450 | - | 12,450 | - | 12,450 | - | 12,450 | - | 12,450 | - | 12,450 | - | 24,900 | 24,900 | 124,500 |
| Total Payroll Related | $ | - | 12,450 | - | 12,450 | - | 12,450 | - | 12,450 | - | 12,450 | - | 12,450 | - | 24,900 | 24,900 | 124,500 |
| | | | | | | | | | | | | | | | | | |
| Lease Operating Expense | | | | | | | | | | | | | | | | | |
| WBH Energy LLC JIB Payment | $ | - | - | 748 | - | - | - | - | 730 | - | - | - | 712 | - | 712 | 712 | 3,614 |
| WBH Energy LP JIB Payment | | - | 108,039 | 103,811 | - | - | - | - | 99,653 | - | - | - | 96,074 | - | 135,161 | 156,341 | 699,080 |
| WBH Energy LP  Van B Davis #1 Plugging Expense | | - | 25,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | 25,000 |
| Van B Davis #1 Plugging Expense | | - | 25,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | 25,000 |
| Total Lease Operating Expense | $ | - | 158,039 | 104,560 | - | - | - | - | 100,383 | - | - | - | 96,786 | - | 135,873 | 157,053 | 752,694 |
| | | | | | | | | | | | | | | | | | |
| General & Administrative | | | | | | | | | | | | | | | | | |
| Interest Expense | | | | | | | | | | | | | | | | | |
| Management Fees | | - | - | - | 33,333 | - | - | - | - | 33,333 | - | - | - | - | 33,333 | 33,333 | 133,332 |
| Office expenses | | 2,800 | - | - | - | - | 1,700 | - | - | - | 1,700 | - | - | - | 1,700 | 1,700 | 9,600 |
| Phone, Internet, other | | 1,943 | - | - | - | - | 1,943 | - | - | - | 1,943 | - | - | - | 1,943 | 1,943 | 9,715 |
| Rent | $ | - | - | - | 4,800 | - | - | - | - | 4,800 | - | - | - | - | 4,800 | 4,800 | 19,200 |
| Total General & Administrative | $ | 4,743 | - | - | 38,133 | - | 3,643 | - | - | 38,133 | 3,643 | - | - | - | 41,776 | 41,776 | 171,847 |
| | | | | | | | | | | | | | | | | | |
| Taxes | | | | | | | | | | | | | | | | | |
| Federal | $ | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| State | | - | 5,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | 5,000 |
| Payroll | | - | 4,175 | - | 4,175 | - | 4,175 | - | 4,175 | - | 4,295 | - | 4,175 | - | 8,350 | 8,350 | 41,870 |
| Total Tax Related | $ | - | 9,175 | - | 4,175 | - | 4,175 | - | 4,175 | - | 4,295 | - | 4,175 | - | 8,350 | 8,350 | 46,870 |
| | | | | | | | | | | | | | | | | | |
| **Total Operating Disbursements** | $ | 4,743 | 179,664 | 104,560 | 16,625 | 38,133 | 20,268 | - | 117,008 | 38,133 | 20,388 | - | 113,411 | - | 210,899 | 232,079 | 1,095,911 |
| | | | | | | | | | | | | | | | | | |
| **Net Operating Cash Flow** | $ | 77,846 | (32,937) | 246,407 | (16,625) | 38,915 | (20,268) | - | 142,538 | (38,133) | 13,809 | - | 43,478 | - | 204,075 | 583,323 | 1,242,428 |
| | | | | | | | | | | | | | | | | | |
| **Non Operating Disbursements** | | | | | | | | | | | | | | | | | |
| Restructuring Professionals | | | | | | | | | | | | | | | | | |
| Debtor's Counsel | $ | - | 175,000 * | 175,000 | - | - | 175,000 | - | - | - | 175,000 | - | - | - | 175,000 | 408,096 | 1,283,096 |
