B10 (Official Form 10) (04/13)

| UNITED STATES BANKRUPTCY COURT     Western District of Texas | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br><br>WBH Energy, LP | Case Number:<br><br>15-10003 | |
|---|---|---|

**NOTE:** *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
U.S. Energy Development Corporation

Name and address where notices should be sent:
Eric J. Taube
Taube Summers, et al.
100 Congress Ave., Ste. 1800, Austin, Texas 78701

Telephone number: (512) 472-5997   email:  etaube@taubesummers.com

Name and address where payment should be sent (if different from above):
U.S. Energy Development Corporation
Attn: Ryan Holbrook
2350 North Forest Rd., Suite 31B, Getzville, NY 14068

Telephone number: (716) 636-0401   email:  rholbrook@usedc.com

**COURT USE ONLY**

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number:_____
    (If known)

Filed on:_____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:**   $ at least $11,400,000

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:**   See Exhibit A
    (See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:**

| | 3a. Debtor may have scheduled account as:<br><br>_____<br>(See instruction #3a) | 3b. Uniform Claim Identifier (optional):<br><br>_____<br>(See instruction #3b) |
|---|---|---|

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☑Real Estate  ☐Motor Vehicle  ☑Other
Describe:

**Value of Property:** $_____

**Annual Interest Rate_____% ☐Fixed  or  ☐Variable**
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:

$_____

Basis for perfection:  Memorandum of JOA

Amount of Secured Claim:  $ TBD

Amount Unsecured:  $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(__).

Amount entitled to priority:

$_____

*Amounts are subject to adjustment on 4/01/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

B10 (Official Form 10) (04/13)                                                                                                                                                       2

**7. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**8. Signature:** (See instruction #8)

Check the appropriate box.

☐ I am the creditor.   ☑ I am the creditor's authorized agent.   ☐ I am the trustee, or the debtor,   ☐ I am a guarantor, surety, indorser, or other codebtor.
or their authorized agent.   (See Bankruptcy Rule 3005.)
(See Bankruptcy Rule 3004.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:  Ryan Holbrook
Title:  Corporate Counsel
Company:  U.S. Energy Development Corporation
Address and telephone number (if different from notice address above):
2350 North Forest Rd., Suite 31B
Getzville, NY 14068                                    (Signature)                                    5/11/15
_____                                                                    (Date)
Telephone number: (716) 639-3449     email: rholbrook@usedc.com

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

---

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the

claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the claim.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest and documents required by FRBP 3001(c) for claims based on an open-end or revolving consumer credit agreement or secured by a security interest in the debtor's principal residence. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

B10 (Official Form 10) (04/13)                                                                                                  3

_____DEFINITIONS_____                                        _____INFORMATION_____

**Debtor**
A debtor is the person, corporation, or other entity
that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity to
whom debtor owes a debt that was incurred before
the date of the bankruptcy filing. See 11 U.S.C.
§101 (10).

**Claim**
A claim is the creditor's right to receive payment for
a debt owed by the debtor on the date of the
bankruptcy filing. See 11 U.S.C. §101 (5). A claim
may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to
indicate the amount of the debt owed by the debtor
on the date of the bankruptcy filing. The creditor
must file the form with the clerk of the same
bankruptcy court in which the bankruptcy case was
filed.

**Secured Claim Under 11 U.S.C. § 506 (a)**
A secured claim is one backed by a lien on property
of the debtor. The claim is secured so long as the
creditor has the right to be paid from the property
prior to other creditors. The amount of the secured
claim cannot exceed the value of the property. Any
amount owed to the creditor in excess of the value of
the property is an unsecured claim. Examples of
liens on property include a mortgage on real estate or
a security interest in a car. A lien may be voluntarily
granted by a debtor or may be obtained through a
court proceeding. In some states, a court judgment is
a lien.

A claim also may be secured if the creditor owes the
debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the
requirements of a secured claim. A claim may be
partly unsecured if the amount of the claim exceeds
the value of the property on which the creditor has a
lien.

**Claim Entitled to Priority Under 11 U.S.C. § 507
(a)**
Priority claims are certain categories of unsecured
claims that are paid from the available money or
property in a bankruptcy case before other unsecured
claims.

**Redacted**
A document has been redacted when the person filing
it has masked, edited out, or otherwise deleted,
certain information. A creditor must show only the
last four digits of any social-security, individual's
tax-identification, or financial-account number, only
the initials of a minor's name, and only the year of
any person's date of birth. If the claim is based on the
delivery of health care goods or services, limit the
disclosure of the goods or services so as to avoid
embarrassment or the disclosure of confidential
health care information.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien,
certificate of title, financing statement, or other
document showing that the lien has been filed or
recorded.

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may
either enclose a stamped self-addressed envelope and
a copy of this proof of claim or you may access the
court's PACER system
(www.pacer.psc.uscourts.gov) for a small fee to view
your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing
claims for an amount less than the face value of the
claims. One or more of these entities may contact the
creditor and offer to purchase the claim. Some of the
written communications from these entities may
easily be confused with official court documentation
or communications from the debtor. These entities
do not represent the bankruptcy court or the debtor.
The creditor has no obligation to sell its claim.
However, if the creditor decides to sell its claim, any
transfer of such claim is subject to FRBP 3001(e),
any applicable provisions of the Bankruptcy Code
(11 U.S.C. § 101 *et seq.*), and any applicable orders
of the bankruptcy court.

**EXHIBIT A**

1.     U.S. Energy Development Corporation ("USEDC"), WBH Energy LP ("WBH, LP") and WBH Energy Partners LLC ("WBH, LLC") are parties to that certain Joint Operating Agreement ("JOA") dated September 1, 2011 covering several oil and gas leases (the "Leases") more particularly described in Exhibit A thereto, in Archer, Clay, Jack and Montague Counties. A copy of the JOA is attached as **Exhibit 1**. The JOA was amended by amendments effective September 1, 2011 and June 1, 2014.

2.     A Memorandum of the JOA was filed and recorded in the relevant County Clerk's records, as follows:

  a.     Filed September 13, 2011, recorded in Volume 737, Page 269, Official Public Records, Archer County, Texas.

  b.     Filed September 14, 2011, recorded in Volume 10, Page 92, Official Public Records, Clay County.

  c.     Filed September 14, 2011, recorded in Volume 869, Page 70, Official Public Records, Jack County, Texas.

  d.     Filed September 14, 2011, recorded in Volume 585, Page 689, Real Property Records, Montague County, Texas.

Copies of the Memorandums are attached as **Exhibit 2**.

3.     As set forth more fully in "Plaintiff's Original Petition, Application for Ancillary Injunctive Relief and Request for Disclosure" filed on September 29, 2014 in the 271st District Court of Jack County, Texas, each of the Debtors have breached their duties owed to USEDC and, with respect to WBH Energy Partners LLC and WBH Energy LP, have breached their obligations under the JOA.  A true and correct copy of the Original Petition is attached hereto as **Exhibit 3.**  At a minimum, USEDC has suffered damages of $11,400,000.00 based on WBH Energy LP's failure to fund and WBH Energy Partners LLC's failure to collect and acquiescence in its affiliate's failure to fund.

4.     Additionally, both WBH Energy Partners LLC (in a First Amended Counterclaim filed in Adv. No. 15-1006) and WBH Energy Partners LP (in  Motion to Intervene filed in Adv. No. 15-1006) have asserted claims against USEDC stating that USEDC is responsible to pay the amount of $11,400,000.00, which is the amount that WBH Energy LP has failed to fund for its portion of outstanding amounts due to the Operator under the Joint Operating Agreement. Copies of the Counterclaim and Motion to Intervene are attached (without the JOA attached) as **Exhibits 4 and 5.**

5.     WBH Energy Partners LLC and USEDC are also parties to an Escrow Agreement dated October 25, 2013 with Horizon Bank as Escrow Agent.  USEDC deposited funds into the Escrow Account based upon written statements requesting funding from USEDC for its share of

costs under the JOA, and USEDC funded such requests.  A copy of the Escrow Agreement is attached as **Exhibit 6**.  WBH Energy Partners LLC failed to use the funds for the purposes represented in the statements provided to USEDC, and has breached its obligations under the Escrow Agreement.  Moreover, at the time that escrow funds were requested, Each of WBH, LLC, WBH, LP and WBH Energy Partners GP, LLC ("WBH, GP")knew that WBH, LP was unable to and was not going to fund its share of joint interest billings and was not going to fund the required amounts. None of the Debtors provided such information to USEDC, and knew that such inability to fund was material to USEDC's willing to release funds from escrow.

6.     USEDC seeks recovery of all damages relating to the actions set forth in the Original Petition, as well as any amounts which USEDC is required to pay as a result of the matters set forth in the Debtors' counterclaims.  WBH, GP is liable for all obligations of WBH, LP as a consequence of its position as the general partner of WBH, LP pursuant to applicable partnership law.

7.     Pursuant to the liens granted under the JOA and the Memorandum of the JOA which have been filed and referenced above, this claim is a secured claim against WBH, LP.

EXHIBIT 1

A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

__September 1__ , __2011__ ,
*year*

OPERATOR   **WBH Energy Partners LLC**

CONTRACT AREA   **See Exhibit A**

COUNTY OR PARISH OF _____ , STATE OF _____

COPYRIGHT 1989 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED FORM.

A.A.P.L. NO. 610 – 1989

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | DEFINITIONS | 1 |
| II. | EXHIBITS | 1 |
| III. | INTERESTS OF PARTIES | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| IV. | TITLES | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| | 4. Curing Title | 3 |
| V. | OPERATOR | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | 3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| | 1. Competitive Rates and Use of Affiliates | 4 |
| | 2. Discharge of Joint Account Obligations | 4 |
| | 3. Protection from Liens | 4 |
| | 4. Custody of Funds | 5 |
| | 5. Access to Contract Area and Records | 5 |
| | 6. Filing and Furnishing Governmental Reports | 5 |
| | 7. Drilling and Testing Operations | 5 |
| | 8. Cost Estimates | 5 |
| | 9. Insurance | 5 |
| VI. | DRILLING AND DEVELOPMENT | 5 |
| | A. INITIAL WELL: | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less Than All Parties | 6 |
| | 3. Stand-By Costs | 7 |
| | 4. Deepening | 8 |
| | 5. Sidetracking | 8 |
| | 6. Order of Preference of Operations | 8 |
| | 7. Conformity to Spacing Pattern | 9 |
| | 8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| | 1. Completion | 9 |
| | 2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| | 1. Abandonment of Dry Holes | 9 |
| | 2. Abandonment of Wells That Have Produced | 10 |
| | 3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND: | 10 |
| | (Option 1) Gas Balancing Agreement | 10 |
| | (Option 2) No Gas Balancing Agreement | 11 |
| VII. | EXPENDITURES AND LIABILITY OF PARTIES | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 12 |
| | C. ADVANCES: | 12 |
| | D. DEFAULTS AND REMEDIES: | 12 |
| | 1. Suspension of Rights | 13 |
| | 2. Suit for Damages | 13 |
| | 3. Deemed Non-Consent | 13 |
| | 4. Advance Payment | 13 |
| | 5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | 13 |
| | F. TAXES: | 13 |
| VIII. | ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST | 14 |
| | A. SURRENDER OF LEASES: | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | 14 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## TABLE OF CONTENTS

D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: ..................................................... 15
E. WAIVER OF RIGHTS TO PARTITION: ................................................................................... 15
F. PREFERENTIAL RIGHT TO PURCHASE: ............................................................................... 15
IX. **INTERNAL REVENUE CODE ELECTION** ............................................................................... 15
X. **CLAIMS AND LAWSUITS** ......................................................................................................... 15
XI. **FORCE MAJEURE** ..................................................................................................................... 16
XII. **NOTICES** ................................................................................................................................... 16
XIII. **TERM OF AGREEMENT** ........................................................................................................... 16
XIV. **COMPLIANCE WITH LAWS AND REGULATIONS** ............................................................... 16
A. LAWS, REGULATIONS AND ORDERS: ................................................................................. 16
B. GOVERNING LAW: ................................................................................................................. 16
C. REGULATORY AGENCIES: .................................................................................................... 16
XV. **MISCELLANEOUS** ................................................................................................................... 17
A. EXECUTION: ........................................................................................................................... 17
B. SUCCESSORS AND ASSIGNS: ............................................................................................... 17
C. COUNTERPARTS: .................................................................................................................... 17
D. SEVERABILITY ....................................................................................................................... 17
XVI. **OTHER PROVISIONS** ............................................................................................................... 17

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989



**OPERATING AGREEMENT**

THIS AGREEMENT, entered into by and between ___WBH Energy Partners LLC___

hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

**WITNESSETH:**

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

**ARTICLE I.**

**DEFINITIONS**

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement.  Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A."

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the lesser.

E. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

F. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority.  If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

G. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located.

H. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

I. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.B.2.

J. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

K. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

L. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by parties to this agreement.

M. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

N. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

O. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

P. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore.  Such operations include, but are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

Q. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome mechanical difficulties.

R. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

**ARTICLE II.**

**EXHIBITS**

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

  __X__   A. Exhibit "A," shall include the following information:

          (1) Description of lands subject to this agreement,

          (2) Restrictions, if any, as to depths, formations, or substances,

          (3) Parties to agreement with addresses / and telephone numbers for notice purposes,
                  email addresses

          (4) Percentages or fractional interests of parties to this agreement,

          (5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,

          ~~(6) Burdens on production.~~

      ~~B. Exhibit "B," Form of Lease.~~

  __X__   C. Exhibit "C," Accounting Procedure.

  __X__   D. Exhibit "D," Insurance.

  __X__   E. Exhibit "E," Gas Balancing Agreement.

      ~~F. Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.~~

      ~~G. Exhibit "G," Tax Partnership.~~

  __X__   H. Other: ___Form of Memorandum of Joint Operating Agreement___

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Exhibit E

1       If any provision of any exhibit, except ~~Exhibits "E," "F," and "G,"~~ is inconsistent with any provision contained in

2 the body of this agreement, the provisions in the body of this agreement shall prevail.

3                **ARTICLE III.**

4            **INTERESTS OF PARTIES**

5 **A. Oil and Gas Interests:**

6       ~~If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this~~

7 ~~agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B,"~~

8 ~~and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.~~

9 **B. Interests of Parties in Costs and Production:**

10       Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne

11 and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their

12 interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the

13 Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

14       Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other

15 burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or

16 cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of,

17 **the burdens of record effective as of the date hereof** and shall indemnify, defend and hold the other parties free from any liability therefor.

18 Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is

19 burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts

20 stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend

21 and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as

22 the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to

23 be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s)

24 which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any

25 liability therefor.

26       No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's

27 lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher

28 price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

29       Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby,

30 and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in

31 said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

32 **C. Subsequently Created Interests:**

33       If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security

34 for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production

35 payment, net profits interest, assignment of production or other burden payable out of production attributable to its working

36 interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed

37 hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden

38 payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such

39 burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's

40 Lease or Interest to exceed the amount stipulated in Article III.B. above.

41       The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and

42 alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other

43 parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses

44 chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the

45 same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required

46 under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the

47 production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of

48 said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or

49 parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

50                **ARTICLE IV.**

51                **TITLES**

52 **A. Title Examination:**

53       Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and,

54 if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire

55 Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working

56 interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing

57 Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator

58 all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of

59 charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the

60 examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or

61 by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in

62 procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty

63 opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling

64 Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such

65 interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel

66 in the performance of the above functions.

67       ~~Each party~~ <sub>Operator</sub> shall be responsible for securing curative matter and pooling amendments or agreements required in

68 connection with Leases or Oil and Gas Interests contributed by such party. Operator shall be responsible for the preparation

69 and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings

70 before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to

71 the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings.

72 Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental **or with securing curative matters and so forth**

73 agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct

74 charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C."

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the Drilling Parties in such well.

**B. Loss or Failure of Title:**

1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,

(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure.

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time is is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;

(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;

(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of the title failure shall be borne severally by each party (including a predecessor to a current party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;

(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and

(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."

2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

3. Other Losses: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests, shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.

- 3 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

ARTICLE V.

OPERATOR

**A. Designation and Responsibilities of Operator:**

WBH Energy Partners LLC shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

**B. Resignation or Removal of Operator and Selection of Successor:**

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

**C. Employees and Contractors:**

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or contractors shall be the employees or contractors of Operator.

**D. Rights and Duties of Operator:**

1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from

- 4 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. **Custody of Funds:** Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

5. **Access to Contract Area and Records:** Operator shall, except as otherwise provided herein, permit each Non-Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. **Filing and Furnishing Governmental Reports:** Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. **Drilling and Testing Operations:** The following provisions shall apply to each well drilled hereunder, including but not limited to the Initial Well:

(a) Operator will promptly advise Non-Operators of the date on which the well is spudded, or the date on which drilling operations are commenced.

(b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. **Cost Estimates:** Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. **Insurance:** At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

**A. Initial Well:**

On or before the _____ day of _____, _____, Operator shall commence the drilling of the Initial Well at the following location:

and shall thereafter continue the drilling of the well with due diligence to
**AS PROPOSED BY THE OPERATOR IN ACCORDANCE WITH ARTICLE XVI.**

The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.

**B. Subsequent Operations:**

1. **Proposed Operations:** If any party hereto should desire to drill any well on the Contract Area other than the Initial Well, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be
2   performed, the location, proposed depth, objective Zone and the estimated cost of the operation.  The parties to whom such a
3   notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work
4   whether they elect to participate in the cost of the proposed operation.  If a drilling rig is on location, notice of a proposal to
5   Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-
6   eight (48) hours, exclusive of Saturday, Sunday and legal holidays.  Failure of a party to whom such notice is delivered to reply
7   within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.
8   Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties
9   within the time and in the manner provided in Article VI.B.6.

10       If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be
11   contractually committed to participate therein provided such operations are commenced within the time period hereafter set
12   forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as
13   promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case
14   may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of
15   the parties participating therein; provided, however, said commencement date may be extended upon written notice of same
16   by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such
17   additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-
18   way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or
19   acceptance.  If the actual operation has not been commenced within the time provided (including any extension thereof as
20   specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct
21   said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior
22   proposal had been made.  ~~Those parties that did not participate in the drilling of a well for which a proposal to Deepen or~~
23   ~~Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation,~~
24   ~~reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance~~
25   ~~with Article VI.B.5. in the event of a Sidetracking operation.~~

26     2.  Operations by Less Than All Parties:

27       (a) Determination of Participation.  If any party to whom such notice is delivered as provided in Article VI.B.1. or
28   VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this
29   Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no
30   later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the
31   expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the
32   proposed operation and complete it with due diligence.  Operator shall perform all work for the account of the Consenting
33   Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party,
34   the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the
35   account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work.  The
36   rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party
37   designated as Operator for an operation in which the original Operator is a Non-Consenting Party.  Consenting Parties, when
38   conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this
39   agreement.

40       If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the
41   applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its
42   recommendation as to whether the Consenting Parties should proceed with the operation as proposed.  Each Consenting Party,
43   within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the
44   proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its
45   proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in
46   the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of
47   Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties'
48   interests that any Consenting Party did not elect to take.  Any interest of Non-Consenting Parties that is not carried by a
49   Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its
50   proposal.  Failure to advise the proposing party within the time required shall be deemed an election under (i).  In the event a
51   drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a
52   total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays).  The proposing party, at its election, may
53   withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10)
54   days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period.
55   If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties
56   of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the
57   period provided in Article VI.B.1., subject to the same extension right as provided therein.

58       (b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be
59   borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding
60   paragraph.  Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and
61   encumbrances of every kind created by or arising from the operations of the Consenting Parties.  If such an operation results
62   in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore
63   the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that
64   participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate
65   shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not
66   increased by the subsequent operations of the Consenting Parties.  If any well drilled, Reworked, Sidetracked, Deepened,
67   Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in
68   paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the
69   well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the
70   expense and for the account of the Consenting Parties.  Upon commencement of operations for the drilling, Reworking,
71   Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the
72   provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the
73   Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-
74   Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-
2  Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect
3  to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or
4  market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes,
5  royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production
6  from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

7      (i)    __300__ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment
8  beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and
9  piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first
10  production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other
11  provisions of this Article, it being agreed that each such Non-Consenting Party's share of such costs and equipment will be that
12  interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning
13  of the operations; and

14      (ii)    __300__ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening,
15  Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C.,
16  and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections),
17  which would have been chargeable to such Non-Consenting Party if it had participated therein.

18      Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone
19  described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable
20  substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each
21  Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a
22  shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-
23  Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the
24  cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-
25  Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions
26  of this Article VI.B.2. (b) shall apply to such party's interest.

27      (c)  Reworking, Recompleting or Plugging Back.  An election not to participate in the drilling, Sidetracking or
28  Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in
29  such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full
30  recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount.  Similarly, an election not to
31  participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking
32  operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at
33  any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount.  Any such
34  Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the
35  cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties __100__ % of
36  that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to
37  such Non-Consenting Party had it participated therein.  If such a Reworking, Recompleting or Plugging Back operation is
38  proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting
39  Parties in said well.

40      (d)  Recoupment Matters.  During the period of time Consenting Parties are entitled to receive Non-Consenting Party's
41  share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem,
42  production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to
43  Non-Consenting Party's share of production not excepted by Article III.C.

44      In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting
45  Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all
46  such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back,
47  Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each
48  party receiving its proportionate part in kind or in value, less cost of salvage.

49      Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations
50  for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to
51  the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing,
52  Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement
53  of such costs of operation, may submit a detailed statement of monthly billings. / Each month thereafter, during the time the
        __No less often than once each quarter__
54  Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties
55  shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of
56  the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from
57  the sale of the well's working interest production during the preceding month.  In determining the quantity of Oil and Gas
58  produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or
59  periodic well tests.  Any amount realized from the sale or other disposition of equipment newly acquired in connection with
60  any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited
61  against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such
62  Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-
63  Consenting Party.

64      If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided
65  for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day
66  following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall
67  own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as
68  such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking,
69  Deepening, Recompleting or Plugging Back of said well.  Thereafter, such Non-Consenting Party shall be charged with and
70  shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this
71  agreement and Exhibit "C" attached hereto.

72      3. Stand-By Costs:  When a well which has been drilled or Deepened has reached its authorized depth and all tests have
73  been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise
74  terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking,

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening.

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C."

6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the

- 8 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**All proposals must be considered in accordance with Article XVI "Priority of Operations"**

1. ~~initial proposal shall prevail.~~ / Operator shall deliver notice of such result to all parties entitled to participate in the operation
2. within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday
3. and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig
4. is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to
5. relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within
6. such period shall be deemed an election not to participate in the prevailing proposal.

7.     7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.1., it is agreed that no wells shall be
8. proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract
9. Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.

10.     8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or
11. Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except
12. with the consent of all parties that have not relinquished interests in the well at the time of such operation.

13. **C. Completion of Wells; Reworking and Plugging Back:**

14.     1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well
15. drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling,
16. Deepening or Sidetracking shall include:

17.     ☑ Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and
18. equipping of the well, including necessary tankage and/or surface facilities.

19.     ☐ ~~Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. When~~
20. ~~such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results~~
21. ~~thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to~~
22. ~~participate in a Completion attempt whether or not Operator recommends attempting to Complete the well,~~
23. ~~together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice~~
24. ~~shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of~~
25. ~~notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an~~
26. ~~accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting~~
27. ~~with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the~~
28. ~~procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all~~
29. ~~necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface~~
30. ~~facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party~~
31. ~~receiving such notice to reply within the period above fixed shall constitute an election by that party not to~~
32. ~~participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of~~
33. ~~conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the~~
34. ~~provision of Article VI.B.3. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging~~
35. ~~Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations~~
36. ~~thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each~~
37. ~~separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting~~
38. ~~Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party~~
39. ~~in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier~~
40. ~~Completions or Recompletion have recouped their costs pursuant to Article VI.B.2.; provided further, that any~~
41. ~~recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in~~
42. ~~which the Completion attempt is made. Election by a previous Non-Consenting party to participate in a subsequent~~
43. ~~Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable~~
44. ~~materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt,~~
45. ~~insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a~~
46. Completion attempt.

47.     2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked,
48. Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking,
49. Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and
50. Completing and equipping of said well, including necessary tankage and/or surface facilities.

51. **D. Other Operations:**

52.     Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of ___**fifty thousand**___
53. _____ Dollars ($ **50,000**      ) except in connection with the
54. drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously
55. authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden
56. emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion
57. are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the
58. emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so
59. requesting an information copy thereof for any single project costing in excess of ___**fifty thousand**_____ Dollars
60. ($ **50,000**_____). Any party who has not relinquished its interest in a well shall have the right to propose that
61. Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as
62. salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but
63. not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall
64. be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the
65. amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under
66. Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively be those Articles). Operator shall deliver such
67. proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent
68. of any party or parties owning at least _____**50**_____ % of the interests of the parties entitled to participate in such operation,
69. each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated
70. to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms
71. of the proposal.

72. **E. Abandonment of Wells:**

73.     1. Abandonment of Dry Holes: Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has
74. been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any
2    party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after
3    delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the
4    proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the
5    cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to
6    plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday,
7    Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such
8    forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of
9    Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct
10    such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and
11    abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party
12    taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against
13    liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and
14    restoring the surface, for which the abandoning parties shall remain proportionately liable.

15    2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been
16    conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has
17    been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to
18    such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk
19    and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed
20    abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the
21    proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its
22    operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the
23    applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties
24    against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide
25    proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well
26    within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession
27    of such well and plug and abandon the well.

28    Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of
29    the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost
30    of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event
31    the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the
32    value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing
33    operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning
34    parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all
35    of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only
36    insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the
37    interest of the abandoning party is or includes an Oil and Gas Interest, such party shall execute and deliver to the non-
38    abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of
39    one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form
40    attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located.
41    The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their
42    respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract
43    Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

44    Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production
45    from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon
46    request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and
47    charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate
48    ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor
49    shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in
50    further operations therein subject to the provisions hereof.

51    3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as
52    between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided,
53    however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further
54    operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well
55    in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest
56    in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as
57    provided in Article VI.B.2.(b).

58    **F. Termination of Operations:**

59    Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing,
60    Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without
61    consent of parties bearing _____60_____ % of the costs of such operation; provided, however, that in the event granite or other
62    practically impenetrable substance or condition in the hole is encountered which renders further operations impractical,
63    Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1., and the
64    provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

65    **G. Taking Production in Kind:**

66    ☑ **Option No. 1: Gas Balancing Agreement Attached**

67    Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the
68    Contract Area, exclusive of production which may be used in development and producing operations and in preparing and
69    treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking
70    in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any
71    party taking its share of production in kind shall be required to pay for only its proportionate share of such part of
72    Operator's surface facilities which it uses.

73    Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in
74    production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment

### A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  directly from the purchaser thereof for its share of all production.

2      If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate

3  share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by

4  the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to

5  time, for the account of the non-taking party.   Any such purchase or sale by Operator may be terminated by

6  Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to

7  the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any

8  time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser.

9  Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time

10  as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a

11  period in excess of one (1) year.

12      Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator

13  shall have no duty to share any existing market or to obtain a price equal to that received under any existing

14  market.   The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing

15  contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said

16  contract.   No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days

17  written notice of such intended purchase and the price to be paid or the pricing basis to be used.

18      All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following

19  month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements.

20  Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which

21  records shall be made available to Non-Operators upon reasonable request.

22      In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate

23  pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportion-

24  ate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with

25  any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a

26  separate agreement.   Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

27  ☐ **Option No. 2: No Gas Balancing Agreement:**

28  ~~Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from~~

29  ~~the Contract Area, exclusive of production which may be used in development and producing operations and in~~

30  ~~preparing and treating Oil and Gas for marketing purposes and production unavoidably lost.   Any extra expenditures~~

31  ~~incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall~~

32  ~~be borne by such party.   Any party taking its share of production in kind shall be required to pay for only its~~

33  ~~proportionate share of such part of Operator's surface facilities which it uses.~~

34  ~~Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in~~

35  ~~production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment~~

36  ~~directly from the purchaser thereof for its share of all production.~~

37  ~~If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate~~

38  ~~share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the~~

39  ~~revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others~~

40  ~~at any time and from time to time, for the account of the non-taking party.   Any such purchase or sale by Operator~~

41  ~~may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall~~

42  ~~be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator~~

43  ~~to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered~~

44  ~~to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's~~

45  ~~election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase~~

46  ~~contract having a term extending beyond such ten (10) day period. Any purchase or sale by Operator of any other~~

47  ~~party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the~~

48  ~~minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1)~~

49  ~~year.~~

50  ~~Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator~~

51  ~~shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation~~

52  ~~fee equal to that received under any existing market or transportation arrangement.   The sale or delivery by~~

53  ~~Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not~~

54  ~~give the non-taking party any interest in or make the non-taking party a party to said contract.   No purchase of Oil~~

55  ~~and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written~~

56  ~~notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give~~

57  ~~notice to all parties of the first sale of Gas from any well under this Agreement.~~

58  ~~All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following~~

59  ~~month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements.~~

60  ~~Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which~~

61  ~~records shall be made available to Non-Operators upon reasonable request.~~

62  **ARTICLE VII.**

63  **EXPENDITURES AND LIABILITY OF PARTIES**

64  **A. Liability of Parties:**

65      The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations,

66  and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area.   Accordingly, the

67  liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have

68  any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation

69  hereunder.   It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other

70  partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or

71  principals.   In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have

72  established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own

73  respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other

74  with respect to activities hereunder.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**B. Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder.  Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement **(including a photographic or other reproduction hereof)** / or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder.  Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party.  All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof.  In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas.  All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties.  The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed.  In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder.  Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

**C. Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof.  Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received.  If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid.  Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable.  For purposes of this Article VII.D., all notices and elections shall be delivered

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator,
2    and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator.
3    Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified
4    below or otherwise available to a non-defaulting party.

5    1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default,
6    specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one
7    or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such
8    Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the
9    default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of
10    the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the
11    Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area
12    after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting
13    party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right
14    to receive information as to any operation conducted hereunder during the period of such default, the right to elect to
15    participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being
16    conducted under this agreement even if the party has previously elected to participate in such operation, and the right to
17    receive proceeds of production from any well subject to this agreement.

18    2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint
19    account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default
20    until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from
21    suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

22    3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the
23    defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in
24    which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a
25    well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting
26    party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with
27    respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party,
28    notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the
29    non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

30    Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure
31    its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such
32    payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-
33    defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the
34    non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership
35    of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

36    4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or
37    Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting
38    party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may
39    be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of
40    the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of
41    drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the
42    defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided
43    in the Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining
44    when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

45    5. Costs and Attorneys' Fees: In the event any party is required to bring legal proceedings to enforce any financial
46    obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of
47    collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

48    **E. Rentals, Shut-in Well Payments and Minimum Royalties:**

49    Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid
50    by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties
51    own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to
52    make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper
53    evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or
54    minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which
55    results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

56    Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to
57    production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such
58    action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of
59    failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make
60    timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article
61    IV.B.3.

62    **F. Taxes:**

63    Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all
64    property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed
65    thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as
66    to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and
67    Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being
68    subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes
69    resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to
70    such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part
71    upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to
72    the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's
73    working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner
74    provided in Exhibit "C."

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
2  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final
3  determination.  During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes
4  and any interest and penalty.  When any such protested assessment shall have been finally determined, Operator shall pay the tax for
5  the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be
6  paid by them, as provided in Exhibit "C."
7      Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect
8  to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.
9                              ARTICLE VIII.
10           ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST
11  **A. Surrender of Leases:**
12      The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
13  or in part unless all parties consent thereto.
14      However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written
15  notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after
16  delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto.  Failure of a
17  party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases
18  described in the notice.  If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or
19  implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be
20  located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender.  If the interest of the
21  assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not
22  consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long
                                                    on a mutually agreeable form.
23  thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be / on the form attached hereto as Exhibit "B."
24  Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore
25  accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party
26  shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained
27  in any lease made under the terms of this Article.  The party assignee or lessee shall pay to the party assignor or lessor the
28  reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased
29  acreage.  The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less
30  the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface.  If such value is less
31  than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit.  If the
32  assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the
33  interest of each bears to the total interest of all such parties.  If the interest of the parties to whom the assignment is to be made
34  varies according to depth, then the interest assigned shall similarly reflect such variances.
35      Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
36  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
37  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
38  agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.
39  **B. Renewal or Extension of Leases:**
40      If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties
41  shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease,
42  promptly upon expiration of the existing Lease.  The parties notified shall have the right for a period of thirty (30) days following
43  delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease
44  affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost
45  allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the
46  parties in the Contract Area.  Each party who participates in the purchase of a renewal or replacement Lease shall be given an
47  assignment of its proportionate interest therein by the acquiring party.
48      If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned
49  by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in
50  the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the
51  purchase of such renewal or replacement Lease.  The acquisition of a renewal or replacement Lease by any or all of the parties hereto
52  shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which
53  less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating
54  Agreement in the form of this agreement.
55      If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in
56  renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.
57      The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by
58  the expiring Lease or cover only a portion of its area or an interest therein.  Any renewal or replacement Lease taken before the
59  expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the
60  existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time
61  the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the
62  expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this
63  agreement.
64      The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.
65  **C. Acreage or Cash Contributions:**
66      While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other
67  operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall
68  be applied by it against the cost of such drilling or other operation.  If the contribution be in the form of acreage, the party to whom
69  the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the
70  proportions said Drilling Parties shared the cost of drilling the well.  Such acreage shall become a separate Contract Area and, to  the
71  extent possible, be governed by provisions identical to this agreement.  Each party shall promptly notify all other parties of any
72  acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area.  The above
73  provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled
74  inside Contract Area.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder,
2  such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

3  **D. Assignment; Maintenance of Uniform Interest:**

4  ~~For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas~~
5  ~~Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other~~
6  ~~disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells,~~
7  ~~equipment and production unless such disposition covers either:~~
8  ~~1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or~~
9  ~~2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells,~~
10 ~~equipment and production in the Contract Area.~~

11  Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement
12  and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and
13  Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of
14  the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale,
15  encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the
16  instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other
17  disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect
18  to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation
19  conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security
20  interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

21  If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion,
22  may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures,
23  receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to
24  bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-
25  owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of
26  the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale
27  proceeds thereof.

28  **E. Waiver of Rights to Partition:**

29  If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
30  undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its
31  undivided interest therein.

32  **F. Preferential Right to Purchase:**

33  ☐ (Optional; Check if applicable.)

34  ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract~~
35  ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which~~
36  ~~shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase~~
37  ~~price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an~~
38  ~~optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the~~
39  ~~same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the~~
40  ~~purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all~~
41  ~~purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage~~
42  ~~its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests,~~
43  ~~or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets~~
44  ~~to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any~~
45  ~~company in which such party owns a majority of the stock.~~

46  **ARTICLE IX.**

47  **INTERNAL REVENUE CODE ELECTION**

48  If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the
49  parties have not otherwise agreed ~~to form a tax partnership pursuant to Exhibit "G" or other agreement between them~~, each
50  party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle
51  "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and
52  the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected
53  such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal
54  Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by
55  Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this
56  election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal
57  Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action
58  inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract
59  Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter
60  1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party
61  hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each
62  such party states that the income derived by such party from operations hereunder can be adequately determined without the
63  computation of partnership taxable income.

64  **ARTICLE X.**

65  **CLAIMS AND LAWSUITS**

66  Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure
67  does not exceed __twenty-five thousand_____ Dollars ($ __25,000.00_____ ) and if the payment is in complete settlement
68  of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over
69  the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling,
70  or otherwise discharging such claim or suit shall be a the joint expense of the parties participating in the operation from which the
71  claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations
72  hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall
73  immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder
74

- 15 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT – 1989

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XII.
## NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier / email or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A". All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile / email address or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by / telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by / telephone email when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☑ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☐ ~~Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of _____ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within _____ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.~~

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.
## COMPLIANCE WITH LAWS AND REGULATIONS

A. Laws, Regulations and Orders:

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located; to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

B. Governing Law:

This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of ___Texas___ shall govern.

C. Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or

- 16 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1 orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or
2 production of wells, on tracts offsetting or adjacent to the Contract Area.

3       With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages,
4 injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation
5 or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission
6 or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not
7 constitute gross negligence.   Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of
8 production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such
9 an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such
10 incorrect interpretation or application.

11 **ARTICLE XV.**
12 **MISCELLANEOUS**

13 **A. Execution:**

14     This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been
15 executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of
16 the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which
17 own, in fact, an interest in the Contract Area.   Operator may, however, by written notice to all Non-Operators who have
18 become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no
19 event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this
20 agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of
21 drilling operations.   In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease
22 as of such termination.   In the event any Non-Operator has advanced or prepaid any share of drilling or other costs
23 hereunder, all sums so advanced shall be returned to such Non-Operator without interest.   In the event Operator proceeds
24 with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a
25 current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the
26 Initial Well which would have been charged to such person under this agreement if such person had executed the same and
27 Operator shall receive all revenues which would have been received by such person under this agreement if such person had
28 executed the same.

29 **B. Successors and Assigns:**

30     This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs,
31 devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or
32 Interests included within the Contract Area.

33 **C. Counterparts:**

34     This instrument may be executed in any number of counterparts, each of which shall be considered an original for all
35 purposes.

36 **D. Severability:**

37     For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws,
38 this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to
39 this agreement to comply with all of its financial obligations provided herein shall be a material default.

40 **ARTICLE XVI.**
41 **OTHER PROVISIONS**

42
43 SEE ATTACHED
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70
71
72
73
74

## ARTICLE XVI

## OTHER PROVISIONS

This Article XVI is part of the Joint Operating Agreement (this "<u>Agreement</u>") dated September 1, 2011 between WBH Energy Partners LLC ("<u>WBH</u>") as Operator and US Energy Development Corporation ("<u>USED</u>") and VW Ventures, LLC ("<u>VW Ventures</u>") as Non-Operators.

A. **Additional Definitions**. In addition to the terms defined in Article I hereof or elsewhere in this Article XVI, as used in this Agreement:

    1 "<u>Affiliate</u>" (whether or not capitalized) means, with respect to any Person, a Person that directly or indirectly controls, is controlled by, or is under common control with, such Person, with control in such context meaning the ability to direct the management or policies of a Person through ownership of voting shares or other securities, pursuant to a written agreement, or otherwise.

    2 "<u>Drilling Unit</u>" means the number of acres permitted for a proration unit applicable to the Subject Leases on which a well is located.

    3 "<u>Person</u>" (whether or not capitalized) means any individual, corporation, partnership, limited liability company, joint venture, trust, estate, governmental authority, or any other entity.

    4 "<u>Parties</u>" shall mean any Person that is a party to this Agreement from time to time and "<u>Party</u>" shall have the correlative meaning.

    5 "<u>Subject Leases</u>" means the oil and gas leases covered by this Agreement.

B. **Joint Development Agreement.** As of the execution of this Agreement, (i) WBH owns an undivided 5% interest on an eight-eighths basis, (ii) USED owns an undivided 50% interest on an eight-eighths basis, and (iii) VW Ventures owns an undivided 45% interest on an eight-eighths basis, in each case of all right, title, and interest formerly owned by Vicars Mineral Ventures, LLC, a Texas limited liability company, Jacob A. Warnock, Inc., a Texas corporation, Warnock Operating Company, LLC, a Texas limited liability company, and L.F. Merrill, an individual, in certain oil and gas leases covering lands in Archer, Clay, Jack, and Montague Counties that constitute the Subject Leases as of the date hereof.

C. **Relinquishment of Interests for Non-Participation.** Upon commencement of subsequent operations for the drilling of the first well in any Drilling Unit in the Contract Area (the "<u>First Well</u>") as to which there is a Non-Consenting Party or Parties in accordance with Article VI.B, or the Completion of the First Well as to which there is a Non-Consenting Party or Parties in accordance with Article VI.C, should the Consenting Parties establish commercial production as a result of such subsequent operations, each Non-Consenting Party shall be deemed to have permanently relinquished to the Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of the Non-Consenting Party's interest in the applicable Drilling Unit. Upon the occurrence of any of the foregoing events, within sixty (60) days of the final determination of each Consenting Party's participating interest in such subsequent operation, each Non-Consenting Party shall execute and deliver to the Consenting Parties, in proportion to their ownership, an assignment of the Non-Consenting Party's interest so relinquished.

D. **WBH Acreage Retention.** Notwithstanding anything to the contrary contained in this Agreement, for so long as WBH remains Operator, WBH shall maintain a working interest in the Subject Leases as of the date hereof that is not less than the working interest that WBH owns in such Subject Leases as of the date hereof. To the best of WBH's knowledge, WBH owns an undivided 5% working interest in each of the Subject Leases as of the date hereof. When WBH is no longer Operator, the parties to this Agreement shall select a successor Operator in accordance with the terms of this Agreement. Notwithstanding anything to the contrary contained herein, including Article V.B, if at the time WBH first ceases to be Operator USED and its Affiliates collectively own an undivided working interest in the Subject Leases that is not less than the interest in the Subject Leases as of the date hereof that USED owns as of the date hereof, USED shall have the sole and exclusive authority to select a successor Operator.

E.**Severance Taxes**.  Subject to the other provisions of this Agreement, Operator shall be responsible for the payment of, and shall pay as and when due all production, severance, excise, gathering, and other such taxes based upon units of production ("Production Taxes") that are due on all production for which Operator is disbursing proceeds.  In the event any Party takes in kind and separately disposes of its share of the production, or receives the proceeds of its share of production directly from the purchaser thereof, such Party shall be responsible for the payment of Production Taxes with respect to such share of production.  If a Non-Operator is responsible for reporting or paying any Production Taxes, Operator shall promptly provide such information in its possession as is necessary for reporting or paying such Production Taxes.

F. **Covenants Running with the Land**.  The terms, covenants and conditions of this Agreement shall be covenants running with the land covered hereby and leasehold estates therein and with each transfer or assignment of said lands or leasehold estates.  Each party making an assignment or transfer of any lands or leasehold estates covered hereby shall state in such assignment or transfer that it is subject to all of the terms, covenants and conditions hereof, and shall promptly give notice to the Operator of any such assignments or transfer.

G. **Operator Liability**.

1. Notwithstanding anything herein to the contrary, Operator shall not be obligated to perform nor be liable for its failure to perform or to continue any work or incur any expenditure or indebtedness hereunder for the Joint Account until all funds requested of Non-Operators pursuant to cash calls given in accordance with the applicable provisions hereof have been received by Operator.

2. **THE PARTIES HERETO ACKNOWLEDGE AND AGREE THAT THE FOLLOWING PROVISIONS ARE CLEAR AND CONSPICUOUS AND SATISFY THE EXPRESS NEGLIGENCE RULE. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, OPERATOR SHALL HAVE NO LIABILITY, IN CONTRACT, TORT, OR OTHERWISE, TO THE OTHER PARTIES TO THIS AGREEMENT FOR LOSSES OR LIABILITIES, WHETHER OR NOT SUCH LOSSES OR LIABILITIES ARE CAUSED BY THE NEGLIGENCE, SOLE OR CONCURRENT, OF OPERATOR INCURRED, ARISING OUT OF OR IN CONNECTION WITH THE PERFORMANCE OR ADMINISTRATION OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY PAYMENT OF ROYALTY, DELAY RENTALS, SHUT-IN WELL PAYMENTS, ACCOUNTING, MARKETING, PURCHASING OR GOVERNMENTAL FILINGS, OR OPERATIONS PERFORMED UNDER THIS AGREEMENT OR ON THE CONTRACT AREA, EXCEPT SUCH AS MAY RESULT FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF OPERATOR.**

3. Any penalties incurred as a result of any incorrect filing, notice, report or application shall, in the absence of gross negligence or willful misconduct, be charged to the parties owning the production to which the penalty pertains.

H.**Limitation on Damages**.  Notwithstanding anything to the contrary contained in this Agreement, no party to this Agreement, nor any Affiliate thereof, shall be entitled to consequential, special, or punitive damages in connection with this Agreement and the transactions contemplated hereby (other than consequential, special, or punitive damages suffered by third Persons for which responsibility is allocated among the parties hereto) and each party hereto, for itself and its Affiliates, hereby expressly waives any right to consequential, special, or punitive damages in connection with this Agreement and the transactions contemplated hereby (other than consequential, special, or punitive damages suffered by third Persons for which responsibility is allocated among the parties hereto).

I. **Conflicts**.  In the event of a conflict between the provisions of this Article XVI and any other provision of this Agreement, the provisions of this Article XVI shall control and prevail.

J. **Unenforceable Provision**.  If any provision of this Agreement is declared to be unlawful or unenforceable by final, non-appealable decision of a court of competent jurisdiction, this Agreement shall be deemed to be amended, as of the effective date of this Agreement, to delete the unlawful or unenforceable provision, and this Agreement shall nevertheless remain binding as so amended.  If such court's ruling is subsequently reversed or set aside by such court or a higher court, this Agreement shall be deemed to be amended, as of the Effective Date of this

Agreement, to reinstate such provision, and this Agreement shall be deemed binding as so amended.

K. **Bankruptcy of Non-Operator**. If, following the granting of relief under Title 11 of the United States Code (the "Bankruptcy Code") to any party hereto as debtor thereunder, this Agreement should be held to be an executory contract, then the other parties shall be entitled to a determination by debtor or the trustee for debtor within thirty (30) days from the date an order for relief is entered under the Bankruptcy Code as to the rejection or assumption of this Agreement. In the event of an assumption, the other parties shall be entitled to adequate assurances as to the future performance of the debtor's future performance of its obligations hereunder and protection of the interests of such parties. The debtor shall satisfy its obligation to provide adequate assurances by either advancing or depositing in escrow its proportionate share of the expenses of any operations reasonably anticipated to be commenced in the three-month period following the rejection or assumption of this Agreement.

L. **Multiple Counterparts; Mutuality.** This Agreement may be executed in counterparts and, if so executed, shall be valid, binding, and have the same effect as if all parties hereto actually joined and executed one and the same document. The parties hereto acknowledge and declare that this Agreement is the result of extensive negotiations between themselves. Accordingly in the event of any ambiguity in this Agreement, there shall be no presumption that this instrument was prepared solely by either party hereto.

M. **Memorandum of Operating Agreement**. This Agreement is not to be recorded, provided that, contemporaneously with this agreement becoming effective (or, upon the Operator's request, thereafter), the parties hereto (including Operator) shall execute a Memorandum of Operating Agreement substantially in the form of Exhibit "H" in order to give third Persons notice of the this Agreement, and such memorandum shall be duly executed and notarized by each party. Upon receipt, Operator shall cause the memorandum to be duly recorded in the appropriate real property or other records affecting the Contract Area, and, promptly upon request, shall furnish copies of the recorded memorandum to any party requesting the same.

N. **Deductions from Proceeds by Operator**. Operator may deduct from the proceeds due to a Non-Operator pursuant to this Agreement all severance and ad valorem taxes, royalties, and other such costs and expenses incurred and payable by reason of the drilling or subsequent operations (including maintenance) of or with respect to wells in which such Non-Operator is a Consenting Party, to the extent properly chargeable under Exhibit "C" in the ordinary course of business consistent with past practice. Operator shall keep accurate records of such costs and expenses and shall, if any such costs and expenses are so deducted, provide to the applicable Non-Operator a statement thereof, showing each such deduction and the reason therefor in reasonable detail.

O. **Gathering, Processing and Plant Facilities**. Each Non-Operator will have the right, on an ongoing basis, to participate for its proportionate share as set out on Exhibit "A" to this Agreement, in the acquisition or construction of any gathering, processing, or plant facilities that may be necessary or convenient for the production or transmission of any gas produced under the terms of this Agreement, in which Non-Operator has an interest.

P. **Lease Payments**. Except to the extent that WBH and USED have made other written arrangements with respect thereto pursuant to that certain Purchase and Sale Agreement by and between WBH and USED dated January 28, 2011, during the joint ownership of any leases, Operator shall continue to make all rental payments, extensions, modifications, renewals, and bonuses on any leases subject to this Agreement and shall be reimbursed by Non-Operators for any such payments in the amount of the percentage interest owned by the Non-Operators. Operator shall not be held liable to Non-Operators for any loss resulting from a good faith effort to properly make any payment, except for gross negligence or willful misconduct.

Q. **Volume Discounts**. In addition to the terms set forth in Exhibit "C" COPAS Accounting Procedure, Joint Operations, in the event Operator receives a volume discount or other price reduction for any operations conducted or for any goods purchased, Non-Operators shall also be entitled to such discount or reduction.

R. **Priority of Operations**.  Notwithstanding any provisions to the contrary, whenever there is more than one proposal in connection with any horizontal or multi-lateral well which has been drilled to or is drilling toward its proposed total depth, operations pursuant to such proposals shall be conducted in the following order of priority:

A. Completion of drilling operations on all proposed laterals
B. Extension or deepening of any lateral.
C. Kick out and drill additional lateral in the same formation.
D. Additional logging and/or formation evaluation
E. Attempt a completion in a lateral, including testing and logging required under Article V.D.7.
F. Plug back the well to a formation or zone above the formation in which a lateral was drilled; if there is more than one proposal to plug back, the proposal to plug back to the next deepest prospective interval shall have priority over a proposal to plug back to a shallower prospective interval.
G. Abandon the well as provided in Article VI.E.
H. No party may propose any operations with respect to any horizontal or multi-lateral well while there is in progress any approved operation on such well until such approved operations has been completed.
I. It is provided, however, that if at the time said participating parties are considering any of the above operations, the hole is in such a condition that a reasonably prudent operator would not conduct an operation in the sequence above provided, for fear of placing the hole in jeopardy or losing the same prior to completing the well in the objective depth or objective formation, such operations shall not given the priority hereinabove set forth.

Notwithstanding anything to the contrary contained in this Agreement, including this Article XVI and this Section W, to the extent one or more parties representing a minority in interest under this Agreement elect not to pursue a higher priority operation (determined in accordance with the priority of operations specified above) (a "Reverse Priority Operation") that the majority in interest (the "Majority Parties") elect to pursue, the Majority shall have the right to take such Reverse Priority Operation at the sole cost and risk of the Majority Parties; provided, however, that to the extent that any such Reverse Priority Operation is effected, the Majority Parties shall bear and pay all reasonable costs required in order to deliver the wellbore that is subject to such Reverse Priority Operation in a condition that is suitable for subsequent operations with respect to such wellbore.

S. **Additional Costs**.  In the event it is evident in any party's reasonable judgment that AFE overruns of more than ten percent (10%) of the total AFE for such operations are likely to occur prior to the completion of the approved operations, then such party shall notify the other parties and Operator shall immediately furnish to Non-Operators a revised AFE for approval of the parties. All parties who wish to consent to the revised AFE shall notify Operator of such fact within forty-eight (48) hours after receipt of the revised AFE and Operator shall advise the consenting parties of the total interest of the parties approving such AFE and its recommendation as to whether the consenting parties should proceed with the operation as proposed. Each consenting party, within forty-eight (48) hours inclusive of Saturday, Sunday, and legal holidays after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest shown on Exhibit "A" or (b) carry its proportionate part of non-consenting party's interest and failure to advise the proposing party shall be deemed an election under (a).  The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.  Should less than all parties consent to the revised AFE, and at least one consenting party commences operation under the revised AFE within forty-eight (48) hours after expiration of the original forty-eight (48) hour notice period, the non-consenting parties shall be subject to the non-consent penalties prescribed herein. Provided however, Operator shall have the responsibility and authority to take any actions deemed necessary to conduct continuous operations of a well until such time as Operator receives the required approval mentioned hereinabove.  In this event, a party that does not wish to participate in such operation shall remain liable for its share of such operation unless and until such time as its interest is assumed by the participating parties.  In the event no party (including the Operator) elects to proceed under any such revised AFE, Operator shall immediately proceed to abandon the applicable operation in accordance with the terms set forth herein.

T. **Conflict**.  The provisions of the Article XVI-Other Provisions supersede those set forth in the other Articles of the Operating Agreement to which it is attached and any other Operating Agreement executed by WBH and USED with respect to the lands covered hereby (including that certain Joint Operating Agreement between USED and WBH dated January 28, 2011).  Any conflict between the terms of these provisions and other provisions of the Operating Agreement shall be resolved in a manner which gives priority to the intent expressed in these provisions.

U. **Wellbore Assignments**.  Notwithstanding anything to the contrary contained herein, the Parties agree that wellbore assignments shall be permitted between or among any combination of the Parties with respect to any well located in the Contract Area and the Operator shall be required to recognize any assignee of an interest in any wellbore located in the Contract Area ( a "Wellbore Assignee") for all purposes of this Agreement to the extent of the interest assigned to such Wellbore Assignee and the Wellbore Assignee shall be obligated to pay its proportionate share of all costs and expenses associated with such wellbore pursuant to this Agreement.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1     IN WITNESS WHEREOF, this agreement shall be effective as of the __1st__ day of __September__,

2  __2011__.

3     __WBH Energy Partners LLC__, who has prepared and circulated this form for execution, represents and warrants

4 that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in

5 Articles __n/a__, have been made to the form.

6

7 ATTEST OR WITNESS:               OPERATOR
                               WBH Energy Partners LLC

8 _____    By _____

9 _____    David R. Henderson
                               Type or print name

10                                Title __President__

11                                Date __Aug 31, 2011__

12                                Tax ID or S.S. No. __27-4614935__

13

14                         NON-OPERATORS

15

16 _____

17 _____    By _____

18                                Type or print name

19                                Title _____

20                                Date _____

21                                Tax ID or S.S. No. _____

22

23                              _____

24 _____    By _____

25 _____    Type or print name

26

27                                Title _____

28                                Date _____

29                                Tax ID or S.S. No. _____

30                              _____

31 _____    By _____

32 _____

33                                Type or print name

34                                Title _____

35                                Date _____

36                                Tax ID or S.S. No. _____

37

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**ACKNOWLEDGMENTS**

1

2     Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts.

3   The validity and effect of these forms in any state will depend upon the statutes of that state.

4

5   Individual acknowledgment:

6   State of _____Texas_____ )

7              ) ss.

8   County of ____Travis____ )

9     This instrument was acknowledged before me on

10   *Aug 15, 2015*  by  *David Henderson*

11

12   (Seal, if any)

    *Dala Campbell*

DALA CAMPBELL
Notary Public, State of Texas
My Commission Expires 01-24-2015

Title (and Rank) _____

My commission expires: ___*1-24-15*___

15

16   Acknowledgment in representative capacity:

17   State of _____ )

18           ) ss.

19   County of _____ )

20     This instrument was acknowledged before me on

21   _____ by _____ as

22   _____ of _____

23   (Seal, if any)

  _____

24             Title (and Rank) _____

25             My commission expires: _____

26

27

28

29

30

31

32

33

34

35

36

37

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1 |    IN WITNESS WHEREOF, this agreement shall be effective as of the __1st__ day of __September__,
2 | __2011__.
3 |    __WBH Energy Partners LLC__, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form
4    Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in
5 | Articles __n/a_____, have been made to the form.

6   ATTEST OR WITNESS:                     OPERATOR

---

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1 |    IN WITNESS WHEREOF, this agreement shall be effective as of the __1st__ day of __September__.
2 | __2011__
3 |    __WBH Energy Partners LLC__, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form
4    Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in
5 | Articles __n/a_____, have been made to the form.

6   ATTEST OR WITNESS:                     OPERATOR
7
8   _____      By _____
9   _____      Type or print name
10                                       Title _____
11                                       Date _____
12                                       Tax ID or S.S. No. _____
13
14                            NON-OPERATORS
15
16                                       U.S. Energy Development Corporation
17  _____      By _____
                                         Douglas Walch
18  _____      Type or print name
19                                       Title  President
20                                       Date  SEPTEMBER 1, 2011
21                                       Tax ID or S.S. No.  16-1142489
22
23                                       _____
24  _____      By _____
25                                       
                                         Type or print name
26                                       Title _____
27                                       
28                                       Date _____
                                         Tax ID or S.S. No. _____
29
30                                       _____
31  _____      By _____
32  _____      
33                                       Type or print name
34                                       Title _____
35                                       Date _____
36                                       Tax ID or S.S. No. _____
37

- 18 -

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## ACKNOWLEDGMENTS

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts.

The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of ____Texas____ )

                   ) ss.

County of ___Wichita___ )

This instrument was acknowledged before me on

8/31/2011              by _Jacob A. Warnock_

                                       Marcua Roach

(Seal, if any)
> Marcane Roach
> Notary Public
> State of Texas
> My Commission Expires 01-17-2014

Title (and Rank) ___Notary___

My commission expires: _1-17-2014_

Acknowledgment in representative capacity:

State of _____ )

                   ) ss.

County of _____ )

This instrument was acknowledged before me on

_____ by _____ as

_____ of _____

(Seal, if any)

                                         Title (and Rank) _____

                                         My commission expires: _____

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

IN WITNESS WHEREOF, this agreement shall be effective as of the __1st__ day of __September__

__2011__

_____ **WBH Energy Partners LLC**, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles __n/a_____, have been made to the form.

**ATTEST OR WITNESS:**                          **OPERATOR**

_____

_____          By _____

_____          Type or print name

                                            Title _____

                                            Date _____

                                            Tax ID or S.S. No. _____


**NON-OPERATORS**

                                            _____

_____          By _____

_____          Type or print name

                                            Title _____

                                            Date _____

                                            Tax ID or S.S. No. _____


                                            _____

_____          By _____

_____          Type or print name

                                            Title _____

                                            Date _____

                                            Tax ID or S.S. No. _____


                                            VW Ventures, LLC

_____          By _Gregory N. Vilars_____

_____          Gregory N. Vilars
                                            Type or print name

                                            Title  **Governing Person**

                                            Date _September 1, 2011_____

                                            Tax ID or S.S. No. _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_

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1

## ACKNOWLEDGMENTS

2    Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts.

3    The validity and effect of these forms in any state will depend upon the statutes of that state.

4

5    Individual acknowledgment.

6    State of New Mexico_____ )

7              ) ss.

8    County of Lincoln_____ )

9    This instrument was acknowledged before me on

10    *September 1, 2011*    by *Gregory N. Vicars, governing*

11    *person for VW Ventures, LLC*

12    (Seal, if any)    *D L Siddens*

13    Title (and Rank) *Douglas L. Siddens*

14    My commission expires: *3-14-2015*

15

16    Acknowledgment in representative capacity.

17    State of *New Mexico*

18             ) ss.

19    County of *Lincoln* )

20    This instrument was acknowledged before me on

21    *September 1, 2011*    by *Gregory N. Vicars* as

22    *governing person for VW Ventures, LLC*

23    (Seal, if any)    *D L Siddens*

24    Title (and Rank) *notary*

25    My commission expires: *3-14-2015*

26

27

28

29

30

31

32

33

34

35

36

37

## EXHIBIT "A"

Attached to and made a part of that certain Joint Operating Agreement dated September, 1 2011, by and between WBH Energy Partners LLC, as Operator and U.S. Energy Development Partners and VW Ventures, LLC as Non-Operators.

1. **CONTRACT AREA:** The oil and gas properties in which, after giving effect to the transactions contemplated by that certain Purchase and Sale Agreement dated January 28, 2011 between WBH Energy Partners LLC ("WBH") and U.S. Energy Development Corporation ("USED"), both WBH and USED own interests.

2. **RESTRICTIONS**

   None.

3. **THE PERCENTAGE INTEREST OF THE PARTIES TO THIS AGREEMENT**

| INTEREST OWNER | WI |
|---|---|
| WBH ENERGY PARTNERS LLC | 5.00% |
| U.S. ENERGY DEVELOPMENT CORPORATION | 50.00% |
| VW VENTURES, LLC | 45.00% |
| TOTAL | 100.00% |

4. **OIL AND GAS LEASES SUBJECT TO THIS AGREEMENT**

   [see attached]

5. **ADDRESS OF THE PARTIES TO THIS JOINT OPERATING AGREEMENT**

Operator:
WBH Energy Partners LLC
PO Box 302380
Austin, TX 78703
Telephone: (512) 330-9502
Facsimile: (512) 330-9504
Email Address: joe@wbhenergy.com

Non-Operators:
U.S. Energy Development Corporation
2350 North Forest Road
Getzville, NY 14068
Facsimile: (716) 636-0418
Email: dwalch@usenergydevcorp.com
Email: carol.platter@jmjayson.com

VW Ventures, LLC
2004 Berkley
Wichita Falls, TX 76308
Telephone: (940) 782-0319
Facsimile: (512) 330-9504
Email: jacob@wbhenergy.com

6. **CONFLICT:**  The provisions of this Agreement supersede any other Joint Operating Agreement executed by WBH and USED with respect to the lands covered hereby (including that certain Joint Operating Agreement between USED and WBH dated January 28, 2011).  Any conflict between the terms of these provisions and other provisions of any other Joint Operating Agreement shall be resolved in a manner which gives priority to the intent expressed in this Agreement.

**EXHIBIT A**

| County | Lessor | Lessee | Date of Lease | Inst | Lease Vol/Page | Amendment Vol/Page |
|---|---|---|---|---|---|---|
| Montague | Holly McCall Carpenter | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350376 | |
| Montague | Nancy Miertschin | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350269 | |
| Montague | Carol Ann Seaberry | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350270 | |
| Montague | William E. McPherson | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350271 | |
| Montague | David Len McPherson | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350272 | |
| Montague | Mary Margaret McPherson Osborn | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350273 | |
| Montague | John T. McCall | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350274 | |
| Montague | Robert M. Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350276 | |
| Montague | Gayle Marie Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350278 | |
| Montague | Suzanne Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350280 | |
| Montague | Robert Mark McCall | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350282 | |
| Montague | Rosemary McCall Wingate | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350284 | |
| Montague | Carolyn McCall Perryman | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350284 | |
| Montague | William Mark Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350286 | |
| Montague | Don C. Peterson III | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5250288 | |
| Montague | Rebecca Peterson-Male | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350289 | |
| Montague | C.S. McCall III | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350290 | |
| Montague | The McCall Family Trust | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350292 | |
| Montague | James Michael Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350294 | |
| Montague | Josephine Storey Bybee | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 5350299 | |
| Montague | Holly McCall Carpenter | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5551388 | |
| Montague | Nancy Miertschin | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5542262 | |
| Montague | Carol Ann Seaberry | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5542257 | |
| Montague | William E. McPherson | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5551311 | |
| Montague | David Len McPherson | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5541301 | |
| Montague | Mary Margaret McPherson Osborn | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5541306 | |
| Montague | John T. McCall | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5551148 | |
| Montague | Robert M. Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5542296 | |
| Montague | Gayle Marie Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5542292 | |
| Montague | Suzanne Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5541287 | |
| Montague | Robert Mark McCall | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5542282 | |
| Montague | Rosemary McCall Wingate | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5542272 | |
| Montague | Carolyn McCall Perryman | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5542272 | |
| Montague | William Mark Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5542277 | |
| Montague | Don C. Peterson III | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5542252 | |
| Montague | Rebecca Peterson-Male | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5542247 | |
| Montague | C.S. McCall III | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5542237 | |
| Montague | The McCall Family Trust | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5551143 | |
| Montague | James Michael Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 5542242 | |

| County | Name | Lessee | Date | Type | Number |
|---|---|---|---|---|---|
| Montague | Josephine Storey Bybee | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/267 |
| Montague | WANDA L ROBERTSON MATHESON | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 574/324 |
| Montague | SHIRLEY BLACKSTOCK MEGASON | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/591 |
| Montague | BILLY JOE ROBERTSON JR | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/595 |
| Montague | PATRICIA ANN ROBERTSON GOOD | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/599 |
| Montague | LUTHER D ROBERTSON | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/603 |
| Montague | STELLA KAY ROBERTSON WYER | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/607 |
| Montague | FREDA JEAN ROBINSON BLAYLOCK | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/611 |
| Montague | MICHAEL ROBINSON | Jacob A. Warnock Inc. | 5/4/2011 | OGL | 574/811 |
| Montague | RON C BLACKSTOCK | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/615 |
| Montague | Holly McCall Carpenter | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/138 |
| Montague | Nancy Miertschin | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/262 |
| Montague | Carol Ann Seaberry | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/257 |
| Montague | William E. McPherson | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/311 |
| Montague | David Len McPherson | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/301 |
| Montague | Mary Margaret McPherson Osborn | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/306 |
| Montague | John T. McCall | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/148 |
| Montague | Robert M. Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/296 |
| Montague | Gayle Marie Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/292 |
| Montague | Suzanne Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/287 |
| Montague | Robert Mark McCall | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/282 |
| Montague | Rosemary McCall Wingate | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/272 |
| Montague | Carolyn McCall Perryman | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/272 |
| Montague | William Mark Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/277 |
| Montague | Don C. Peterson III | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/252 |
| Montague | Rebecca Peterson-Male | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/247 |
| Montague | C.S. McCall III | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/237 |
| Montague | The McCall Family Trust | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/143 |
| Montague | James Michael Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/242 |
| Montague | Josephine Storey Bybee | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/267 |
| Clay | Robert T. Gowan | Vicars Mineral Ventures LLC | 2/28/2008 | MOGL | 512/477; 512/480; 512/482 | 5746 |
| Clay | W Crozier Gowan | Vicars Mineral Ventures LLC | 2/28/2008 | MOGL | 512/477; 512/480; 512/482 | 5748 |
| Clay | Grace W Gowan, Ind Extrx of the Estate of John Richard Gowan | Vicars Mineral Ventures LLC | 2/28/2008 | MOGL | 512/477; 512/480; 512/482 | 5750 |
| Clay | Mary Beth Roye | Vicars Mineral Ventures LLC | 2/28/2008 | MOGL | 512/477 | 5752 |

| County | Lessor | Lessee | Date | Type | Vol/Page | Ref |
|---|---|---|---|---|---|---|
| Clay | Virgil Rosser III | Vicars Mineral Ventures LLC | 2/28/2008 | MOGL | 512/477 | 5754 |
| Clay | Richard M. Rosser | Vicars Mineral Ventures LLC | 2/28/2008 | MOGL | 512/477 | 5756 |
| Clay | Bill E. Gowan | Vicars Mineral Ventures LLC | 3/28/2008 | MOGL | 512/813 | 5758 |
| Clay | Thomas B. Gowan | Vicars Mineral Ventures LLC | 3/28/2008 | MOGL | 513/33 | 5760 |
| Clay | Liggett Family Trust | Jacob A. Warnock Inc. | 5/14/2007 | OGL | 505/176 | 5740 |
| Clay | James Weldon Wetsel | Jacob A. Warnock Inc. | 5/14/2007 | OGL | 505/184 | 5728 |
| Clay | Geraldine Maurine Bell | Jacob A. Warnock Inc. | 5/14/2007 | OGL | 505/184 | 5728 |
| Clay | Myra Joan Wetsel | Jacob A. Warnock Inc. | 5/14/2007 | OGL | 505/180 | 5734 |
| Clay | Carla Sue Mayfield Pullen | Jacob A. Warnock Inc. | 4/27/2011 | MOGL | 5/664 | |
| Clay | Sherrell Oneill | Jacob A. Warnock Inc. | 5/23/2007 | OGL | 506/196 | |
| Clay | Betty Ingram ETAL | Jacob A. Warnock Inc. | 5/23/2007 | OGL | 506/225 | |
| Clay | William Bracey ETAL | Jacob A. Warnock Inc. | 5/23/2007 | OGL | 506/221 | |
| Clay | James Karroll Ingram | Jacob A. Warnock Inc. | 5/23/2007 | OGL | 506/218 | |
| Clay | David Ingram | Jacob A. Warnock Inc. | 5/23/2007 | OGL | 506/215 | |
| Jack | Ralph Lowell Cooper and Rosemary Cooper | Jacob A. Warnock Inc. | 4/22/2008 | OGL | 799/871 | |
| Jack | Keith Shelton | Jacob A. Warnock Inc. | 3/14/2008 | MOGL | 799/839 | 862/524 |
| Jack | Bradley G. Campsey president of the Jack County oil and Gas Association | Jacob A. Warnock Inc. | 3/1/2008 | MOGL | 799/837 | 862/466 |
| Jack | Ralph Lowell Cooper | Jacob A. Warnock Inc. | 3/6/2008 | MOGL | 797/224 | |
| Jack | Lilly May West | Jacob A. Warnock Inc. | 3/6/2008 | MOGL | 797/228 | |
| Jack | Byron Sanders | Jacob A. Warnock Inc. | 2/22/2008 | MOGL | 797/209 | 862/469 |
| Jack | Doris Waits and David Waits | Jacob A. Warnock Inc. | 2/22/2008 | MOGL | 797/212 | 862/473 |
| Jack | Jeffrey Crawford | Jacob A. Warnock Inc. | 3/20/2008 | MOGL | 805/236 | 862/477 |
| Jack | Jeremy Crawford | Jacob A. Warnock Inc. | 3/20/2008 | MOGL | 799/615 | 862/480 |
| Jack | James Crawford Jr. | Jacob A. Warnock Inc. | 3/20/2008 | MOGL | 799/612 | 862/483 |
| Jack | Christopher Crawford | Jacob A. Warnock Inc. | 3/20/2008 | MOGL | 801/406 | 862/486 |
| Jack | Rebecca Owens | Jacob A. Warnock Inc. | 2/22/2008 | MOGL | 797/221 | 862/489 |
| Jack | Karen Waits Brayton | Jacob A. Warnock Inc. | 2/22/2008 | MOGL | 797/216 | 862/492 |
| Jack | John F. Townley | Jacob A. Warnock Inc. | 2/15/2008 | MOGL | 797/238 | 862/519 |
| Jack | Mitchel Davenport Receiver for mary Stewart ETAL | Jacob A. Warnock Inc. | 8/18/2008 | MOGL | 809/817 | |
| Jack | Wanda Davis | Vicars Mineral Ventures LLC | 2/26/2008 | MOGL | 797/245 | |
| Jack | Nathan Scarber | Vicars Mineral Ventures LLC | 10/17/2008 | MOGL | 812/439 | |
| Jack | Margaret McGlaun | Jacob A. Warnock Inc. | 2/15/2008 | MOGL | 797/238 | 862/519 |
| Jack | Effie Leek | Jacob A. Warnock Inc. | 2/15/2008 | MOGL | 797/238 | 862/519 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Jack | Marie Coker | Vicars Mineral Ventures LLC | 2/26/2008 | MOGL | 7997/203 | 862/495 |
| Jack | Barton J. Ord | Vicars Mineral Ventures LLC | 2/26/2008 | MOGL | 7997/219 | 862/498 |
| Jack | Gary Ray Conner | Vicars Mineral Ventures LLC | 2/26/2008 | MOGL | 7997/205 | 862/501 |
| Jack | Kelly Conner | Vicars Mineral Ventures LLC | 2/26/2008 | MOGL | 7997/207 | 862/504 |
| Jack | Big Creek Properties LTD | Vicars Mineral Ventures LLC | 2/26/2008 | MOGL | 7997/243,79 8/402, 798/404 | 862/507 |
| Jack | Todd Corry Jr. Individually, Todd Corry Jr. as POA for Bettye Bonner Corry, and Todd Corry Jr. as AIF and Guardian of Todd Corry Sr. | | 3/31/2008 | MOGL | 798/399 | |
| Jack | Ed Allison D/B/A Sunrise Enterprises | Jacob A. Warnock Inc. | 3/28/2008 | Assn | 798/395 | |
| Clay | Michael W. Rater | Jacob A. Warnock Inc. | 2/26/2008 | MOGL | 513/35 | 5/665 |
| Clay | Mark Rater | Jacob A. Warnock Inc. | 2/26/2008 | MOGL | 512/557 | 5/668 |
| Clay | Lea Ann Dudley | Jacob A. Warnock Inc. | 2/26/2008 | MOGL | 512/554 | 5/671 |
| Clay | James Rater | Jacob A. Warnock Inc. | 2/26/2008 | MOGL | 512/551 | 5/674 |
| Clay | Gary D. Rater | Jacob A. Warnock Inc. | 2/26/2008 | MOGL | 512/809 | 5/677 |
| Clay | Monte Rater | Jacob A. Warnock Inc. | 2/26/2008 | MOGL | 512/806 | 5/680 |
| Clay | Barbara Lambert | Jacob A. Warnock Inc. | 2/26/2008 | MOGL | 512/561 | 5/683 |
| Archer | Charles Veitenheimer | Vicars Mineral Ventures LLC | 4/15/2011 | Assn | 697/373, 733/597 | 733/594 |
| Archer | Charles Veitenheimer | Vicars Mineral Ventures LLC | 4/22/2008 | OGL | 6997/366 | 733/601 |
| Archer | Johnny Rater | Vicars Mineral Ventures LLC | 4/25/2008 | OGL | 698/220 | 733/605 |
| Archer | James G Veitenheimer | Vicars Mineral Ventures LLC | 4/29/2008 | MOGL | 698/218 | 733/454 |
| Archer | Ricky Wayne Greaves | Jacob A. Warnock Inc. | 10/31/2008 | MOGL | 7055/512 | 733/457 |
| Archer | David Richards | Jacob A. Warnock Inc. | 9/17/2008 | MOGL | 705/576 | 733/460 |
| Archer | Winona Herrin | Jacob A. Warnock Inc. | 9/17/2008 | MOGL | 705/578 | 733/463 |
| Archer | LaVerne Sandlin | Jacob A. Warnock Inc. | 9/17/2008 | MOGL | 705/580 | 733/466 |
| Archer | Paul W. Tidwell & Lillian G. Tidwell Revocable Trust | Jacob A. Warnock Inc. | 9/17/2008 | MOGL | 705/582 | 733/469 |
| Archer | Joy D. McCaw | Jacob A. Warnock Inc. | 9/26/2008 | MOGL | 705/584 | 733/472 |
| Archer | Paula McHenry | Jacob A. Warnock Inc. | 9/23/2008 | MOGL | 705/586 | 733/475 |
| Archer | Jessee E. Liles III | Jacob A. Warnock Inc. | 9/23/2008 | MOGL | 705/588 | 733/478 |
| Archer | Nelda Callarman | Jacob A. Warnock Inc. | 9/17/2008 | MOGL | 705/590 | 733/481 |
| Archer | Charlie Juanita Kirkland POA for Ina Mae Liles | Jacob A. Warnock Inc. | 9/23/2008 | MOGL | 705/592 | 733/484 |
| Archer | Royce Meares | Jacob A. Warnock Inc. | 9/26/2008 | MOGL | 705/594 | 733/487 |
| Archer | Wanda Joyce Maltsberger | Jacob A. Warnock Inc. | 9/17/2008 | MOGL | 705/596 | |
| Archer | Imagene Young Executrix of the D. Keith Young Est | Jacob A. Warnock Inc. | 9/26/2008 | MOGL | 705/598 | 733/490 |
| Archer | Rickie Lee Liles | Jacob A. Warnock Inc. | 9/23/2008 | MOGL | 705/100 | 733/493 |
| Archer | Linda Owens | Jacob A. Warnock Inc. | 9/23/2008 | MOGL | 705/102 | 733/497 |
| Archer | Georgia Ann Earl | Jacob A. Warnock Inc. | 9/23/2008 | MOGL | 705/104 | 733/500 |
| Archer | Coy Ramon meares | Jacob A. Warnock Inc. | 9/26/2008 | MOGL | 705/106 | 733/503 |
| Archer | Charlene L. Hord | Jacob A. Warnock Inc. | 9/17/2008 | MOGL | 705/108 | |

| County | Name | Grantee | Date | Book/Page | Book/Page |
|---|---|---|---|---|---|
| Archer | David Lee Liles | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/110 | 733/505 |
| Archer | Sylvia Jane Halbrooks | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/112 | 733/508 |
| Archer | Mary Seale King | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/114 | 733/511 |
| Archer | Jerry Alan Meares | Jacob A. Warnock Inc. | 10/7/2008 MOGL | 705/116 | 733/514 |
| Archer | Jonnie Jannette Elliston | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/118 | 733/517 |
| Archer | Sandra Jean Arndt | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/120 | 733/520 |
| Archer | Lena Mearns Ind. and as trustee for the Mearns Rev. Trust | Jacob A. Warnock Inc. | 10/7/2008 MOGL | 705/122 | 733/523 |
| Archer | Kathy Jan Skuza | Jacob A. Warnock Inc. | 10/7/2008 MOGL | 705/124 | 733/526 |
| Archer | Jodie Irene Bridges | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/126 | 733/529 |
| Archer | Lynn Welch | Jacob A. Warnock Inc. | 9/26/2008 MOGL | 705/128 | 733/532 |
| Archer | Shirley Joyce Perrin | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/130 | 733/535 |
| Archer | Connie Lois Smith | Jacob A. Warnock Inc. | 10/7/2008 MOGL | 705/132 | 733/538 |
| Archer | Gary William Liles | Jacob A. Warnock Inc. | 10/23/2008 MOGL | 705/134 | 733/541 |
| Archer | Susan B. Spinks AKA Susan Bailey | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/136 | 733/544 |
| Archer | Kenneth W. young | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/138 | 733/547 |
| Archer | Melody Loy Greaves Newsom | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/140 | 733/550 |
| Archer | Deborah Carol Marchbanks | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/142 | 733/553 |
| Archer | Loy Clanton AKA Loy Greaves | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/144 | 733/556 |
| Archer | Thomas Edward Meares | Jacob A. Warnock Inc. | 10/7/2008 MOGL | 705/146 | 733/559 |
| Archer | Jimmie Francis Dunn | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/148 | 733/562 |
| Archer | Marcia Zoe Greaves Long Jefferis | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/150 | 733/565 |
| Archer | Barbara Blair | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/152 | 733/568 |
| Archer | Nina June Bailey | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/154 | 733/571 |
| Archer | Janice Thomasen Jager | Jacob A. Warnock Inc. | 11/10/2008 MOGL | 705/156 | 733/574 |
| Archer | Heather Nicole Dunn Fuqua | Jacob A. Warnock Inc. | 11/10/2008 MOGL | 705/158 | 733/577 |
| Archer | Rebecca Hallmark | Jacob A. Warnock Inc. | 12/5/2008 MOGL | 705/160 | 733/580 |
| Archer | Steven Scott Blair | Jacob A. Warnock Inc. | 12/5/2008 MOGL | 705/162 | 733/583 |
| Archer | Sue Ellen Deen | Jacob A. Warnock Inc. | 3/4/2009 MOGL | 705/164 | 733/585 |
| Archer | Judy Charlene McLemore | Jacob A. Warnock Inc. | 3/4/2009 MOGL | 705/166 | 733/587 |
| Archer | Larry McMurtry | Jacob A. Warnock Inc. | 3/4/2009 MOGL | 705/170 | 733/589 |
| Archer | Charlie McMurtry | Jacob A. Warnock Inc. | 3/4/2009 MOGL | 705/168 | 733/591 |
| Archer | Tony Wayne Greaves | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/174 | |
| Jack | Vernie Middlebrooks | Jacob A. Warnock Inc. | 2/15/2008 MOGL | 797/241 | 8623390 |
| Jack | Ralph Lowell Cooper and wife Rosemary Cooper | Jacob A. Warnock Inc. | 4/26/2008 Assn | 799/823 | |
| Jack | Lilly May West | Jacob A. Warnock Inc. | 4/22/2008 OGL | 799/864 | |
| Jack | Ralph Lowell Cooper (Rosemary Cooper) | Jacob A. Warnock Inc. | | 799/864 | |
| Jack | Ralph Lowell Cooper and wife Rosemary Cooper DBA 6-C oil Company | Jacob A. Warnock Inc. | 4/28/2008 Assn | 799/805 | |
| Jack | Gary Ray Conner | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 797/205 | |
| Jack | Lucy Miller | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 798/402 | 8625510 |
| Jack | Stormy Miller | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 798/404 | 8625513 |
| Jack | Jackie Little | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 797/243 | 8625516 |

| County | Lessor | Lessee | Date / Type | Recording 1 | Recording 2 |
|---|---|---|---|---|---|
| Jack | Kelly Ike Conner | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 797/207 | 862/372 |
| Jack | Joyce Low | Jacob A. Warnock Inc. | 3/15/2008 MOGL | 798/406 | 862/375 |
| Jack | Loretta Newell | Jacob A. Warnock Inc. | 3/15/2008 MOGL | 799/818 | |
| Jack | Barbara J. Bean as Trustee of the Wayne O. Bean and Barbara J. Bean Revocable Trust | Jacob A. Warnock Inc. | | | |
| Jack | Mark Lundgren | Jacob A. Warnock Inc. | 6/18/2008 MOGL | 805/231 | 862/378 |
| Jack | Mitchel Davenport Receiver for Bessie Peppard ETAL | Jacob A. Warnock Inc. | 9/3/2009 MOGL | 830/397 | |
| Jack | Irma Ree Mayo | Jacob A. Warnock Inc. | 8/18/2008 OGL | 809/813 | 862/328 |
| Jack and Clay | Lannie Hubble | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 809/506 | 862/336 |
| Jack and Clay | E.J. Hubble | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 811/939 | 862/326 |
| Jack and Clay | N.E. Deweber Jr. | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 811/941 | 862/338 |
| Jack and Clay | N.E. Deweber | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 808/350 | 862/324 |
| Jack and Clay | Lattice Whitaker | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 809/508 | 862/340 |
| Jack and Clay | Coleen White | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 811/945 | 862/332 |
| Jack and Clay | Leonita Rhone | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 811/943 | 862/342 |
| Jack and Clay | Ronnie Ogle | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 808/629 | 862/316 |
| Jack and Clay | Larry Ogle | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 808/352 | 862/344 |
| Jack and Clay | Donna Roth | Jacob A. Warnock Inc. | 4/17/2008 MOGL | 808/354 | 862/370 |
| Jack and Clay | Evelyn Deweber | Jacob A. Warnock Inc. | 4/17/2008 MOGL | 799/858 | 862/320 |
| Jack and Clay | Elaine Tischler /Shadow Creek Enterprises | Jacob A. Warnock Inc. | 4/17/2008 MOGL | 799/803 | 862/346 |
| Jack and Clay | Elois Williams | Jacob A. Warnock Inc. | 4/17/2008 MOGL | 811/947 | 862/318 |
| Jack and Clay | Enell Beals | Jacob A. Warnock Inc. | 4/17/2008 MOGL | 811/947 | 862/048 |
| Jack and Clay | Eloyce Cauble | Jacob A. Warnock Inc. | 4/17/2008 MOGL | 811/947 | 862/350 |
| Jack and Clay | Elizabeth Hardin | Jacob A. Warnock Inc. | 4/17/2008 MOGL | 811/947 | 862/322 |
| Jack and Clay | Evon Reeves | Jacob A. Warnock Inc. | 4/17/2008 MOGL | 811/947 | 862/352 |
| | Ronnie Dale Ewing and wife, Mary Ann Ewing and Gladys Lemons | Wise Production Company | 11/11/2003 AOGL | 483/18 / 268/4141 | 862/354 |
| Clay | Gowin Davis | Jacob A. Warnock Inc. | 11/25/2009 MOGL | 525/49 | |
| Jack | Jimmy Wayne Riddle | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 709/829 | 862/399 |
| Jack | Rita Riddle Finley | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/846 | 862/402 |
| Jack | Dallas Riddle | Jacob A. Warnock Inc. | 3/8/2011 MOGL | 862/383 | |
| Jack | Krisena Riddle | Jacob A. Warnock Inc. | 3/8/2011 MOGL | 862/385 | |

| | | | | | |
|---|---|---|---|---|---|
| Jack | Faye Sloan | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 805/234 | 862/405 |
| Jack | Linda Potter | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/835 | 862/408 |
| Jack | Vanessa Nicole Potter | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/835 | 862/411 |
| Jack | Jason Potter | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/835 | 862/414 |
| Jack | Joshua Potter | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/835 | 862/417 |
| Jack | Paula Ferren | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/835 | 862/420 |
| Jack | Jenny Hughey | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/835 | 862/423 |
| Jack | James Stephen Potter | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/835 | 862/810 |
| Jack | Benny Lloyd Gary | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/835 | 862/387 |
| Jack | Ben Gary | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/835 | 862/426 |
| Jack | Paul Wayne Potter | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/835 | 862/430 |
| Jack | Gary Potter | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/835 | 862/433 |
| Jack | Jenelle Batey | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/835 | 862/436 |
| Jack | James Steven Whitehead | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/827 | 862/439 |
| Jack | Ronald Frank Whitehead | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/827 | 862/442 |
| Jack | Patrick Edward Whitehead | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/827 | 862/445 |
| Jack | Ruth Ann Cueto | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/827 | 862/448 |
| Jack | Lillian Gossett Priddy | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/810 | 862/451 |
| Jack | Janis Evelyn Besselaar | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/831 | 862/454 |
| Jack | James Thomas Rumage | Jacob A. Warnock Inc. | 4/9/2008 | MOGL | 799/852 | 862/457 |
| Jack | Jerry Riddle | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 799/833 | 862/460 |
| Jack | Joe D. Bloodworth | Jacob A. Warnock Inc. | 4/17/2008 | MOGL | 799/821 | 862/463 |
| Jack | Margaret C. Bloodworth Bond | Jacob A. Warnock Inc. | 4/17/2008 | ROGL | 801/402 | 863/741 |
| Jack | Lilly May West | Jacob A. Warnock Inc. | 4/22/2008 | OGL | 799/877 | |
| Jack | Ralph Lowell Cooper & Rosemary Cooper | Jacob A. Warnock Inc. | 4/22/2008 | OGL | 799/877 | |
| Jack | Aldie Marie McAnear | Jacob A. Warnock Inc. | 2/15/2008 | MOGL | 7977/236 | 862/393 |
| Jack | John W. Pursley | Jacob A. Warnock Inc. | 5/23/2008 | Assn | 801/581 | |
| Jack | Jimmie Cozart and Leila Cozart | Jacob A. Warnock Inc. | 2/15/2008 | MOGL | 7977/232 | 862/896 |
| Clay | W.C. Gilbert and Donna M. Gilbert | Jacob A. Warnock Inc. | 3/15/2008 | MOGL | 512/564 | 5/686 |
| Clay | W.C. Gilbert | L.F. Merrill | 2/22/2008 | MOGL | 5177/668 | 7/603 |
| Clay | Mack Lacy | Jacob A. Warnock Inc. | 8/27/2008 | MOGL | 5177/651 | 5/689 |
| Clay | Curtis Lacy | Jacob A. Warnock Inc. | 8/27/2008 | MOGL | 5177/650 | 5/691 |
| Clay | Jim Worley | Jacob A. Warnock Inc. | 8/27/2008 | MOGL | 5177/649 | 5/693 |
| Clay | Danny Bell | Jacob A. Warnock Inc. | 3/7/2008 | MOGL | 513/650 | 5/695 |
| Clay | Janet Diane Starkey-Wolfenberger | Jacob A. Warnock Inc. | 3/7/2008 | MOGL | 513/34 | 5/697 |
| Clay | Teddie Howell | Jacob A. Warnock Inc. | 3/7/2008 | MOGL | 512/560 | 5/699 |
| Clay | Freda Braymiller | Jacob A. Warnock Inc. | 3/7/2008 | MOGL | 512/812 | 5/701 |
| Clay | Lavaughn McManus and Kathryn McManus | Jacob A. Warnock Inc. | 2/29/2008 | MOGL | 512/560 | 5/703 |
| Jack and Clay | Beth Elaine Boyett | Jacob A. Warnock Inc. | 9/9/2008 | MOGL | 811/980 | 862/861 |
| Jack and Clay | Serisha Lynn Boyett | Jacob A. Warnock Inc. | 9/9/2008 | MOGL | 518/337 | 862/857 |
| Jack and Clay | Leslie Ann Coates | Jacob A. Warnock Inc. | 7/14/2008 | MOGL | 807/96 | 862/865 |
| Jack and Clay | Sonya Leaton Martin Morley | Jacob A. Warnock Inc. | 7/14/2008 | MOGL | 807/94 | 862/869 |
| Jack and Clay | Leslie L. Leaton Jr. | Jacob A. Warnock Inc. | 9/4/2008 | MOGL | 809/502 | 862/873 |

| Jack and Clay | Everett Cloer | | Jacob A. Warnock Inc. | 5/8/2008 | MOGL | 8011409 | 8062/877 |
| Jack and Clay | Allyne Whatley | | Jacob A. Warnock Inc. | 5/8/2008 | MOGL | 8011404 | 8062/881 |
| Jack and Clay | Tiger Verlayne Reynolds AKA Tiger Veralene Leaton | Jacob A. Warnock Inc. | 9/2/2008 | OGL | 812/441 | 8062/885 |

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

# EXHIBIT "C"

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

**1. Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

**2. Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3. Advances and Payments by Non-Operators**

A.  Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B.  Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate 10% per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

- 1 -

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

4. **Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

5. **Audits**

A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section 1. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B. The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6. **Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2. **Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

3. **Labor**

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2) Salaries of First level Supervisors in the field.

(3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

- 2 -



COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

(4) Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation or the Joint Property if such charges are excluded from the overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

**4. Employee Benefits**

Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

**5. Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

**6. Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charges shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

- 3 -

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

7. **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8. **Equipment and Facilities Furnished By Operator**

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest no gross investment less accumulated depreciation not to exceed _ten_____ percent (____10____%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9. **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10. **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under this agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

12. **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers' Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

- 4 -

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

13. Abandonment and Reclamation

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14. Communications

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15. Other Expenditures

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

### III. OVERHEAD

1. Overhead - Drilling and Producing Operations

i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( X ) Fixed Rate Basis, Paragraph 1A, or

(    ) Percentage Basis, Paragraph 1B

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III.

ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

(    ) shall be covered by the overhead rates, or

( X ) shall not be covered by the overhead rates.

iii. The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

(    ) shall be covered by the overhead rates, or

( X ) shall not be covered by the overhead rates.

A. Overhead - Fixed Rate Basis

(1) Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $ 6,500.00

(Prorated for less than a full month)

Producing Well Rate $ 650.00

-5-

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



(2)  Application of Overhead - Fixed Rate Basis shall be as follows:

(a)  Drilling Well Rate

(1)  Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2)  Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b)  Producing Well Rates

(1)  An active well either produced or injected less for any portion of the month shall be considered as a one-well charge for the entire month.

(2)  Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3)  An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4)  A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5)  All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3)  The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached.  The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

2.  Overhead - Major Construction

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the separation of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall negotiate a rate prior to the beginning of construction.

3.  Amendment of Rates

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

- 6 -

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies


COPAS

IV.    PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1.    Purchases

      Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2.    Transfers and Dispositions

      Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

      A.    New Material (Condition A)

            (1)    Tubular Goods Other than Line Pipe

                   (a)    Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

                   (b)    For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

                   (c)    Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

                   (d)    Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

            (2)    Line Pipe

                   (a)    Line pipe movements (except size 24 inch OD and larger with walls 1/2 inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

                   (b)    Line Pipe movements (except size 24 inch OD) and larger with walls 1/2 inch and over) less than 30,000 pounds shall be priced as Eastern mill published carload base prices effective as of date of shipment,

                                               - 7 -

plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(c) Line pipe 24 inch OD and over and ¼ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

(d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(l) and (2).

B.   Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1)   Material moved to the Joint Property

(a)   At seventy-five percent (75%) of current new price, as determined by Paragraph A.

(2)   Material used on and moved from the Joint Property

(a)   At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

(b)   At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material

(3)   Material not used on and moved from the Joint Property

(a)   At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C.   Other Used Material

(1)   Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

- 8 -

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

(2) Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a) Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b) Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis.

(3) Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.  Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.  Pricing Conditions

(1) Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3.  Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4.  Warranty of Material Furnished By Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

- 9 -



COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

# V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories, Notice and Representation**

   At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. **Reconciliation and Adjustment of Inventories**

   Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

   Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4. **Expense of Conducting Inventories**

   A. The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

   B. The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

## EXHIBIT "D"

ATTACHED TO AND MADE A PART OF THAT CERTAIN OPERATING AGREEMENT
DATED SEPTEMBER 1, 2011 BY AND BETWEEN WBH ENERGY PARTNERS LLC, AS
OPERATOR, AND U.S. ENERGY DEVELOPMENT CORPORATION AND VW
VENTURES, LLC AS NON-OPERATORS

## INSURANCE

I.    Workmen's Compensation insurance in accordance with the laws of the State of Texas.

II.   All premiums on the provided for insurance described below shall be charged to the Joint Account.

III.  Operator shall not be obligated or authorized, at the cost of the Joint Account, to carry any insurance other than that specified below.  In particular unless provided for below, Operator will not carry fire, windstorm, tornado, explosion, vandalism or malicious mischief insurance.  Any party many, at its own expense, acquire such insurance as it deems proper to protect itself against any claims, losses, damages, or destruction arising out of the operation of the Contract Area.

IV.   Except as may be otherwise expressly provided in the Operation Agreement to which this Exhibit is attached, the Joint Account shall be charged with all liabilities and expenditures resulting from any claims, damages, or losses against which Operator is not required to carry insurance.

V.    Operator shall not be liable to Non-Operators for the loss suffered on account of the insufficiency of insurance carried, or of the insurer with whom carried.

| KIND | POLICY FORM | MINIMUM LIMITS |
|------|-------------|----------------|
| Workmen's Compensation | Statutory | Statutory |
| Comprehensive | General Liability | $1,000,000.00 (each person)<br>$1,000,000.00 (each person)<br>$5,000,000.00 (aggregate) |
| Excess Liability | Umbrella Form | $5,000,000.00 (each accident) |
| Motor Vehicle | Comprehensive | $1,000,000.00 (BI/PD combined) |

EXHIBIT E

GAS BALANCING AGREEMENT

1. **Ownership of Gas Production**

   a) It is the intent of the parties that each party shall have the right to take in kind and separately dispose of its proportionate share of gas (including casinghead gas) produced from each formation in each well located on acreage ("Contract Area") covered by the Operating Agreement to which this Exhibit is attached ("Operating Agreement").

   b) Operator shall control the gas production and be responsible for administering the provisions of this Agreement and shall take reasonable efforts to deliver or cause to be delivered gas to the parties' gas purchasers as may be required in order to balance the accounts of the parties in accordance with the provisions contained herein. For purposes of this Agreement, Operator shall balance the accounts of the parties based upon the number of MMBtu's actually contained in the gas produced from a particular formation in a well and delivered at the outlet of lease equipment for each parties' account regardless of whether sales of such gas are made on a wet or dry basis. All references in this Agreement to quantity or volume shall refer to the number of Mcf's contained in the gas stream.

2. **Balancing of Production Accounts**

   a) Each Party desiring to take Gas will notify the Operator, or cause the Operator to be notified, of the volumes nominated, the name of the transporting pipeline and the pipeline contract number (if available) and the meter station relating to such delivery, sufficiently in advance for the Operator, acting with reasonable diligence, to meet all nomination and other requirements. Operator is authorized to deliver the volumes so nominated and confirmed (if confirmation is required) to the transporting pipeline in accordance with the terms of this Agreement.

   b) Each Party is required to take its Full Share of Current Production each month, to the extent that such production is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.

   c) If at any time a party hereto or such party's purchaser is not taking or marketing its full share of gas produced from a particular formation in a well, the remaining parties shall have the right, but not the obligation, to produce, take, sell and deliver (in addition to the full share of gas to which such parties are otherwise entitled) all or any portion of the gas attributable to such party. In the event there is more than one party taking or marketing such gas, each party shall be entitled to such gas in the ratio that such party's interest in production bears to the total interest in production of all parties then taking or marketing such gas.

   d) Any "Underproduced Party" (a party who has taken a lesser percentage of the Mcf's of gas attributable to its interest in any formation in a well than the percentage to which such party in entitled); upon giving 30 days notice in writing to Operator, shall be entitled, on a monthly basis, to produce, take, sell and deliver, in addition to the full share of gas to which such party in otherwise entitled, a quantity of gas ("make-up gas") equal to: (i) during the months of November through March (the "Winter Months"), 25%, and (ii) during all other months, 50%, of the total share of gas attributable to all parties having cumulative overproduction with respect to such gas. Any Overproduced Party (a party who has taken a greater percentage of Mcf's of gas from a particular formation in a well than the percentage of Mcf's of gas attributable to its interest in a particular formation in a well than the percentage to which such party is entitled) shall never be obligated to reduce its takes to less than 25% during the Winter Months and 50% during the remaining months of the quantity to which such party is otherwise entitled.

   e) Notwithstanding the provisions of section 2 (a) hereof, no Overproduced Party shall be entitled in any month to take any Gas in excess of three hundred percent

(300%) of its Percentage Interest of the Balancing Area's then current Maximum Monthly Availability; provided, however, that this limitation shall not apply to the extent that it would preclude production that is required to maintain leases in effect, to protect the producing capacity of a well reservoir, to preserve correlative rights, or to maintain oil production. "Maximum Monthly Availability" shall mean the maximum average monthly rate of production at which Gas can be delivered from the Balancing Area, as determined by the operator, considering the maximum efficient well rate for each well within the Balancing Area, the maximum allowable(s) set by the appropriate regulatory agency, mode of operation, production facility capabilities and pipeline pressures.

(f)     In the event there is more than one Underproduced Party desiring make-up gas, each such Underproduced Party shall be entitled to such make-up gas in the ratio that such party's interest in production bears to the total interest in production of all parties then desiring make-up gas. Any portion of the applicable make-up gas to which an Underproduced Party is entitled and which is not taken by such Underproduced Party may be taken by any other Underproduced Party(ies).

(g)     In the event there is more than one Overproduced Party required to furnish make-up gas, each such Overproduced Party shall furnish make-up gas in the ratio that such party's interest in production bears to the total interest in production of all parties then required to furnish make-up gas. Except as provided in (f) below, each Overproduced Party in any formation in a well shall be entitled, on a monthly basis, to take its full share of gas less its share of the applicable make-up gas then being produced from the particular formation in the well in which it is overproduced.

(g)     If in the good faith opinion of Operator, Operator believes that an Overproduced Party has recovered one hundred percent (100%) of such Overproduced Party's share of the recoverable reserves from a particular formation in a well, such Overproduced Party (upon being notified in writing of such fact by Operator) shall cease taking gas from such formation and the remaining parties shall be entitled to take one hundred percent (100%) of such production until the accounts of the parties are balanced, at which time thereafter such Overproduced Party shall again have the right to take its share of the remaining production, if any, in accordance with the provisions contained herein.  Notwithstanding anything to the contrary contained herein, if continued production by an Overproduced Party after such Overproduced Party has recovered its full share of the recoverable reserves from a particular formation in a well is necessary for lease maintenance purposes or if continued production by such Overproduced Party is permitted by those parties owning a majority of interest in the Contract Area (excluding the interest of the Overproduced Party), then such Overproduced Party may continue to take gas in excess of such Overproduced Party's full share of the revocable reserves in accordance with the provisions contained herein.

3.     Cash Settlements

(a)     Upon the earlier of (i) the plugging and abandonment of the last producing interval in the Balancing Area, (ii) the termination of the Operating Agreement or any pooling or unit agreement covering the Balancing Area,  (iii) any time no Gas is taken from the Balancing Area for a period of twelve (12) consecutive months, or (iv) all leases in the Balancing Area have expired, any Party may give written notice calling for cash settlement of the Gas production imbalances among the Parties.  Such notice shall be given to all Parties in the Balancing Area.

(b)     Within sixty (60) days after the notice calling for cash settlement under Section 3(a), the Operator will distribute to each Party a Final Gas Settlement Statement detailing the quantity of Overproduction owed by each Overproduced Party to each Underproduced Party and identifying the month to which such Overproduction is attributed, pursuant to the methodology set out in Section 3(d).

(c)     Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will pay to each Underproduced Party entitled to settlement the appropriate cash settlement, accompanied by appropriate accounting detail.  At the time of payment, the Overproduced Party will notify the Operator of the Gas imbalance settled by the Overproduced Party's payment.

(d)     The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the Gas taken from time to time by the Overproduced Party in excess of the Overproduced Party's Full Share of Current Production.  Any Makeup Gas taken by the Underproduced Party prior to monetary

settlement hereunder will be applied to offset Overproduction chronologically in the order of accrual.

(e)     The values used for calculating the cash settlement under Section 3(d) will include all proceeds received for the sale of the Gas by the Overproduced Party calculated at the Balancing Area, after deducting any production or severance taxes paid and any Royalty actually paid by the Overproduced Party to an Underproduced Party's Royalty owner(s), to the extent said payments amounted to a discharge of said Underproduced Party's Royalty obligation, as well as any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of the Overproduction.

(f)     To the extent the Overproduced Party did not sell all Overproduction under an Arm's Length Agreement, the cash settlement will be based on the weighted average price received by the Overproduced Party for any gas sold from the Balancing Area under Arm's Length Agreements during the months to which such Overproduction is attributed. In the event that no sales under Arm's Length Agreements were made during any such month the cash settlement for such month will be based on the Published Reference Price applicable for that area, less applicable gathering and treating costs for the month the imbalance was created.

(g)     Interest compounded at the prime rate published by the *Wall Street Journal* plus one percent (__1_%) per annum or the maximum lawful rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section 3(a) beginning the first day following the date payment is due pursuant to Section 3(o). Such interest shall be borne by the Overproducer or any Overproduced Party in the proportion that their respective delays beyond the deadlines set out in Sections 3(b) and 3(e) contributed to the accrual of the interest.

1.     **Deliverability Tests**

At the request of any party, Operator may produce the entire well stream for a deliverability

test not to exceed seventy-two (72) hours in duration (or such longer period of time as may be

mutually agreed upon by the parties) if required under such requesting party's gas sales or

transportation contract.

2.     **Statements**

(a)     The Operator will maintain appropriate accounting on a monthly and cumulative basis of the volumes of Gas that each Party is entitled to receive and the volumes of Gas actually taken or sold for each Party's account. Within sixty (60) days after the month of production, the Operator will furnish a statement for such month showing (1) each Party's Full Share of Current Production, (2) the total volume of Gas actually taken or sold for each Party's account, (3) the difference between the volume taken by each Party and that Party's Full Share of Current Production, (4) the Overproduction or Underproduction of each Party. Each Party taking Gas will promptly provide to the Operator any data required by the Operator for preparation of the statements required hereunder. If the Operator is notified that a Party elects to have another Party market or otherwise dispose of its Gas, the Operator will allocate to each such Party, in proportion to their respective Percentage Interests, the difference between the total volume of Gas actually taken by such Parties and their combined Full Share of Current Production.

(b)     If any Party fails to provide the data required herein for four (4) consecutive production months, the Operator, or where the Operator has failed to provide data, another Party, may audit the production and Gas sales and transportation volumes of the non-reporting Party to provide the required data. Such audit shall be conducted only after reasonable notice and during normal business hours in the office of the Party whose records are being audited. All costs associated with such audit will be charged to the account of the Party failing to provide the required data.

3.     **Payment on Production**

(a)     Each Party taking Gas shall pay or cause to be paid all production and severance taxes due on all volumes of Gas actually taken by such Party.

(b)     Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to whom it is accountable based on the volume of Gas actually taken for its account.

(c)    In the event that any governmental authority requires that Royalty payments be made on any other basis than that provided for in this Section 6, each Party agrees to make such Royalty payments accordingly, commencing on the effective date required by such governmental authority, and the method provided for herein shall be thereby superseded.

4.    **Operating Expenses**

    (a)    The operating expenses are to be borne as provided in the Operating Agreement, regardless of whether all parties are selling or using gas or whether the sales and use of each are in proportion to their respective interests in such gas.

EXHIBIT "H"

ATTACHED TO AND MADE A PART OF THAT CERTAIN OPERATING
AGREEMENT DATED SEPTEMBER 1, 2011 BY AND BETWEEN WBH ENERGY
PARTNERS LLC, AS OPERATOR, AND U.S. ENERGY DEVELOPMENT
CORPORATION AND VW VENTURES, LLC AS NON-OPERATORS

**FORM OF MEMORANDUM OF JOINT OPERATING AGREEMENT**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS, THAT: |
| COUNTIES OF ARCHER, CLAY | § | |
| JACK AND MONTAGUE | § | |

This Memorandum of Joint Operating Agreement (this "Memorandum") is dated effective as of the 1st day of September, 2011 (the "Effective Date"), by and among WBH Energy Partners LLC, whose address is PO Box 302380, Austin, TX 78703 (hereinafter referred to as "Operator"), U.S. Energy Development Corporation, whose address is 2350 North Forest Road, Getzville, NY 14068 ("USED"), and VW Ventures, LLC, a Texas limited liability company, whose address is 2004 Berkley, Wichita Falls, TX 76308 ("VW Ventures", and together with USED, collectively referred to as "Non-Operator").  Operator and Non-Operator are collectively referred to herein as the "Parties."

Section 1.    Operator and Non-Operator have entered into a Model Form Operating Agreement, dated effective September 1, 2011 (the "Agreement"), which provides for the development and production of oil, gas, and other substances from all or part of oil and gas leases and interests, lands, and other properties in Archer, Clay, Montague, and Jack Counties, Texas set forth on Exhibit A hereto (the "Contract Area").

Section 2.    Among other provisions, the Agreement (a) provides for the joint development of the Contract Area by the Parties, (b) contains an accounting procedure, which establishes, among other things, the direct and indirect charges to be billed to the joint account contemplated by the Agreement and (c) includes a gas balancing agreement.

Section 3.    Operator hereby certifies that a true and correct copy of the Agreement is on file and is available for inspection by third parties at the offices of Operator at the address set forth in this Memorandum.

Section 4.    It is understood and agreed by the Parties hereto that if any part, term, or provision of this Memorandum is held to be illegal or in conflict with any law, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the Parties shall be construed and enforced as if the Memorandum did not contain the particular part, term, or provision held to be invalid.

Section 5.    This Memorandum shall be binding upon and shall inure to the benefit of the Parties and their respective legal representatives, successors and permitted assigns.  The failure of one or more persons owning an interest in the Contract Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who execute this Memorandum.  This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute but one instrument.

Section 6.    Each Party confirms and acknowledges that the terms and conditions of the Agreement are by reference specifically incorporated herein and made a part hereof with the same force as if the same were set forth herein in full.  This Memorandum is subject in all respects to the terms of the Agreement.  In the event of a conflict between the terms of the Agreement and this Memorandum, the terms of the Agreement shall control.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

EXECUTED as of the dates set forth in the respective notary certifications below, but effective the 1st day of September 2011.

OPERATOR:
**WBH ENERGY PARTNERS LLC**

By: _____
Name: David R. Henderson
Title:  President


STATE OF TEXAS

COUNTY OF TRAVIS

The foregoing instrument was acknowledged before me this 30th day of August, 2011 by David R. Henderson, President of WBH ENERGY PARTNERS LLC, a Texas limited liability company, on behalf of said limited liability company.


Name: _____
Notary Public in and for the State of Texas

NON-OPERATOR:
**U.S. ENERGY DEVELOPMENT CORPORATION**

By: _____
Name: Douglas Walch
Title: President


STATE OF NEW YORK

COUNTY OF ERIE

The foregoing instrument was acknowledged before me this 1st day of September, 2011 by Douglas Walch, as President of U.S. ENERGY DEVELOPMENT CORPORATION on behalf of said corporation.


Name:_____
Notary Public in and for the State of New York

NON-OPERATOR:
**VW VENTURES**

By: _____

Name:   Jacob A. Warnock

Title:   Governing Person

By: _____

Name:   Gregory N. Vicars

Title:   Governing Person

STATE OF TEXAS

COUNTY OF WICHITA

     The foregoing instrument was acknowledged before me this 1st day of September, 2011 by Jacob A. Warnock, a Governing Person of VW Ventures LLC, a Texas limited liability company, on behalf of said limited liability company.

_____

Name:_____

Notary Public in and for the State of Texas

STATE OF NEW MEXICO

COUNTY OF LINCOLN

The foregoing instrument was acknowledged before me this 1st day of September, 2011 by Gregory N. Vicars, a Governing Person of VW Ventures LLC, a Texas limited liability company, on behalf of said limited liability company.

Name:_____
Notary Public in and for the State of New Mexico

**EXHIBIT A**
**TO**
**MEMORANDUM OF JOINT OPERATING AGREEMENT**

**Contract Area**

[see attached]

**FIRST AMENDMENT**
**TO**
**JOINT OPERATING AGREEMENT**

This FIRST AMENDMENT TO JOINT OPERATING AGREEMENT (this "Amendment") is made and entered into on December 30, 2011 to be effective for all purposes as of September 1, 2011 (the "Effective Date") by and between WBH Energy Partners LLC, a Texas limited liability company ("Operator"), WBH Energy, LP, a Texas limited partnership ("New LP"), U.S. Energy Development Corporation, a New York corporation ("USED"), and VW Ventures, LLC, a Texas limited liability company ("VW"). Operator, New LP, USED, and VW are sometimes referred to collectively in this Agreement as the "Parties" and individually as a "Party." Capitalized terms used herein but not defined herein shall have the meanings ascribed to them in the Joint Operating Agreement (as defined below).

WHEREAS, the Parties entered into that certain Operating Agreement dated as of September 1, 2011 (the "Joint Operating Agreement"); and

WHEREAS, the Parties desire and have agreed to amend the Joint Operating Agreement as more fully set forth herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is acknowledged, the Parties hereby agree as follows:

1.     WBH Acreage Retention. Section D of Article XVI of the Joint Operating Agreement is hereby amended and restated as follows:

"**D. WBH Acreage Retention**. Notwithstanding anything to the contrary contained in this Agreement, for so long as WBH remains Operator, WBH or its Affiliates shall maintain a working interest in the Subject Leases that is not less than the working interest that WBH owns in such Subject Leases as of September 1, 2011. To the best of WBH's knowledge, WBH owns an undivided 5% working interest in each of the Subject Leases as of the date hereof. In the event that WBH and its Affiliates, collectively, at any time own less than the working interest in the Subject Leases that they collectively owned as of September 1, 2011, USED shall have the right to request that WBH resign as Operator, and, within thirty (30) days of such request, WBH agrees to and shall resign as Operator subject to and in accordance with this Agreement. When WBH is no longer Operator, the parties to this Agreement shall select a successor Operator in accordance with the terms of this Agreement; however, in that event such parties agree that neither WBH nor any of its Affiliates shall have a vote in selecting a successor Operator pursuant to Article V.B.2. Notwithstanding anything to the contrary contained herein, including Article V.B., if at any time WBH first ceases to be Operator USED and its Affiliates collectively own an undivided working interest in the Subject Leases that is not less than the interest owned by USED and its Affiliates as of September 1, 2011 in the Subject Leases, USED shall have the sole and exclusive authority to select a successor Operator."

2.     Interest of Operator.  Article XVI of the Joint Operating Agreement is hereby amended to insert the following as Section V thereof:

"V. **Interest of Operator.**  Although WBH Energy Partners LLC owns no leasehold interest in the Contract Area, by executing this Agreement it covenants that it will perform all duties of Operator as set out in this Agreement and shall be deemed to own an interest in the Contract Area for all purposes under this Agreement for so long as it remains Operator in accordance with the terms hereof."

3.     References; Reaffirmation.  All references to the Joint Operating Agreement in any document, instrument, agreement or writing delivered pursuant to or in connection with the Joint Operating Agreement (as amended hereby), including this Amendment, shall be deemed to refer to the Joint Operating Agreement as amended hereby. The Parties hereby ratify and affirm in all respects the Joint Operating Agreement, as amended hereby, and covenant and agree that the Joint Operating Agreement, as amended by this Amendment, sets forth the entire agreement and understanding of the Parties in respect of the transactions contemplated hereby and supersedes all prior agreements, prior arrangements and prior understandings relating to the subject matter hereof.

4.     Multiple Counterparts. This Amendment may be executed by the Parties (and acknowledged on behalf of) in any number of counterparts and each such counterpart hereof shall be deemed to be an original instrument, but all of such counterparts shall constitute for all purposes one agreement. Any signature hereto delivered by a Party by facsimile or other electronic transmission shall be deemed an original signature hereto.

5.     Further Assurances; Effective Date Matters.  The Parties shall (i) execute, acknowledge and deliver or cause to be executed, acknowledged, and delivered such instruments and (ii) take such other actions as may be necessary or advisable to accomplish the purposes of this Amendment. This Amendment shall be effective as of the Effective Date, regardless of the date on which it is executed or acknowledged by or on behalf of any of the Parties.

6.     Matters Related to New LP.  The Parties hereby expressly acknowledge and agree that Operator has assigned all of its right, title and interest, in and to the Subject Leases (as defined in Article XVI of the Joint Operating Agreement) to New LP and that, after giving effect to such assignment, New LP is a party to the Joint Operating Agreement for all purposes.

7.     Governing Law.  This Amendment shall be governed by and construed in accordance with the laws of the State of Texas.

*[Remainder of Page Intentionally Left Blank; Signature Pages and Acknowledgments Follow]*

2

IN WITNESS WHEREOF, this Amendment has been signed by each of the Parties to be effective as of the Effective Date, regardless of the date on which it is executed.

**OPERATOR:**

WBH ENERGY PARTNERS LLC

By: _____

Name: David R. Henderson

Title:  President

**ACKNOWLEDGMENT**

State of Texas

County of Travis

The foregoing instrument was acknowledged before me on _____, by David R. Henderson, President of WBH ENERGY PARTNERS LLC, a Texas limited liability company, on behalf of said limited liability company.

_____

Notary Public, State of Texas

Printed Name:_____

*[Signature Page and Acknowledgment to First Amendment to Joint Operating Agreement]*

**NEW LP:**

WBH ENERGY, LP

By: WBH ENERGY GP, LLC, its general partner

By: _____
    Name: David R. Henderson
    Title:  President

## ACKNOWLEDGMENT

State of Texas
County of Travis

The foregoing instrument was acknowledged before me on _____ by David R. Henderson, the President of WBH Energy GP, LLC, the general partner of WBH Energy, LP, a Texas limited partnership, on behalf of said limited partnership.

_____
Notary Public, State of Texas
Printed Name:_____

*[Signature Page and Acknowledgment to First Amendment to Joint Operating Agreement]*

USED:

U.S. Energy Development Corporation

By: _____

Name: Douglas Walch
Title:   President

## ACKNOWLEDGMENT

State of New York
County of Erie

The foregoing instrument was acknowledged before me on December 30, 2011   by
Douglas Walch, the President of U.S. Energy Development Corporation, a New York
corporation, on behalf of said corporation.

_____

Notary Public, State of New York
Printed Name: michele anne Chambers (witmer)

MICHELE ANNE CHAMBERS (witmer)
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN ERIE COUNTY
NO 6136845
MY COMMISSION EXPIRES NOV. 14, 20 13

*[Signature Page and Acknowledgment to First Amendment to Joint Operating Agreement]*

**VW:**

VW Ventures, LLC

By: _____
    Name: Jacob A. Warnock
    Title:  Governing Person


**ACKNOWLEDGMENT**

STATE OF TEXAS

COUNTY OF _____

    This instrument was acknowledged before me on the ___ day of _____, 20__, by Jacob A. Warnock, as a governing person of VW Ventures, LLC, a Texas limited liability company, on behalf of said limited liability company.

                                  _____
                                  Name:_____
                                  Notary Public in and for the State of Texas

*[Signature Page and Acknowledgment to First Amendment to Joint Operating Agreement]*

VW:

VW Ventures, LLC

By: _____
    Name: Gregory N. Vicars
    Title:  Governing Person

### ACKNOWLEDGMENT

STATE OF _____

COUNTY OF _____

    This instrument was acknowledged before me on the ___ day of _____, 20__, by Gregory N. Vicars, as a governing person of VW Ventures, LLC, a Texas limited liability company, on behalf of said limited liability company.

_____
Name:_____
Notary Public in and for the State of Texas

*[Signature Page and Acknowledgment to First Amendment to Joint Operating Agreement]*

EXHIBIT 2A

## MEMORANDUM OF JOINT OPERATING AGREEMENT

THE STATE OF TEXAS     §
                     §      KNOW ALL MEN BY THESE PRESENTS, THAT:
                     §
COUNTIES OF ARCHER, CLAY    §
JACK AND MONTAGUE        §

This Memorandum of Joint Operating Agreement (this "Memorandum") is dated effective as of the 1st day of September, 2011 (the "Effective Date"), by and among WBH Energy Partners LLC, whose address is PO Box 302380, Austin, TX 78703 (hereinafter referred to as "Operator"), U.S. Energy Development Corporation, whose address is 2350 North Forest Road, Getzville, NY 14068 ("USED"), and VW Ventures, LLC, a Texas limited liability company, whose address is 2004 Berkley, Wichita Falls, TX 76308 ("VW Ventures", and together with USED, collectively referred to as "Non-Operator"). Operator and Non-Operator are collectively referred to herein as the "Parties."

Section 1.      Operator and Non-Operator have entered into a Model Form Operating Agreement, dated effective September 1, 2011 (the "Agreement"), which provides for the development and production of oil, gas, and other substances from all or part of oil and gas leases and interests, lands, and other properties in Archer, Clay, Montague, and Jack Counties, Texas set forth on Exhibit A hereto (the "Contract Area").

Section 2.      Among other provisions, the Agreement (a) provides for the joint development of the Contract Area by the Parties, (b) contains an accounting procedure, which establishes, among other things, the direct and indirect charges to be billed to the joint account contemplated by the Agreement and (c) includes a gas balancing agreement.

Section 3.      Operator hereby certifies that a true and correct copy of the Agreement is on file and is available for inspection by third parties at the offices of Operator at the address set forth in this Memorandum.

Section 4.      It is understood and agreed by the Parties hereto that if any part, term, or provision of this Memorandum is held to be illegal or in conflict with any law, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the Parties shall be construed and enforced as if the Memorandum did not contain the particular part, term, or provision held to be invalid.

Section 5.      This Memorandum shall be binding upon and shall inure to the benefit of the Parties and their respective legal representatives, successors and permitted assigns. The failure of one or more persons owning an interest in the Contract Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who execute this Memorandum. This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute but one instrument.

VOL: 0737   PG: 0269

1

A CERTIFIED COPY

ATTEST: NOV 18 , 2014
KARREN WINTER, COUNTY CLERK
ARCHER COUNTY, TEXAS

BY: _____ DEPUTY

Section 6.    Each Party confirms and acknowledges that the terms and conditions of the Agreement are by reference specifically incorporated herein and made a part hereof with the same force as if the same were set forth herein in full.  This Memorandum is subject in all respects to the terms of the Agreement.  In the event of a conflict between the terms of the Agreement and this Memorandum, the terms of the Agreement shall control.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

2

A CERTIFIED COPY

ATTEST: Nov 18 2014
KARREN WINTER, COUNTY CLERK
ARCHER COUNTY, TEXAS
BY: _____ DEPUTY

EXECUTED as of the dates set forth in the respective notary certifications below, but effective the 1st day of September 2011.

OPERATOR:
**WBH ENERGY PARTNERS LLC**

By: 

Name:  David R. Henderson
Title:  President

## ACKNOWLEDGMENT

STATE OF TEXAS

COUNTY OF TRAVIS

The foregoing instrument was acknowledged before me this 30th day of August, 2011 by David R. Henderson, President of WBH ENERGY PARTNERS LLC, a Texas limited liability company, on behalf of said limited liability company.

**DALA CAMPBELL**
Notary Public, State of Texas
My Commission Expires 01-24-2015

Name: _____
Notary Public in and for the State of Texas

*[WBH Signature and Acknowledgement Page to Memorandum of JOA]*

VOL: 0737  PG: 0271

A CERTIFIED COPY

ATTEST: Nov 18 2014
KARREN WINTER, COUNTY CLERK
ARCHER COUNTY, TEXAS

BY: _____ DEPUTY

VOL.: 0737   PG: 0272

NON-OPERATOR:
**U.S. ENERGY DEVELOPMENT CORPORATION**

By:

Name:   Douglas Walch
Title:   President

STATE OF NEW YORK

COUNTY OF ERIE

The foregoing instrument was acknowledged before me this 1st day of September, 2011 by Douglas Walch, as President of U.S. ENERGY DEVELOPMENT CORPORATION on behalf of said corporation.

Name:
Notary Public in and for the State of New York

William H. Mattrey
Notary Public, State of New York
Qualified in Erie County
My Commission Expires February 28, 20 ___

*[USED Signature and Acknowledgement Page to Memorandum of JOA]*

A CERTIFIED COPY

ATTEST: Nov. 18 , 2014
KARREN WINTER, COUNTY CLERK
ARCHER COUNTY, TEXAS

BY: _____ DEPUTY

**NON-OPERATOR:**
**VW VENTURES**

By: _[signature]_
Name: Jacob A. Warnock
Title: Governing Person

## ACKNOWLEDGMENT

STATE OF TEXAS

COUNTY OF WICHITA

     This instrument was acknowledged before me on the 31st day of August, 2011, by Jacob A. Warnock, as a governing person of VW Ventures, LLC, a Texas limited liability company, on behalf of said limited liability company.

Name: Marlene Roach
Notary Public in and for the State of Texas

Marlene Roach
Notary Public
State of Texas
My Commission Expires 01-17-2014

_[VW Ventures Signature and Acknowledgment Page to Memorandum of JOA]_

A CERTIFIED COPY
ATTEST: Nov. 18, 2014
KARREN WINTER, COUNTY CLERK
ARCHER COUNTY, TEXAS
BY: _[signature]_ DEPUTY

VOL: 0737    PG: 0274

**NON-OPERATOR:**
**VW VENTURES**

By: _Gregory N. Vicars_
Name:    Gregory N. Vicars
Title:    Governing Person

### ACKNOWLEDGMENT

STATE OF NEW MEXICO

COUNTY OF LINCOLN

The foregoing instrument was acknowledged before me this 1st day of September, 2011 by Gregory N. Vicars, a Governing Person of VW Ventures LLC, a Texas limited liability company on behalf of said limited liability company.

Name: _Douglas L. Siddens_
Notary Public in and for the State of New Mexico
Commission Expires 3-14-15

*[VW Ventures Signature and Acknowledgement Page to Memorandum of JOA]*

A CERTIFIED COPY
ATTEST: NOV. 18, 2014
KARREN WINTER, COUNTY CLERK
ARCHER COUNTY, TEXAS
BY: _Sally Harney_ DEPUTY

**EXHIBIT A**
**TO**
**MEMORANDUM OF JOINT OPERATING AGREEMENT**

**Contract Area**

[see attached]

VOL: 0737  PG: 0275

A CERTIFIED COPY

ATTEST: NOV 18 2014
KARREN WINTER, COUNTY CLERK
ARCHER COUNTY, TEXAS

BY: _Haley Harney_ DEPUTY

**EXHIBIT A**

| County | Lessor | Lessee | Date of Lease | Inst | Lease Vol/Page | Amendment Vol/Page |
|---|---|---|---|---|---|---|
| Montague | Holly McCall Carpenter | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/276 | |
| Montague | Nancy Meertschin | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/269 | |
| Montague | Carol Ann Seaberry | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/270 | |
| Montague | William E. McPherson | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/271 | |
| Montague | David Len McPherson | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/272 | |
| Montague | Mary Margaret McPherson Osborn | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/273 | |
| Montague | John T. McCall | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/274 | |
| Montague | Robert M. Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/276 | |
| Montague | Gayle Marie Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/278 | |
| Montague | Suzanne Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/280 | |
| Montague | Robert Mark McCall | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/282 | |
| Montague | Rosemary McCall Wingate | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/284 | |
| Montague | Carolyn McCall Perryman | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/284 | |
| Montague | William Mark Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/286 | |
| Montague | Don C. Peterson III | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/288 | |
| Montague | Rebecca Peterson-Male | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/289 | |
| Montague | C.S. McCall III | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/290 | |
| Montague | The McCall Family Trust | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/292 | |
| Montague | James Michael Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/294 | |
| Montague | Josephine Storey Bybee | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/299 | |
| Montague | Holly McCall Carpenter | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/138 | |
| Montague | Nancy Meertschin | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/262 | |
| Montague | Carol Ann Seaberry | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/257 | |
| Montague | William E. McPherson | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/311 | |
| Montague | David Len McPherson | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/301 | |
| Montague | Mary Margaret McPherson Osborn | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/306 | |
| Montague | John T. McCall | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/148 | |
| Montague | Robert M. Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/296 | |
| Montague | Gayle Marie Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/292 | |
| Montague | Suzanne Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/287 | |
| Montague | Robert Mark McCall | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/282 | |
| Montague | Rosemary McCall Wingate | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/272 | |
| Montague | Carolyn McCall Perryman | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/277 | |
| Montague | William Mark Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/262 | |
| Montague | Don C. Peterson III | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/247 | |
| Montague | Rebecca Peterson-Male | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/237 | |
| Montague | C.S. McCall III | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/143 | |
| Montague | The McCall Family Trust | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/242 | |
| Montague | James Michael Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | | |

A CERTIFIED COPY
ATTEST: NOV. 18, 2014
KARREN WINTER, COUNTY CLERK
ARCHER COUNTY, TEXAS
BY: Haley Harney DEPUTY

VOL: 0737  PG: 0277

| County | Name | Grantee | Date | Reference |
|---|---|---|---|---|
| Montague | Josephine Storey Bybee | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 554/267 |
| Montague | WANDA L ROBERTSON MATHESON | Jacob A. Warnock Inc. | 3/29/2011 OGL | 574/024 |
| Montague | SHIRLEY BLACKSTOCK MEGASON | Jacob A. Warnock Inc. | 3/29/2011 OGL | 570/591 |
| Montague | BILLY JOE ROBERTSON JR | Jacob A. Warnock Inc. | 3/29/2011 OGL | 570/595 |
| Montague | PATRICIA ANN ROBERTSON GOOD | Jacob A. Warnock Inc. | 3/29/2011 OGL | 570/599 |
| Montague | LUTHER D ROBERTSON | Jacob A. Warnock Inc. | 3/29/2011 OGL | 570/603 |
| Montague | STELLA KAY ROBERTSON WYER | Jacob A. Warnock Inc. | 3/29/2011 OGL | 570/607 |
| Montague | FREDA JEAN ROBINSON BLAYLOCK | Jacob A. Warnock Inc. | 3/29/2011 OGL | 570/611 |
| Montague | MICHAEL ROBINSON | Jacob A. Warnock Inc. | 5/4/2011 OGL | 574/611 |
| Montague | RON C BLACKSTOCK | Jacob A. Warnock Inc. | 3/29/2011 OGL | 570/615 |
| Montague | Holly McCall Carpenter | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 555/138 |
| Montague | Nancy Miertschin | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 554/262 |
| Montague | Carol Ann Seaberry | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 554/257 |
| Montague | William E. McPherson | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 555/311 |
| Montague | David Len McPherson | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 554/301 |
| Montague | Mary Margaret McPherson Osborn | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 554/306 |
| Montague | John T. McCall | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 555/148 |
| Montague | Robert M. Storey | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 554/296 |
| Montague | Gayle Marie Storey | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 554/292 |
| Montague | Suzanne Storey | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 554/287 |
| Montague | Robert Mark McCall | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 554/282 |
| Montague | Rosemary McCall Wingate | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 554/272 |
| Montague | Carolyn McCall Perryman | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 554/277 |
| Montague | William Mark Storey | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 554/252 |
| Montague | Don C. Paterson III | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 554/247 |
| Montague | Rebecca Peterson-Male | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 555/143 |
| Montague | C.S. McCall III | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 554/237 |
| Montague | The McCall Family Trust | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 554/242 |
| Montague | James Michael Storey | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 554/267 |
| Montague | Josephine Storey Bybee | Jacob A. Warnock Inc. | 1/1/2011 MOGL | 512/477; 512/480; |
| Clay | Robert T. Gowan | Vicars Mineral Ventures LLC | 2/28/2008 MOGL | 512/477; 512/480; 512/482 |
| Clay | W Crozier Gowan | Vicars Mineral Ventures LLC | 2/28/2008 MOGL | 512/477; 512/480; 512/482 |
| Clay | Grace W Gowan, Ind Extrx of the Estate of John Richard Gowan | Vicars Mineral Ventures LLC | 2/28/2008 MOGL | 512/482 |
| Clay | Mary Beth Roye | Vicars Mineral Ventures LLC | 2/28/2008 MOGL | 512/477 |

| 5746 |
|---|
| 5748 |
| 5750 |
| 5752 |

A CERTIFIED COPY

ATTEST: Nov. 18, 2014
KARREN WINTER, COUNTY CLERK
ARCHER COUNTY, TEXAS
BY: _____ DEPUTY

VOL: 737 PG: 0278

| County | Name | Grantee | Date/Type | | | |
|---|---|---|---|---|---|---|
| Clay | Virgil Rosser III | Vicars Mineral Ventures LLC | 2/28/2008 MOGL | 512477 | 512477 | 5/754 |
| Clay | Richard M. Rosser | Vicars Mineral Ventures LLC | 2/28/2008 MOGL | 512477 | | 5/756 |
| Clay | Bill E. Gowan | Vicars Mineral Ventures LLC | 3/28/2008 MOGL | 512/813 | | 5758 |
| Clay | Thomas B. Gowan | Vicars Mineral Ventures LLC | 3/28/2008 MOGL | 513/33 | 505/176 | 5/760 |
| Clay | Liggett Family Trust | Jacob A. Warnock Inc. | 5/14/2007 OGL | 505/176 | 5740 | |
| Clay | James Weldon Wetsel | Jacob A. Warnock Inc.. | 5/14/2011 OGL | 505/184 | 5728 | |
| Clay | Geraline Maurine Bell | Jacob A. Warnock Inc. | 11/14/2011 OGL | 505/184 | 5728 | |
| Clay | Myra Joan Wetsel | Jacob A. Warnock Inc. | 11/14/2011 OGL | 505/180 | 5734 | |
| Clay | Carla Sue Mayfield Pullen | Jacob A. Warnock Inc. | 4/27/2011 OGL | 5664 | 5664 | |
| Clay | Sherrell Oneill | Jacob A. Warnock Inc. | 5/23/2007 OGL | 506/196 | | |
| Clay | Betty Ingram ETAL | Jacob A. Warnock Inc. | 5/23/2007 OGL | 506/225 | | |
| Clay | William Bracey ETAL | Jacob A. Warnock Inc. | 5/23/2007 OGL | 506/221 | | |
| Clay | James Karroll Ingram | Jacob A. Warnock Inc. | 5/23/2007 OGL | 506/218 | | |
| Clay | David Ingram | Jacob A. Warnock Inc. | 5/23/2007 OGL | 506/215 | | |
| Clay | Ralph Lowell Cooper and Rosemary Cooper | Jacob A. Warnock Inc. | 4/22/2008 OGL | 799/871 | | |
| Jack | Keith Shelton | Jacob A. Warnock Inc. | 3/14/2008 MOGL | 799/839 | 862/524 | |
| Jack | Bradley G. Campsey president of the Jack County oil and Gas Association | Jacob A. Warnock Inc. | 3/11/2008 MOGL | 790/837 | 862/466 | |
| Jack | Ralph Lowell Cooper | Jacob A. Warnock Inc. | 3/6/2008 MOGL | 797/224 | | |
| Jack | Lilly May West | Jacob A. Warnock Inc. | 3/6/2008 MOGL | 797/228 | | |
| Jack | Byron Sanders | Jacob A. Warnock Inc. | 2/27/2008 MOGL | 797/209 | 862/469 | |
| Jack | Doris Waits and David Waits | Jacob A. Warnock Inc. | 2/27/2008 MOGL | 797/212 | 862/473 | |
| Jack | Jeffrey Crawford | Jacob A. Warnock Inc. | 3/20/2008 MOGL | 805/236 | 862/477 | |
| Jack | Jeremy Crawford | Jacob A. Warnock Inc. | 3/20/2008 MOGL | 799/815 | 862/480 | |
| Jack | James Crawford Jr. | Jacob A. Warnock Inc. | 3/20/2008 MOGL | 799/812 | 862/483 | |
| Jack | Christopher Crawford | Jacob A. Warnock Inc. | 3/20/2008 MOGL | 801/406 | 862/486 | |
| Jack | Rebecca Owens | Jacob A. Warnock Inc. | 2/22/2008 MOGL | 797/221 | 862/489 | |
| Jack | Karen Watts Brayton | Jacob A. Warnock Inc. | 2/22/2008 MOGL | 797/216 | 862/492 | |
| Jack | John F. Townley | Jacob A. Warnock Inc. | 2/15/2008 MOGL | 797/238 | 862/519 | |
| Jack | Mitchel Davenport Receiver for mary Stewart ETAL | Jacob A. Warnock Inc. | 8/18/2008 MOGL | 809/817 | | |
| Jack | Wanda Davis | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 797/245 | | |
| Jack | Nathan Scarber | Vicars Mineral Ventures LLC | 10/17/2008 MOGL | 812/439 | | |
| Jack | Margaret McGlaun | Jacob A. Warnock Inc. | 2/15/2008 MOGL | 797/238 | 862/519 | |
| Jack | Effie Losik | Jacob A. Warnock Inc. | 2/15/2008 MOGL | | 862/519 | |

A CERTIFIED COPY
ATTEST: NOV 18 2014
KARREN WINTER, COUNTY CLERK
ARCHER COUNTY, TEXAS
BY: _____ DEPUTY

| County | Grantor | Grantee | Date / Type | | |
|---|---|---|---|---|---|
| Jack | Marie Coker | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 797/203 | 862/495 |
| Jack | Barton J. Ord | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 797/219 | 862/498 |
| Jack | Gary Ray Conner | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 797/205 | 862/501 |
| Jack | Kelly Conner | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 797/207 | 862/504 |
| Jack | Big Creek Properties LTD, Todd Conry Jr. Individually, Todd Conry Jr. as POA for Bettye Bonner Conry, and Todd Conry Jr. as AIF and Guardian of Todd Conry Sr. | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 797/243,79 8/402, 798/404 | 862/507 |
| Jack | Ed Allison D/B/A Sunrise Enterprises | Jacob A. Warnock Inc. | 3/31/2008 MOGL | 798/399 | |
| Jack | Michael W. Rater | Jacob A. Warnock Inc. | 3/28/2008 Assn | 798/395 | |
| Clay | Mark Rater | Jacob A. Warnock Inc. | 2/26/2008 MOGL | 512/635 | 5/668 |
| Clay | Lee Ann Dudley | Jacob A. Warnock Inc. | 2/26/2008 MOGL | 512/657 | 5/671 |
| Clay | James Rater | Jacob A. Warnock Inc. | 2/26/2008 MOGL | 512/654 | 5/674 |
| Clay | Gary D. Rater | Jacob A. Warnock Inc. | 2/26/2008 MOGL | 512/651 | 5/677 |
| Clay | Monte Rater | Jacob A. Warnock Inc. | 2/26/2008 MOGL | 512/809 | 5/680 |
| Clay | Barbara Lambert | Jacob A. Warnock Inc. | 2/26/2008 MOGL | 512/806 | 5/683 |
| Clay | | | 2/26/2008 MOGL | 512/661 | |
| Archer | Charles Valtenheimer | Vicars Mineral Ventures LLC | 4/15/2011 Assn | 733/697 | |
| Archer | Charles Valtenheimer | Vicars Mineral Ventures LLC | 4/22/2008 OGL | 697/366 | 733/594 |
| Archer | Johnny Rater | Vicars Mineral Ventures LLC | 4/25/2008 OGL | 698/220 | 733/601 |
| Archer | James G Valtenheimer | Vicars Mineral Ventures LLC | 4/29/2008 MOGL | 698/218 | 733/605 |
| Archer | Ricky Wayne Greaves | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/512 | 733/454 |
| Archer | David Richards | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/76 | 733/457 |
| Archer | Winona Harrin | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/78 | 733/460 |
| Archer | LaVerne Sandlin | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/80 | 733/463 |
| Archer | Paul W. Tidwell & Lillian G. Tidwell Revocable Trust | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/82 | 733/466 |
| Archer | Joy D. McCaw | Jacob A. Warnock Inc. | 9/26/2008 MOGL | 705/84 | 733/469 |
| Archer | Paula McHenry | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/86 | 733/472 |
| Archer | Jossee E. Liles III | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/88 | 733/475 |
| Archer | Nelda Callamran | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/90 | 733/478 |
| Archer | Charlie Juanita Kirkland POA for Ina Mae Liles | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/92 | 733/481 |
| Archer | Royce Meares | Jacob A. Warnock Inc. | 9/26/2008 MOGL | 705/94 | 733/484 |
| Archer | Wanda Joyca Maltsberger | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/96 | 733/487 |
| Archer | Imagene Young Executrix of the D. Keith Young Est | Jacob A. Warnock Inc. | 9/26/2008 MOGL | 705/98 | 733/490 |
| Archer | Riddie Lee Liles | Jacob A. Warnock inc. | 9/23/2008 MOGL | 705/100 | |
| Archer | Linda Owens | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/102 | 733/493 |
| Archer | Georgia Ann Earl | Jacob A. Warnock Inc. - | 9/23/2008 MOGL | 705/104 | 733/497 |
| Archer | Coy Ramon meares | Jacob A. Warnock Inc. | 9/26/2008 MOGL | 705/106 | 733/500 |
| Archer | Charlene L. Hord | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/108 | 733/503 |

A CERTIFIED COPY
ATTEST: Nov. 18, 2014
KARREN WINTER, COUNTY CLERK
ARCHER COUNTY, TEXAS
BY: _____ DEPUTY

| County | Grantor | Grantee | Instrument | Vol/Page 1 | Vol/Page 2 |
|---|---|---|---|---|---|
| Archer | David Lee Liles | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/110 | 733/505 |
| Archer | Sylvia Jane Halbrooks | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/112 | 733/508 |
| Archer | Mary Seale King | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/114 | 733/511 |
| Archer | Jerry Alan Meares | Jacob A. Warnock Inc. | 10/7/2008 MOGL | 705/116 | 733/514 |
| Archer | Jonnie Jannelle Elliston | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/118 | 733/517 |
| Archer | Sandra Jean Arndt | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/120 | 733/520 |
| Archer | Lena Meares Indi. and as trustee for the Meares Rev. Trust | Jacob A. Warnock Inc. | 10/7/2008 MOGL | 705/122 | 733/523 |
| Archer | Kathy Jan Skuza | Jacob A. Warnock Inc. | 10/7/2008 MOGL | 705/124 | 733/526 |
| Archer | Jodi Irene Bridges | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/126 | 733/529 |
| Archer | Lynn Welch | Jacob A. Warnock Inc. | 9/26/2008 MOGL | 705/128 | 733/532 |
| Archer | Shirley Joyce Perrin | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/130 | 733/535 |
| Archer | Connie Lola Smith | Jacob A. Warnock Inc. | 10/7/2008 MOGL | 705/132 | 733/538 |
| Archer | Gary L. William Liles | Jacob A. Warnock Inc. | 10/23/2008 MOGL | 705/134 | 733/541 |
| Archer | Susan B. Spinks AKA Susan Bailey | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/136 | 733/544 |
| Archer | Kenneth W. young | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/138 | 733/547 |
| Archer | Melody Loy Greaves Newsom | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/140 | 733/550 |
| Archer | Deborah Carol Marchbanks | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/142 | 733/553 |
| Archer | Loy Clanton AKA Loy Greaves | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/144 | 733/556 |
| Archer | Thomas Edward Meares | Jacob A. Warnock Inc. | 10/7/2008 MOGL | 705/146 | 733/559 |
| Archer | Jimmie Francis Dunn | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/148 | 733/562 |
| Archer | Marcia Zea Greaves Long Jefferis | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/150 | 733/565 |
| Archer | Barbara Blair | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/152 | 733/568 |
| Archer | Nina June Bailey | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/154 | 733/571 |
| Archer | Janice Thomasen Jagler | Jacob A. Warnock Inc. | 11/10/2008 MOGL | 705/156 | 733/574 |
| Archer | Heather Nicole Dunn Fuqua | Jacob A. Warnock Inc. | 11/10/2008 MOGL | 705/158 | 733/577 |
| Archer | Rebecca Hallmark | Jacob A. Warnock Inc. | 12/5/2008 MOGL | 705/160 | 733/580 |
| Archer | Steven Scott Blair | Jacob A. Warnock Inc. | 12/5/2008 MOGL | 705/162 | 733/583 |
| Archer | Sue Ellen Deen | Jacob A. Warnock Inc. | 3/4/2009 MOGL | 705/164 | 735/585 |
| Archer | Judy Charlene McLemore | Jacob A. Warnock Inc. | 3/4/2009 MOGL | 705/166 | 735/585 |
| Archer | Larry McMurtry | Jacob A. Warnock Inc. | 3/4/2009 MOGL | 705/168 | 735/587 |
| Archer | Charlie McMurtry | Jacob A. Warnock Inc. | 3/4/2009 MOGL | 705/170 | 735/589 |
| Archer | Tony Wayne Greaves | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/168 | 735/591 |
| Archer | Vernie Middlebrooks | Jacob A. Warnock Inc. | 2/15/2008 MOGL | 705/241 | 735/599 |
| Jack | Ralph Lowell Cooper and wife Rosemary Cooper | Jacob A. Warnock Inc. | 4/28/2008 Assn | 7397/390 | 8627/390 |
| Jack | Lilly May West | Jacob A. Warnock Inc. | 4/22/2008 OGL | 799/864 | 799/864 |
| Jack | Ralph Lowell Cooper (Rosemary Cooper) | Jacob A. Warnock Inc. | 799/805 | 799/805 | |
| Jack | Ralph Lowell Cooper and wife Rosemary Cooper / D/B/A 6 C oil Company | Jacob A. Warnock Inc. | 4/28/2008 Assn | 797/205 | 797/205 |
| Jack | Gary Ray Conner | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 798/402 | 862/510 |
| Jack | Lucy Miller | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 798/404 | 862/513 |
| Jack | Stormy Miller | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 798/404 | 862/513 |
| Jack | Jackie Little | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 797/243 | 862/516 |

A CERTIFIED COPY

ATTEST: NOV. 18, 2014
KARREN WINTER, COUNTY CLERK
ARCHER COUNTY, TEXAS
BY: _____ DEPUTY

VOL: 0737  PG: 0281

| | | | | | |
|---|---|---|---|---|---|
| Jack | Kelly Ree Conner | Vicars Mineral Ventures LLC | 2/26/2008|MOGL | 797/207 | 822/372 |
| Jack | Joyce Low | Jacob A. Warnock Inc. | 3/15/2008|MOGL | 798/406 | 822/372 |
| Jack | Loretta Newell | Jacob A. Warnock Inc. | 3/15/2008|MOGL | 798/818 | 822/375 |
| Jack | Barbara J. Bean as Trustee of the Wayne O. Bean and Barbara J. Bean Revocable Trust | Jacob A. Warnock Inc. | 6/18/2008|MOGL | 805/231 | 822/378 |
| Jack | Mark Lundgren | Jacob A. Warnock Inc. | 9/3/2009|MOGL | 830/597 | |
| Jack | Mitchel Davenport Receiver for Bessie Peppard ETAL | Jacob A. Warnock Inc. | 8/18/2008|OGL | 809/813 | 822/328 |
| Jack and Clay | Irma Ree Mayo | Jacob A. Warnock Inc. | 4/17/2008|CM/OGL | 809/506 | 822/336 / 822/326 |
| Jack and Clay | Lannie Hubble | Jacob A. Warnock Inc. | 4/17/2008|CM/OGL | 811/939 | 822/338 / 822/324 |
| Jack and Clay | E.J. Hubble | Jacob A. Warnock Inc. | 4/17/2008|CM/OGL | 811/941 | 822/340 / 822/332 |
| Jack and Clay | N.E. Deweber Jr. | Jacob A. Warnock Inc. | 4/17/2008|CM/OGL | 809/550 | 822/342 |
| Jack and Clay | N.E. Deweber | Jacob A. Warnock Inc. | 4/17/2008|CM/OGL | 809/508 | 822/316 / 822/344 |
| Jack and Clay | Latrice Whitaker | Jacob A. Warnock Inc. | 4/17/2008|CM/OGL | 811/945 | 822/334 / 822/370 |
| Jack and Clay | Coleen White | Jacob A. Warnock Inc. | 4/17/2008|CM/OGL | 811/943 | 822/320 / 822/346 |
| Jack and Clay | Leonita Rhone | Jacob A. Warnock Inc. | 4/17/2008|CM/OGL | 808/629 | 822/318 / 822/348 |
| Jack and Clay | Ronnie Ogle | Jacob A. Warnock Inc. | 4/17/2008|CM/OGL | 808/352 | 822/350 |
| Jack and Clay | Larry Ogle | Jacob A. Warnock Inc. | 4/17/2008|CM/OGL | 808/654 | 822/322 / 822/352 |
| Jack and Clay | Donna Roth | Jacob A. Warnock Inc. | 4/17/2008|CM/OGL | 799/658 | 822/354 / 822/530 |
| Jack and Clay | Evelyn Deweber | Jacob A. Warnock Inc. | 4/17/2008|CM/OGL | 799/803 | 822/356 |
| Jack and Clay | Elaine Tischler /Shadow Creek Enterprises | Jacob A. Warnock Inc. | 4/17/2008|MOGL | 811/947 | 822/558 |
| Jack and Clay | Elois Williams | Jacob A. Warnock Inc. | 4/17/2008|MOGL | 811/947 | 822/580 |
| Jack and Clay | Emell Beals | Jacob A. Warnock Inc. | 4/17/2008|MOGL | 811/947 | 822/562 |
| Jack and Clay | Elloyce Cizdzie | Jacob A. Warnock Inc. | 4/17/2008|MOGL | 811/947 | 822/564 |
| Jack and Clay | Elizabeth Hardin | Jacob A. Warnock Inc. | 4/17/2008|MOGL | 811/947 | 822/566 |
| Jack and Clay | Evon Reeves | Jacob A. Warnock Inc. | 4/17/2008|MOGL | 811/947 | 822/568 |
| Clay | Ronnie Dale Ewing and wife, Mary Ann Ewing and | Wise Production Company | 11/11/2003|AOGL | 483/18 | 269/141 |
| Clay | Gladys Lemons | Jacob A. Warnock Inc. | 11/25/2009|MOGL | 525/49 | |
| Clay | Gowin Davis | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 799/829 | 862/399 |
| Jack | Jimmy Wayne Riddle | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 799/846 | 862/402 |
| Jack | Rita Riddle Finley | Jacob A. Warnock Inc. | 3/8/2011|MOGL | 862/383 | |
| Jack | Dallas Riddle | Jacob A. Warnock Inc. | 3/8/2011|MOGL | 862/385 | |
| Jack | Krisana Riddle | Jacob A. Warnock Inc. | 3/8/2011|MOGL | | |

A CERTIFIED COPY
ATTEST: NOV 18, 2014
KARREN WINTER, COUNTY CLERK
ARCHER COUNTY, TEXAS
BY: _____ DEPUTY

| | | | | | |
|---|---|---|---|---|---|
| Jack | Faye Sloan | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 805/234 | 852/405 |
| Jack | Linda Potter | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/635 | 852/408 |
| Jack | Vanessa Nicole Potter | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/635 | 852/411 |
| Jack | Jason Potter | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/635 | 852/414 |
| Jack | Joshua Potter | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/635 | 852/417 |
| Jack | Paula Ferren | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/635 | 852/420 |
| Jack | Jenny Hughey | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/635 | 852/423 |
| Jack | James Stephen Potter | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/635 | 852/610 |
| Jack | Benny Lloyd Gary | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/635 | 852/387 |
| Jack | Ben Gary | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/635 | 852/426 |
| Jack | Paul Wayne Potter | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/635 | 852/430 |
| Jack | Gary Potter | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/635 | 852/433 |
| Jack | Janelle Bailey | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/635 | 852/436 |
| Jack | James Steven Whitehead | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/627 | 852/439 |
| Jack | Ronald Frank Whitehead | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/627 | 852/442 |
| Jack | Patrick Edward Whitehead | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/627 | 852/445 |
| Jack | Ruth Ann Cueto | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/627 | 852/448 |
| Jack | Lillian Gossett Priddy | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/610 | 852/451 |
| Jack | Janie Evelyn Besselaar | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/631 | 852/454 |
| Jack | James Thomas Ramage | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/632 | 852/457 |
| Jack | Jerry Riddle | Jacob A. Warnock Inc. | 4/8/2008 MOGL | 799/633 | 852/460 |
| Jack | Joe D. Bloodworth | Jacob A. Warnock Inc. | 4/17/2008 MOGL | 799/821 | 852/463 |
| Jack | Margaret C. Bloodworth Bond | Jacob A. Warnock Inc. | 4/17/2008 ROGL | 801/402 | 853/741 |
| Jack | Lily May West | Jacob A. Warnock Inc. | 4/22/2008 OGL | 799/877 | |
| Jack | Ralph Lowell Cooper & Rosemary Cooper | Jacob A. Warnock Inc. | 4/22/2008 OGL | 799/877 | |
| Jack | Aldie Marie McAvear | Jacob A. Warnock Inc. | 5/23/2008 MOGL | 797/236 | 852/393 |
| Jack | John W. Pursley | Jacob A. Warnock Inc. | 5/23/2008 Assn | 801/581 | |
| Jack | Jimmie Cozart and Leila Cozart | Jacob A. Warnock Inc. | 2/15/2008 MOGL | 797/232 | 852/396 |
| Jack | W.C. Gilbert and Donna M. Gilbert | Jacob A. Warnock Inc. | 3/15/2008 MOGL | 512/564 | 5/886 |
| Clay | W.C. Gilbert | L.F. Merrell | 2/22/2008 MOGL | 517/668 | 7/603 |
| Clay | Mack Lacy | Jacob A. Warnock Inc. | 8/27/2008 MOGL | 517/651 | 5/689 |
| Clay | Curtis Lacy | Jacob A. Warnock Inc. | 8/27/2008 MOGL | 517/650 | 5/691 |
| Clay | Jim Worley | Jacob A. Warnock Inc. | 8/27/2008 MOGL | 517/649 | 5/693 |
| Clay | Danny Bell | Jacob A. Warnock Inc. | 3/7/2008 MOGL | 513/650 | 5/695 |
| Clay | Janet Diane Starkey-Wolfenberger | Jacob A. Warnock Inc. | 3/7/2008 MOGL | 513/34 | 5/697 |
| Clay | Teddie Howell | Jacob A. Warnock Inc. | 3/7/2008 MOGL | 512/560 | 5/699 |
| Clay | Freda Braymiller | Jacob A. Warnock Inc. | 3/7/2008 MOGL | 512/612 | 5/701 |
| Clay | Lavaughn McManus and Kathryn McManus | Jacob A. Warnock Inc. | 2/29/2008 MOGL | 512/550 | 5/703 |
| Clay | Beth Elaine Boyett | Jacob A. Warnock Inc. | 9/9/2008 MOGL | 811/680 | 852/861 |
| Clay | Serisha Lynn Boyett | Jacob A. Warnock Inc. | 9/9/2008 MOGL | 518/337 | 852/857 |
| Clay | Leslie Ann Coates | Jacob A. Warnock Inc. | 7/14/2008 MOGL | 807/96 | 852/866 |
| Jack and Clay | Sonya Leaton Martin Morley | Jacob A. Warnock Inc. | 7/14/2008 MOGL | 807/794 | 852/869 |
| Jack and Clay | Leslie L. Leaton Jr. | Jacob A. Warnock Inc. | 9/4/2008 MOGL | 809/502 | 852/873 |

A CERTIFIED COPY
ATTEST: Nov. 18, 2014
KARREN WINTER, COUNTY CLERK
ARCHER COUNTY, TEXAS
BY: _____ DEPUTY

VOL: 0737  PG: 0283

| | | | | |
|---|---|---|---|---|
| Jack and Clay | Everett Cloer | Jacob A. Warnock Inc. | 5/8/2008 | MOGL | 807/409 | 862/877 |
| Jack and Clay | Allyne Whatley | Jacob A. Warnock Inc. | 5/8/2008 | MOGL | 807/404 | 862/881 |
| Jack and Clay | Tiger Verlayne Reynolds AKA Tiger Veralene Leaton | Jacob A. Warnock Inc. | 9/2/2008 | OGL | 812/441 | 862/885 |

THE STATE OF TEXAS
COUNTY OF ARCHER

I, Karren Winter, Clerk County Court in and for said county
hereby do certify that the foregoing instrument was filed for
record in my office on 13 September, 2011, at 12:47 PM and duly
recorded on that date, in the Official Public Records of said
county, in Volume 0737 on page 0269.
WITNESS my hand and seal of the County Court at my office
in Archer City, Texas the day and year last above written.

By _____
THERESA BOTTLINGER, DEPUTY    Karren Winter
Clerk County Court
Archer County, Texas

A TRUE AND CORRECT COPY, I HEREBY CERTIFY
this 18 day of Nov A.D. 20 14
Vol. 737 Page 269  Karren Winter, County Clerk
Archer County, Texas

Official Public By _____ Deputy
Records

EXHIBIT 2B

01889

## MEMORANDUM OF JOINT OPERATING AGREEMENT

THE STATE OF TEXAS             §
                               §    KNOW ALL MEN BY THESE PRESENTS, THAT:
COUNTIES OF ARCHER, CLAY       §
JACK AND MONTAGUE              §

This Memorandum of Joint Operating Agreement (this "Memorandum") is dated effective as of the 1st day of September, 2011 (the "Effective Date"), by and among WBH Energy Partners LLC, whose address is PO Box 302380, Austin, TX 78703 (hereinafter referred to as "Operator"), U.S. Energy Development Corporation, whose address is 2350 North Forest Road, Getzville, NY 14068 ("USED"), and VW Ventures, LLC, a Texas limited liability company, whose address is 2004 Berkley, Wichita Falls, TX 76308 ("VW Ventures", and together with USED, collectively referred to as "Non-Operator"). Operator and Non-Operator are collectively referred to herein as the "Parties."

Section 1.    Operator and Non-Operator have entered into a Model Form Operating Agreement, dated effective September 1, 2011 (the "Agreement"), which provides for the development and production of oil, gas, and other substances from all or part of oil and gas leases and interests, lands, and other properties in Archer, Clay, Montague, and Jack Counties, Texas set forth on Exhibit A hereto (the "Contract Area").

Section 2.    Among other provisions, the Agreement (a) provides for the joint development of the Contract Area by the Parties, (b) contains an accounting procedure, which establishes, among other things, the direct and indirect charges to be billed to the joint account contemplated by the Agreement and (c) includes a gas balancing agreement.

Section 3.    Operator hereby certifies that a true and correct copy of the Agreement is on file and is available for inspection by third parties at the offices of Operator at the address set forth in this Memorandum.

Section 4.    It is understood and agreed by the Parties hereto that if any part, term, or provision of this Memorandum is held to be illegal or in conflict with any law, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the Parties shall be construed and enforced as if the Memorandum did not contain the particular part, term, or provision held to be invalid.

Section 5.    This Memorandum shall be binding upon and shall inure to the benefit of the Parties and their respective legal representatives, successors and permitted assigns. The failure of one or more persons owning an interest in the Contract Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who execute this Memorandum. This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute but one instrument.

1

A CERTIFIED COPY
Attest: 11/18/2014 11:46:01 AM
Sasha Kelton, County Clerk
Clay County, Texas
By: _____ Deputy

EXECUTED as of the dates set forth in the respective notary certifications below, but effective the 1st day of September 2011.

OPERATOR:
**WBH ENERGY PARTNERS LLC**

By: 
Name: David R. Henderson
Title:   President

### ACKNOWLEDGMENT

STATE OF TEXAS

COUNTY OF TRAVIS

The foregoing instrument was acknowledged before me this 30th day of August, 2011 by David R. Henderson, President of WBH ENERGY PARTNERS LLC, a Texas limited liability company, on behalf of said limited liability company.

> **DALA CAMPBELL**
> Notary Public, State of Texas
> My Commission Expires 01-24-2015

Name:
Notary Public in and for the State of Texas

*[WBH Signature and Acknowledgement Page to Memorandum of JOA]*

A CERTIFIED COPY
Attest: 11/18/2014 11:46:01 AM
Sasha Kelton, County Clerk
Clay County, Texas
By:                              Deputy

NON-OPERATOR:
**VW VENTURES**

By: _____
Name:   Jacob A. Warnock
Title:   Governing Person

## ACKNOWLEDGMENT

STATE OF TEXAS

COUNTY OF WICHITA

This instrument was acknowledged before me on the 31st day of August, 2011, by Jacob A. Warnock, as a governing person of VW Ventures, LLC, a Texas limited liability company, on behalf of said limited liability company.

Marcena Roach
Notary Public
State of Texas
My Commission Expires 01-17-2014

Name: Marcena Roach
Notary Public in and for the State of Texas

*[VW Ventures Signature and Acknowledgment Page to Memorandum of JOA]*

A CERTIFIED COPY
Attest: 11/18/2014 11:46:01 AM
Sasha Kelton, County Clerk
Clay County, Texas

By: _____ Deputy

**EXHIBIT A**
**TO**
**MEMORANDUM OF JOINT OPERATING AGREEMENT**

**Contract Area**

[see attached]



A CERTIFIED COPY
Attest: 11/18/2014 11:46:01 AM
Sasha Kelton, County Clerk
Clay County, Texas

By: _____ Deputy

| County | Name | Lessee | Date/Type | Ref | |
|---|---|---|---|---|---|
| Montague | Josephine Storey Bybee | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5542697 | |
| Montague | WANDA L ROBERTSON MATHESON | Jacob A. Warnock Inc. | 3/29/2011 OGL | 5574524 | |
| Montague | SHIRLEY BLACKSTOCK MEGASON | Jacob A. Warnock Inc. | 3/29/2011 OGL | 5704591 | |
| Montague | BILLY JOE ROBERTSON JR | Jacob A. Warnock Inc. | 3/29/2011 OGL | 5704591 | |
| Montague | PATRICIA ANN ROBERTSON GOOD | Jacob A. Warnock Inc. | 3/29/2011 OGL | 5704909 | |
| Montague | LUTHER D ROBERTSON | Jacob A. Warnock Inc. | 3/29/2011 OGL | 5704603 | |
| Montague | STELLA MAY ROBERTSON WYPER | Jacob A. Warnock Inc. | 3/29/2011 OGL | 5704907 | |
| Montague | FREDA JEAN ROBINSON BLAYLOCK | Jacob A. Warnock Inc. | 3/29/2011 OGL | 5704911 | |
| Montague | MICHAEL ROBINSON | Jacob A. Warnock Inc. | 5/4/2011 OGL | 5745811 | |
| Montague | RON O BLACKSTOCK | Jacob A. Warnock Inc. | 3/29/2011 OGL | 5704915 | |
| Montague | Hal McCall Carpenter | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5504133 | |
| Montague | Nancy Manberin | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5542622 | |
| Montague | Carol Ann Seaberry | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5542237 | |
| Montague | William E McPherson | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5565811 | |
| Montague | David Lon McPherson | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5542501 | |
| Montague | Mary Margaret McPherson Osborn | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5564306 | |
| Montague | John T. McCall | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5565149 | |
| Montague | Robert M. Storey | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5542095 | |
| Montague | Gayle Marie Storey | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5542292 | |
| Montague | Suzanne Storey | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5542697 | |
| Montague | Robert Mark McCall | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5542262 | |
| Montague | Rosemary McCall Wingate | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5542772 | |
| Montague | Carolyn McCall Harryman | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5542772 | |
| Montague | William Mark Storey | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5542277 | |
| Montague | Don C. Paterson III | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5542262 | |
| Montague | Rebecca Paterson-Mata | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5542247 | |
| Montague | C.S. McCall III | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5542237 | |
| Montague | The McCall Family Trust | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5550143 | |
| Montague | James McCall Storey | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5542242 | |
| Montague | Josephine Storey Bybee | Jacob A. Warnock Inc. | 1/1/2011 MXOL | 5542697 | |
| Clay | Robert T. Gowen | Vicars Mineral Ventures LLC | 2/26/2008 MXOL | 5129480; 5129482 | 5746 |
| Clay | W Crozier Gowen | Vicars Mineral Ventures LLC | 2/26/2008 MXOL | 5129477; 5129480; 5129482 | 5748 |
| Clay | Grace W Gowen, Ind Extrx of the Estate of John Richard Gowen | Vicars Mineral Ventures LLC | 2/26/2008 MXOL | 5129477; 5129480; 5129482 | 5750 |
| Clay | Mary Beth Reys | Vicars Mineral Ventures LLC | 2/26/2008 MXOL | 5129477 | 5752 |

A CERTIFIED COPY
Attest: 11/18/2014 11:46:01 AM
Sasha Kelton, County Clerk
Clay County, Texas
By: _____ Deputy

| | | | | | |
|---|---|---|---|---|---|
| Jack | Maria Coker | Vicars Mineral Ventures LLC | 2/26/2008 MOOL | 7917203 | 8825466 |
| Jack | Burton J. Ord | Vicars Mineral Ventures LLC | 2/26/2008 MOOL | 7917212 | 8824168 |
| Jack | Gary Ray Conner | Vicars Mineral Ventures LLC | 2/26/2008 MOOL | 7917205 | 8825501 |
| Jack | Kelly Conner | Vicars Mineral Ventures LLC | 2/26/2008 MOOL | 7917207 | 8825504 |
| Jack | Big Creek Properties LTD Todd Corry Jr. Individually, Todd Corry Jr. as POA for Bettye Boorse Corry, and Todd Corry Jr. as AIF and | Vicars Mineral Ventures LLC | 2/26/2008 MOOL | 7917204.179 8/4/02, 7994404 | 8825507 |
| Jack | Guardian of Todd Corry Sr. | Jacob A. Warnock Inc. | | | |
| Jack | Ed Allison D/B/A Starrise Enterprises | Jacob A. Warnock Inc. | 3/31/2008 MOOL | 7994499 | |
| Clay | Michael W. Rater | Jacob A. Warnock Inc. | 2/26/2008 MOOL | 513235 | 54566 |
| Clay | Mark Rater | Jacob A. Warnock Inc. | 2/26/2008 MOOL | 512507 | 54568 |
| Clay | Lara Ann Dudley | Jacob A. Warnock Inc. | 2/26/2008 MOOL | 512554 | 54574 |
| Clay | James Rater | Jacob A. Warnock Inc. | 2/26/2008 MOOL | 512551 | 54574 |
| Clay | Gary D. Rater | Jacob A. Warnock Inc. | 2/26/2008 MOOL | 512609 | 54577 |
| Clay | Monte Rater | Jacob A. Warnock Inc. | 2/26/2008 MOOL | 512906 | 54580 |
| Clay | Barbara Lambert | Jacob A. Warnock Inc. | 2/26/2008 MOOL | 512561 | 54583 |
| Archer | Charles Valkenheimer | Vicars Mineral Ventures LLC | 4/16/2011/Assn | 8870373 | |
| Archer | Charles Valkenheimer | Vicars Mineral Ventures LLC | 4/22/2008 OGL | 8870897 | 733/684 |
| Archer | Johnny Rater | Vicars Mineral Ventures LLC | 4/22/2008 OGL | 8870469 | 733/684 |
| Archer | James G Valkenheimer | Vicars Mineral Ventures LLC | 4/22/2008 MOOL | 6882250 | 733/681 |
| Archer | Ricky Wayne Greeves | Jacob A. Warnock Inc. | 10/31/2008 MOOL | 6884726 | 733/680 |
| Archer | David Richards | Jacob A. Warnock Inc. | 9/17/2008 MOOL | 705/612 | 733/457 |
| Archer | Winona North | Jacob A. Warnock Inc. | 9/17/2008 MOOL | 705/578 | 733/457 |
| Archer | LaVerne Sandlin | Jacob A. Warnock Inc. | 9/17/2008 MOOL | 705/600 | 733/460 |
| Archer | Paul W. Tidwell & Lillian G. Tidwell Revocable Trust | Jacob A. Warnock Inc. | 9/17/2008 MOOL | 705/692 | 733/463 |
| Archer | Joy D. McClure | Jacob A. Warnock Inc. | 9/22/2008 MOOL | 705/682 | 733/466 |
| Archer | Paula McHenry | Jacob A. Warnock Inc. | 9/22/2008 MOOL | 705/654 | 733/472 |
| Archer | Jessee E. Liles III | Jacob A. Warnock Inc. | 9/22/2008 MOOL | 705/680 | 733/475 |
| Archer | Nelda Cederman | Jacob A. Warnock Inc. | 9/17/2008 MOOL | 705/685 | 733/478 |
| Archer | Charlie Juanita Kirkland POA for Ina Mae Liles | Jacob A. Warnock Inc. | 9/22/2008 MOOL | 705/692 | 733/481 |
| Archer | Royce Meese | Jacob A. Warnock Inc. | 9/25/2008 MOOL | 705/692 | 733/484 |
| Archer | Wanda Joyce Mahlsberger | Jacob A. Warnock Inc. | 9/17/2008 MOOL | 705/694 | 733/487 |
| Archer | Imogene Young Executrix of the D. Keith Young Est. | Jacob A. Warnock Inc. | 9/26/2008 MOOL | 705/98 | 733/490 |
| Archer | Robbie Lee Liles | Jacob A. Warnock Inc. | 9/23/2008 MOOL | 705/100 | |
| Archer | Linda Owens | Jacob A. Warnock Inc. | 9/23/2008 MOOL | 705/102 | 733/483 |
| Archer | Georgia Ann Earl | Jacob A. Warnock Inc. | 9/22/2008 MOOL | 705/104 | 733/487 |
| Archer | Coy Ramon meares | Jacob A. Warnock Inc. | 9/25/2008 MOOL | 705/106 | 733/489 |
| Archer | Charlene L. Hoot | Jacob A. Warnock Inc. | 9/17/2008 MOOL | 705/108 | 733/520 |

A CERTIFIED COPY
Attest: 11/18/2014 11:46:01 AM
Sasha Kelton, County Clerk
Clay County, Texas
By: _____ Deputy

| | | | | | |
|---|---|---|---|---|---|
| Jack | Kelly Rae Conner | Vicars Mineral Ventures LLC | 2/25/2008/MKXL | 7912027 | |
| Jack | Joyce Low | Jacob A. Warnock Inc. | 3/15/2008/MKXL | 7904406 | 862272 |
| Jack | Loretta Newell | Jacob A. Warnock Inc. | 3/15/2008/MKXL | 7906918 | 862273 |
| Jack | Barbara J. Bean as Trustee of the Wayne O. Bean and Barbara J. Bean Revocable Trust | Jacob A. Warnock Inc. | 9/16/2008/MKXL | 805231 | 862278 |
| Jack | Mark Lundgren | Jacob A. Warnock Inc. | 9/3/2008/MKXL | 830097 | |
| Jack | Mitchel Davenport Receiver for Bessie Peppard ETAL | Jacob A. Warnock Inc. | 9/18/2008/OGL | 809613 | 862628 |
| Jack and Clay | Irma Rae Mayo | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 808506 | 862636 |
| Jack and Clay | Lannie Hubble | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 811939 | 862638 |
| Jack and Clay | E.J. Hubble | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 811941 | 862624 |
| Jack and Clay | N.E. Deweber Jr. | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 808/560 | 862632 |
| Jack and Clay | N.E. Deweber | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 808508 | 862716 |
| Jack and Clay | Larkoa Whitaker | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 811945 | 862670 |
| Jack and Clay | Coleen White | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 811943 | 862620 |
| Jack and Clay | Leontha Rhone | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 808626 | 862746 |
| Jack and Clay | Ronnie Ogle | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 808352 | 862748 |
| Jack and Clay | Larry Ogle | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 808354 | 862622 |
| Jack and Clay | Donna Roth | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 808808 | 862632 |
| Jack and Clay | Evelyn Deweber | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 799803 | 862530 |
| Jack and Clay | Elaine Tischler (Shadow Creek Enterprises | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 811047 | 862556 |
| Jack and Clay | Elva Williams | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 811047 | 862550 |
| Jack and Clay | Enid Seals | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 811047 | 862580 |
| Jack and Clay | Elayna Cauble | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 811047 | 862562 |
| Jack and Clay | Elizabeth Hardin | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 811047 | 862542 |
| Jack and Clay | Evon Reeves | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 811047 | 862566 |
| Jack and Clay | Ronna Dale Ewing and wife, Mary Ann Ewing and | Jacob A. Warnock Inc. | 4/17/2008/CMKOL | 811047 | 862568 |
| Clay | Gladys Lemons | Wiles Production Company | 11/11/2003/AOGL | 485018 | |
| Clay | Gweda Dean | Jacob A. Warnock Inc. | 11/25/2009/MKXL | 525749 | 862536 |
| Clay | Jimmy Wayne Riddle | Jacob A. Warnock Inc. | 4/8/2009/MKXL | 2958141 | 862546 |
| Clay | Rita Riddle Finley | Jacob A. Warnock Inc. | 4/8/2008/MKXL | 7908303 | 862599 |
| Clay | Dallas Riddle | Jacob A. Warnock Inc. | 3/8/2011/MKXL | 7908466 | 862402 |
| Clay | Kristina Riddle | Jacob A. Warnock Inc. | 3/8/2011/MKXL | 7908463 | 862583 |

A CERTIFIED COPY
Attest: 11/18/2014 11:46:01 AM
Sasha Kelton, County Clerk
Clay County, Texas
By: _____ Deputy

| Jack and Clay | Everest Cader | Jacob A. Warnock Inc. | 5/6/2006 MCKSL | 8014409 | 8862877 |
| Jack and Clay | Alijma Whadley | Jacob A. Warnock Inc. | 5/6/2006 MCKSL | 8014404 | 8862881 |
| Jack and Clay | Tiger Verdamo Reynolds AKA Tiger Verdamo Laetan | Jacob A. Warnock Inc. | 9/2/2006 OCL | 8124441 | 8862895 |



Filed for record Sept 14 2011
Sasha Kelton, County Clerk
By Carla Moore Deputy

A CERTIFIED COPY
Attest: 11/18/2014 11:46:01 AM
Sasha Kelton, County Clerk
Clay County, Texas
By: _____ Deputy

EXHIBIT 2C

BOOK PAGE

0869 0070

## MEMORANDUM OF JOINT OPERATING AGREEMENT

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS, THAT: |
| COUNTIES OF ARCHER, CLAY | § | |
| JACK AND MONTAGUE | § | |

This Memorandum of Joint Operating Agreement (this "Memorandum") is dated effective as of the 1st day of September, 2011 (the "Effective Date"), by and among WBH Energy Partners LLC, whose address is PO Box 302380, Austin, TX 78703 (hereinafter referred to as "Operator"), U.S. Energy Development Corporation, whose address is 2350 North Forest Road, Getzville, NY 14068 ("USED"), and VW Ventures, LLC, a Texas limited liability company, whose address is 2004 Berkley, Wichita Falls, TX 76308 ("VW Ventures", and together with USED, collectively referred to as "Non-Operator"). Operator and Non-Operator are collectively referred to herein as the "Parties."

Section 1.    Operator and Non-Operator have entered into a Model Form Operating Agreement, dated effective September 1, 2011 (the "Agreement"), which provides for the development and production of oil, gas, and other substances from all or part of oil and gas leases and interests, lands, and other properties in Archer, Clay, Montague, and Jack Counties, Texas set forth on Exhibit A hereto (the "Contract Area").

Section 2.    Among other provisions, the Agreement (a) provides for the joint development of the Contract Area by the Parties, (b) contains an accounting procedure, which establishes, among other things, the direct and indirect charges to be billed to the joint account contemplated by the Agreement and (c) includes a gas balancing agreement.

Section 3.    Operator hereby certifies that a true and correct copy of the Agreement is on file and is available for inspection by third parties at the offices of Operator at the address set forth in this Memorandum.

Section 4.    It is understood and agreed by the Parties hereto that if any part, term, or provision of this Memorandum is held to be illegal or in conflict with any law, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the Parties shall be construed and enforced as if the Memorandum did not contain the particular part, term, or provision held to be invalid.

Section 5.    This Memorandum shall be binding upon and shall inure to the benefit of the Parties and their respective legal representatives, successors and permitted assigns. The failure of one or more persons owning an interest in the Contract Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who execute this Memorandum. This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute but one instrument.

1



A CERTIFIED COPY Page 1 of 15
Attest 11-18-14
Janice Robinson, County Clerk
Jack County Texas
Deputy

Section 6.      Each Party confirms and acknowledges that the terms and conditions of the Agreement are by reference specifically incorporated herein and made a part hereof with the same force as if the same were set forth herein in full.  This Memorandum is subject in all respects to the terms of the Agreement.  In the event of a conflict between the terms of the Agreement and this Memorandum, the terms of the Agreement shall control.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

2



A CERTIFIED COPY Page 2 of 15
Attest  1·18·14
Janice Robinson, County Clerk
Jack County, Texas
Deputy

EXECUTED as of the dates set forth in the respective notary certifications below, but effective the 1st day of September 2011.

OPERATOR:
**WBH ENERGY PARTNERS LLC**

By: 
Name: David R. Henderson
Title:   President

### ACKNOWLEDGMENT

STATE OF TEXAS

COUNTY OF TRAVIS

The foregoing instrument was acknowledged before me this 30th day of August, 2011 by David R. Henderson, President of WBH ENERGY PARTNERS LLC, a Texas limited liability company, on behalf of said limited liability company.

**DALA CAMPBELL**
Notary Public, State of Texas
My Commission Expires 01-24-2015

Name: _____
Notary Public in and for the State of Texas

*[WBH Signature and Acknowledgement Page to Memorandum of JOA]*



A CERTIFIED COPY Pages 3 of 15
Attest 11-18-14
Janice Robinson, County Clerk
Jack County Texas
Deputy

BOOK      PAGE

0869    0073

NON-OPERATOR:
**U.S. ENERGY DEVELOPMENT CORPORATION**

By: _____

Name:   Douglas Walch
Title:    President


STATE OF NEW YORK

COUNTY OF ERIE

The foregoing instrument was acknowledged before me this 1st day of September, 2011 by Douglas Walch, as President of U.S. ENERGY DEVELOPMENT CORPORATION on behalf of said corporation.

Name: _____
Notary Public in and for the State of New York

William H. Mattrey
Notary Public, State of New York
Qualified in Erie County
My Commission Expires February 28, 20 __

*[USED Signature and Acknowledgement Page to Memorandum of JOA]*



A CERTIFIED COPY Page 1 of 5
Attest 11-18-14
Janice Robinson, County Clerk
Jack County, Texas
Deputy

BOOK     PAGE

0869    0074

**NON-OPERATOR**:
**VW VENTURES**

By: _____

Name: Jacob A. Warnock

Title: Governing Person

## ACKNOWLEDGMENT

STATE OF TEXAS

COUNTY OF WICHITA

This instrument was acknowledged before me on the 31st day of August, 2011, by Jacob A. Warnock, as a governing person of VW Ventures, LLC, a Texas limited liability company, on behalf of said limited liability company.

Name: Marlene Roach

Notary Public in and for the State of Texas

Marcene Roach
Notary Public
State of Texas
My Commission Expires 01-17-2014

*[VW Ventures Signature and Acknowledgment Page to Memorandum of JOA]*


A CERTIFIED COPY Page 5 of 15
Attest 11-18-14
Janice Robinson, County Clerk
Jack County Texas
Deputy

BOOK 0869   PAGE 0075

**NON-OPERATOR:**
**VW VENTURES**

By: _Gregory N. Vicars_
Name:  Gregory N. Vicars
Title:  Governing Person

## ACKNOWLEDGMENT

STATE OF NEW MEXICO

COUNTY OF LINCOLN

The foregoing instrument was acknowledged before me this 1st day of September, 2011 by Gregory N. Vicars, a Governing Person of VW Ventures LLC, a Texas limited liability company, on behalf of said limited liability company.

Name: _Douglas L. Siddens_
Notary Public in and for the State of New Mexico
Commission Expires 3-14-15

*[VW Ventures Signature and Acknowledgement Page to Memorandum of JOA]*



A CERTIFIED COPY Page 6 of 15
Attest 11-18-14
Janice Robinson, County Clerk
Jack County Texas
Deputy

BOOK     PAGE

0869    0076

**EXHIBIT A**
**TO**
**MEMORANDUM OF JOINT OPERATING AGREEMENT**

**Contract Area**

[see attached]



A CERTIFIED COPY Page ___ Lot 7/5
Attest 11-18-14
Janice Robinson, County Clerk
Jack County Texas
Deputy

**EXHIBIT A**

| County | Lessor | Lessee | Date of Lease | Inst | Lease Vol/Page | Amendment Vol/Page |
|---|---|---|---|---|---|---|
| Montague | Holly McCall Carpenter | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/2376 | |
| Montague | Nancy Miertschin | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/289 | |
| Montague | Carol Ann Seabeny | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/270 | |
| Montague | William E. McPherson | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/271 | |
| Montague | David Len McPherson | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/272 | |
| Montague | Mary Margaret McPherson Osborn | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/273 | |
| Montague | John T. McCall | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/274 | |
| Montague | Robert M. Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/276 | |
| Montague | Gayle Marie Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/278 | |
| Montague | Suzanne Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/280 | |
| Montague | Robert Mark McCall | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/282 | |
| Montague | Rosemary McCall Wingate | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/284 | |
| Montague | Carolyn McCall Perryman | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/284 | |
| Montague | William Mark Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/286 | |
| Montague | Don C. Peterson III | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/286 | |
| Montague | Rebecca Peterson-Male | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 525/288 | |
| Montague | C.S. McCall III | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/289 | |
| Montague | The McCall Family Trust | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/290 | |
| Montague | James Michael Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/292 | |
| Montague | Josephine Storey Bybee | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/294 | |
| Montague | Holly McCall Carpenter | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/299 | |
| Montague | Nancy Miertschin | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/138 | |
| Montague | Carol Ann Seabeny | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/282 | |
| Montague | William E. McPherson | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/257 | |
| Montague | David Len McPherson | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/311 | |
| Montague | Mary Margaret McPherson Osborn | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/301 | |
| Montague | John T. McCall | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/306 | |
| Montague | Robert M. Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/148 | |
| Montague | Gayle Marie Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/296 | |
| Montague | Suzanne Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/292 | |
| Montague | Robert Mark McCall | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/287 | |
| Montague | Rosemary McCall Wingate | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/282 | |
| Montague | Carolyn McCall Perryman | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/272 | |
| Montague | William Mark Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/272 | |
| Montague | Don C. Peterson III | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/277 | |
| Montague | Rebecca Peterson-Male | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/252 | |
| Montague | C.S. McCall III | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/247 | |
| Montague | The McCall Family Trust | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/237 | |
| Montague | James Michael Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/143 | |
| Montague | James Michael Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/242 | |

A CERTIFIED COPY Page 8 of 15
Attest 11-18-14
Janice Robinson, County Clerk
Jack County Texas
Deputy


BOOK
0869    0078

| County | Name | Lessee | Date | Type | Number | Number 2 |
|---|---|---|---|---|---|---|
| Montague | Josephine Storey Bybee | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/267 | |
| Montague | WANDA L ROBERTSON MATHESON | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 574/624 | |
| Montague | SHIRLEY BLACKSTOCK MEGASON | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/591 | |
| Montague | BILLY JOE ROBERTSON JR | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/595 | |
| Montague | PATRICIA ANN ROBERTSON GOOD | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/699 | |
| Montague | LUTHER D ROBERTSON | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/603 | |
| Montague | STELLA KAY ROBERTSON WYER | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/607 | |
| Montague | FREDA JEAN ROBINSON BLAYLOCK | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/611 | |
| Montague | MICHAEL ROBINSON | Jacob A. Warnock Inc. | 5/4/2011 | OGL | 574/611 | |
| Montague | RON C BLACKSTOCK | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/615 | |
| Montague | Holly McCall Carpenter | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/138 | |
| Montague | Nancy Mietschin | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/262 | |
| Montague | Carol Ann Seaberry | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/257 | |
| Montague | William E. McPherson | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/311 | |
| Montague | David Len McPherson | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/301 | |
| Montague | Mary Margaret McPherson Osborn | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/306 | |
| Montague | John T. McCall | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/148 | |
| Montague | Robert M. Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/296 | |
| Montague | Gayle Marie Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/292 | |
| Montague | Suzanne Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/287 | |
| Montague | Robert Mark McCall | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/282 | |
| Montague | Rosemary McCall Wingate | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/272 | |
| Montague | Carolyn McCall Perryman | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/272 | |
| Montague | William Mark Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/277 | |
| Montague | Don C. Peterson III | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/252 | |
| Montague | Rebecca Peterson-Male | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/247 | |
| Montague | C.S. McCall III | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/237 | |
| Montague | The McCall Family Trust | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/143 | |
| Montague | James Michael Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/242 | |
| Montague | Josephine Storey Bybee | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/267 | |
| Clay | Robert T. Gowan | Vicars Mineral Ventures LLC | 2/28/2008 | MOGL | 512/477; 512/480; 512/482 | 57/46 |
| Clay | W Crozier Gowan | Vicars Mineral Ventures LLC | 2/28/2008 | MOGL | 512/477; 512/480; 512/482 | 57/48 |
| Clay | Grace W Gowan, Ind Extrx of the Estate of John Richard Gowan | Vicars Mineral Ventures LLC | 2/28/2008 | MOGL | 512/477; 512/480; 512/482 | 57/50 |
| Clay | Mary Beth Roye | Vicars Mineral Ventures LLC | 2/28/2008 | MOGL | 512/477 | 57/52 |


A CERTIFIED COPY Page 9 of 15
Attest 11-18-14
Janice Robinson County Clerk
Jack County Texas
Deputy

| County | Name | Company | Date / Type | Ref 1 | Ref 2 |
|---|---|---|---|---|---|
| Clay | Virgil Rosser III | Vicars Mineral Ventures LLC | 2/28/2008 MOGL | 512477 | 5754 |
| Clay | Richard M. Rosser | Vicars Mineral Ventures LLC | 2/28/2008 MOGL | 512477 | 5756 |
| Clay | Bill E. Gowan | Vicars Mineral Ventures LLC | 3/28/2008 MOGL | 512/813 | 5758 |
| Clay | Thomas B. Gowan | Vicars Mineral Ventures LLC | 3/28/2008 MOGL | 513/33 | 5760 |
| Clay | Liggett Family Trust | Jacob A. Warnock Inc. | 5/14/2007 / 11/14/2011 OGL | 505/176 / 505/740 | 5740 |
| Clay | James Weldon Wetsel | Jacob A. Warnock Inc. | 5/14/2007 / 11/14/2011 OGL | 505/184 / 505/728 | |
| Clay | Geraldine Maurine Bell | Jacob A. Warnock Inc. | 5/14/2007 / 11/14/2011 OGL | 505/184 / 57/28 | |
| Clay | Myra Joan Wetsel | Jacob A. Warnock Inc. | 5/14/2007 | 505/180 | |
| Clay | Carla Sue Mayfield Pullen | Jacob A. Warnock Inc. | 11/14/2011 OGL | 5/734 | |
| Clay | Sherrell Oneill | Jacob A. Warnock Inc. | 4/27/2011 OGL | 5/864 | |
| Clay | Betty Ingram ETAL | Jacob A. Warnock Inc. | 5/23/2007 OGL | 506/196 | |
| Clay | William Bracey ETAL | Jacob A. Warnock Inc. | 5/23/2007 OGL | 506/225 | |
| Clay | James Karroll Ingram | Jacob A. Warnock Inc. | 5/23/2007 OGL | 506/221 | |
| Clay | David Ingram | Jacob A. Warnock Inc. | 5/23/2007 OGL | 506/218 | |
| Clay | Ralph Lowell Cooper and Rosemary Cooper | Jacob A. Warnock Inc. | 5/23/2007 OGL | 506/215 | |
| Clay | Keith Shelton | Jacob A. Warnock Inc. | 4/22/2008 MOGL | 790/871 | |
| Jack | Bradley G. Campasey president of the Jack County oil and Gas Association | Jacob A. Warnock Inc. | 3/14/2008 MOGL | 790/839 | 862/524 |
| Jack | Ralph Lowell Cooper | Jacob A. Warnock Inc. | 3/1/2008 MOGL | 799/837 | 862/466 |
| Jack | Lilly May West | Jacob A. Warnock Inc. | 3/6/2008 MOGL | 797/224 | 862/469 |
| Jack | Byron Sanders | Jacob A. Warnock Inc. | 3/6/2008 MOGL | 797/228 | 862/473 |
| Jack | Doris Walts and David Walts | Jacob A. Warnock Inc. | 2/27/2008 MOGL | 797/209 | 862/477 |
| Jack | Jeffrey Crawford | Jacob A. Warnock Inc. | 2/22/2008 MOGL | 797/212 | 862/480 |
| Jack | Jeremy Crawford | Jacob A. Warnock Inc. | 3/20/2008 MOGL | 805/236 | 862/483 |
| Jack | James Crawford Jr. | Jacob A. Warnock Inc. | 3/20/2008 MOGL | 799/815 | 862/486 |
| Jack | Christopher Crawford | Jacob A. Warnock Inc. | 3/20/2008 MOGL | 799/812 | 862/489 |
| Jack | Rebecca Owens | Jacob A. Warnock Inc. | 3/20/2008 MOGL | 801/406 | 862/492 |
| Jack | Karen Walts Brayton | Jacob A. Warnock Inc. | 2/22/2008 MOGL | 797/221 | 862/489 |
| Jack | John F. Townley | Jacob A. Warnock Inc. | 2/22/2008 MOGL | 797/216 | 862/492 |
| Jack | | Jacob A. Warnock Inc. | 2/15/2008 MOGL | 797/238 | 862/519 |
| Jack | Mitchel Davenport Receiver for mary Stewart ETAL | Jacob A. Warnock Inc. | 8/18/2008 MOGL | 809/817 | 862/519 |
| Jack | Wanda Davis | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 797/245 | |
| Jack | Nathan Scarber | Vicars Mineral Ventures LLC | 10/17/2008 MOGL | 812/439 | |
| Jack | Margaret McGlaun | Jacob A. Warnock Inc. | 2/15/2008 MOGL | 797/238 | |
| Jack | Effie Leek | Jacob A. Warnock Inc. | 2/15/2008 MOGL | 797/238 | 862/519 |



A CERTIFIED COPY Page 10 of 15
Attest 11-18-14
Janice Robinson, County Clerk
Jack County Texas
Deputy

| County | Name | Grantee | Date | Type | Volume | Page |
|---|---|---|---|---|---|---|
| Jack | Marie Coker | Vicars Mineral Ventures LLC | 2/26/2008 | MOGL | 7917203 | 8624495 |
| Jack | Barton J. Ord | Vicars Mineral Ventures LLC | 2/26/2008 | MOGL | 7917219 | 8624498 |
| Jack | Gary Ray Conner | Vicars Mineral Ventures LLC | 2/26/2008 | MOGL | 7917235 | 8624501 |
| Jack | Kelly Conner | Vicars Mineral Ventures LLC | 2/26/2008 | MOGL | 7917207 | 8624504 |
| Jack | Big Creek Properties LTD | Vicars Mineral Ventures LLC | 2/26/2008 | MOGL | 7917243,79 8402, | 8624507 |
| Jack | Todd Cony Jr. individually, Todd Cony Jr. as POA for Betye Bonner Corry, and Todd Cony Jr. as PR and Guardian of Todd Cony Sr. | Vicars Mineral Ventures LLC | 2/26/2008 | MOGL | 7984404 | |
| Jack | Ed Allison D/B/A Sunrise Enterprises | Jacob A. Warnock Inc. | 3/31/2008 | MOGL | 790/399 | |
| Jack | Michael W. Rater | Jacob A. Warnock Inc. | 3/28/2008 | Assn | 790/395 | |
| Clay | Mark Rater | Jacob A. Warnock Inc. | 2/26/2008 | MOGL | 513/35 | 5/665 |
| Clay | Lea Ann Dudley | Jacob A. Warnock Inc. | 2/26/2008 | MOGL | 512/557 | 5/668 |
| Clay | James Rater | Jacob A. Warnock Inc. | 2/26/2008 | MOGL | 512/554 | 5/671 |
| Clay | Gary D. Rater | Jacob A. Warnock Inc. | 2/26/2008 | MOGL | 512/551 | 5/674 |
| Clay | Monte Rater | Jacob A. Warnock Inc. | 2/26/2008 | MOGL | 512/809 | 5/677 |
| Clay | Barbara Lambert | Jacob A. Warnock Inc. | 2/26/2008 | MOGL | 512/806 | 5/680 |
| Clay | | Jacob A. Warnock Inc. | 2/26/2008 | MOGL | 512/861 | 5/683 |
| Archer | Charles Veitenheimer | Vicars Mineral Ventures LLC | 4/15/2011 | Assn | 697/373 | |
| Archer | Charles Veitenheimer | Vicars Mineral Ventures LLC | 4/22/2008 | OGL | 697/366 | 733/594 |
| Archer | Johnny Rater | Vicars Mineral Ventures LLC | 4/25/2008 | OGL | 698/220 | 733/601 |
| Archer | James G Veitenheimer | Vicars Mineral Ventures LLC | 4/29/2008 | MOGL | 698/218 | 733/605 |
| Archer | Ricky Wayne Greaves | Jacob A. Warnock Inc. | 10/31/2008 | MOGL | 705/612 | 733/454 |
| Archer | David Richards | Jacob A. Warnock Inc. | 9/17/2008 | MOGL | 705/76 | 733/457 |
| Archer | Winona Hamm | Jacob A. Warnock Inc. | 9/17/2008 | MOGL | 705/78 | 733/460 |
| Archer | LaVerne Sandlin | Jacob A. Warnock Inc. | 9/17/2008 | MOGL | 705/80 | 733/463 |
| Archer | Paul W. Tidwell & Lillian G. Tidwell Revocable Trust | Jacob A. Warnock Inc. | 9/17/2008 | MOGL | 705/82 | 733/466 |
| Archer | Joy D. McCaw | Jacob A. Warnock Inc. | 9/26/2008 | MOGL | 705/84 | 733/469 |
| Archer | Paula McHenry | Jacob A. Warnock Inc. | 9/25/2008 | MOGL | 705/86 | 733/472 |
| Archer | Jessee E. Llees III | Jacob A. Warnock Inc. | 9/25/2008 | MOGL | 705/88 | 733/475 |
| Archer | Nelda Callarman | Jacob A. Warnock Inc. | 9/17/2008 | MOGL | 705/90 | 733/478 |
| Archer | Charlie Juanita Kirkland POA for Ina Mae Liles | Jacob A. Warnock Inc. | 9/23/2008 | MOGL | 705/92 | 733/481 |
| Archer | Royce Meares | Jacob A. Warnock Inc. | 9/26/2008 | MOGL | 705/94 | 733/484 |
| Archer | Wanda Joyce Maltsberger | Jacob A. Warnock Inc. | 9/17/2008 | MOGL | 705/96 | 733/487 |
| Archer | Imogene Young Executrix of the D. Keith Young Est | Jacob A. Warnock Inc. | 9/26/2008 | MOGL | 705/98 | 733/490 |
| Archer | Rickie Lee Liles | Jacob A. Warnock Inc. | 9/23/2008 | MOGL | 705/100 | 733/493 |
| Archer | Linda Owens | Jacob A. Warnock Inc. | 9/23/2008 | MOGL | 705/102 | 733/496 |
| Archer | Georgia Ann Earl | Jacob A. Warnock Inc. | 9/23/2008 | MOGL | 705/104 | 733/497 |
| Archer | Coy Ramon meares | Jacob A. Warnock Inc. | 9/26/2008 | MOGL | 705/106 | 733/500 |
| Archer | Charlene L. Hord | Jacob A. Warnock Inc. | 9/17/2008 | MOGL | 705/108 | 733/503 |


A CERTIFIED COPY Page 11 of 15
Attest 11-18-14
Janice Robinson, County Clerk
Jack County Texas
Deputy

| | | | | | | |
|---|---|---|---|---|---|---|
| Archer | David Lee Liles | Jacob A. Warnock Inc. | 9/23/2008 | MOGL | 705/110 | 733/505 |
| Archer | Sylvia Jane Halbrooks | Jacob A. Warnock Inc. | 9/23/2008 | MOGL | 705/112 | 733/508 |
| Archer | Mary Seale King | Jacob A. Warnock Inc. | 9/17/2008 | MOGL | 705/114 | 733/511 |
| Archer | Jerry Alan Meares | Jacob A. Warnock Inc. | 10/7/2008 | MOGL | 705/116 | 733/514 |
| Archer | Jonnie Jannette Elliston | Jacob A. Warnock Inc. | 9/23/2008 | MOGL | 705/118 | 733/517 |
| Archer | Sandra Jean Arndt | Jacob A. Warnock Inc. | 9/23/2008 | MOGL | 705/120 | 733/520 |
| Archer | Lena Meares Ind. and as trustee for the Meares Rev. Trust | Jacob A. Warnock Inc. | 10/7/2008 | MOGL | 705/122 | 733/523 |
| Archer | Kathy Jan Skuza | Jacob A. Warnock Inc. | 10/7/2008 | MOGL | 705/124 | 733/526 |
| Archer | Jodi Irene Bridges | Jacob A. Warnock Inc. | 9/23/2008 | MOGL | 705/126 | 733/529 |
| Archer | Lynn Welch | Jacob A. Warnock Inc. | 9/26/2008 | MOGL | 705/128 | 733/532 |
| Archer | Shirley Joyce Perrin | Jacob A. Warnock Inc. | 9/23/2008 | MOGL | 705/130 | 733/535 |
| Archer | Connie Lois Smith | Jacob A. Warnock Inc. | 10/7/2008 | MOGL | 705/132 | 733/538 |
| Archer | Gary William Liles | Jacob A. Warnock Inc. | 10/23/2008 | MOGL | 705/134 | 733/541 |
| Archer | Susan B. Spinks AKA Susan Bailey | Jacob A. Warnock Inc. | 10/31/2008 | MOGL | 705/136 | 733/544 |
| Archer | Kenneth W. young | Jacob A. Warnock Inc. | 9/17/2008 | MOGL | 705/138 | 733/547 |
| Archer | Melody Loy Greaves Newsom | Jacob A. Warnock Inc. | 10/31/2008 | MOGL | 705/140 | 733/550 |
| Archer | Deborah Carol Marchbanks | Jacob A. Warnock Inc. | 10/31/2008 | MOGL | 705/142 | 733/553 |
| Archer | Loy Clanton AKA Loy Greaves | Jacob A. Warnock Inc. | 10/31/2008 | MOGL | 705/144 | 733/556 |
| Archer | Thomas Edward Meares | Jacob A. Warnock Inc. | 10/7/2008 | MOGL | 705/146 | 733/559 |
| Archer | Jimmie Francis Dunn | Jacob A. Warnock Inc. | 10/31/2008 | MOGL | 705/148 | 733/562 |
| Archer | Marcia Zee Greaves Long Jefferis | Jacob A. Warnock Inc. | 10/31/2008 | MOGL | 705/150 | 733/565 |
| Archer | Barbara Blair | Jacob A. Warnock Inc. | 9/23/2008 | MOGL | 705/152 | 733/568 |
| Archer | Nina June Bailey | Jacob A. Warnock Inc. | 10/31/2008 | MOGL | 705/154 | 733/571 |
| Archer | Janice Thomasen Jager | Jacob A. Warnock Inc. | 11/10/2008 | MOGL | 705/156 | 733/574 |
| Archer | Heather Nicole Dunn Fuqua | Jacob A. Warnock Inc. | 11/10/2008 | MOGL | 705/158 | 733/577 |
| Archer | Rebecca Hallmark | Jacob A. Warnock Inc. | 12/5/2008 | MOGL | 705/160 | 733/580 |
| Archer | Steven Scott Blair | Jacob A. Warnock Inc. | 12/5/2008 | MOGL | 705/162 | 733/583 |
| Archer | Sue Ellen Dean | Jacob A. Warnock Inc. | 3/4/2009 | MOGL | 705/166 | 733/583 |
| Archer | Judy Charlene McLemore | Jacob A. Warnock Inc. | 3/4/2009 | MOGL | 705/164 | 733/585 |
| Archer | Larry McMurtry | Jacob A. Warnock Inc. | 3/4/2009 | MOGL | 705/168 | 733/587 |
| Archer | Charlie McMurty | Jacob A. Warnock Inc. | 3/4/2009 | MOGL | 705/170 | 733/589 |
| Archer | Tony Wayne Greaves | Jacob A. Warnock Inc. | 10/31/2008 | MOGL | 705/168 | 733/589 |
| Archer | Verrie Middlebrooks | Jacob A. Warnock Inc. | 10/31/2008 | MOGL | 705/74 | 733/591 |
| Jack | Ralph Lowell Cooper and wife Rosemary Cooper | Jacob A. Warnock Inc. | 2/15/2008 | MOGL | 797/241 | 862/390 |
| Jack | Lilly May West | Jacob A. Warnock Inc. | 4/28/2008 | Assn | 759/823 | |
| Jack | Ralph Lowell Cooper (Rosemary Cooper) | Jacob A. Warnock Inc. | 4/28/2008 | Assn | 759/864 | |
| Jack | Ralph Lowell Cooper and wife Rosemary Cooper | Jacob A. Warnock Inc. | 4/22/2008 | OGL | 759/864 | |
| Jack | D/B/A 6-C oil Company | Jacob A. Warnock Inc. | 4/28/2008 | Assn | 759/805 | |
| Jack | Gary Ray Conner | Vicars Mineral Ventures LLC | 2/26/2008 | MOGL | 797/205 | 862/510 |
| Jack | Lucy Miller | Vicars Mineral Ventures LLC | 2/26/2008 | MOGL | 798/402 | 862/513 |
| Jack | Stormy Miller | Vicars Mineral Ventures LLC | 2/26/2008 | MOGL | 798/404 | 862/513 |
| Jack | Jackie Little | Vicars Mineral Ventures LLC | 2/26/2008 | MOGL | 797/243 | 862/516 |



A CERTIFIED COPY Page 13 of 15
Attest 11-18-14
Janice Robinson, County Clerk
Jack County, Texas
Deputy

| County | Lessor | Lessee | Date/Code | Vol/Page | Vol/Page |
|---|---|---|---|---|---|
| Jack | Kelly Ike Conner | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 7971207 | |
| Jack | Joyce Low | Jacob A. Warnock Inc. | 3/15/2008 MOGL | 758/1406 | 862/372 |
| Jack | Loretta Newell | Jacob A. Warnock Inc. | 3/15/2008 MOGL | 759/818 | 862/375 |
| Jack | Barbara J. Bean as Trustee of the Wayne O. Bean and Barbara J. Bean Revocable Trust | Jacob A. Warnock Inc. | 6/18/2008 MOGL | 805/231 | 862/378 |
| Jack | Mark Lundgren | Jacob A. Warnock Inc. | 9/3/2009 MOGL | 830/397 | |
| Jack | Mitchel Davenport Receiver for Bessie Peppard ET AL | Jacob A. Warnock Inc. | 8/18/2008 OGL | 809/813 | |
| Jack and Clay | Irma Ree Mayo | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 809/506 | 862/328 / 862/336 |
| Jack and Clay | Lannie Hubble | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 811/839 | 862/526 / 862/338 |
| Jack and Clay | E.J. Hubble | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 811/841 | 862/324 / 862/340 |
| Jack and Clay | N.E. Deweber Jr. | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 808/950 | 862/332 / 862/342 |
| Jack and Clay | N.E. Deweber | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 809/508 | 862/316 / 862/344 |
| Jack and Clay | Latice Whitaker | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 811/945 | 862/334 / 862/370 |
| Jack and Clay | Coleen White | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 811/943 | 862/320 / 862/346 |
| Jack and Clay | Leonita Rhone | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 808/629 | 862/318 / 862/348 |
| Jack and Clay | Ronnie Ogle | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 808/352 | 862/350 / 862/322 |
| Jack and Clay | Larry Ogle | Jacob A. Warnock Inc. | 4/17/2008 CMOGL | 808/354 | 862/352 |
| Jack and Clay | Donna Roth | Jacob A. Warnock Inc. | 4/17/2008 MOGL | 759/858 | 862/354 |
| Jack and Clay | Evelyn Deweber | Jacob A. Warnock Inc. | 4/17/2008 MOGL | 799/603 | 862/330 |
| Jack and Clay | Elaine Tischler /Shadow Creek Enterprises | Jacob A. Warnock Inc. | 4/17/2008 MOGL | 811/647 | 862/356 |
| Jack and Clay | Elois Williams | Jacob A. Warnock Inc. | 4/17/2008 MOGL | 811/647 | 862/358 |
| Jack and Clay | Enell Beals | Jacob A. Warnock Inc. | 4/17/2008 MOGL | 811/647 | 862/360 |
| Jack and Clay | Eleyce Cauble | Jacob A. Warnock Inc. | 4/17/2008 MOGL | 811/647 | 862/362 |
| Jack and Clay | Elizabeth Hardin | Jacob A. Warnock Inc. | 4/17/2008 MOGL | 811/647 | 862/364 |
| Jack and Clay | Evon Reeves | Jacob A. Warnock Inc. | 4/17/2008 MOGL | 811/947 | 862/366 |
| Clay | Ronnie Dale Ewing and wife, Mary Ann Ewing and Gladys Lemons | Wise Production Company | 11/11/2003 AOGL | 483/18 | 862/368 |
| Clay | Gowin Davis | Jacob A. Warnock Inc. | 11/25/2009 MOGL | 525/49 | 2891/41 |
| Clay | Jimmy Wayne Riddle | Jacob A. Warnock Inc. | 4/6/2008 MOGL | 799/829 | 862/399 |
| Jack | Rita Riddle Finley | Jacob A. Warnock Inc. | 4/6/2008 MOGL | 799/846 | 862/402 |
| Jack | Dallas Riddle | Jacob A. Warnock Inc. | 3/6/2011 MOGL | 862/383 | |
| Jack | Krisana Riddle | Jacob A. Warnock Inc. | 3/6/2011 MOGL | 862/385 | |


A CERTIFIED COPY Page 3-15
Attest 1-18-14
Janice Robinson, County Clerk
Jack County Texas
Deputy

0869    0083

| | | | | | | |
|---|---|---|---|---|---|---|
| Jack | Faye Sloan | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 805234 | 8627405 |
| Jack | Linda Potter | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 7598353 | 8627408 |
| Jack | Vanessa Nicole Potter | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759835 | 8627411 |
| Jack | Jason Potter | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759835 | 8627414 |
| Jack | Joshua Potter | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759835 | 8627417 |
| Jack | Paula Ferren | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759835 | 8627420 |
| Jack | Jenny Hughey | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759835 | 8627423 |
| Jack | James Stephen Potter | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759835 | 8627810 |
| Jack | Benny Lloyd Gary | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759835 | 8627387 |
| Jack | Ben Gary | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759835 | 8627426 |
| Jack | Paul Wayne Potter | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759835 | 8627430 |
| Jack | Gary Potter | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759835 | 8627433 |
| Jack | Jenelle Batey | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759835 | 8627436 |
| Jack | James Steven Whitehead | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759835 | 8627439 |
| Jack | Ronald Frank Whitehead | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759827 | 8627442 |
| Jack | Patrick Edward Whitehead | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759827 | 8627445 |
| Jack | Ruth Ann Custo | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759827 | 8627448 |
| Jack | Lillian Gossett Priddy | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759827 | 8627451 |
| Jack | Janis Evelyn Besselaar | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759810 | 8627454 |
| Jack | James Thomas Rumage | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759831 | 8627457 |
| Jack | Jerry Riddle | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759832 | 8627460 |
| Jack | Joe D. Bloodworth | Jacob A. Warnock Inc. | 4/8/2008 | MOGL | 759833 | 8627463 |
| Jack | Margaret C. Bloodworth Bond | Jacob A. Warnock Inc. | 4/17/2008 | MOGL | 759821 | 8628741 |
| Jack | Lilly May West | Jacob A. Warnock Inc. | 4/17/2008 | ROGL | 8011402 | |
| Jack | Ralph Lowell Cooper & Rosemary Cooper | Jacob A. Warnock Inc. | 4/22/2008 | OGL | 7898777 | |
| Jack | Aldie Marie McAnear | Jacob A. Warnock Inc. | 2/15/2008 | MOGL | 797/236 | 8629393 |
| Jack | John W. Pursley | Jacob A. Warnock Inc. | 5/23/2008 | Assn | 801/581 | |
| Jack | Jimmie Cozart and Lelia Cozart | Jacob A. Warnock Inc. | 2/15/2008 | MOGL | 797/232 | 8629396 |
| Clay | W.C. Gilbert and Donna M. Gilbert | Jacob A. Warnock Inc. | 3/15/2008 | MOGL | 512/564 | 5/688 |
| Clay | W.C. Gilbert | L.F. Merrell | 2/22/2008 | MOGL | 517/668 | 7/603 |
| Clay | Mack Lacy | Jacob A. Warnock Inc. | 8/27/2008 | MOGL | 517/651 | 5/689 |
| Clay | Curtis Lacy | Jacob A. Warnock Inc. | 8/27/2008 | MOGL | 517/650 | 5/691 |
| Clay | Jim Worley | Jacob A. Warnock Inc. | 8/27/2008 | MOGL | 517/649 | 5/693 |
| Clay | Danny Bell | Jacob A. Warnock Inc. | 3/7/2008 | MOGL | 513/650 | 5/695 |
| Clay | Janet Diane Starkey-Wolfenberger | Jacob A. Warnock Inc. | 3/7/2008 | MOGL | 513/34 | 5/697 |
| Clay | Teddie Howell | Jacob A. Warnock Inc. | 3/7/2008 | MOGL | 512/560 | 5/699 |
| Clay | Freda Braymiller | Jacob A. Warnock Inc. | 3/7/2008 | MOGL | 512/560 | 5/701 |
| Clay | Lavaughn McManus and Kathryn McManus | Jacob A. Warnock Inc. | 2/26/2008 | MOGL | 512/612 | 5/703 |
| Clay | Beth Elaine Boyett | Jacob A. Warnock Inc. | 9/8/2008 | MOGL | 811/990 | 8628961 |
| Clay | Sentena Lynn Boyett | Jacob A. Warnock Inc. | 9/8/2008 | MOGL | 518/337 | 8628957 |
| Clay | Leslie Ann Coates | Jacob A. Warnock Inc. | 7/14/2008 | MOGL | 807/96 | 8628867 |
| Clay | Sonya Leeton Martin Morley | Jacob A. Warnock Inc. | 7/14/2008 | MOGL | 807/94 | 8628865 |
| Jack and Clay | Leslie L. Leaton Jr. | Jacob A. Warnock Inc. | 9/4/2008 | MOGL | 808/502 | 8628873 |


A CERTIFIED COPY Page 14 of 15
Attest 11-18-14
Janice Robinson, County Clerk
Jack County, Texas
Deputy

BOOK    PAGE

0869    0084

Doc# 2011000297
#Pages 15   NM#Pages 0
9/14/2011 10:41:32 AM
Filed & Recorded in
Official Public Records of
Jack County Clerk
Shelly Clayton
Fees 67.00

STATE OF TEXAS, COUNTY OF JACK   I hereby
certify that this instrument was FILED on the
date stamped hereon by me and was duly
RECORDED in the Volume and Page of the
Official Public Records of Jack County, Texas.

Shelly Clayton, Jack County Clerk

By: _____
Deputy



| | | | | | | |
|---|---|---|---|---|---|---|
| Jack and Clay | Everett Cloer | Jacob A. Warnock Inc. | 5/8/2008 | MOGL | 801/409 | 862/877 |
| Jack and Clay | Allyne Whatley | Jacob A. Warnock Inc. | 5/8/2008 | MOGL | 801/404 | 862/681 |
| Jack and Clay | Tiger Verlayne Reynolds AKA Tiger Veralene Leaton | Jacob A. Warnock Inc. | 9/2/2008 | OGL | 812/441 | 862/885 |



A CERTIFIED COPY Page 2 of 3
Attest  11-18-14
Janice Robinson, County Clerk
Jack County, Texas
Deputy

## CLERKS CERTIFICATE

I, Janice Robinson, County Clerk of Jack County Texas do hereby certify that the foregoing is a true and correct copy of the following documents filed in the records of Jack County, Texas to wit:

MEMORANDUM OF JOINT OPERATING AGREEMENT EXCUTED BY **WBH ENERGY PARTNERS LLC** IN FAVOR OF **VW VENTURES LLC** AS SAME APPEARS OF RECORD IN VOLUME 869, PAGE 70 OFFICIAL PUBLIC RECORDS, JACK COUNTY, TEXAS.

Given under my hand and seal of office on the 18th day of November, 2014.

*Janice Robinson*

Janice Robinson
County Clerk
Jack County, Texas

EXHIBIT 2D

119818

VOL 585 PAGE 689

## MEMORANDUM OF JOINT OPERATING AGREEMENT

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § KNOW ALL MEN BY THESE PRESENTS, THAT: |
| COUNTIES OF ARCHER, CLAY | § |
| JACK AND MONTAGUE | § |

This Memorandum of Joint Operating Agreement (this "Memorandum") is dated effective as of the 1st day of September, 2011 (the "Effective Date"), by and among WBH Energy Partners LLC, whose address is PO Box 302380, Austin, TX 78703 (hereinafter referred to as "Operator"), U.S. Energy Development Corporation, whose address is 2350 North Forest Road, Getzville, NY 14068 ("USED"), and VW Ventures, LLC, a Texas limited liability company, whose address is 2004 Berkley, Wichita Falls, TX 76308 ("VW Ventures", and together with USED, collectively referred to as "Non-Operator"). Operator and Non-Operator are collectively referred to herein as the "Parties."

Section 1. Operator and Non-Operator have entered into a Model Form Operating Agreement, dated effective September 1, 2011 (the "Agreement"), which provides for the development and production of oil, gas, and other substances from all or part of oil and gas leases and interests, lands, and other properties in Archer, Clay, Montague, and Jack Counties, Texas set forth on Exhibit A hereto (the "Contract Area").

Section 2. Among other provisions, the Agreement (a) provides for the joint development of the Contract Area by the Parties, (b) contains an accounting procedure, which establishes, among other things, the direct and indirect charges to be billed to the joint account contemplated by the Agreement and (c) includes a gas balancing agreement.

Section 3. Operator hereby certifies that a true and correct copy of the Agreement is on file and is available for inspection by third parties at the offices of Operator at the address set forth in this Memorandum.

Section 4. It is understood and agreed by the Parties hereto that if any part, term, or provision of this Memorandum is held to be illegal or in conflict with any law, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the Parties shall be construed and enforced as if the Memorandum did not contain the particular part, term, or provision held to be invalid.

Section 5. This Memorandum shall be binding upon and shall inure to the benefit of the Parties and their respective legal representatives, successors and permitted assigns. The failure of one or more persons owning an interest in the Contract Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who execute this Memorandum. This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute but one instrument.

1

I, Glenda Henson, County Clerk, Montague County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on _____

Glenda Henson, County Clerk

By Deputy: _____

Section 6.     Each Party confirms and acknowledges that the terms and conditions of the Agreement are by reference specifically incorporated herein and made a part hereof with the same force as if the same were set forth herein in full.   This Memorandum is subject in all respects to the terms of the Agreement.  In the event of a conflict between the terms of the Agreement and this Memorandum, the terms of the Agreement shall control.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

2

I, Glenda Henson, County Clerk, Montague County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office, Witness my hand and seal of office on _____



Glenda Henson, County Clerk

By Deputy: _____

EXECUTED as of the dates set forth in the respective notary certifications below, but effective the 1st day of September 2011.

OPERATOR:
**WBH ENERGY PARTNERS LLC**



By:
Name:  David R. Henderson
Title:   President

### ACKNOWLEDGMENT

STATE OF TEXAS

COUNTY OF TRAVIS

The foregoing instrument was acknowledged before me this 30th day of August, 2011 by David R. Henderson, President of WBH ENERGY PARTNERS LLC, a Texas limited liability company, on behalf of said limited liability company.

**DALA CAMPBELL**
Notary Public, State of Texas
My Commission Expires 01-24-2015

Name:
Notary Public in and for the State of Texas

*[WBH Signature and Acknowledgement Page to Memorandum of JOA]*

I, Glenda Henson, County Clerk, Montague County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on _____

Glenda Henson, County Clerk
By Deputy:

NON-OPERATOR:
**U.S. ENERGY DEVELOPMENT CORPORATION**

By: _____

Name:  Douglas Walch

Title:  President


STATE OF NEW YORK

COUNTY OF ERIE

The foregoing instrument was acknowledged before me this 1st day of September, 2011 by Douglas Walch, as President of U.S. ENERGY DEVELOPMENT CORPORATION on behalf of said corporation.

Name: _____

Notary Public in and for the State of New York


William H. Mattrey
Notary Public, State of New York
Qualified in Erie County
My Commission Expires February 28, 20___


*[USED Signature and Acknowledgement Page to Memorandum of JOA]*


I, Glenda Henson, County Clerk, Montague County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on _____

Glenda Henson, County Clerk

By Deputy: _____



**VOL 585   PAGE 693**

**NON-OPERATOR:**
**VW VENTURES**

By: _____
Name: Jacob A. Warnock
Title: Governing Person

## ACKNOWLEDGMENT

STATE OF TEXAS

COUNTY OF WICHITA

This instrument was acknowledged before me on the 31st day of August, 2011, by Jacob A. Warnock, as a governing person of VW Ventures, LLC, a Texas limited liability company, on behalf of said limited liability company.

Name: Marcene Roach
Notary Public in and for the State of Texas

> Marcene Roach
> Notary Public
> State of Texas
> My Commission Expires 01-17-2014

*[VW Ventures Signature and Acknowledgment Page to Memorandum of JOA]*

I, Glenda Henson, County Clerk, Montague County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on 11-19-14

Glenda Henson, County Clerk
By Deputy: _____


**VOL 585   PAGE 694**

**NON-OPERATOR:**
**VW VENTURES**

By: _Gregory N. Vicars_
Name:   Gregory N. Vicars
Title:   Governing Person

## ACKNOWLEDGMENT

STATE OF NEW MEXICO

COUNTY OF LINCOLN

The foregoing instrument was acknowledged before me this 1st day of September, 2011 by Gregory N. Vicars, a Governing Person of VW Ventures LLC, a Texas limited liability company, on behalf of said limited liability company.

Name: _Douglas L. Siddens_
Notary Public in and for the State of New Mexico
Commission Expires  3-14-15

*[VW Ventures Signature and Acknowledgement Page to Memorandum of JOA]*

I, Glenda Henson, County Clerk, Montague County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on 1-18-14



Glenda Henson, County Clerk
By Deputy: _____

**EXHIBIT A**
**TO**
**MEMORANDUM OF JOINT OPERATING AGREEMENT**

**Contract Area**

[see attached]

I, Glenda Henson, County Clerk, Montague County,
Texas, do hereby certify that this is a true and
correct copy as same appears of record in my office.
Witness my hand and seal of office on 11-18-15

Glenda Henson, County Clerk
By Deputy: 

**EXHIBIT A**

| County | Lessor | Lessee | Date of Lease | Inst | Lease Vol/Page | Amendment Vol/Page |
|---|---|---|---|---|---|---|
| Montague | Holly McCall Carpenter | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/276 | |
| Montague | Nancy Miertschin | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/269 | |
| Montague | Carol Ann Seaberry | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/270 | |
| Montague | William E. McPherson | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/271 | |
| Montague | David Len McPherson | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/272 | |
| Montague | Mary Margaret McPherson Osborn | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/273 | |
| Montague | John T. McCall | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/274 | |
| Montague | Robert M. Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/276 | |
| Montague | Gayle Marie Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/278 | |
| Montague | Suzanne Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/280 | |
| Montague | Robert Mark McCall | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/282 | |
| Montague | Rosemary McCall Wingate | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/284 | |
| Montague | Carolyn McCall Perryman | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/286 | |
| Montague | William Mark Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/288 | |
| Montague | Don C. Peterson III | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/289 | |
| Montague | Rebecca Peterson-Male | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/290 | |
| Montague | C.S. McCall III | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/292 | |
| Montague | The McCall Family Trust | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/294 | |
| Montague | James Michael Storey | Jacob A. Warnock Inc. | 9/1/2010 | MOGL | 535/299 | |
| Montague | Josephine Storey Bybee | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/138 | |
| Montague | Holly McCall Carpenter | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/282 | |
| Montague | Nancy Miertschin | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/257 | |
| Montague | Carol Ann Seaberry | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/311 | |
| Montague | William E. McPherson | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/301 | |
| Montague | David Len McPherson | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/306 | |
| Montague | Mary Margaret McPherson Osborn | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/148 | |
| Montague | John T. McCall | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/296 | |
| Montague | Robert M. Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/292 | |
| Montague | Gayle Marie Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/287 | |
| Montague | Suzanne Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/282 | |
| Montague | Robert Mark McCall | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/272 | |
| Montague | Rosemary McCall Wingate | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/272 | |
| Montague | Carolyn McCall Perryman | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/277 | |
| Montague | William Mark Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/252 | |
| Montague | Don C. Peterson III | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/247 | |
| Montague | Rebecca Peterson-Male | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/237 | |
| Montague | C.S. McCall III | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/143 | |
| Montague | The McCall Family Trust | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/242 | |
| Montague | James Michael Storey | Jacob A. Warnock Inc. | | | | |

I, Glenda Henson, County Clerk, Montague County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on 4-18-14

Glenda Henson, County Clerk
By Deputy: 

| | | | | | |
|---|---|---|---|---|---|
| Montague | Josephine Storey Bybee | Jacob A. Warnock Inc. | 1/1/2011 | OGL | 554/267 |
| Montague | WANDA L ROBERTSON MATHESON | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 574/324 |
| Montague | SHIRLEY BLACKSTOCK MEGASON | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/591 |
| Montague | BILLY JOE ROBERTSON JR | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/595 |
| Montague | PATRICIA ANN ROBERTSON GOOD | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/599 |
| Montague | LUTHER D ROBERTSON | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/603 |
| Montague | STELLA KAY ROBERTSON WYER | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/607 |
| Montague | FREDA JEAN ROBINSON BLAYLOCK | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/611 |
| Montague | MICHAEL ROBINSON | Jacob A. Warnock Inc. | 5/4/2011 | OGL | 574/811 |
| Montague | RON C BLACKSTOCK | Jacob A. Warnock Inc. | 3/29/2011 | OGL | 570/615 |
| Montague | Holly McCall Carpenter | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/138 |
| Montague | Nancy Mierisch | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/262 |
| Montague | Carol Ann Seaberry | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/257 |
| Montague | William E. McPherson | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/311 |
| Montague | David Len McPherson | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/301 |
| Montague | Mary Margaret McPherson Osborn | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/306 |
| Montague | John T. McCall | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/148 |
| Montague | Robert M. Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/296 |
| Montague | Gayle Marie Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/292 |
| Montague | Suzanne Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/287 |
| Montague | Robert Mark McCall | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/282 |
| Montague | Rosemary McCall Wingate | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/272 |
| Montague | Carolyn McCall Perryman | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/277 |
| Montague | William Mark Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/252 |
| Montague | Don C. Peterson III | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/247 |
| Montague | Rebecca Peterson-Male | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/237 |
| Montague | C.S. McCall III | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 555/143 |
| Montague | The McCall Family Trust | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/242 |
| Montague | James Michael Storey | Jacob A. Warnock Inc. | 1/1/2011 | MOGL | 554/267 |
| Montague | Josephine Storey Bybee | Jacob A. Warnock Inc. | | | 512/477; 512/480; 512/482 |
| Clay | Robert T. Gowan | Vicars Mineral Ventures LLC | 2/28/2008 | MOGL | 512/477; 512/480; 512/482 | 5746 |
| Clay | W Crozier Gowan | Vicars Mineral Ventures LLC | 2/28/2008 | MOGL | 512/477; 512/480; 512/482 | 5748 |
| Clay | Grace W Gowan, Ind Extx of the Estate of John Richard Gowan | Vicars Mineral Ventures LLC | 2/28/2008 | MOGL | 512/477; 512/480; 512/482 | 5750 |
| Clay | Mary Beth Roye | Vicars Mineral Ventures LLC | 2/28/2008 | MOGL | 512/477 | 5752 |

I, Glenda Henson, County Clerk, Montague Count Texas, do hereby certify that this is a true and correct copy as same appears of record in my offic Witness my hand and seal of office on 11-18-A

Glenda Henson, County Clerk
By Deputy: _____



VOL 585   PAGE 698

| County | Grantor | Grantee | Date / Type | | | |
|---|---|---|---|---|---|---|
| Clay | Virgil Rosser III | Vicars Mineral Ventures LLC | 2/28/2008 MOGL | 512/477 | 5756 | 5754 |
| Clay | Richard M. Rosser | Vicars Mineral Ventures LLC | 2/28/2008 MOGL | 512/477 | 5756 | |
| Clay | Bill E. Gowan | Vicars Mineral Ventures LLC | 3/28/2008 MOGL | 512/813 | 5758 | |
| Clay | Thomas B. Gowan | Vicars Mineral Ventures LLC | 3/28/2008 MOGL | 513/33 | | 5760 |
| Clay | Liggett Family Trust | Jacob A. Warnock Inc. | 5/14/2007 OGL | 505/176 | | |
| Clay | | Jacob A. Warnock Inc. | 11/14/2011 OGL | 5740 | | |
| Clay | | Jacob A. Warnock Inc. | 5/14/2007 | 505/184 | | |
| Clay | James Weldon Wetsel | Jacob A. Warnock Inc. | 11/14/2011 OGL | 5728 | | |
| Clay | | Jacob A. Warnock Inc. | 5/14/2007 | 505/184 | | |
| Clay | Geraldine Maurine Bell | Jacob A. Warnock Inc. | 11/14/2011 OGL | 5728 | | |
| Clay | | Jacob A. Warnock Inc. | 5/14/2007 | 505/180 | | |
| Clay | | Jacob A. Warnock Inc. | 11/14/2011 MOGL | 5734 | | |
| Clay | Myra Joan Wetsel | Jacob A. Warnock Inc. | 4/27/2011 MOGL | 5664 | | |
| Clay | Carla Sue Mayfield Pullen | Jacob A. Warnock Inc. | 5/23/2007 OGL | 506/196 | | |
| Clay | Sherrell Onelli | Jacob A. Warnock Inc. | 5/23/2007 OGL | 506/225 | | |
| Clay | Betty Ingram ETAL | Jacob A. Warnock Inc. | 5/23/2007 OGL | 506/221 | | |
| Clay | William Bracey ETAL | Jacob A. Warnock Inc. | 5/23/2007 OGL | 506/216 | | |
| Clay | James Kandl Ingram | Jacob A. Warnock Inc. | 5/23/2007 OGL | 506/215 | | |
| Clay | David Ingram | Jacob A. Warnock Inc. | 5/23/2007 OGL | 506/218 | | |
| Clay | Ralph Lowell Cooper and Rosemary Cooper | Jacob A. Warnock Inc. | 4/22/2008 OGL | 790/871 | | |
| Clay | Keith Shelton | Jacob A. Warnock Inc. | 3/14/2008 MOGL | 790/839 | | 862/524 |
| Jack | Bradley G. Campsey president of the Jack County oil and Gas Association | Jacob A. Warnock Inc. | 3/1/2008 MOGL | 790/837 | | 862/466 |
| Jack | Ralph Lowell Cooper | Jacob A. Warnock Inc. | 3/6/2008 MOGL | 797/224 | | |
| Jack | Lilly May West | Jacob A. Warnock Inc. | 3/6/2008 MOGL | 797/228 | | 862/469 |
| Jack | Byron Sanders | Jacob A. Warnock Inc. | 2/22/2008 MOGL | 797/209 | | 862/473 |
| Jack | Doris Walls and David Walls | Jacob A. Warnock Inc. | 2/22/2008 MOGL | 797/212 | | 862/477 |
| Jack | Jeffrey Crawford | Jacob A. Warnock Inc. | 3/20/2008 MOGL | 805/236 | | 862/480 |
| Jack | Jeremy Crawford | Jacob A. Warnock Inc. | 3/20/2008 MOGL | 799/815 | | 862/483 |
| Jack | James Crawford Jr. | Jacob A. Warnock Inc. | 3/20/2008 MOGL | 799/812 | | 862/486 |
| Jack | Christopher Crawford | Jacob A. Warnock Inc. | 3/20/2008 MOGL | 801/406 | | 862/489 |
| Jack | Rebecca Owens | Jacob A. Warnock Inc. | 2/22/2008 MOGL | 797/221 | | 862/492 |
| Jack | Karen Walls Brayton | Jacob A. Warnock Inc. | 2/22/2008 MOGL | 797/216 | | |
| Jack | John F. Townley | Jacob A. Warnock Inc. | 2/15/2008 MOGL | 797/238 | | 862/519 |
| Jack | Michal Davenport Receiver for mary Stewart ETAL | Jacob A. Warnock Inc. | 8/18/2008 MOGL | 809/817 | | |
| Jack | Wanda Davis | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 797/245 | | |
| Jack | Nathan Scarber | Vicars Mineral Ventures LLC | 10/17/2008 MOGL | 812/439 | | |
| Jack | Margaret McGlaun | Jacob A. Warnock Inc. | 2/15/2008 MOGL | 797/238 | | 862/519 |
| Jack | Effie Leak | Jacob A. Warnock Inc. | 2/15/2008 MOGL | 797/238 | | |


I, Glenda Henson, County Clerk, Montague County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on 11-13-14

Glenda Henson, County Clerk
By Deputy: _____

**VOL 585   PAGE 699**

| County | Owner | Grantee | Date / Code | Ref 1 | Ref 2 |
|---|---|---|---|---|---|
| Jack | Marie Coker | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 797/203 | 862/495 |
| Jack | Barton J. Ord | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 797/219 | 862/498 |
| Jack | Gary Ray Conner | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 797/205 | 862/501 |
| Jack | Kelly Conner | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 797/207 7917243,79 84402, 798/404 | 862/504 862/507 |
| Jack | Big Creek Properties LTD / Todd Corry Jr. Individually, Todd Corry Jr. as POA for / Bettye Boener Corry, and Todd Corry Jr. as AIF and / Guardian of Todd Corry Sr. | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 798/399 | |
| Jack | Ed Allison DBA Sunrise Enterprises | Jacob A. Warnock Inc. | 3/31/2008 MOGL | 513/35 | 5/985 |
| Clay | | Jacob A. Warnock Inc. | 3/26/2008 Assn | 512/557 | 5/988 |
| Clay | Michael W. Rater | Jacob A. Warnock Inc. | 2/26/2008 MOGL | 512/554 | 5/871 |
| Clay | Mark Rater | Jacob A. Warnock Inc. | 2/26/2008 MOGL | 512/551 | 5/674 |
| Clay | Lea Ann Dudley | Jacob A. Warnock Inc. | 2/26/2008 MOGL | 512/809 | 5/677 |
| Clay | James Rater | Jacob A. Warnock Inc. | 2/26/2008 MOGL | 512/806 | 5/680 |
| Clay | Gary D. Rater | Jacob A. Warnock Inc. | 2/26/2008 MOGL | 512/561 | 5/683 |
| Clay | Monte Rater | Jacob A. Warnock Inc. | 2/26/2008 MOGL | 697/373 | |
| Clay | Barbara Lambert | Jacob A. Warnock Inc. | | | |
| Archer | Charles Veltenheimer | Vicars Mineral Ventures LLC | 4/15/2011 Assn | 733/597 | |
| Archer | Charles Veltenheimer | Vicars Mineral Ventures LLC | 4/22/2008 OGL | 697/366 | 733/594 |
| Archer | Johnny Rater | Vicars Mineral Ventures LLC | 4/25/2008 OGL | 698/220 | 733/601 |
| Archer | James G Veltenhaimer | Vicars Mineral Ventures LLC | 4/29/2008 MOGL | 698/218 | 733/605 |
| Archer | Ricky Wayne Greeves | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/512 | 733/454 |
| Archer | David Richards | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/76 | 733/457 |
| Archer | Winona Herrin | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/78 | 733/460 |
| Archer | LaVerne Sandlin | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/80 | 733/463 |
| Archer | Paul W. Tidwell & Lillian G. Tidwell Revocable Trust | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/82 | 733/466 |
| Archer | Joy D. McCaw | Jacob A. Warnock Inc. | 9/26/2008 MOGL | 705/84 | 733/469 |
| Archer | Paula McHenry | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/86 | 733/472 |
| Archer | Jessee E. Liles III | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/88 | 733/475 |
| Archer | Nadia Culberman | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/90 | 733/478 |
| Archer | Charlie Juanita Kirkland POA for Ina Mae Liles | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/92 | 733/481 |
| Archer | Royda Meares | Jacob A. Warnock Inc. | 9/26/2008 MOGL | 705/94 | 733/484 |
| Archer | Wanda Joyce Maltsberger | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/96 | 733/487 |
| Archer | Imagene Young Executrix of the D. Keith Young Est | Jacob A. Warnock Inc. | 9/26/2008 MOGL | 705/98 | 733/490 |
| Archer | Rickie Lee Liles | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/100 | 733/493 |
| Archer | Linda Owens | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/102 | 733/493 |
| Archer | Georgia Ann Earl | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/104 | 733/497 |
| Archer | Coy Ramon meares | Jacob A. Warnock Inc. | 9/26/2008 MOGL | 705/106 | 733/500 |
| Archer | Charlene L. Hord | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/108 | 733/503 |

I, Glenda Henson, County Clerk, Montague County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on _____

Glenda Henson, County Clerk
By Deputy: _____



| County | Grantor | Grantee | Date / Type | Ref 1 | Ref 2 |
|---|---|---|---|---|---|
| Archer | David Lee Liles | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/110 | 733/505 |
| Archer | Sylvia Jane Halbrooks | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/112 | 733/508 |
| Archer | Mary Sissie King | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/114 | 733/611 |
| Archer | Jerry Allan Meares | Jacob A. Warnock Inc. | 10/7/2008 MOGL | 705/116 | 733/614 |
| Archer | Jonnie Jannette Elliston | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/118 | 733/617 |
| Archer | Sandra Jean Ard | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/120 | 733/620 |
| Archer | Lena Meares Ind. and as trustee for the Meares Rev. Trust | Jacob A. Warnock Inc. | 10/7/2008 MOGL | 705/122 | 733/523 |
| Archer | Kathy Jan Souza | Jacob A. Warnock Inc. | 10/7/2008 MOGL | 705/124 | 733/526 |
| Archer | Jodie Irene Bridges | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/126 | 733/529 |
| Archer | Lynn Welch | Jacob A. Warnock Inc. | 9/26/2008 MOGL | 705/128 | 733/532 |
| Archer | Shirley Joyce Partin | Jacob A. Warnock Inc | 9/23/2008 MOGL | 705/130 | 733/535 |
| Archer | Connie Lois Smith | Jacob A. Warnock Inc | 10/7/2008 MOGL | 705/132 | 733/538 |
| Archer | Gary William Liles | Jacob A. Warnock Inc. | 10/23/2008 MOGL | 705/134 | 733/541 |
| Archer | Susan B. Spinks AKA Susan Bailey | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/136 | 733/544 |
| Archer | Kenneth W. young | Jacob A. Warnock Inc. | 9/17/2008 MOGL | 705/138 | 733/547 |
| Archer | Melody Loy Greaves Newsom | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/140 | 733/550 |
| Archer | Deborah Carol Marchbanks | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/142 | 733/553 |
| Archer | Loy Clanton AKA Loy Greaves | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/144 | 733/556 |
| Archer | Thomas Edward Meares | Jacob A. Warnock Inc. | 10/7/2008 MOGL | 705/146 | 733/559 |
| Archer | Jimmie Francis Dunn | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/148 | 733/562 |
| Archer | Marcia Zee Greaves Long Jefferts | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/150 | 733/565 |
| Archer | Barbara Blair | Jacob A. Warnock Inc. | 9/23/2008 MOGL | 705/152 | 733/568 |
| Archer | Nina June Bailey | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 705/154 | 733/571 |
| Archer | Janice Thomasen Jager | Jacob A. Warnock Inc. | 11/10/2008 MOGL | 705/156 | 733/574 |
| Archer | Heather Nicole Dunn Fuqua | Jacob A. Warnock Inc. | 11/10/2008 MOGL | 705/158 | 733/577 |
| Archer | Rebecca Hallmark | Jacob A. Warnock Inc. | 12/5/2008 MOGL | 705/160 | 733/580 |
| Archer | Steven Scott Blair | Jacob A. Warnock Inc. | 12/5/2008 MOGL | 705/162 | 733/583 |
| Archer | Sue Ellen Deen | Jacob A. Warnock Inc. | 3/4/2009 MOGL | 705/164 | 733/585 |
| Archer | Judy Charlene McLemore | Jacob A. Warnock Inc. | 3/4/2009 MOGL | 705/166 | 733/587 |
| Archer | Larry McMurtry | Jacob A. Warnock Inc. | 3/4/2009 MOGL | 705/168 | 733/689 |
| Archer | Charles McMurtry | Jacob A. Warnock Inc. | 3/4/2009 MOGL | 705/170 | 733/691 |
| Archer | Tony Wayne Greaves | Jacob A. Warnock Inc. | 2/15/2008 MOGL | 705/74 | |
| Archer | Vernie Middlebrooks | Jacob A. Warnock Inc. | 4/28/2008 MOGL | 7917/241 | 862/380 |
| Jack | Ralph Lowell Cooper and wife Rosemary Cooper | Jacob A. Warnock Inc. | 10/31/2008 MOGL | 799/823 | 862/690 |
| Jack | Lilly May West | Jacob A. Warnock Inc. | | 799/864 | |
| Jack | Ralph Lowell Cooper (Rosemary Cooper) | Jacob A. Warnock Inc. | 4/22/2008 OGL | 799/864 | |
| Jack | Ralph Lowell Cooper and wife Rosemary Cooper | Jacob A. Warnock Inc. | 4/28/2008 Asan | 799/805 | |
| Jack | D/B/A 6 -C oil Company | Vicars Mineral Ventures LLC | 4/28/2008 Asan | 7917/205 | |
| Jack | Gary Ray Conner | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 7917/205 | |
| Jack | Lucy Miller | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 798/402 | 862/510 |
| Jack | Stormy Miller | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 798/404 | 862/513 |
| Jack | Jackie Little | Vicars Mineral Ventures LLC | 2/26/2008 MOGL | 7917/243 | 862/516 |

I, Glenda Henson, County Clerk, Montague County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on 4-19-14



Glenda Henson, County Clerk
By Deputy: _____

**VOL 585   PAGE 701**

| | | | | | |
|---|---|---|---|---|---|
| Jack | Kelly Ike Conner | Vicars Mineral Ventures LLC | 2/26/2008|MOGL | 797/207 | |
| Jack | Joyce Low | Jacob A. Warnock Inc. | 3/15/2008|MOGL | 798/406 | 862372 |
| Jack | Loretta Newell | Jacob A. Warnock Inc. | 3/15/2008|MOGL | 799/818 | 862375 |
| Jack | Barbara J. Bean as Trustee of the Wayne O. Bean and Barbara J. Bean Revocable Trust | Jacob A. Warnock Inc. | 6/18/2008|MOGL | 805/231 | 862378 |
| Jack | Mark Lundgren | Jacob A. Warnock Inc. | 9/3/2009|MOGL | 830/397 | |
| Jack | | | | 809/813 | |
| Jack | Mitchel Davenport Receiver for Bessie Pepperd ET AL | Jacob A. Warnock Inc. | 8/18/2008|OGL | 809/506 | 862328 / 862336 |
| Jack | Irma Roe Mayo | Jacob A. Warnock Inc. | 4/17/2008|CMOGL | 809/506 | 862326 / 862338 |
| Jack and Clay | Lannie Hubble | Jacob A. Warnock Inc. | 4/17/2008|CMOGL | 811/939 | 862324 / 862340 |
| Jack and Clay | E.J. Hubble | Jacob A. Warnock Inc. | 4/17/2008|CMOGL | 811/941 | 862532 / 862542 |
| Jack and Clay | N.E. Deweber Jr. | Jacob A. Warnock Inc. | 4/17/2008|CMOGL | 809/350 | 862344 / 862316 |
| Jack and Clay | N.E. Deweber | Jacob A. Warnock Inc. | 4/17/2008|CMOGL | 809/508 | 862334 |
| Jack and Clay | Larhoe Whitaker | Jacob A. Warnock Inc. | 4/17/2008|CMOGL | 811/945 | 862570 / 862320 |
| Jack and Clay | Coleen White | Jacob A. Warnock Inc. | 4/17/2008|CMOGL | 811/943 | 862846 / 862318 |
| Jack and Clay | Leontia Rhone | Jacob A. Warnock Inc. | 4/17/2008|CMOGL | 808/629 | 862348 / 862350 |
| Jack and Clay | Ronnie Ogle | Jacob A. Warnock Inc. | 4/17/2008|CMOGL | 808/352 | 862822 / 862552 |
| Jack and Clay | Larry Ogle | Jacob A. Warnock Inc. | 4/17/2008|CMOGL | 808/354 | 862354 / 862330 |
| Jack and Clay | Donna Roth | Jacob A. Warnock Inc. | 4/17/2008|MOGL | 799/658 | 862356 |
| Jack and Clay | Evelyn Deweber | Jacob A. Warnock Inc. | 4/17/2008|MOGL | 799/803 | 862558 |
| Jack and Clay | Elaine Tischler /Shadow Creek Enterprises | Jacob A. Warnock Inc. | 4/17/2008|MOGL | 811/947 | 862560 / 862562 |
| Jack and Clay | Elois Williams | Jacob A. Warnock Inc. | 4/17/2008|MOGL | 811/947 | 862564 |
| Jack and Clay | Enell Beals | Jacob A. Warnock Inc. | 4/17/2008|MOGL | 811/947 | 862596 |
| Jack and Clay | Elbyce Calubé | Jacob A. Warnock Inc. | 4/17/2008|MOGL | 811/947 | 862598 |
| Jack and Clay | Elizabeth Hartin | Jacob A. Warnock Inc. | 4/17/2008|MOGL | 811/947 | |
| Jack and Clay | Evon Reeves/Ronnie Dale Ewing and wife, Mary Ann Ewing and | Jacob A. Warnock Inc. | 11/11/2003|AOGL | 483/18 | 289/141 |
| Clay | Gladys Lemons | Wise Production Company | 11/25/2009|MOGL | 823/49 | |
| Clay | Gowin Davis | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 799/829 | 862699 |
| Jack | Jimmy Wayne Riddle | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 799/846 | 862402 |
| Jack | Rita Riddle Finley | Jacob A. Warnock Inc. | 3/8/2011|MOGL | 862/383 | |
| Jack | Dallas Riddle | Jacob A. Warnock Inc. | 3/8/2011|MOGL | 862/385 | |
| Jack | Krisana Riddle | Jacob A. Warnock Inc. | 3/8/2011|MOGL | 862/385 | |

I, Glenda Henson, County Clerk, Montague County Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on 11-19-14

Glenda Henson, County Clerk
By Deputy: _____



**VOL 585   PAGE 702**

| Party | Name | Grantee | Date / Type | | |
|---|---|---|---|---|---|
| Jack | Faye Sloan | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 805234 | 8826405 |
| Jack | Linda Potter | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998835 | 8826408 |
| Jack | Vanessa Nicole Potter | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998835 | 8826411 |
| Jack | Jason Potter | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998835 | 8826414 |
| Jack | Joshua Potter | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998835 | 8826417 |
| Jack | Paula Farren | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998835 | 8826420 |
| Jack | Jenny Hughey | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998835 | 8826423 |
| Jack | James Stephen Potter | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998835 | 8826810 |
| Jack | Benny Lloyd Gary | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998835 | 8826387 |
| Jack | Ben Gary | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998835 | 8826426 |
| Jack | Paul Wayne Potter | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998835 | 8826430 |
| Jack | Gary Potter | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998835 | 8826433 |
| Jack | Jenelle Bailey | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998835 | 8826436 |
| Jack | James Steven Whitehead | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998627 | 8826439 |
| Jack | Ronald Frank Whitehead | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998627 | 8826442 |
| Jack | Patrick Edward Whitehead | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998627 | 8826445 |
| Jack | Ruth Ann Cueto | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998627 | 8826448 |
| Jack | Lillian Grossett Priddy | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998610 | 8826451 |
| Jack | Janis Evelyn Bessolaar | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998631 | 8826454 |
| Jack | James Thomas Rumage | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998682 | 8826457 |
| Jack | Jerry Riddle | Jacob A. Warnock Inc. | 4/8/2008|MOGL | 7998633 | 8826460 |
| Jack | Joe D. Bloodworth | Jacob A. Warnock Inc. | 4/17/2008|MOGL | 7998821 | 8826463 |
| Jack | Margaret C. Bloodworth Bond | Jacob A. Warnock Inc. | 4/17/2008|ROGL | 8014402 | 8637441 |
| Jack | Lilly May West | Jacob A. Warnock Inc. | 4/22/2008|OGL | 7998877 | |
| Jack | Ralph Lowell Cooper & Rosemary Cooper | Jacob A. Warnock Inc. | 2/15/2008|MOGL | 7917236 | 8627393 |
| Jack | Aldie Marie McAnear | Jacob A. Warnock Inc. | 5/23/2008|Assn | 801/581 | |
| Jack | John W. Pursley | Jacob A. Warnock Inc. | 2/15/2008|MOGL | 7917632 | 8627396 |
| Jack | Jimmie Cozart and Leila Cozart | Jacob A. Warnock Inc. | 3/15/2008|MOGL | 512/564 | 5686 |
| Clay | W.C. Gilbert and Donna M. Gilbert | Jacob A. Warnock Inc. | 2/22/2008|MOGL | 517/668 | 7/603 |
| Clay | W.C. Gilbert | L.F. Merrell | 8/27/2008|MOGL | 517/651 | 5/689 |
| Clay | Mack Lacy | Jacob A. Warnock Inc. | 8/27/2008|MOGL | 517/650 | 5/691 |
| Clay | Curtis Lacy | Jacob A. Warnock Inc. | 8/27/2008|MOGL | 517/649 | 5/693 |
| Clay | Jim Worley | Jacob A. Warnock Inc. | 3/7/2008|MOGL | 513/650 | 5/695 |
| Clay | Danny Bell | Jacob A. Warnock Inc. | 3/7/2008|MOGL | 513/34 | 5/697 |
| Clay | Janet Diane Starkey-Woltenberger | Jacob A. Warnock Inc. | 3/7/2008|MOGL | 512/560 | 5/699 |
| Clay | Teddie Howell | Jacob A. Warnock Inc. | 3/7/2008|MOGL | 512/812 | 5/701 |
| Clay | Freddie Bryan | Jacob A. Warnock Inc. | 3/7/2008|MOGL | 512/550 | 5/703 |
| Clay | Leevaughn McManus and Kathryn McManus | Jacob A. Warnock Inc. | 2/29/2008|MOGL | 811/680 | 8627661 |
| Jack and Clay | Beth Elaine Boyett | Jacob A. Warnock Inc. | 9/9/2008|MOGL | 518/337 | 8627857 |
| Jack and Clay | Sertsha Lynn Boyett | Jacob A. Warnock Inc. | 9/9/2008|MOGL | 518/337 | 8627657 |
| Jack and Clay | Leslie Ann Coates | Jacob A. Warnock Inc. | 7/14/2008|MOGL | 807/96 | 8627655 |
| Jack and Clay | Sonya Leaton Martin Morley | Jacob A. Warnock Inc. | 7/14/2008|MOGL | 807/94 | 8627659 |
| Jack and Clay | Leslie L. Leaton Jr. | Jacob A. Warnock Inc. | 9/4/2008|MOGL | 809/502 | 8627673 |

I, Glenda Henson, County Clerk, Montague County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on _____

Glenda Henson, County Clerk
By Deputy: _____


**VOL 585  PAGE 703**

| | | | | | |
|---|---|---|---|---|---|
| Jack and Clay | Everett Clear | Jacob A. Warnock Inc. | | 801/409 | 862/877 |
| Jack and Clay | Allyne Whatley | Jacob A. Warnock Inc. | 5/8/2008 MOGL | 801/404 | 862/881 |
| Jack and Clay | | | 5/8/2008 MOGL | | |
| Jack and Clay | Tiger Verdayne Reynolds AKA Tiger Veralene Leaton | Jacob A. Warnock Inc. | 9/2/2008 OGL | 812/441 | 862/885 |

FILED FOR RECORD: 9-14 20 11 AT 12:36 A.M. P.M.
RECORDED: 9-14 20 11 AT 5:00 P.M.
GLENDA HENSON, COUNTY CLERK, MONTAGUE COUNTY, TX.
VOLUME 585

I, Glenda Henson, County Clerk, Montague County
Texas, do hereby certify that this is a true and
correct copy as same appears of record in my office
Witness my hand and seal of office on 11-18-14

Glenda Henson, County Clerk
By Deputy 

EXHIBIT 3

CAUSE NO. *14-12-142*

| | | |
|---|---|---|
| U.S. ENERGY DEVELOPMENT CORPORATION, PLAINTIFF | § § § | IN THE DISTRICT COURT OF |
| | § | |
| V. | § § | JACK COUNTY, TEXAS |
| WBH ENERGY PARTNERS LLC, WBH ENERGY, LP AND WBH ENERGY GP, LLC, DEFENDANTS | § § § § § | 271ST JUDICIAL DISTRICT |

### PLAINTIFF'S ORIGINAL PETITION, APPLICATION FOR ANCILLARY INJUNCTIVE RELIEF AND REQUEST FOR DISCLOSURE

Plaintiff, U.S. Energy Development Corporation, files this original petition, application for ancillary injunctive relief and request for disclosure against Defendants, WBH Energy Partners LLC ("WBHEP"), WBH Energy, LP (WBHLP") and WBH Energy GP, LLC ("WBHGP"), and will show as follows:

### DISCOVERY CONTROL PLAN

1.      Plaintiff intends to conduct discovery under Level 2. This suit is not governed by the expedited-actions process in Texas Rule of Civil Procedure 169 because Plaintiff requests injunctive relief and seeks monetary relief over $100,000.

### PARTIES

2.      Plaintiff is a corporation organized and existing under the laws of the State of New York and registered to do business in Texas.

3.      Defendant WBH Energy Partners LLC is a Texas limited liability company that may be served with process by serving its registered agent, Joe Warnock, at its registered office, 4407 Bee Caves Road, Suite 421, Austin, Texas 78746.



FILED
_____ A.M. 3:00 P.M.

DEC 29 2014

TRACIE PIPPIN DIST. CLERK
JACK COUNTY, TEXAS
BY_____ DEPUTY

4.    Defendant WBH Energy, LP is a Texas limited partnership that may be served with process by serving its registered agent, Joe Warnock, at its registered office, 4407 Bee Caves Road, Suite 421, Austin, Texas 78746.

5.    Defendant WBH Energy GP, LLC is a Texas limited liability company that may be served with process by serving its registered agent, Joe Warnock, at its registered office, 4407 Bee Caves Road, Suite 421, Austin, Texas 78746. WBHGP is the general partner of WBHLP, a limited partnership, and is being sued as the general partner of the limited partnership.

## SUBJECT MATTER JURISDICTION

6.    The damages sought are within the jurisdictional limits of this Court.

## VENUE

7.    Venue is mandatory in Jack County under Tex. Civ. Prac. & Rem. Code 15.011 because this is a suit involving land lying partially in Jack County. Plaintiff seeks a determination of its right to operate oil and gas leases in the land, for injury to such interests in land and to foreclose on oil and gas interests in the land.

## FACTS

8.    Defendant WBHEP, as Operator, and Plaintiff and VW Ventures, LLC, as Non-Operators, executed a Joint Operating Agreement (the "JOA") dated September 1, 2011, covering several oil and gas leases (the "Leases") more particularly described in Exhibit A thereto, in Archer, Clay, Jack and Montague Counties. A Memorandum of the JOA was filed and recorded in the relevant County Clerks' records as follows:

    a.    Filed September 13, 2011, recorded in Volume 737, Page 269, Official Public Records, Archer County, Texas.

b.  Filed September 14, 2011, recorded in Volume 10, Page 92, Official Public Records, Clay County.

c.  Filed September 14, 2011, recorded in Volume 869, Page 70, Official Public Records, Jack County, Texas.

d.  Filed September 14, 2011, recorded in Volume 585, Page 689, Real Property Records, Montague County, Texas.

9.  VW Ventures, LLC and WBHEP subsequently assigned their interests in the Leases to WBHLP and Plaintiff.

10.  The JOA was amended by amendments dated effective September 1, 2011 and June 1, 2014.

11.  The JOA imposes the following duties on the Operator, among others:

a.  Article V.D.2:  Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to the JOA and shall charge each of the parties thereto with their respective proportionate shares.

b.  Article V.D.3:  Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from liens and encumbrances resulting therefrom except those resulting from a bona fide dispute as to services rendered or materials supplied.

c.  Article V.D.4:  Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations under the JOA or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B.  Operator's duty to account to the Non-Operators under this provision is expressly identified as fiduciary.

12.  WBHEP and Plaintiff entered into various Escrow Agreements to facilitate payment of Plaintiff's share of the expense of operations under the JOA.  Under these

agreements, Plaintiff would transfer "its proportionate share" necessary to drill or complete such wells to the escrow accounts, administered by Horizon Bank. Under par. 3(a)(ii) of the Escrow Agreements, upon the date any subject well had been drilled to total depth or casing point, WBHEP was required to provide the Bank written notice of such event, "together with the amount of funds to be distributed to Operator(which amount must be equal to the remaining funds allocated to drilling operations through the casing point of such Well)." The Escrow Agreements provide that the Bank would release the requested funds to WBHEP unless Plaintiff, within 2 business days of Plaintiff's receipt of such notice from WBHEP, delivered notice to the Bank, accompanied by reasonable supporting documentation and an affidavit, that WBHEP was then in material breach of the JOA or that WBHEP was withdrawing funds prematurely and without good reason.

13.     WBHEP submitted various notices to the Bank requesting disbursements from the accounts, representing that such disbursements were "to cover U.S. Energy Development Corporation's share of its obligations under" the JOA. WBHEP in fact used the funds to cover only a portion of Plaintiff's share of costs, but also its Non-Operator affiliate's share of certain costs. WBHEP failed to inform Plaintiff until recently that WBHEP was withdrawing funds from the escrow accounts to pay its affiliate's share.

14.     In October 2014 WBHEP advised Plaintiff that its Non-Operator affiliate, WBHLP, had been unable to obtain the last traunche of funding from its lender, CL III Funding Holding Company, LLC, because WBHLP was in default under it loan agreements. WBHEP advised Plaintiff that its Non-Operator affiliate would therefore be unable to pay its share of expenses, and that WBHEP consequently would not be able to perform its payment obligations

under Articles V.D.2 and V.D.3. Prior to this time, and while making false representations to the Bank and Plaintiff about the use of the funds to be withdrawn, WBHEP failed to disclose to Plaintiff that WBHEP was using Plaintiff's money to pay WBHEP's affiliate's share of costs.

15.     WBHEP has failed to provide Plaintiff documentation confirming that WBHEP gave its Non-Operator affiliate, WBHLP, notice of default for failing to pay its share of the cost of operations under the JOA.

16.     Various vendors that provided materials and labor or services for operations in the Contract Area as requested by WBHEP have threatened to file liens against the wells for which they provided materials, labor or services.  Some, in fact, have already filed lien affidavits claiming liens against Plaintiff's interests in leases and wells subject to the JOA.

17.     As a result of WBHEP's inability to obtain funds from its affiliate, it is unable to complete various wells drilled under the JOA to casing point.  The wells are therefore not producing.  Plaintiff believes that valuable production will be lost if the Court fails to grant the relief requested herein.

18.     Article V.B.1 of the JOA provides that "If Operator . . . is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor."

19.     Article V.B.3 of the JOA provides, "If Operator becomes insolvent, . . . it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor."

20.     The second paragraph of Article V.B.1 provides for an effective date for resignation, but includes an exception if "a successor Operator has been selected and assumes the

duties of Operator at an earlier date." In addition, the second paragraph of Article V.B.1 effective date is expressly made subject to Article VII.D.1, which provides, "If Operator is the party in default, the Non-Operators shall have . . . the right, by vote of Non-Operators owning a majority interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately."

21.     Article XVI.D of the JOA provides, "Notwithstanding anything to the contrary contained herein, including Article V.B, if at the time [WBHEP] first ceases to be Operator [Plaintiff] and its affiliates collectively own an undivided working interest in the Subject Leases that is not less than the interest in the Subject Leases as of the date hereof that [Plaintiff] owns as of the date hereof, [Plaintiff] shall have the sole and exclusive authority to select a successor Operator."

22.     Plaintiff and any affiliates have at all times since the date of the JOA collectively owned an undivided working interest in the Leases at least equal to their interest as of the date of the JOA.

23.     By letter dated November 20, 2014, Plaintiff notified WBHEP that under Articles V.B.1 and V.B.3 of the JOA, WBHEP was deemed to have resigned as operator and that Plaintiff had selected itself as the successor operator. In the letter Plaintiff demanded that WBHEP complete the forms to be filed with the Texas Railroad Commission changing the operator to Plaintiff, promptly deliver the items described in Article V.A.2. of the JOA, provide copies of any correspondence between WBHLP or its affiliates, and all partners or parties to the JOA, including but not limited to, correspondence relating to requests for funding for payment of costs associated with the JOA, provide as soon as possible any information or documentation related

to accounting under the Agreements, including but not limited to, demand letters, lien notices, and a breakdown of payments to vendors associated with the Agreements and how those payments were allocated to the parties to the Agreement. WBHEP has failed and refused to comply with these demands.

24. By letter dated November 21, 2014, WBHEP advised Plaintiff that WBHEP disputed it had resigned as Operator.

25. On December 9, 2014, Plaintiff notified WBHEP by email that WBHEP was in default under Articles V.D.2-4 of the JOA, and that under Article VII.D.1, it was replaced by Plaintiff.

26. Article V.B.2 of the JOA requires an operator that has been replaced to promptly deliver to its successor all records and data relating to the operations conducted by the former operator.

27. Article VII.B of the JOA grants Plaintiff a lien on Defendants' leasehold interests, working interests, operating rights, and overriding royalty interests and in the Contract Area and oil and gas produced therefrom, to secure the performance of all of their obligations under the JOA, "including but not limited to payment of expense, interests and fees, the proper disbursement of all monies paid [under the JOA], . . . and the proper performance of operations."

28. WBHEP has indicated that it may require Plaintiff to pay WBHEP's Non-Operator affiliate's share of costs.

29. While serving as operator under the JOA, WBHEP has drilled six wells that it has failed to complete. It has failed to complete the wells because it doesn't have enough money. Most or all of the oil and gas leases under which the wells were drilled have provisions that will

result in the termination of the leases if operations for completion are not commenced on or before January 18, 2015. Plaintiff has spent substantial sums in the drilling of these wells which, if not timely completed, will result in substantial financial losses to Plaintiff which cannot be recovered due to the insolvency of WBHEP. In particular, Plaintiff has made the following expenditures on wells that are at risk:

| Well Name | Pre-Paid Balance | Drilling Expense | Lease Operating Expense | Tangible | Total |
|---|---|---|---|---|---|
| Lewis Stuart B #1H | $124,417 | $778,322 | $63,640 | $185,950 | $1,152,329 |
| Lewis Stuart B #2H | $178,783 | $723,805 | $63,391 | $188,256 | $1,154,234 |
| Lewis Stuart E #1H | $254,115 | $686,841 | $176,518 | $184,088 | $1,301,562 |
| Lewis Stuart E #2H | $247,554 | $684,019 | $208,566 | $182,571 | $1,322,710 |
| Lewis Stuart F #3H | $163,517 | $734,668 | $23,377 | $179,913 | $1,101,475 |
| Lewis Stuart F #4H | $0 | $999,405 | $21,004 | $180,384 | $1,200,793 |
| | $968,386 | $4,607,060 | $556,496 | $1,101,161 | $7,233,103 |

30.    Plaintiff incorporates by reference in each count below all above allegations.

## BREACH OF CONTRACT

31.    Plaintiff and WBHEP executed a valid and enforceable written contract, the JOA. The JOA imposed various obligations on WBHEP which WBHEP failed to perform. WBHEP breached the JOA by:

    a.    failure to promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to the JOA;

    b.    failure to charge each of the parties thereto with their respective proportionate shares;

    c.    failure to pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof;

d.   Failure to keep the Contract Area free from liens and encumbrances resulting therefrom except those resulting from a bona fide dispute as to services rendered or materials supplied;

e.   failure to hold for Plaintiff's account funds Plaintiff advanced or paid to WBHEP, either for the conduct of operations under the JOA or as a result of the sale of production from the Contract Area; and

f.   failure to step down as operator.

32.   WBHEP's breach caused Plaintiff damages.

## COMMON LAW FRAUD BASED ON FALSE PROMISE

33.   WBHEP promised Plaintiff on several occasions that WBHEP's withdrawals from the Escrow Accounts were to pay Plaintiff's share of costs.   The representations were material. The representations were false. WBHEP made the representations knowing they were false.   WBHEP intended for Plaintiff to rely on the representations.   Plaintiff relied on the representations, resulting in injury to Plaintiff and causing it damages.

## COMMON LAW FRAUD

34.   WBHEP made material representations to Plaintiff which were false, including promises which WBHEP did not intend to keep.   WBHEP knew the representations were false when it made them, and it made them with the intent that Plaintiff would act and rely on them. WBHEP also failed to disclose facts which it had a duty to disclose to Plaintiff.   Plaintiff relied on these misrepresentations and nondisclosures to its detriment and as a result suffered substantial injury. This fraud was the proximate cause of damage to Plaintiff.

## BREACH OF FIDUCIARY DUTY

35.   Under Texas law, when one person delivers money to another for a specific purpose, the person accepting the money becomes a trustee and the transaction becomes a trust.

*See Mobil Oil Corp. v. Texas Commerce Bank-Airline*, 813 S.W.2d 607, 609 (Tex. App.—Houston [1st Dist.] 1991, no pet.). Plaintiff delivered money to WBHEP for a specific purpose, to pay Plaintiff's share of costs. WBHEP, however, used a substantial portion of Plaintiff's money for another purpose, to pay WBHEP's affiliate's share of costs.

36.     Moreover, the JOA imposes a fiduciary obligation on WBHEP with respect to Plaintiff's funds.

37.     WBHEP breached its fiduciary duties to Plaintiff, causing injury to Plaintiff and benefiting Defendants. The various conduct and transactions in breach of fiduciary duty were unfair and inequitable. Each of these breaches caused Plaintiff damages.

## CONSPIRACY

38.     Defendants combined for one or more unlawful purposes or to accomplish one or more lawful purposes by an unlawful means. They had a meeting of the minds on the object or course of action. One or more of them committed an unlawful overt act to further the object or course of action. Plaintiff suffered injury as a proximate result.

## SUIT FOR ACCOUNTING

39.     Plaintiff is entitled to an accounting from WBHEP for all monies received by WBHEP from Plaintiff.

## FORECLOSURE

40.     Plaintiff seeks an order that its liens against Defendants' interests in the Contract Area be foreclosed.

41. Defendants are in breach of obligations under the JOA. Those obligations are secured by a lien granted to Plaintiff by the JOA against Defendant's leasehold interests, working interests, operating rights.

42. On December 9, 2014, Plaintiff served on Defendants notices of default with respect to such obligations.

## CONSTRUCTIVE TRUST

43. WBHEP breached a special trust and fiduciary relationship and committed actual fraud and has thereby been unjustly enriched. WBHEP is therefore entitled to a constructive trust to avoid unjust enrichment.

## EXEMPLARY DAMAGES

44. Plaintiff's injuries resulted from the Defendants' fraud, which entitles Plaintiff to exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003(a).

## DECLARATORY JUDGMENT ACTION

45. Plaintiff seeks a judgment from the Court declaring that WBHEP is no longer the Operator under either JOA and that Plaintiff is the Operator under both JOAs, both effective November 20, 2014.

## ANCILLARY INJUNCTIVE RELIEF

46. Ancillary to Plaintiff's declaratory judgment action, Plaintiff is seeking a temporary restraining order, temporary injunction and permanent injunction. Plaintiff is entitled to such relief under both equitable principles and Tex. Civ. Prac. & Rem. Code § 65.011.

47. Plaintiff has a probable right to the relief it seeks in its petition against WBHEP. Plaintiff is likely to succeed on the merits of its claims. WBHEP has been insolvent at all times

relevant to this controversy; WBHEP has been unable to perform its duties as operator at all times relevant to this controversy; WBHEP is in default under various provisions of the JOA; WBHEP has misapplied funds that it held in trust for Plaintiff; WBHEP is deemed to have resigned as operator; Plaintiff had the sole right to appoint an operator to succeed WBHEP; Plaintiff had the right to replace WBHEP with itself effective immediately; and Plaintiff in fact replaced WBHEP with itself as operator effective November 20, 2014.

48.  If a temporary restraining order and temporary injunction are not granted, harm is imminent because WBHEP has already misapplied funds it holds in trust for Plaintiff. WBHEP has used Plaintiff's funds to satisfy its payment obligations in full under contracts with vendors even though WBHEP held Plaintiff's funds in trust for the payment of only Plaintiff's share of the vendor charges. Although Plaintiff is no longer releasing funds to WBHEP for payment of vendor invoices, since WBHEP is refusing to relinquish operatorship, it is still in control of, and able to receive, Plaintiff's share of certain production revenues. WBHEP's misapplication of Plaintiff's expense funds establishes the likelihood that WBHEP will also misapply Plaintiff's production revenues.

49.  Additional harm is imminent in that WBHEP has taken no action against its non-operator affiliate, WBHLP, to collect WBHLP's share of expenses or exercise the operator's remedies under the JOA against WBHLP. Taking the actions that WBHEP is unwilling to take against its affiliate are critical to seeing that vendors are paid and thereby avoiding the filing of additional oil and gas well liens against the wells and leases under the JOA.

50.     The injury will be irreparable. WBHEP owes the vendors a contractual obligation to pay them. They are entitled to be paid. Plaintiff cannot recover damages from WBHEP because WBHEP is insolvent.

51.     Irrespective of any remedy at law, irreparable injury to real property is threatened. *See* Tex. Civ. Prac. & Rem. Code § 65.011(5); *Tri-Star Petr. Co. v. Tipperary Corp.*, 101 S.W.3d 583, 591; (Tex. App.—El Paso 2003, pet. denied); *R & R Resources Corporation v. Echelon Oil & Gas, L.L.C.*, 2006 WL 66458 p. 7 (Tex. App.—Austin 2006, no pet.) (opinion not published). Plaintiff therefore need not demonstrate the lack of an adequate remedy at law.

52.     Unless WBHEP is restrained as applied for herein, Plaintiff will also suffer loss of goodwill and loss of business reputation as a result of vendors' claims of non-payment and assertion of lien rights as a matter of public record.

53.     WBHEP's practices have caused and will continue to cause non-payment of expenses; claims against Plaintiff by creditors; loss, interruption and/or delay in production of valuable minerals. These damages will continue to occur so long as WBHEP fails and refuses to relinquish operations.

54.     Ongoing and continuing harm from an operator's refusal to relinquish operations is a basis for injunctive relief. *Tri-Star Petr. Co.*, 101 S.W.3d at 591; *R & R Resources Corporation*, 2006 WL 66458 p. 7.

55.     There is not enough time to serve notice on WBHEP and hold a hearing on a temporary restraining order. As stated above, WBHEP has already misapplied funds it held in trust for Plaintiff and is in a position to do so again. Giving WBHEP notice of a hearing only gives it more time and reason to misappropriate Plaintiff's money. It is important to note here

that WBHEP did not give Plaintiff notice that its affiliate was insolvent and that Plaintiff's money was being used to pay the affiliate's bills until most of Plaintiff's expense money had disappeared.

56.     As stated above Plaintiff has spent $7,233,103 in drilling six wells which are presently at risk due to the insolvency of WBHEP. Many of the oil and gas leases under which the wells were drilled have provisions that will result in the termination of the leases if operations for completion are not commenced on or before January 18, 2015. A substantial amount of time and effort will be required as soon as possible to make the arrangements necessary for commencing such operations timely. Plaintiff therefore needs immediate relief, without the time it would take for a hearing and notice to WBHEP.

57.     Plaintiff is entitled to preservation of the status quo pending a trial on the merits. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). In *Tri-Star Petr. Co. v. Tipperary Corp.*, 101 S.W.3d 583, 588 (Tex. App.—El Paso 2003, pet. denied), the court examined the status quo of the parties at the time Tipperary filed its application for temporary injunction. The trial court found that Tipperary had a probable right to recover on its claims that Tri-Star had been properly removed as operator for failing and refusing to carry out its duties, Tipperary then became the duly elected successor operator, and that Tri-Star had failed to yield operations to Tipperary. The court found "the status quo between the parties consisted in non-operator working interest owners having the contractual ability under the JOA to follow the provision for removal and selection of successor as written, which Tri–Star now challenges as invalid and requiring judicial determination of cause for removal." Plaintiff's status quo is in all relevant aspects the same as Tipperary's.

58.     Plaintiff asks the court for a temporary restraining order and temporary injunction against WBHEP and its officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with them, prohibiting the following:

a.      refusing to join in the immediate execution and delivery of proper joint form P-4s designating Plaintiff as the operator under the JOA;

b.      interfering, opposing, preventing or refusing to cooperate with Plaintiff's efforts to file and obtain approval from the Texas Railroad Commission of joint form P-4s designating Plaintiff (for Commission purposes) as the operator under the JOA;

c.      further operating or performing operations under the JOA;

d.      interfering, opposing, preventing or refusing to cooperate with Plaintiff's operation of the Contract Area under the JOA;

e.      refusing to deliver to Plaintiff the well files, records, data, and all other documentation relating to previous operation under the JOA or necessary to continue such operations;

f.      withholding from Plaintiff, or denying Plaintiff access to, any property or records (including paper or tangible documents or files and electronic files) pertaining to the JOA;

g.      interfering with Plaintiff's efforts to have all payors of production proceeds from the Contract Area deliver such proceeds to Plaintiff;

h.      giving Horizon Bank or any other escrow agent notice or taking any other action to withdraw any funds from any of Plaintiff's escrow accounts related to the JOA; and

i.      damaging, destroying, tampering with, transferring or moving (except as required in the Court's order), hiding or secreting any property or records (including paper or tangible documents or files and electronic files), any text messages, computer files, faxes or other paper or electronic documents that relate to the JOA or operations thereunder;

and requiring that WBHEP do the following:

j.      deliver to Plaintiff all records and data relating to the operations conducted by the former operator within five (5) business days after service of the order or writ;

k. advise all parties paying production proceeds for the JOA Contract Area, no later than three (3) business days after service of the order or writ, to pay all such proceeds to Plaintiff;

l. deliver to Plaintiff a full accounting for all money received and expended by WBHEP in connection with operations under the JOA within ten (10) business days after service of the order or writ;

m. complete the forms to be filed with the Texas Railroad Commission changing the operator to Plaintiff and deliver them to Plaintiff no later than three (3) business days after the service of the order or writ; and

n. take such action as might be necessary to allow all payors of production proceeds for the Contract Area deliver all such proceeds to Plaintiff.

59. The requested injunctive relief is prohibitive in nature. While the relief requires WBHEP to take some affirmative action in allowing Plaintiff to assume operations, the action required on WBHEP's part is incidental to its non-interference with the successor operator's assumption of control in the interim. *Tipperary*, 101 S.W.3d at 592-93.

60. Plaintiff is willing to post a bond.

61. Plaintiff has not been guilty of unreasonable delay in pursuing this injunction.

62. At trial Plaintiff will seek the imposition of a permanent injunction against WBHEP.

## ATTORNEY FEES

63. Plaintiff is entitled to recover reasonable attorney fees under the provisions of a written contract as set out in Article VII.D.5 of the JOA and under the Declaratory Judgment Act.

## CONDITIONS PRECEDENT

64. All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

## RULE 47(C) COMPLIANCE

65.     Plaintiff seeks monetary relief of more than $1,000,000 and injunctive relief.

## RULE 193.7 NOTICE

66.     Plaintiff intends to use all documents produced in response to a written discovery request against the producing party in any pretrial proceeding or trial.

## REQUEST FOR DISCLOSURE

67.     Plaintiff requests that Defendants disclose, within 50 days after service hereof, the information described in Tex. R. Civ. P 194.2.

## PRAYER

68.     Plaintiff asks the Court to award Plaintiff judgment for the following:

a.     actual damages;

b.     an accounting;

c.     a constructive trust;

d.     exemplary damages;

e.     prejudgment and postjudgment interest;

f.     court costs;

g.     attorney fees;

h.     a decree that Plaintiff has a lien securing the foregoing in the property described herein;

i.     an order of sale and writ of possession for the properties subject to the lien directing that the proceeds of the sale be applied against such obligations;

j.     a declaration that Plaintiff is the Operator under the JOA effective November 20, 2014;

k.     a temporary restraining order;

l.   a temporary injunction;

m.   a permanent injunction; and

n.   all other relief to which Plaintiff is entitled.

Respectfully submitted,

LAW OFFICES OF M. STEVE SMITH

*Steve Smith* DS

M. Steve Smith
State Bar No. 18645650
1177 West Loop S., Suite 1100
Houston, Texas 77027
713-787-9901
713-963-9169 (fax)
mssmith@mstevesmith.com

SPILLER & SPILLER

*David Spiller*

David Spiller
State Bar No. 18934950
P.O. Box 447
122 E. Belknap
Jacksboro, Texas 76458
940-567-6644
940-567-3999 (fax)
david.spillerlaw@sbcglobal.net

ATTORNEYS FOR PLAINTIFF,
U.S. ENERGY DEVELOPMENT
CORPORATION

## VERIFICATION

STATE OF NEW YORK      §
                                §

COUNTY OF ERIE          §

      BEFORE ME, the undersigned Notary Public, on this day personally appeared Douglas K. Walch, who, being by me duly sworn on oath deposed and said that he is the President of U.S. Energy Development Corporation; that he has read the above Plaintiff's Original Petition, Application for Injunctive Relief and Requests for Disclosure; and that every statement of fact contained therein is within his personal knowledge and true and correct.

                                          Douglas K. Walch

      SUBSCRIBED AND SWORN TO BEFORE ME on the 22nd day of December, 2014, by Douglas K. Walch, to certify which witness my hand and official seal.

                                          Notary Public

P:\Clmatters\USEN01\002775\Court Papers - State\Petitionorig (141220mss Red).Doc

## VERIFICATION

STATE OF NEW YORK       §

                              §

COUNTY OF ERIE          §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Douglas K. Walch, who, being by me duly sworn on oath deposed and said that he is the President of U.S. Energy Development Corporation; that he has read the above Plaintiff's Original Petition, Application for Injunctive Relief and Requests for Disclosure; and that every statement of fact contained therein is within his personal knowledge and true and correct.

_____
Douglas K. Walch

SUBSCRIBED AND SWORN TO BEFORE ME on the 22nd day of December, 2014, by Douglas K. Walch, to certify which witness my hand and official seal.

_____
Notary Public

P:\C\matters\USEN01\002775\Court Papers - State\Petitionorig (141220mss Red).Doc

Michele Anne Witmer
Notary Public, State of New York
Qualified in Erie County
No. 01WI6136845
Commission Expires Nov 14, 20_17_

# EXHIBIT 4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **WBH Energy, LP,** | § | Case No. 15-10003 |
| **WBH Energy Partners LLC** | § | |
| **WBH Energy GP, LLC** | § | **Chapter 11** |
| | § | |
| Debtors. | § | *Jointly Administered* |
| | § | |
| | § | |
| **U.S. Energy Development Corporation,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 15-1006** |
| | § | |
| **WBH Energy, LP,** | § | |
| **WBH Energy Partners LLC** | § | |
| **WBH Energy GP, LLC** | § | |
| | § | |
| Defendants. | § | |

## WBH ENERGY PARTNERS LLC'S FIRST AMENDED COUNTERCLAIMS

WBH Energy Partners LLC ("Operator") as Counter-Plaintiff, files the following first amended counterclaims against Counter-Defendant U.S. Energy Development Corporation ("USED"), and would show the Court as follows:[1]

## PRELIMINARY STATEMENT

1.     USED seeks to avoid honoring its obligations under the JOA by improperly removing WBH Energy Partners LLC as Operator. Under Article VII.B of the JOA, upon demand by the Operator, USED *shall* pay any outstanding amounts owed to the Operator (which

---

[1] WBH Energy Partners LLC filed its initial counterclaim on January 30, 2015 as a part of Debtors' Answer to Original Complaint, Response to Application for Injunctive Relief, Affirmative Defenses, and Counterclaim. *See* Dkt. No. 26. Debtors' Answer to Original Complaint, Response to Application for Injunctive Relief, and Affirmative Defenses are not restated herein, remain in effect, and are not intended to be superseded by the filing of these amended counterclaims.

amounts would allow Operator to pay vendors in full) by any other non-operating party. WBH Energy, LP is a non-operating party that has failed to pay Operator approximately $11,400,000. In accordance with its rights under Article VII.B, Operator made demand on several occasions upon USED to pay the unpaid amount of $11,400,000. Rather than honor its contractual agreement under the JOA, USED refused to pay the $11,400,000 and sought to install itself as operator under the JOA. Presumably, if it gains operatorship, USED will not require itself to pay the $11,400,000 owed to vendors.

2.     USED states that "[Vendors] are entitled to be paid." (Complaint ¶ 38). Operator agrees and this is why Article VII.B of the JOA was created and why Operator has made demand on USED under that same Article. Yet USED refuses to pay as required and seeks to displace Operator to insure that USED will never have to pay. In short, USED's actions are a thinly veiled attempt by USED to enjoy the benefits of $11,400,000 of vendor materials and services without having to pay for them as it agreed it would under the JOA. Consequently, Operator has been forced to institute this action.

3.     Furthermore, payment of expenses incurred by Operator under the JOA for the benefit of the properties are due from non-operating parties to Operator within 15 days of receipt of a written statement per Exhibit C, Section 3.B for the JOA. USED has failed to timely pay Operator its portion of such expenses in the amount of approximately $2,500,000 that have been incurred under the JOA dating from March 2012 to present. Indeed, USED has acknowledged that it owes Operator approximately $1,900,000 in adversary proceeding 15-1010. These amounts are due and owing and USED's failure to pay is a breach of the JOA.

4.     On February 17, 2015, this Court entered an order granting USED's Application for a Preliminary Injunction Against Defendant WBH Energy Partners, LLC (Dkt. No. 26),

-2-

which had the general effect of deeming USED as the operator under the JOA on a preliminary basis. In so doing, the Court ordered USED to file "a written undertaking by which it . . . agrees to perform the obligations of the Operator under the JOA." (*Id.* at 4). Accordingly, USED filed a Notice of Agreement for Undertaking on February 20, 2014 in which it acknowledged and agreed "to perform the obligations of the Operator under the Joint Operating Agreement." (Dkt. No. 30).

5.       Despite this Court's preliminary injunction deeming USED as operator under the JOA and the Notice of Agreement for Undertaking filed with this Court, USED has refused and failed to perform the obligations of the operator under the JOA. In particular, USED has refused and failed to pay at least $13,896,087 owed to vendors that provided materials and labor or services for operations in the Contract Area and USED has refused and failed to keep the Contract Area free of liens.

## PARTIES

6.       Operator is a limited liability company organized and existing under the laws of the State of Texas.

7.       USED is a corporation organized and existing under the laws of the State of New York and registered to do business in Texas. USED may be served by serving its registered agent, M. Steve Smith, at its registered office, 1177 West Loop South, Suite 1100, Houston, TX 77027.

## JURISDICTION AND VENUE

8.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(b)(1) and 28 U.S.C. § 1334.

9.       This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1)(A) and (C).

-3-

10.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a) because the chapter 11 cases this proceeding arises in are pending in this district.

## BACKGROUND FACTS

11.     Operator, together with USED and VW Ventures, LLC, as Non-Operators, executed a Joint Operating Agreement (the "<u>JOA</u>", as attached hereto as **Exhibit A**) dated September 1, 2011. The JOA is incorporated into this countersuit as if fully restated herein.

12.     The JOA was amended by amendments dated effective September 1, 2011, and June 1, 2014.

13.     Article VII.B of the JOA provides, in part, that:

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties.

...

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interest in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expenses, interest and fees....

...

14.     Article VII.D of the JOA provides, in part, that:

If any party fails to discharge any financial obligations under this agreement, ... then in addition to the remedies provided in Article VII.B, or elsewhere in this agreement, the remedies specified below shall be applicable.

#4797129.8

15.     The rights under Article VII.D of the JOA include (a) suspension of rights, (b) suit of damages (at joint account expense), (c) deemed non-consent, (d) advance payment, and (e) costs and attorneys' fees.

16.     As of December 11, 2014, WBH Energy, LP had failed to pay its share of costs totaling approximately $11,397,377.00 within 120 days of rendition of a statement therefor by Operator.

17.     On October 30, 2014, Operator's management met with USED management at USED's offices in Buffalo, New York. At that meeting, Operator's management requested that USED pay the unpaid amount of WBH Energy, LP's costs in accordance with Article VII.B of the JOA. During a telephone call on November 7, 2014, Operator's management again requested that USED pay the unpaid amount of WBH Energy, LP's costs in accordance with Article VII.B of the JOA. Finally, on December 11, 2014, Operator's management again met with USED management at USED's offices in Buffalo, New York, and Operator again requested that USED pay the unpaid amount of WBH Energy, LP's costs in accordance with Article VII.B of the JOA.

18.     On or around November 26, 2014, USED informed Operator that USED would not fund its obligations as required under Article VII.B of the JOA.

19.     Article III of the JOA provides, in part, that "all costs and liabilities in operations under this agreement shall be borne and paid … by the parties as their interest are set forth in Exhibit 'A.'" USED has working interests ranging from 50% to 94.5% in the properties governed by the JOA.

20.     Exhibit C, Section 2 to the JOA provides, in part, that "Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month."

21.     Pursuant to Exhibit C, Section 3.B, "Each Non-Operator shall pay its proportionate share of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of 10% per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts."

22.     USED has failed to pay its proportionate share of all bills within 15 days of receipt of a joint interest billing. Specifically, USED owes the Debtor $2,498,710.57 plus interest for its proportionate share of bills from March 2012 to December 31, 2014.

23.     USED has previously admitted that it owes Operator $733,799.73 for the period from March 2012 to June 2013.

24.     Article XVI.G.1 of the JOA provides that:

> Notwithstanding anything herein to the contrary, Operator shall not be obligated to perform nor be liable for its failure to perform or to continue any work or incur any expenditure or indebtedness hereunder for the Joint Account until all funds requested of Non-Operators pursuant to cash calls given in accordance with the applicable provisions hereof have been received by Operator.

25.     As a result of USED failing to make its required payments under the JOA, Operator is unable to satisfy the costs and expenses it owes to vendors.

26.     As a result of USED failing to make its required payments under the JOA, Operator has suffered reputational damage and loss of goodwill.

27.     In addition, Operator has suffered damage and loss of goodwill due to USED's failure to perform the obligations of operator under the JOA. By virtue of USED's status as the deemed operator and as it agreed and acknowledged in the Notice of Agreement for Undertaking filed with this Court, USED must perform the obligations of operator under the JOA—at least

-6-

temporarily. Significantly, USED recognizes in its own Original Complaint (Dkt. No. 4 at 3) that the JOA imposes the following duties on the JOA operator:

(a) Article V.D.2: Operator shall promptly pay and discharge expenses incurred in the development and operator of the Contract Area pursuant to the JOA and shall charge each of the parties thereto with their respective proportionate shares.

(b) Article V.D.3: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from liens and encumbrances resulting therefrom except those resulting from a bona fide dispute as to services rendered or materials supplied.

28. USED, however, has failed to "promptly pay and discharge expenses incurred in the development and operation of the Contract area" totaling at least $13,896,087. As a result, various vendors have asserted lien rights on the Contract Area. Thus, in refusing to pay these amounts, USED also has failed to "keep the Contract Area free from liens and encumbrances resulting from non-payment" as it is required to do as the deemed operator under the JOA.

## CAUSES OF ACTION

### COUNT ONE: BREACH OF CONTRACT (NON-OPERATOR OBLIGATIONS)

29. The JOA is a valid, enforceable contract between the Operator and USED.

30. Operator is a party to the JOA and thus a proper party to sue for breach of contract.

31. Operator has performed or was excused under Article XVI.G of the JOA from performing its contractual obligations.

32. USED has breached the JOA by failing to pay the approximately $11,400,000 in costs pursuant to Article VII.B of the JOA after Operator requested USED make such payment.

-7-

#4797129.8

33.  USED has breached the JOA by failing to pay its share of costs after rendition of a statement therefore, totaling approximately $2,500,000, in compliance with Article III of the JOA, and Exhibit C, Section 3 of the JOA.

34.  As a result of USED failing to make its required payments under the JOA, Operator is damaged by being unable to satisfy the costs and expenses it owes to vendors.

35.  As a result of USED failing to make its required payments under the JOA, Operator has suffered reputational damage and loss of goodwill.

## II. COUNT TWO:  BREACH OF CONTRACT (OPERATOR OBLIGATIONS)

36.  Operator re-alleges and incorporates by reference each of the preceding paragraphs.

37.  USED has breached the JOA while acting as operator by failing to promptly pay and discharge expenses incurred in the development and operation of the Contract area, totaling at least $13,896,087, in violation of Article V.D.2 of the JOA.

38.  USED has breached the JOA while acting as operator by failing to pay, or causing to be paid, as and when they become due and payable, all accounts of contractors and suppliers for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area, totaling at least $13,896,087, in violation of Article V.D.3 of the JOA.

39.  USED has breached the JOA while acting as operator by failing to keep the Contract Area free from liens and encumbrances in violation of Article V.D.3 of the JOA.

40.  As a result of USED's breach of Articles V.D.2 and V.D.3, Operator has suffered damage, including, for example, reputational damage and loss of goodwill as a result of the assertion of lien rights by unpaid vendors, which is a matter of public record.

### III. COUNT THREE: VIOLATION OF AGREEMENT FOR UNDERTAKING

41.    Operator re-alleges and incorporates by reference each of the preceding paragraphs.

42.    Pursuant to this Court's February 17, 2015 order, USED was ordered to file a written undertaking by which it "agrees to perform the obligations of the Operator under the JOA."

43.    On February 20, 2015, USED filed a Notice of Agreement for Undertaking where it acknowledged and agreed "to perform the obligations of the Operator under the Joint Operating Agreement."

44.    USED, however, has refused to pay vendors, which is an obligation of the operator under the JOA.  In so refusing, USED has directly violated its Agreement for Undertaking, which was executed by counsel for USED and filed with this Court in response to an order of this Court.

45.    In addition, USED has refused to keep the Contract Area free from liens and encumbrances, which is an obligation of the operator under the JOA.  In so refusing, USED has directly violated its Agreement for Undertaking, which was executed by counsel for USED and filed with this Court in response to an order of this Court.

46.    As a result, Operator has suffered damage, including, for example, reputational damage and loss of goodwill as a result of the assertion of lien rights by unpaid vendors, which is a matter of public record.

### COUNT FOUR: COSTS AND ATTORNEYS' FEES

47.    Debtor is entitled to recover all court costs, costs of collection, and reasonable attorney fees under the provisions of a written contract as set out in Article VIII.D.5 of the JOA.

#4797129.8

WHEREFORE, Operator requests that the Court award it a judgment against USED for the following:

(a)    the sum of $11,397,377 plus interest;

(b)    the sum of $2,498,710.57 plus interest;

(c)    a lien and security interest pursuant to Article VII.B of the JOA in all interests that USED now owns or hereafter acquires in the oil and gas leases and interests subject to the JOA until the amounts owing under the JOA plus interest are satisfied in full;

(d)    the suspension of all rights of USED under the JOA pursuant to Article VII.D of the JOA until the amounts owing under the JOA plus interest are satisfied in full;

(e)    an order requiring USED to comply with its obligations as operator, including those under Articles V.D.2 and V.D.3 of the JOA, while it is the deemed operator in accordance with this Court's preliminary injunction order;

(f)    an order requiring USED to comply with its agreement in the Notice of Agreement for Undertaking to perform the obligations of the operator under the JOA;

(g)    an order requiring USED to promptly pay and discharge all expenses incurred in the development and operation of the Contract area, including at least $13,896,087 currently outstanding;

(h)    court costs;

(i)    attorneys' fees; and

(j)    all other relief for the Operator that the Court deems just.

#4797129.8

Respectfully submitted,

**BRACEWELL & GIULIANI LLP**

By: */s/ William A. (Trey) Wood III*
    William A. (Trey) Wood III
    Texas Bar No. 21916050
    Trey.Wood@bgllp.com
    Jason G. Cohen
    Texas Bar No. 24050435
    Jason.Cohen@bgllp.com
    David Morris
    Texas Bar No. 24046481
    David.Morris@bgllp.com
    711 Louisiana, Suite 2300
    Houston, Texas 77002
    Telephone: (713) 223-2300
    Facsimile: (713) 221-1212

**PROPOSED COUNSEL FOR THE DEBTORS AND DEBTORS IN POSSESSION**

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2015, a true and correct copy of this pleading was served by the Court's ECF notification system on the parties registered to receive such notice.

By: */s/ Jason G. Cohen*
    Jason G. Cohen

EXHIBIT A (the JOA) HAS BEEN
REMOVED TO REDUCE FILE SIZE

EXHIBIT 5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| WBH Energy, LP, | § | Case No. 15-10003 |
| WBH Energy Partners LLC | § | |
| WBH Energy GP, LLC | § | Chapter 11 |
| | § | |
| Debtors. | § | *Jointly Administered* |
| | § | |
| U.S. Energy Development Corporation, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 15-1006 |
| | § | |
| WBH Energy, LP, | § | |
| WBH Energy Partners LLC | § | |
| WBH Energy GP, LLC | § | |
| | § | |
| Defendants. | § | |

## WBH ENERGY, LP'S MOTION TO INTERVENE

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-FOUR DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

WBH Energy, LP ("Debtor LP"), by and through its undersigned counsel, hereby files this motion to intervene in Adversary No. 15-1006. In support thereof, Debtor LP represents as follows:

#4877417.2

## I. JURISDICTION

1.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory basis for the relief sought in this Motion is Federal Rule of Civil Procedure 24, as made applicable by Federal Rule of Bankruptcy Procedure 7024.

## II. RELEVANT BACKGROUND

2.    WBH Energy Partners LLC (as operator), and U.S. Energy Development Corporation ("USED") and VW Ventures, LLC (as non-operators) executed a Joint Operating Agreement (the "JOA"), dated September 1, 2011, covering several oil and gas leases in Archer, Clay, Jack, and Montague Counties (the "Contract Area"). The JOA was amended by amendments dated effective September 1, 2011 and June 1, 2014.

3.    VW Ventures, LLC and WBH Energy Partners LLC subsequently assigned their interests to the leases in the Contract Area to Debtor LP and USED. By virtue of this assignment, Debtor LP currently is a non-operating working interest owner in the Contract Area leases. As a non-operating working interest owner, Debtor LP has a property interest in the Contract Area wells and generally is entitled to participate in profits from these wells.

4.    On February 17, 2015, this Court entered an order granting USED's Application for a Preliminary Injunction Against Defendant WBH Energy Partners, LLC (Dkt. No. 26), which had the general effect of deeming USED as the operator under the JOA on a preliminary basis. In so doing, the Court ordered USED to file "a written undertaking by which it . . . agrees to perform the obligations of the Operator under the JOA." (*Id.* at 4). Accordingly, USED filed a Notice of Agreement for Undertaking on February 20, 2014. (Dkt. No. 30). The Notice stated that USED "hereby acknowledges and agrees (1) to perform the obligations of the Operator under the Joint Operating Agreement." (*Id.* at 1).

-2-

#4877417.2

5.      The Joint Operating Agreement ("JOA") imposes, among other things, the following duties on the JOA operator:

(a)     Article V.D.2: Operator shall promptly pay and discharge expenses incurred in the development and operator of the Contract Area pursuant to the JOA and shall charge each of the parties thereto with their respective proportionate shares.

(b)     Article V.D.3: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from liens and encumbrances resulting therefrom except those resulting from a bona fide dispute as to services rendered or materials supplied.

6.      Despite this Court's preliminary injunction deeming USED the operator under the JOA and the Notice of Agreement for Undertaking filed with this Court, USED has refused and failed to perform the above-described obligations of the operator under the JOA. In particular, USED has refused and failed to pay at least $13,896,087 owed to vendors that provided materials and labor or services for operations in the Contract Area.

7.      As a result of USED's failure to meet its payment obligations under the JOA, many vendors claim or continue to claim liens against the wells for which they provided materials, labor, or services. In addition, many vendors already have filed lien affidavits claiming liens against Debtor LP's interests in the leases and wells subject to the JOA. Accordingly, USED has also failed to keep the Contract Area free of liens and encumbrances as it is required to do as the deemed operator under the JOA. As a result of USED's failure to satisfy its obligations as the deemed operator under the JOA, Debtor LP has suffered damages, including, for example, reputational damage and loss of goodwill as a result of the assertion of lien rights by unpaid vendors, which is a matter of public record.

#4877417.2

### III. <u>REQUEST FOR RELIEF AND BASIS THEREFOR</u>

8.     Debtor LP requests that it be permitted to intervene in this adversary proceeding as a matter of right pursuant to Federal Rule of Civil Procedure 24(a)(2), or, alternatively, by permission pursuant to Federal Rule of Civil Procedure 24(b)(1)(B).

**A.     Debtor LP May Intervene As A Matter Of Right.**

9.     Under Federal Rule of Civil Procedure 24(a)(2), intervention as a matter of right is permitted when a party makes a timely motion and

> claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2).  This rule is intended to prevent multiple lawsuits where common questions of law or fact are involved. *See Deus v. Allstate Ins. Co.*, 15 F.3d 506, 525 (5th Cir. 1994).  Importantly, courts generally construe this rule broadly in favor of intervenors. *See, e.g., John Doe No. 1 v. Glickman*, 256 F.3d 371, 375 (5th Cir. 2001) (recognizing that intervention should be allowed when no one would be hurt and greater justice can be obtained).

*(i)     Debtor LP's Motion Is Timely.*

10.     When considering timeliness, courts evaluate (1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness. *See United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994).

11.     In this case, Debtor LP's Motion is timely.  The Court deemed USED to be the operator (albeit preliminarily) on February 17, 2015.  (Dkt. No. 26).  And it has only recently become fully apparent that USED has refused, and continues to refuse, to pay outstanding

-4-

amounts owed to vendors servicing wells on the Contract Area. There is no prejudice to the existing parties resulting from any delay. Debtor LP, however, will be severely prejudiced if its Motion is denied because it will be unable to ensure that its non-operating working interests in the Contract Area leases are fully protected.

> (ii)    *Debtor LP Has Interests In The Contract Area Leases That Are The Subject of This Adversary Proceeding.*

12.    As described above, Debtor LP holds a non-operating working interest in the leases in the Contract Area governed by the JOA. As a working interest owner, Debtor LP is entitled to share in the profits of wells drilled on leases within the Contract Area, and accordingly, it has a direct and substantial interest in ensuring that USED—the deemed operator—makes vendor payments as it is required to do as the operator under the JOA. Similarly, Debtor LP has a direct and substantial interest in ensuring that its working interests are not compromised or devalued by liens placed on wells within the Contract Area by unpaid vendors.

> (iii)    *Disposition Of This Adversary Proceeding Will Impede Or Impair Debtor LP's Rights, Which Are Not Adequately Represented.*

13.    Disposing of this adversary proceeding—particularly in any way that does not require USED to make payments to vendors and require USED to prevent liens and encumbrances on the Contract Area—will impair and impede Debtor LP's interests in the Contract Area. Given that no party in this proceeding adequately represents Debtor LP's interest, the risk to Debtor LP is substantial.

14.    Notably, the burden to demonstrate inadequacy of representation is minimal. *See Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). Here, Debtor LP is situated differently than the other parties. Although WBH Energy Partners LLC ("Debtor LLC") shares many of the same criticisms of USED, Debtor LLC is not a working interest owner in the

-5-

#4877417.2

leases in the Contract Area. As a party without a working interest in the Contract Area, Debtor LLC cannot adequately represent Debtor LP's significant working interest in the Contract Area leases.

15.    Moreover, Debtor LP's interests certainly are not adequately represented by USED, which is adverse to Debtor LP in practically every way. Debtor LP's position is that USED, as acting operator, is required to pay vendors and ensure that the Contract Area remains free from liens. USED's actions, however, prove that it holds the opposite opinion. Accordingly, there is no question that USED cannot adequately represent Debtor LP's working interest in the Contract area leases. Accordingly, Debtor LP is entitled to intervene as of right.

**B.     Debtor LP Should Be Allowed Permissive Intervention.**

16.    In the alternative, Debtor LP should be allowed to intervene in this adversary proceeding pursuant to Federal Rule of Civil Procedure 24(b)(1), which provides, in relevant part, that a party may intervene in a timely manner if such party "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1).

17.    As described above in paragraphs 10 and 11, this Motion is timely filed. In addition, Debtor LP's claims against USED concern whether the operator under the JOA (including USED as the deemed operator pursuant to this Court's preliminary injunction order) is required to (i) pay vendors and (ii) ensure that the Contract Area is free from liens and encumbrances. These are issues that are before this Court in the adversary proceeding. Debtor LP's complaint in intervention, therefore, shares both common questions of law and fact with the adversary proceeding. Accordingly, Debtor LP should be granted permission to intervene even if the Court were to find that Debtor LP is not entitled to intervene as a matter of right.

#4877417.2

## IV. CONCLUSION

18.     In accordance with Federal Rule of Civil Procedure 24(c), attached to this Motion as **Exhibit A** is Debtor LP's Original Complaint In Intervention, which "sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c).

WHEREFORE, premises considered, Debtor LP requests that this Court enter an order granting Debtor LP the right to intervene in this adversary proceeding and, further, granting Debtor LP such other relief as the Court deems just.

Respectfully submitted,

**BRACEWELL & GIULIANI LLP**

By: */s/ William A. (Trey) Wood III*
      William A. (Trey) Wood III
      Texas Bar No. 21916050
      Trey.Wood@bgllp.com
      Jason G. Cohen
      Texas Bar No. 24050435
      Jason.Cohen@bgllp.com
      David Morris
      Texas Bar No. 24046481
      David.Morris@bgllp.com
      711 Louisiana, Suite 2300
      Houston, Texas 77002
      Telephone: (713) 223-2300
      Facsimile: (713) 221-1212

**COUNSEL FOR WBH ENERGY, LP**

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **WBH Energy, LP,** | § | Case No. 15-10003 |
| **WBH Energy Partners LLC** | § | |
| **WBH Energy GP, LLC** | § | Chapter 11 |
| | § | |
| Debtors. | § | *Jointly Administered* |

| | | |
|---|---|---|
| | § | |
| **U.S. Energy Development Corporation,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 15-1006 |
| | § | |
| **WBH Energy, LP,** | § | |
| **WBH Energy Partners LLC** | § | |
| **WBH Energy GP, LLC** | § | |
| | § | |
| Defendants. | § | |

## WBH ENERGY, LP'S ORIGINAL COMPLAINT IN INTERVENTION

Intervenor, WBH Energy, LP ("Debtor LP"), files this Original Complaint In Intervention against U.S. Energy Development Corporation ("USED") as authorized by Federal Rule of Civil Procedure 24 and Bankruptcy Rule 7024, and would respectfully show as follows:

### PRELIMINARY STATEMENT

1.     On February 17, 2015, this Court entered an order granting USED's Application for a Preliminary Injunction Against Defendant WBH Energy Partners, LLC (Dkt. No. 26), which had the general effect of deeming USED as the operator under the JOA on a preliminary basis. In so doing, the Court ordered USED to file "a written undertaking by which it . . . agrees to perform the obligations of the Operator under the JOA." (*Id.* at 4). Accordingly, USED filed

a Notice of Agreement for Undertaking on February 20, 2014 in which it acknowledged and agreed "to perform the obligations of the Operator under the Joint Operating Agreement." (Dkt. No. 30).

2.     Despite this Court's preliminary injunction deeming USED as the operator under the JOA and the Notice of Agreement for Undertaking filed with this Court, USED has refused and failed to perform the obligations of the operator under the JOA.  In particular, USED has refused and failed to pay at least $13,896,087 owed to vendors that provided materials and labor or services for operations in the Contract Area, and USED has refused and failed to keep the Contract Area free of liens, each failure to the detriment of Debtor LP.

## PARTIES

3.     Intervenor Debtor LP is a Texas limited partnership organized and existing under the laws of the State of Texas.

4.     USED is a corporation organized and existing under the laws of the State of New York and registered to do business in Texas.  USED may be served by serving its registered agent, M. Steve Smith, at its registered office, 1177 West Loop South, Suite 1100, Houston, TX 77027.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(b)(1) and 28 U.S.C. § 1334.

6.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1)(A) and (C).

7.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a) because the chapter 11 cases this proceeding arises in are pending in this district.

-2-

#4877593.1

## BACKGROUND FACTS

8.     WBH Energy Partners LLC (as operator), and U.S. Energy Development Corporation ("USED") and VW Ventures, LLC (as non-operators), executed a Joint Operating Agreement (the "JOA"), dated September 1, 2011, covering several oil and gas leases in Archer, Clay, Jack, and Montague Counties (the "Contract Area").   The JOA is attached hereto as **Exhibit A** and is incorporated into this suit in intervention by reference as if fully restated herein.

9.     VW Ventures, LLC and WBH Energy Partners LLC subsequently assigned their interests to the leases in the Contract Area to Debtor LP and USED.   By virtue of this assignment, Debtor LP currently is a non-operating working interest owner in the Contract Area leases.   As a non-operating working interest owner, Debtor LP has a property interest in the Contract Area wells and generally is entitled to participate in profits from these wells.

10.     On February 17, 2015, this Court entered an order granting USED's Application for a Preliminary Injunction Against Defendant WBH Energy Partners, LLC (Dkt. No. 26), which had the general effect of deeming USED the operator under the JOA on a preliminary basis.   In so doing, the Court ordered USED to file "a written undertaking by which it . . . agrees to perform the obligations of the Operator under the JOA." (*Id.* at 4).   Accordingly, USED filed a Notice of Agreement for Undertaking on February 20, 2014. (Dkt. No. 30).   The Notice stated that USED "hereby acknowledges and agrees (1) to perform the obligations of the Operator under the Joint Operating Agreement." (*Id.* at 1).

11.     The Joint Operating Agreement ("JOA") imposes, among other things, the following duties on the JOA operator:

#4877593.1

(a)     Article V.D.2: Operator shall promptly pay and discharge expenses incurred in the development and operator of the Contract Area pursuant to the JOA and shall charge each of the parties thereto with their respective proportionate shares.

(b)     Article V.D.3: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from liens and encumbrances resulting therefrom except those resulting from a bona fide dispute as to services rendered or materials supplied.

12.     Despite this Court's preliminary injunction deeming USED operator under the JOA and the Notice of Agreement for Undertaking filed with this Court, USED has refused and failed to perform the above-described obligations of the operator under the JOA. In particular, USED has refused and failed to pay at least $13,896,087 owed to vendors that provided materials and labor or services for operations in the Contract Area.

13.     7.     As a result of USED's failure to meet its payment obligations under the JOA, many vendors claim or continue to claim liens against the wells for which they provided materials, labor, or services. In addition, many vendors already have filed lien affidavits claiming liens against Debtor LP's interests in the leases and wells subject to the JOA. Accordingly, USED has also failed to keep the Contract Area free of liens and encumbrances as it is required to do as the deemed operator under the JOA. As a result of USED's failure to satisfy its obligations as the deemed operator under the JOA, Debtor LP has suffered damage, including, for example, reputational damage and loss of goodwill as a result of the assertion of lien rights by unpaid vendors, which is a matter of public record.

14.     Notably, USED's obligation—as the deemed operator—to pay expenses is not excused even though Debtor LP has not paid to the operator all of its pro-rata share of expenses incurred in operating the leases in the Contract Area. Indeed, the JOA explicitly recognizes the potentiality that a non-operating working interest owner might fail to make payments, and in that

-4-

#4877593.1

event, the JOA permits the operator to either pay all of the expenses itself or to require the other non-operating working interest owners to contribute their pro-rata share of the unpaid amounts. The appropriate remedy against the non-paying working interest owner is execution on the lien it granted to the other JOA parties on all interests in the Contract Area.

15.　　Specifically, Article VII.B. of the JOA provides, in part, that:

> If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties.
>
> ...
>
> Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interest in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expenses, interest and fees....

16.　　In addition, under Article VII.D of the JOA, the non-paying party can face suspension of rights under the JOA and a suit for damages, can be deemed a non-consenting party, and can be required to pay for future expenses in advance of procuring vendor services. In no event, however can the operator just refuse to pay vendors. Doing so is a violation of the operator's obligations under the JOA.

## CAUSES OF ACTION

## I. COUNT ONE: BREACH OF CONTRACT

17.　　Debtor LP re-alleges and incorporates by reference each of the preceding paragraphs.

18.　　The JOA is a valid, enforceable contract between USED (as the deemed operator) and Debtor LP (as a non-operating working interest owner).

-5-

#4877593.1

19.     By virtue of assignment of interests in leases in the Contract Area, Debtor LP is a party to the JOA and thus a proper party to sue for breach of contract.

20.     Although Debtor LP has not paid to the operator all of its pro-rata share of expenses incurred in operating the leases in the Contract Area, USED is not excused from making vendor payments and ensuring that the Contract Area is free from liens and encumbrances in accordance with its duties under the JOA. Debtor LP's payment of its share of expenses, therefore, is not a condition precedent to enforcing USED's obligations—as deemed operator—under the JOA.

21.     USED has breached the JOA while acting as operator by failing to promptly pay and discharge expenses incurred in the development and operation of the Contract area, totaling at least $13,896,087, in violation of Article V.D.2 of the JOA.

22.     USED has breached the JOA while acting as operator by failing to pay, or causing to be paid, as and when they become due and payable, all accounts of contractors and suppliers for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area, totaling at least $13,896,087, in violation of Article V.D.3 of the JOA.

23.     USED has breached the JOA while acting as operator by failing to keep the Contract Area free from liens and encumbrances in violation of Article V.D.3 of the JOA.

24.     As a result of USED's breach of Articles V.D.2 and V.D.3, Debtor LP has suffered damage, including, for example, reputational damage and loss of goodwill as a result of the assertion of lien rights by unpaid vendors, which is a matter of public record.

## II. COUNT TWO: VIOLATION OF AGREEMENT FOR UNDERTAKING

25.     Debtor LP re-alleges and incorporates by reference each of the preceding paragraphs.

26.     Pursuant to this Court's February 17, 2015 order, USED was ordered to file a written undertaking by which it "agrees to perform the obligations of the Operator under the JOA."

27.     On February 20, 2015, USED filed a Notice of Agreement for Undertaking where it acknowledged and agreed "to perform the obligations of the Operator under the Joint Operating Agreement."

28.     USED, however, has refused to pay vendors, which is an obligation of the operator under the JOA.  In so refusing, USED has directly violated its Agreement for Undertaking, which was executed by counsel for USED and filed with this Court in response to an order of this Court.

29.     In addition, USED has refused to keep the Contract Area free from liens and encumbrances, which is an obligation of the operator under the JOA.  In so refusing, USED has directly violated its Agreement for Undertaking, which was executed by counsel for USED and filed with this Court in response to an order of this Court.

30.     As a result, Debtor LP has suffered damage, including, for example, reputational damage and loss of goodwill as a result of the assertion of lien rights by unpaid vendors, which is a matter of public record.

### III. COUNT THREE: COSTS AND ATTORNEYS' FEES

31.     Debtor is entitled to recover all court costs, costs of collection, and reasonable attorney fees under the provisions of a written contract as set out in Article VIII.D.5 of the JOA.

WHEREFORE, Operator requests that the Court award it a judgment against USED for the following:

        (a)     an order requiring USED to comply with its obligations as operator, including those under Articles V.D.2 and V.D.3 of the JOA, while it is the

deemed operator in accordance with this Court's preliminary injunction order;

(b) an order requiring USED to comply with its agreement in the Notice of Agreement for Undertaking to perform the obligations of the operator under the JOA;

(c) an order requiring USED to promptly pay and discharge all expenses incurred in the development and operation of the Contract area, including at least $13,896,087 currently outstanding;

(d) court costs;

(e) attorneys' fees; and

(f) all other relief for the Operator that the Court deems just.

Respectfully submitted,

**BRACEWELL & GIULIANI LLP**

By: _/s/ William A. (Trey) Wood III_
       William A. (Trey) Wood III
       Texas Bar No. 21916050
       Trey.Wood@bgllp.com
       Jason G. Cohen
       Texas Bar No. 24050435
       Jason.Cohen@bgllp.com
       David Morris
       Texas Bar No. 24046481
       David.Morris@bgllp.com
       711 Louisiana, Suite 2300
       Houston, Texas 77002
       Telephone: (713) 223-2300
       Facsimile: (713) 221-1212

**COUNSEL FOR WBH ENERGY LP**

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2015, a true and correct copy of this pleading was served by the Court's ECF notification system on the parties registered to receive such notice.

By: /s/ Jason G. Cohen
Jason G. Cohen

-9-

# EXHIBIT A

EXHIBIT A (THE JOA) HAS BEEN REMOVED TO REDUCE FILE SIZE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **WBH Energy, LP,** | § | **Case No. 15-10003** |
| **WBH Energy Partners LLC** | § | |
| **WBH Energy GP, LLC** | § | **Chapter 11** |
| | § | |
| Debtors. | § | *Jointly Administered* |
| | § | |
| **U.S. Energy Development Corporation,** | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 15-1006** |
| | § | |
| **WBH Energy, LP,** | § | |
| **WBH Energy Partners LLC** | § | |
| **WBH Energy GP, LLC** | § | |
| | § | |
| Defendants. | § | |

#4877589.1

### ORDER GRANTING WBH ENERGY, LP'S MOTION TO INTERVENE

The Court, having considered WBH Energy, LP's ("Debtor LP") Motion To Intervene

(the "Motion"), has determined that Debtor LP is entitled to intervene in this proceeding and that

the Motion should be GRANTED. Therefore,

IT IS ORDERED that Debtor LP is authorized to intervene in this adversary proceeding;

IT IS FURTHER ORDERED that the Original Complaint in Intervention of Debtor LP

shall be filed within three (3) business days of the entry of this Order;


### ###


**BRACEWELL & GIULIANI LLP**

By: */s/ William A (Trey) Wood III*
      William A. (Trey) Wood III
      Texas Bar No. 21916050
      Trey.Wood@bgllp.com
      Jason G. Cohen
      Texas Bar No. 24050435
      Jason.Cohen@bgllp.com
      711 Louisiana, Suite 2300
      Houston, Texas 77002
      Telephone: (713) 223-2300
      Facsimile: (713) 221-1212

**COUNSEL FOR WBH ENERGY LP**

#4877589.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 27, 2015, a true and correct copy of this pleading was served (1) by the Court's ECF notification system on the parties registered to receive such notice and (2) by electronic mail to the following:

Eric Taube
Mark Curtis Taylor
Hohman, Taube & Summers, LLP
100 Congress Avenue, Suite 1800
Austin, TX 78701
erict@hts-law.com
markt@hts-law.com

By: */s/ Jason G. Cohen*
Jason G. Cohen

# EXHIBIT 6

# ESCROW AGREEMENT

### among

## WBH ENERGY PARTNERS LLC, as Operator

## U.S. ENERGY DEVELOPMENT CORPORATION, as USED

### and

## HORIZON BANK, as Escrow Agent

### Dated as of October 25, 2013

### (DRILLING ESCROW #3)



EXHIBIT ___ 3
WIT: Warnock
DATE: 1-27-15
Heidi Morrison, CSR, RPR

This **ESCROW AGREEMENT** (this "Agreement"), dated as of October 25, 2013, by and among WBH Energy Partners LLC, a Texas limited liability company (the "Operator"), U.S. Energy Development Corporation, a New York corporation ("USED"), and Horizon Bank, a national banking association organized and existing under the laws of the United States of America ("Horizon") and acting solely in its capacity as escrow agent under this Agreement, and any successors appointed pursuant to the terms hereof (Horizon in such capacity, the "Escrow Agent").  Operator and USED are sometimes collectively referred to herein as the "Interested Parties".

**WHEREAS**, the Interested Parties and their respective Affiliates own interests in certain oil and gas properties that are subject to joint operating agreements with respect to which Operator is the "Operator" thereunder (the "Properties"), and this Agreement shall apply to the following oil and gas wells that are drilled on the Properties: (i) Lewis Stuart A Unit, Wells 1, 2, and 3, (ii) McCall Unit, Wells 1 and 2; (iii) Hayes Unit, Wells 1 and 2, (iv) Lewis Stuart C Unit, Wells 1 and 2; and (v) Browning Trust Unit, Wells 1 and 2 (collectively, the "Wells");

**WHEREAS**, Operator and USED have agreed to establish an escrow account to facilitate the transfer of funds from USED to Operator for certain operating, drilling and development costs, such funds to be held and released by Escrow Agent in accordance with the terms of this Agreement (the "Escrow Account").

**WHEREAS**, the parties hereto intend that this Agreement set forth the rights and obligations of the parties hereto with respect to an escrow arrangement for certain operating, drilling and development costs incurred in connection with the development of the Properties.

**WHEREAS**, the Interested Parties wish to appoint Horizon as Escrow Agent and Horizon is willing to accept such appointment and to act as Escrow Agent, in each case upon the terms and conditions of this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the parties hereto agree as follows:

1.     **Definitions**.

"Affiliate" means, with respect to any Person, a Person that directly or indirectly controls, is controlled by, or is under common control with such Person, with control in such context meaning the ability to direct the management or policies of a Person through ownership of voting shares or other securities, pursuant to a written agreement, or otherwise.

"Business Day" means any day that the Escrow Agent is open for business.

"Operator Account" means the bank account specified by Operator on Operator's signature page hereto.

"Person" means, any individual, corporation, partnership, joint venture, limited liability company, trust, unincorporated organization, other entity or governmental entity.

#4390704.3

2. **Deposit of Escrow Deposit or Property**.

      (a)   *Drilling Costs – Generally.*  Operator shall from time to time in accordance with the terms of any joint operating agreement which both Operator (or any of its Affiliates) on the one hand and USED (or any of its Affiliates) on the other hand are a party as of the date hereof (each a "Joint Operating Agreement" and collectively referred to as the "Joint Operating Agreements"), request that USED contribute its (or its Affiliate's) share of costs associated with a proposed drilling or completion operation with respect to any of the Wells, pursuant to an Authority For Expenditure (an "AFE"). USED shall, after receipt of an AFE from Operator, and upon fifteen (15) days prior written notice that Operator is prepared to commence such drilling operations, or upon fifteen (15) days prior written notice that Operator is prepared to commence such completion operations, contribute its proportionate share of all amounts necessary to drill or complete any such Well on the Properties in accordance with the applicable AFE(s) and the applicable Joint Operating Agreement by depositing the allocable amount for drilling or completion into the Escrow Account. Notwithstanding anything to the contrary contained herein, Operator may drill, or cause to be drilled, more than one Well at any time on the Properties in accordance with any Joint Operating Agreement. USED shall contribute such costs by depositing the full amount thereof into the Escrow Account by wire transfer of immediately available funds. Each deposit under this Section 2(a) shall be subject to release pursuant to Section 3(a).

      (b)   *Ancillary Deposits*. Notwithstanding Section 2(a), in the event Operator is required to prepay vendors in connection with drilling operations, completion operations or other obligations under any Joint Operating Agreement with respect to any of the Wells, Operator may request that USED fund additional amounts into the Escrow Account (any such deposits, "Ancillary Deposits") by delivering a written request to USED describing the reason for and amount of any such deposit. USED shall promptly deposit such funds by wire transfer of immediately available funds to the Escrow Account unless Operator is in material breach of its obligations under this Agreement or any Joint Operating Agreement. Each deposit under this Section 2(b) shall be subject to release pursuant to Section 3(b).

      (c)   *Deposits – Notification by Escrow Agent.* Each deposit by USED pursuant to clauses (a) and (b) of this Section 2 shall constitute a "Deposit". Each deposit by USED pursuant to clauses (a) of this Section 2 shall constitute a "Drilling Deposit". Upon the Escrow Agent's receipt of any Deposit, the Escrow Agent shall promptly notify Operator and USED that it has received the same.

      (d)   *Escrow Deposit.* At any given time Operator and USED acknowledge and agree that, for purposes of this Agreement, the term "Escrow Deposit" shall mean the sum of all amounts that USED has deposited with the Escrow Agent in accordance with the terms hereof. Escrow Agent agrees to administer the Escrow Deposit in accordance with the terms of this Agreement.

**3.    Claims and Payment; Release from Escrow**.

Operator and USED hereby authorize and instruct the Escrow Agent to release and disburse the Escrow Deposit solely in accordance with this Section 3.  The Escrow Agent hereby agrees to disburse the Escrow Deposit solely in accordance with this Section 3.

(a)    Release of Drilling Costs.

(i)    Initial Release.  Upon the Escrow Agent's receipt of any Drilling Deposit, the Escrow Agent shall promptly transfer ten percent (10%) of any such Drilling Deposit to the Operator Account, but under no circumstances shall such transfer be delayed for more than two (2) Business Days.

(ii)    Casing Point Release.  Upon the date on which any Well located on the Properties has been drilled to total depth or the casing point, Operator shall provide written notice of such event to Escrow Agent, together with the amount of funds to be distributed to Operator (which amount must be equal to the remaining funds allocated to drilling operations through the casing point of such Well).  Unless USED delivers, within two (2) Business Days of USED's receipt of such written notice from Operator (the "Freeze Notice Period"), written notice to the Escrow Agent that Operator is in material breach of its obligations under this Agreement or any Joint Operating Agreement or that Operator is withdrawing such funds prematurely and without good reason and USED can provide reasonable supporting documentation in support thereof, which notice must be accompanied by a signed affidavit executed by an authorized officer of USED (any such notice, a "Freeze Notice"), Escrow Agent shall promptly transfer such amount to the Operator Account, but under no circumstances shall such transfer be delayed for more than two (2) Business Days after the expiration of the Freeze Notice Period.

(iii) Completion Release.   Upon the completion of any Well and any fracking operations related thereto, Operator shall provide written notice of such event to Escrow Agent and USED, together with the amount of funds to be distributed to Operator (which amount shall be equal to all remaining funds allocated to the completion of such Well).  Unless USED delivers, within two (2) Business Days of USED's receipt of such written notice from Operator, a Freeze Notice, the Escrow Agent shall promptly transfer such amount to the Operator Account, but under no circumstances shall such transfer be delayed for more than two (2) Business Days after the expiration of the Freeze Notice Period. Notwithstanding the foregoing, this Section 3(a)(iii) shall not operate to eliminate or otherwise restrict USED's rights to consent to or approve operations related to the completion of any Well pursuant to the terms of any Joint Operating Agreement.

(b)    Release of Ancillary Deposits.  Upon the Escrow Agent's receipt of any Ancillary Deposit, the Escrow Agent shall promptly transfer the full amount of such funds to the Operator Account, but under no circumstances shall such transfer be delayed

3

for more than two (2) Business Days.  Operator shall use such funds solely for purposes of payment of ancillary costs (pursuant to the request delivered pursuant to Section 2(b)) and Operator shall provide proof of payment to USED as soon as reasonably practicable after effecting each applicable payment to a third party.

(c)  <u>Other Releases</u>.  In the event that Operator incurs costs for which USED is responsible under the terms of any Joint Operating Agreement and Operator is required to satisfy obligations applicable to such costs prior to the disbursement of funds pursuant to Sections 3(a) or 3(b) Operator shall have the right to request that the Escrow Agent disburse from the Escrow Account funds in an amount equal to the share of USED's obligations under any Joint Operating Agreement by delivering written notice thereof to each of the Escrow Agent and USED.  Unless USED delivers, within two (2) Business Days of USED's receipt of such written notice from Operator, a Freeze Notice, the Escrow Agent shall promptly transfer such amount to the Operator Account, but under no circumstances shall such transfer be delayed for more than two (2) Business Days after the expiration of the Freeze Notice Period.

(d)  <u>Freeze Notices</u>.  In the event that USED has the right to deliver a Freeze Notice with respect to any disbursement pursuant to the terms hereof, the Escrow Agent shall not make any disbursement until the expiration of the applicable Freeze Notice Period.  In the event that the Escrow Agent receives any Freeze Notice under this Agreement, the Escrow Agent shall not make any disbursement to which such Freeze Notice relates until such time as the Escrow Agent has been notified in writing by USED that USED has withdrawn such Freeze Notice, in which case the Escrow Agent shall promptly make the disbursement to which such Freeze Notice related.  In connection therewith, USED agrees that as soon as the circumstances that gave rise to its right to deliver the Freeze Notice cease to exist, USED shall promptly provide notice to the Escrow Agent that it has withdrawn such Freeze Notice.  In no event shall the Escrow Agent incur any liability for relying on any Freeze Notice or any withdrawal of a Freeze Notice, in each case in accordance with the terms hereof.  Notwithstanding anything to the contrary contained herein, USED shall not deliver any Freeze Notice unless, as of the date on which such Freeze Notice is delivered, Operator is in material breach of its obligations under this Agreement or any Joint Operating Agreement or USED reasonably believes that Operator is withdrawing such funds prematurely and without good reason and can provide reasonable supporting documentation to support such belief.

(e)  <u>Release Mechanics</u>.  Notwithstanding anything to the contrary contained herein, to the extent that the Escrow Agent receives a notification or any deposit that triggers a release obligation pursuant to Sections 3(a) thru (d) after 12:00 p.m Austin, Texas time on a particular Business Day, then the two (2) Business Day time limitation provided in Sections 3(a) thru (d) shall be deemed to be measured starting as of the first Business Day following the day on which such notification or deposit is received by Escrow Agent.

**4.**  **Investment of Funds**.  Initially, until otherwise directed in writing by the USED, the Escrow Agent shall invest the Escrow Deposit in a non-interest-bearing, FDIC insured account.  The Escrow Agent shall invest the Escrow Deposit on the date of deposit provided that

4

it is received on or before 3:00 p.m. Austin, Texas time. Any Escrow Deposit or written notice to remit payment received by the Escrow Agent after 3:00 p.m. Austin, Texas time shall be treated as if received on the following Business Day.

5. **Tax Matters**.

(a) The Interested Parties agree that, for tax reporting purposes any interest or other income earned on the Escrow Deposit shall be the property of the Escrow Agent. The Interested Parties agree that this Agreement does not relieve the Interested Parties of their obligation for tax information reporting under Section 6041 of the Internal Revenue Code of 1986, as amended from time to time (the "Code"), and the Treasury regulations thereunder, as well as the obligation to report amounts of imputed interest income to the extent required pursuant to Code Section 483 or Section 1272. The Escrow Agent shall not be responsible for determining or reporting such imputed interest.

(b) Should the Escrow Agent become liable for the payment of taxes owing from Operator or USED, including withholding taxes relating to any funds, including interest and penalties thereon, held by it pursuant to this Agreement or any payment made hereunder, the Interested Parties agree, jointly and severally, to reimburse the Escrow Agent for such taxes, interest and penalties upon demand. Without limiting the foregoing, the Escrow Agent shall be entitled to deduct such taxes, interest and penalties from the Escrow Deposit.

(c) The Interested Parties acknowledge and agree that none of the payments under this Agreement are for compensation for services performed by an employee or independent contractor of any of the Interested Parties.

(d) Horizon, its Affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Horizon and its Affiliates. This Agreement and any amendments or attachments are not intended or written to be used, and cannot be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties. Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

(e) This Section 5 may be amended by the Escrow Agent as necessary and upon notice to the Interested Parties to conform to tax and regulatory requirements and any other changes to the current applicable governmental tax laws. The Escrow Agent's rights under this Section shall survive the termination of this Agreement or the resignation or removal of the Escrow Agent.

6. **Concerning the Escrow Agent**.

(a) <u>Escrow Agent Duties</u>. Each Interested Party acknowledges and agrees that: (i) the duties, responsibilities and obligations of the Escrow Agent shall be limited to those expressly set forth in the Agreement, each of which is administrative or ministerial (and shall not be construed to be fiduciary) in nature, and no duties, responsibilities or obligations shall be inferred or implied; (ii) the Escrow Agent shall not

5

be responsible for any Joint Operating Agreement referred to or described herein or for determining or compelling compliance therewith, and shall not otherwise be bound thereby; (iii) this Agreement shall constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written agreements in regard thereto; (iv) the Escrow Agent shall not be required to expend or risk any of its own funds or otherwise incur any financial or other liability in the performance of any of its duties hereunder; and (v) the Escrow Agent shall not be obligated to take any legal or other action hereunder which might in its judgment involve or cause it to incur any expense or liability unless it shall have been furnished with acceptable indemnification.

(b)     Standard of Care.  The Escrow Agent shall be under no duty to afford the Escrow Deposit any greater degree of care than it gives its own similar property.  The Escrow Agent shall not be liable for any damage, loss or injury resulting from any action taken or omitted by it in the absence of gross negligence or willful misconduct.

(c)     Limitation on Liability.  Notwithstanding any other provision of the Agreement, the Escrow Agent shall not be liable (i) for any indirect, incidental, consequential, punitive or special losses or damages, regardless of the form of action and whether or not any such losses or damages were foreseeable or contemplated, except such losses or damages as may result from the gross negligence or willful misconduct of the Escrow Agent or (ii) for the investment or reinvestment of any Escrow Deposit, or any liquidation of such investment or reinvestment, executed in accordance with the terms of the Agreement, including, without limitation, any liability for any delays (not resulting from its gross negligence or willful misconduct as adjudicated by a court of competent jurisdiction) in the investment or reinvestment of the Escrow Deposit, any loss of interest incident to any such delays, or any loss or penalty as a result of the liquidation of any investment before its stated maturity date.

(d)     Reliance.  The Escrow Agent shall be entitled to reasonably rely upon any order, judgment, certification, demand, instruction, notice, instrument, certification, consent, authorization, receipt, power of attorney, e-mail, .pdf or other writing delivered to it without being required to determine the authenticity or validity thereof, or the correctness of any fact stated therein or the propriety or validity or the service thereof or the jurisdiction of the court issuing any judgment or order.  The Escrow Agent may reasonably act in reliance upon any signature believed by it to be genuine and may assume that any person purporting to make any statement or execute any document in connection with the provisions hereof has been duly authorized to do so.

(e)     Consultation.  The Escrow Agent may consult with counsel satisfactory to it and be reimbursed by the Interested Parties (on a fifty-fifty basis) for any reasonable costs incurred in connection therewith upon delivery of reasonable supporting documentation in respect of such costs, it being understood and agreed that the Escrow Agent shall only consult with such counsel in the event that the Escrow Agent, in good faith, believes that such consultation is reasonably necessary to accomplish the purposes of this Agreement.

7. **Compensation and Indemnification**.

       (a)   <u>Compensation</u>.  The Escrow Agent and Interest Parties agree that the Escrow Agent shall not be entitled to any fees or other similar payment in exchange for the services provided by the Escrow Agent hereunder.  However, the Escrow Agent and the Interested Parties agree any interest that accrues on the Escrow Deposit shall be the property of the Escrow Agent.

       (b)   <u>Indemnification</u>.  Each of the Interested Parties covenants and agrees, jointly and severally, to indemnify the Escrow Agent and its employees, officers and directors (each, an "<u>Indemnified Party</u>") for, hold each Indemnified Party harmless from, and defend each Indemnified Party against, any and all claims, losses, actions, liabilities, costs, damages and expenses of any nature incurred by any Indemnified Party arising out of or in connection with this Agreement or with the administration of its duties hereunder, including but not limited to attorney's fees, tax liabilities (including any taxes, interest and penalties but excluding any income tax liabilities associated with the Escrow Agent's fees), any liabilities or damages that may result from any inaccuracy or misrepresentation made in any tax certification provided to the Escrow Agent, and other costs and expenses of defending or preparing to defend against any claim of liability, except to the extent such loss, liability, damage, cost and expense shall be caused by the Indemnified Party's own gross negligence or willful misconduct.  The foregoing indemnification and agreement to hold harmless shall survive the termination of the Agreement and the resignation or removal of the Escrow Agent.

    **8.**   **Dispute Resolution**.  In the event of any disagreement among any of the Interested Parties to this Agreement, or between any of them and any other person, resulting in adverse claims or demands being made with respect to the subject matter of this Agreement, or in the event that the Escrow Agent, in good faith, is in doubt as to any action it should take hereunder, the Escrow Agent may, at its option, refuse to comply with any claims or demands and refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, the Escrow Agent shall not be liable in any way or to any person for its failure or refusal to act, and the Escrow Agent shall be entitled to continue to so refuse to act and refrain from acting until (i) the rights of all parties having or claiming an interest in the Escrow Deposit or the Escrow Account shall have been fully and finally adjudicated by a court of competent jurisdiction, or all differences and doubts shall have been resolved by agreement among all of the Interested Parties and (ii) the Escrow Agent shall, in the case of adjudication by a court of competent jurisdiction, have received a final order, judgment or decree by such court of competent jurisdiction, which order, judgment or decree is not subject to appeal, and in the case of resolution of differences and doubts by agreement, have received a notice in writing signed by an Authorized Person (as defined below) of each of the Interested Parties setting forth in detail the agreement.  The Escrow Agent shall have the option, after thirty (30) calendar days' notice to the Interested Parties of its intention to do so, to file an action in interpleader requiring the Interested Parties hereto to answer and litigate any claims and rights among themselves.  The costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Escrow Agent in connection with such proceeding shall be paid by, and be the joint and several obligation of, the Interested Parties.  The rights of the Escrow Agent under this Section 8 are cumulative of all other rights which it may have by law or otherwise.

#4390704.3

9. **Exclusive Benefit**. Except as specifically set forth in this Agreement, this Agreement is for the exclusive benefit of the parties to the Agreement and their respective permitted successors, and shall not be deemed to give, either expressly or implicitly, any legal or equitable right, remedy, or claim to any other entity or person whatsoever. No party may assign any of its rights or obligations under the Agreement without the prior written consent of the other parties except that the Escrow Agent may resign upon the terms described in this Agreement.

10. **Force Majeure**. Notwithstanding anything contained in the Agreement to the contrary, the Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility).

11. **Resignation and Removal**.

(a) The Interested Parties may remove the Escrow Agent at any time by giving to the Escrow Agent thirty (30) calendar days' prior written notice of removal signed by an Authorized Person of each of the Interested Parties. The Escrow Agent may resign at any time by giving to each of the Interested Parties thirty (30) calendar days' prior written notice of resignation.

(b) Within thirty (30) calendar days after giving the foregoing notice of removal to the Escrow Agent or within thirty (30) calendar days after receiving the foregoing notice of resignation from the Escrow Agent, the Interested Parties shall appoint a successor escrow agent and give notice of such successor escrow agent to the Escrow Agent. If a successor escrow agent has not accepted such appointment by the end of such (i) 30-day period, in the case of the Escrow Agent's removal, or (ii) 30-day period, in the case of the Escrow Agent's resignation, the Escrow Agent may apply to a court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief.

(c) Upon receipt of notice of the identity of the successor escrow agent, the Escrow Agent shall deliver the Escrow Deposit then held hereunder to the successor escrow agent.

(d) Upon delivery of the Escrow Deposit to the successor escrow agent or to an Interested Party, the Escrow Agent shall have no further duties, responsibilities or obligations hereunder.

8

12. **Negligence**. THE LIMITATION ON LIABILITY AND INDEMNIFICATION PROVISIONS PROVIDED FOR IN THIS AGREEMENT SHALL BE APPLICABLE WHETHER OR NOT THE LIABILITIES, LOSSES, COSTS, EXPENSES AND DAMAGES IN QUESTION AROSE OR RESULTED SOLELY OR IN PART FROM THE NEGLIGENCE BY ANY INDEMNIFIED PARTY. THE INTERESTED PARTIES ACKNOWLEDGE THAT THIS PROVISION COMPLIES WITH THE EXPRESS NEGLIGENCE RULE AND IS CONSPICUOUS.

13. **Governing Law; Jurisdiction; Waivers**.

(a) The provisions of this Escrow Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Texas (excluding any conflicts-of-law rule or principle that might refer same to the laws of another jurisdiction).

(b) The parties hereto irrevocably and unconditionally submit to the exclusive jurisdiction of the federal and state courts located in Travis County, Texas for any proceedings commenced regarding this Agreement, including, but not limited to, any interpleader proceeding or proceeding for the appointment of a successor escrow agent the Escrow Agent may commence pursuant to this Agreement. The parties hereto irrevocably submit to the jurisdiction of such courts for the determination of all issues in such proceedings and irrevocably waive any objection to venue or inconvenient forum for any proceeding brought in any such court.

(c) The parties hereto irrevocably and unconditionally waive, to the fullest extent permitted by law, and agree not to plead or claim, any right of immunity from legal action, suit or proceeding, from setoff or counterclaim, from the jurisdiction of any court, from service of process, from attachment upon or prior to judgment, from execution of judgment, or from any other legal process or proceeding for the giving of any relief or for the enforcement of any judgment, and consents to such relief and enforcement against it, its assets and its revenues in any jurisdiction, in each case with respect to any matter arising out of, or in connection with, the Agreement.

(d) The parties hereto irrevocably and unconditionally waive any right to trial by jury with respect to any proceeding relating to the Agreement.

14. **Instructions, Verification, Communications**.

(a) All instructions or notices required under this Agreement shall be delivered to the Escrow Agent in writing, in English, in facsimile or pdf. form and, if so requested by the Escrow Agent and executed by an Authorized Person (as hereinafter defined) of Operator or USED and or an entity acting on the behalf of Operator or USED, it being understood and agreed that, upon Escrow Agent's request, an original signature page of such instructions shall be supplied by the applicable party or parties. The identity of such Authorized Persons, as well as their specimen signatures, title, telephone number and e-mail address, shall be delivered to the Escrow Agent in the list of authorized signers forms as set forth on <u>Schedule A</u> and shall remain in effect until the applicable

9

Interested Party, or an entity acting on its behalf, notifies Escrow Agent of any change thereto (the person(s) so designated from time to time, the "Authorized Persons"). The Escrow Agent and the Interested Parties agree that the above constitutes a commercially reasonable security procedure and further agree not to comply with any direction or instruction (other than those contained herein or delivered in accordance with the Agreement) from any Interested Party.

(b) To help the U.S. government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. When an account is opened, the Escrow Agent will ask for information that will allow the Escrow Agent to identify relevant parties. The Interested Parties hereby acknowledge such information disclosure requirements and agree to comply with all such information disclosure requests from time to time from the Escrow Agent.

(c) The provisions of this Section 14 may be amended by the Escrow Agent with the consent of the Interested Parties, such consent not to be unreasonably withheld.

**15.  Notices; Wiring Instructions**.

(a) Any notice permitted or required hereunder shall be in writing in English, and shall be sent (i) by personal delivery, overnight delivery by a recognized courier or delivery service, or (ii) mailed by registered or certified mail, return receipt requested, postage prepaid, or (iii) confirmed facsimile transmission accompanied by mailing of the original on the same day by first class mail, postage prepaid, in each case addressed to the address and person(s) designated below their respective signature hereto (or to such other address as any such party may hereafter designate by written notice to the other parties). Notices to the Escrow Agent shall only be deemed given upon actual receipt by the Escrow Agent and shall include reference to "Horizon Bank Account Number 6219075". Whenever under the terms hereof the time for giving a notice or performing an act falls upon a Saturday, Sunday, or a banking holiday in Texas, such time shall be extended to the next Business Day.

(b) Any funds to be paid to or by the Escrow Agent hereunder shall be sent by wire transfer pursuant to the instructions set forth on the respective signature page of the party that is to receive such funds (or by such method of payment and pursuant to such instruction as may have been given in advance and in writing to or by the Escrow Agent, as the case may be, in accordance with Section 15(a) above).

**16.  Amendment**. Except as specifically set forth in the Agreement, any amendment of the Agreement shall be binding only if evidenced by a writing signed by each of the parties to the Agreement.

**17.  Severability**. The invalidity, illegality or unenforceability of any provision of the Agreement shall in no way affect the validity, legality or enforceability of any other provision. If

10

any provision of the Agreement is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

**18.**     **Termination**.  The Agreement shall terminate upon the distribution of all Escrow Deposit from the Escrow Account established hereunder in accordance with the terms hereof, subject, however, to the survival of obligations specifically contemplated in the Agreement to so survive.

**19.**     **Use of Name**.   No printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Horizon" by name or the rights, powers, or duties of the Escrow Agent under the Agreement shall be issued by any Interested Parties hereto, or on such party's behalf, without the prior written consent of the Escrow Agent.

**20.**     **Counterparts**.  The Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement.   Facsimile signatures on counterparts of the Agreement shall be deemed original signatures with all rights accruing thereto except in respect to any non-US entity, whereby originals are required.

**21.**     **Mergers and Conversions**.  Any corporation or entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion or consolidation to which the Escrow Agent will be a party, or any corporation or entity succeeding to the business of the Escrow Agent will be the successor of the Escrow Agent hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, notwithstanding  anything herein to the contrary.

**IN WITNESS WHEREOF**, each of the parties hereto has caused the Escrow Agreement to be executed by a duly authorized representative as of the day and year first written above.

**HORIZON BANK**,
as Escrow Agent

By: _____
Name: Gregg A. Bennett
Title: Executive Vice President –
Operations & CFO
Date: October 24, 2013

By: _____
Name: Jeff P. O'Jibway
Title: Executive Vice President
Date: October 28, 2013

**NOTICE TO:**

**HORIZON BANK.**
Escrow Agent For: WBH Operator Account
Attn: Gregg A. Bennett
600 Congress Ave, Suite 600
Austin, TX 78701
Tele: (512) 637-5730
Fax: (512) 637-5735

**HORIZON BANK.**
Escrow Agent For: WBH Operator Account
Attn: Jeff O'Jibway
600 Congress Ave, Suite 600
Austin, TX 78701
Tele: (512) 637-5730
Fax: (512) 637-5735

**JEREMY ADAM KRUGER, PC.**
Jeremy Adam Kruger
901 S. MoPac Expressway
Bldg 1, Suite 220
Austin, Texas 78746
Tele: 512-410-7400
Fax: 512-501-6375

[Signature Page to Escrow Agreement]

#4390704.2

**USED:**

**U.S. ENERGY DEVELOPMENT**
**CORPORATION**

By:
Name: Douglas Walch
Title: President
Date: [October] 23, 2013

NOTICE TO:
U.S. ENERGY DEVELOPMENT
CORPORATION
Attention: Douglas Walch
2350 North Forest Road
Getzville, NY 14068
Facsimile: (716) 636-0418

Bank: KeyBank
ABA#: 021300077
A/C Name: U.S. Energy/Operating Account
A/C#: 329681036912

[Signature Page to Escrow Agreement]

#4390704.2

OPERATOR:

WBH ENERGY PARTNERS LLC

By: _____
Name: David R. Henderson
Title: President
Date: October 24, 2013

NOTICE TO:
WBH Energy Partners LLC
Attn: Joe Warnock
PO Box 302380
Austin, TX 78703
Facsimile: (512) 330-9504

Bank: Horizon Bank
ABA#: 11907940
Account Number#: 0259598
Attn: Joe Warnock
Ref: WBH Energy Partners LLC

[Signature Page to Escrow Agreement]

**List of Exhibits and Schedules**

Schedule A - Authorized List of Signers

**SCHEDULE A**
**To Escrow Agreement**

**AUTHORIZED LIST OF SIGNERS**

**USED:**

Specimen Signature

| | |
|---|---|
| Name | Douglas Walch |
| Title | President |
| Phone | (716) 636-0401 |
| E-mail Address | dwalch@usenergydevcorp.com |

| | |
|---|---|
| Name | Lynne Stewart |
| Title | Authorized Person |
| Phone | (716) 636-0401 |
| E-mail Address | lstewart@usenergydevcorp.com |

| | |
|---|---|
| Name | Joseph M. Jayson |
| Title | CEO and Secretary |
| Phone | (716) 636-9090 |
| E-mail Address | carol.platter@jmjayson.com |

[Schedule A to Escrow Agreement]

**OPERATOR:**

**WBH Energy Partners LLC**

Specimen Signature

| | |
|---|---|
| Name | David R. Henderson |
| Title | President |
| Phone | (512) 330-9502 |
| E-mail Address | david@wbhenergy.com |

| | |
|---|---|
| Name | Joe Warnock |
| Title | Vice President |
| Phone | (512) 330-9502 |
| E-mail Address | joe@wbhenergy.com |

| | |
|---|---|
| Name | Jacob Warnock |
| Title | Vice President |
| Phone | (940) 782-0319 |
| E-mail Address | jacob@wbhenergy.com |

[Schedule A to Escrow Agreement]