| Creditor Committee Counsel | | - | 174,194 ** | 75,000 | - | - | 75,000 | - | - | - | 75,000 | - | - | - | 75,000 | 150,000 | 624,194 |
| Bankruptcy Noticing Fees | | - | 2,000 | - | - | - | 2,000 | - | - | - | 3,500 | - | - | - | 3,500 | 3,500 | 14,500 |
| U.S. Trustee Fees | | - | - | - | - | - | - | - | - | - | 10,775 | - | - | - | - | 10,775 | 21,550 |
| U.S. Trustee Fees for WBH Energy GP LLC | | - | 375 | - | - | - | - | - | - | - | 375 | - | - | - | - | 375 | 1,125 |
| DIP Lender Counsel fees | | - | 4,000 | - | 4,000 | - | - | - | 4,000 | - | - | - | 7,000 | - | 10,000 | 10,000 | 39,000 |
| Initial DIP Lender fees and costs | | - | 125,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | 125,000 |
| Cantor Fitzgerald Break Up and Expense | | - | 137,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | 137,000 |
| TenOaks Broker Fee | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 200,000 | 200,000 |
| Total Restructuring Professionals | $ | - | 617,569 | 250,000 | 4,000 | - | 252,000 | - | 4,000 | - | 264,650 | - | 7,000 | - | 263,500 | 782,746 | 2,245,465 |
| *Includes amounts previously budgeted but unpaid for March | | | | | | | | | | | | | | | | | |
| **Includes amounts for January (prorated per retention date), and previously budgeted for February, and March. | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| **Total Non Operating Disbursements** | $ | - | 617,569 | 250,000 | 4,000 | - | 252,000 | - | 4,000 | - | 264,650 | - | 7,000 | - | 263,500 | 782,746 | 2,245,465 |
| | | | | | | | | | | | | | | | | | |
| **Net Cash Flow** | $ | 77,846 | (650,506) | (3,593) | (20,625) | 38,915 | (272,268) | - | 138,538 | (38,133) | (250,841) | - | 36,478 | - | (59,425) | (199,423) | (1,003,037) |
| | | | | | | | | | | | | | | | | | |
| Capex for Well Completion to USED* | | - | 3,048,580 | - | 1,401,444 | - | - | - | - | - | - | - | - | - | - | - | 4,450,024 |
| Capex for Lease Extension | | - | 31,346 | - | - | - | - | - | - | - | - | - | - | - | - | - | 31,346 |
| **Net Capex** | $ | - | 3,079,926 | - | 1,401,444 | - | - | - | - | - | - | - | - | - | - | - | 4,481,370 |
| *Actual amounts and timing TBD based on forthcoming AFE from USED | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| **Beginning Cash Balance** | $ | 1,068,412 | 1,146,258 | 2,415,826 | 2,412,233 | 990,164 | 1,029,080 | 756,812 | 756,812 | 895,350 | 857,217 | 606,376 | 606,376 | 642,853 | 642,853 | 583,428 | |
| **Beginning Suspense Cash Balance** | | | | | | | | | | | | | | | | | |
| Net Cash Flow | | 77,846 | (3,730,432) | (3,593) | (1,422,069) | 38,915 | (272,268) | - | 138,538 | (38,133) | (250,841) | - | 36,478 | - | (59,425) | (199,423) | (5,484,407) |
| DIP-Funding | | - | 5,000,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP-Repayment | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Cash Balance** | $ | 1,146,258 | 2,415,826 | 2,412,233 | 990,164 | 1,029,080 | 756,812 | 756,812 | 895,350 | 857,217 | 606,376 | 606,376 | 642,853 | 642,853 | 583,428 | 384,005 | |

Budget Form for WBH Energy Partners LLC
Cash Management Summary
13-Week Cash Flow

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | |
| **Week beginning (Monday)** | 5/4/15 | 5/11/15 | 5/18/15 | 5/25/15 | 6/1/15 | 6/8/15 | 6/15/15 | 6/22/15 | 6/29/15 | 7/6/15 | 7/13/15 | 7/20/15 | 7/27/15 | August | September | Total |
| **Week ending (Friday)** | 5/8/15 | 5/15/15 | 5/22/15 | 5/29/15 | 6/5/15 | 6/12/15 | 6/19/15 | 6/26/15 | 7/3/15 | 7/10/15 | 7/17/15 | 7/24/15 | 7/31/15 | | | |
| **Operating Receipts** | | | | | | | | | | | | | | | | |
| Oil revenue (net of severance taxes) | | | 433 | | | | | 378 | | | | 350 | | 346 | 378 | 1,885 |
| Gas revenue (net of severance taxes) | | | 679 | | | | | 652 | | | | 538 | | 521 | 538 | 2,927 |
| WBH Energy LP - Van B Davis #1 Plugging Payment | | 25,000 | | | | | | | | | | | | | | 25,000 |
| **Total Operating Receipts** | - | 25,000 | 1,112 | - | - | - | - | 1,030 | - | - | - | 888 | - | 867 | 916 | 29,813 |
| **Operating Disbursements** | | | | | | | | | | | | | | | | |
| Lease Operating Expense to USED | | | 373 | | | | | 355 | | | | 337 | | 337 | 337 | 1,739 |
| Lease Operating Expense to Choice Exploration | | | 375 | | | | | 375 | | | | 375 | | 375 | 375 | 1,875 |
| Van B Davis #1 Plugging Expense | | 25,000 | | | | | | | | | | | | | | 25,000 |
| | - | 25,000 | 748 | - | - | - | - | 730 | - | - | - | 712 | - | 712 | 712 | 28,614 |
| Taxes | | | | | | | | | | | | | | | | |
| Federal | | | | | | | | | | | | | | | | - |
| State | | 5,000 | | | | | | | | | | | | | | 5,000 |
| Total Tax | - | 5,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | 5,000 |
| **Total Operating Disbursements** | - | 30,000 | 748 | - | - | - | - | 730 | - | - | - | 712 | - | 712 | 712 | 33,614 |
| **Net Operating Cash Flow** | - | (5,000) | 363 | - | - | - | - | 300 | - | - | - | 176 | - | 155 | 204 | (3,802) |
| **Non Operating Disbursements** | | | | | | | | | | | | | | | | |
| Financing Related | | | | | | | | | | | | | | | | |
| First Lender Fees | | | | | | | | | | | | | | | | - |
| Total Financing Related | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Professionals | | | | | | | | | | | | | | | | |
| Debtors' Counsel | | - | | | | - | | | | | | | | | | - |
| Bankruptcy Noticing Fees | | | | | | | | | | | | | | | | - |
| Creditor Committee Counsel | | | | | | | | | | | | | | | | - |
| U.S. Trustee Fees | | | | | | | | - | | 375 | | | | | 375 | 750 |
| Total Restructuring Professionals | - | - | - | - | - | - | - | - | - | 375 | - | - | - | - | 375 | 750 |
| **Total Non Operating Disbursements** | - | - | - | - | - | - | - | - | - | 375 | - | - | - | - | 375 | 750 |
| **Net Cash Flow** | - | (5,000) | 363 | - | - | | | 300 | - | (375) | - | 176 | - | 155 | (171) | (4,552) |
| **Beginning Cash Balance** | 6,935 | 6,935 | 1,935 | 2,298 | 2,298 | 2,298 | 2,298 | 2,298 | 2,598 | 2,598 | 2,223 | 2,223 | 2,399 | 2,399 | 2,554 | |
| **Addition to Suspense Balance** | | | | | | | | | | | | | | | | |
| Net Cash Flow | - | (5,000) | 363 | - | - | - | - | 300 | - | (375) | - | 176 | - | 155 | (171) | |
| **Ending Cash Balance** | 6,935 | 1,935 | 2,298 | 2,298 | 2,298 | 2,298 | 2,298 | 2,598 | 2,598 | 2,223 | 2,223 | 2,399 | 2,399 | 2,554 | 2,383 | - |

**WBH Energy LP Weekly DIP Budget**
Cash Management Summary
13-Week Cash Flow

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | |
| | 5/4/15 | 5/11/15 | 5/18/15 | 5/25/15 | 6/1/15 | 6/8/15 | 6/15/15 | 6/22/15 | 6/29/15 | 7/6/15 | 7/13/15 | 7/20/15 | 7/27/15 | August | September | |
| | 5/8/15 | 5/15/15 | 5/22/15 | 5/29/15 | 6/5/15 | 6/12/15 | 6/19/15 | 6/26/15 | 7/3/15 | 7/10/15 | 7/17/15 | 7/24/15 | 7/31/15 | | | Total |
| **Production Receipts** | | | | | | | | | | | | | | | | |
| Gas revenue (net of severance taxes) | | | | | | | | | | | | | | | | |
| WBH Energy Partners LLC operated | | | | | | | | | | | | | | | | |
| US Energy Development Corp operated | | 169,538 | 240,869 | | | | | 245,961 | | | | 117,676 | | 108,005 | 125,351 | 1,007,400 |
| less gathering & transportation fees | | (47,811) | (61,942) | | | | | (57,786) | | | | (25,648) | | (23,558) | (23,219) | (239,963) |
| EOG operated | - | | 1,200 | | | | | 1,200 | | | | 1,200 | | 1,200 | 1,200 | 6,000 |
| Oil revenue (net of severance taxes) | | | | | | | | | | | | | | | | |
| US Energy Development Corp operated | | | 169,428 | | | | | 68,843 | | | | 62,472 | | 296,750 | 679,895 | 1,277,387 |
| EOG operated | - | | 300 | | | | | 300 | | | | 300 | | 300 | 300 | 1,500 |
| Total Production Receipts | - | 121,727 | 349,855 | - | - | - | - | 258,517 | - | - | | 156,001 | - | 382,696 | 783,527 | 2,052,323 |
| **Other/Pipeline Receipts** | | | | | | | | | | | | | | | | |
| CMO Pipeline | 19,948 | | | | 19,862 | | | | | 18,058 | | | | 16,872 | 16,869 | 91,608 |
| Central Montague Pipeline | 62,641 | - | | | 57,186 | | | | | 16,139 | | | | 14,539 | 14,090 | 164,595 |
| Total Other/Pipeline Receipts | 82,589 | - | - | - | 77,048 | - | - | - | - | 34,197 | - | - | - | 31,411 | 30,959 | 256,203 |
| **Total Receipts** | 82,589 | 121,727 | 349,855 | - | 77,048 | - | - | 258,517 | - | 34,197 | - | 156,001 | - | 414,107 | 814,486 | 2,308,526 |
| **Operating Expenses** | | | | | | | | | | | | | | | | |
| Lease Operating Expense to USED | | 108,039 | 103,811 | | | | | 99,653 | | | | 96,074 | | 135,161 | 156,341 | 699,080 |
| Van B Davis #1 Plugging Expense | | 25,000 | | | | | | | | | | | | | | 25,000 |
| Total Operating Expenses | - | 133,039 | 103,811 | - | - | - | - | 99,653 | - | - | | 96,074 | - | 135,161 | 156,341 | 724,080 |
| **G&A Expenses** | | | | | | | | | | | | | | | | |
| Interest Expense | | | | | | | | | | | | | | | | |
| Management Fees | | | | | 33,333 | | | | 33,333 | | | | | 33,333 | 33,333 | 133,332 |
| Office Expenses | 2,800 | | | | | 1,700 | | | | 1,700 | | | | 1,700 | 1,700 | 9,600 |
| Payroll Expense | | 12,450 | | 12,450 | | 12,450 | - | 12,450 | - | 12,450 | | 12,450 | | 24,900 | 24,900 | 124,500 |
| Phone, Internet, Other | 1,943 | | | | | 1,943 | | | | 1,943 | | | | 1,943 | 1,943 | 9,715 |
| Rent | | | | | 4,800 | | | | 4,800 | | | | | 4,800 | 4,800 | 19,200 |
| Total G&A Expenses | 4,743 | 12,450 | - | 12,450 | 38,133 | 16,093 | - | 12,450 | 38,133 | 16,093 | - | 12,450 | - | 66,676 | 66,676 | 296,347 |
| **Taxes** | | | | | | | | | | | | | | | | |
| Payroll Taxes | | 4,175 | | 4,175 | | 4,175 | | 4,175 | | 4,295 | | 4,175 | | 8,350 | 8,350 | 41,870 |
| **Total Operating Disbursements** | 4,743 | 149,664 | 103,811 | 16,625 | 38,133 | 20,268 | - | 116,278 | 38,133 | 20,388 | - | 112,699 | - | 210,187 | 231,367 | 1,062,297 |
| **Net Operating Cashflow** | 77,846 | (27,937) | 246,044 | (16,625) | 38,915 | (20,268) | - | 142,239 | (38,133) | 13,809 | - | 43,302 | - | 203,919 | 583,119 | 1,246,230 |
| **Restructuring Professionals** | | | | | | | | | | | | | | | | |
| Debtor's Counsel | | 175,000 * | 175,000 | | | 175,000 | | | | 175,000 | | | | 175,000 | 408,096 *** | 1,283,096 |
| Creditor Committee Counsel | | 174,194 ** | 75,000 | | | 75,000 | | | | 75,000 | | | | 75,000 | 150,000 | 624,194 |
| Bankruptcy Noticing Fees | | 2,000 | | | | 2,000 | | | | 3,500 | | | | 3,500 | 3,500 | 14,500 |
| U.S. Trustee Fees | | | | | | | | | | 10,400 | | | | | 10,400 | 20,800 |
| U.S. Trustee Fees for WBH Energy GP LLC | | 375 | | | | | | | | 375 | | | | | 375 | 1,125 |
| DIP Lender Counsel fees | | 4,000 | | 4,000 | | | | 4,000 | | | | 7,000 | | 10,000 | 10,000 | 39,000 |
| Initial DIP Lender fees and costs | | 125,000 | | | | | | | | | | | | | | 125,000 |
| Cantor Fitzgerald Break Up and Expense | | 137,000 | | | | | | | | | | | | | | 137,000 |
| Broker Fee | | | | | | | | | | | | | | | 200,000 | 200,000 |
| **Total Restructuring Professionals** | - | 617,569 | 250,000 | 4,000 | - | 252,000 | - | 4,000 | - | 264,275 | - | 7,000 | - | 263,500 | 782,371 | 2,444,715 |

*Includes amounts previously budgeted but unpaid for March

**Includes amounts for January (prorated per retention date), and previously budgeted but unpaid amounts for February, and March.

***Counsel fees for September are prorated, and includes 20% holdback on Jan & Feb professional fees

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Capex for Well Completion to USED* | | 3,048,580 | | 1,401,444 | | | | | | | | | | | | 4,450,024 |
| Capex for Lease Extension | | 31,346 | | | | | | | | | | | | | | 31,346 |
| Total Capex | - | 3,079,926 | - | 1,401,444 | - | - | - | - | - | - | - | - | - | - | - | 4,481,370 |

*Actual amounts and timing TBD based on forthcoming AFE from USED

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | 1,061,477 | 1,139,323 | 2,413,891 | 2,409,935 | 987,866 | 1,026,781 | 754,513 | 754,513 | 892,752 | 854,619 | 604,153 | 604,153 | 640,454 | 640,454 | 580,874 | |
| Net Cash Flow | 77,846 | (3,725,432) | (3,956) | (1,422,069) | 38,915 | (272,268) | - | 138,239 | (38,133) | (250,466) | - | 36,302 | - | (59,581) | (199,252) | (5,679,855) |
| DIP - Funding | | 5,000,000 | - | | | | | | | | | | | | | |
| DIP - Repayment | | | | | | | | | | | | | | | | |
| **Ending Cash Balance** | 1,139,323 | 2,413,891 | 2,409,935 | 987,866 | 1,026,781 | 754,513 | 754,513 | 892,752 | 854,619 | 604,153 | 604,153 | 640,454 | 640,454 | 580,874 | 381,621 | |
| **Beginning DIP Balance** | - | - | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | | |
| DIP - funding | | 5,000,000 | - | - | - | - | - | - | - | | | | | | | |
| DIP - repayment | - | | - | - | - | - | - | - | - | | | | | | | |
| **Ending DIP Balance** | - | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | | |